**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION**

| | | |
|---|---|---|
| AARON WILSON GARNER, et al | § | |
| | § | |
| VS. | § | **C.A. NO. G-07-221** |
| | § | |
| BP PRODUCTS NORTH AMERICA, | § | |
| INC. | § | **JURY TRIAL DEMANDED** |

**TRIAL PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR
<u>MOTION FOR SEVERANCE AND FOR ENTRY OF JUDGMENT</u>**

THE BUZBEE LAW FIRM

Anthony G. Buzbee
SBN: 24001820
S.D. Tex. I.D. No. 22679
Sean E. O'Rourke
SBN: 24046547
JPMorgan Chase Tower
600 Travis Street, Suite 7300
Houston, Texas 77002
Tel:    (713) 223-5393
Fax:    (713) 223-5909
www.txattorneys.com

**Arnold & Itkin, LLP**
Kurt B. Arnold
State Bar No. 24036150
S.D. Tex. I.D. No. 36185
5 Houston Center
1401 McKinney Street, Suite 2550
Houston, Texas 77010
Tel:    (713) 222-3800
Fax:    (713) 222-3850
karnold@arnolditkin.com

**ATTORNEYS FOR PLAINTIFFS**

## TABLE OF CONTENTS

| Section | Page |
|---|---|
| TABLE OF AUTHORITIES | 2 |
| I.  SUMMARY OF THE ARGUMENT | 4 |
| II.  ARGUMENT AND AUTHORITIES | 4 |
| A.  The Motion To Sever Is Unopposed | 4 |
| B.  The Record Supports An Award of Punitive Damages | 4 |
| 1.  Plaintiffs proved gross negligence in regard to the SRU | 6 |
| 2.  Maintenance and investigative practices can prove gross negligence | 7 |
| C.  The Texas Statutory Caps Do Not Apply | 8 |
| D.  The Punitive Damages Verdict Does Not Violate the Due Process Clause | 11 |
| 1.  BP's conduct was reprehensible | 12 |
| 2.  The ratio of punitive compensatory damages is appropriate in this circumstance | 13 |
| 3.  Comparable Sanctions | 15 |
| III. CONCLUSION AND PRAYER | 16 |

## TABLE OF AUTHORITIES

| Statutes and Rules | Page |
|---|---|
| 19 U.S.C. § 666 | 15 |
| 42 U.S.C. § 7412 | 15 |
| 42 U.S.C. § 7413(c)(4) | 15 |
| 42 U.S.C. § 7413(c)(5) | 15, 16 |
| FED. R. EVID. 703 | 7 |
| TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(2) | 5 |
| TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) | 4, 5 |
| TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) | 5 |
| TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(c) | 8, 9 |
| TEX. PENAL CODE ANN. § 1.07(a)(6) | 9 |
| TEX. PENAL CODE ANN. § 1.07(a)(24) | 9 |
| TEX. PENAL CODE ANN. § 1.07(a)(38) | 9 |
| TEX. PENAL CODE ANN. § 1.07(a)(46) | 9 |
| TEX. PENAL CODE ANN. § 6.03(b) | 8 |
| TEX. PENAL CODE ANN. § 22.01(a) | 9 |
| TEX. PENAL CODE ANN. § 22.02 | 4, 8, 9 |
| TEX. PENAL CODE ANN. § 32.46 | 4, 8, 9 |
| **Cases** | **Page** |
| *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996) | 11, 12, 13, 14, 15 |
| *Deleon v. State*, 1999 WL 125416 (Tex.App.—Austin Mar. 11, 1999, pet. ref'd) | 9 |
| *Diamond Shamrock Refining Co., L.P. v. Hall*, 168 S.W.3d 164 (Tex. 2005) | 8 |
| *Dillard Dept. Stores, Inc. v. Silva*, 148 S.W.3d 370 (Tex. 1997) | 5 |
| *Exxon Shipping Co. v. Baker*, ___ U.S. ___, 128 S.Ct. 2605 (2008) | 15 |
| *Lee Lewis Constr. Inc., v. Harrison*, 70 S.W.3d 778 (Tex. 2001) | 5, 6 |

| | |
|---|---|
| *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1 (1991) | 13, 14, 16 |
| *Qwest Int'l Commc'ns v. AT&T Corp.*, 167 S.W. 324 (Tex. 2005) | 5, 6 |
| *Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607 (Tex. 2004) | 5 |
| *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003) | 8, 12, 13, 14 |
| *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1994) | 5 |
| *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993) | 13, 14 |
| *Universal Life Ins. Co. v. Giles*, 950 S.W.2d 48 (Tex. 1997) | 5 |
| *Viterbo v. Dow Chemical Co.*, 826 F.2d 420 (5th Cir. 1987) | 7 |
| **Other Materials** | **Page** |
| Erwin Serba, *BP Texas refinery hit with record safety fine, available at* http://www.businessspectator.com.au/bs.nsf/Article/UPDATE-2-US-hits-BP-with-record-fine-for-Texas-ref-XBK8L?OpenDocument | 14, 15 |
| Plea Agreement | 16 |

Plaintiffs Gilbert Cantu, Rosa Fernandez (f/k/a Rosa Claudio), Jose A. Estrada, Gregorio Fuentes, Eleno Guerra, Wayne Jefferson, Willy Mays, Edwin Munoz, Wayne Pearson, and Charles Taylor (collectively, "Trial Plaintiffs) respectfully submit this Reply Brief in Support of their Motion for Severance and For Entry of Judgment and, in support, would show:

## I.    SUMMARY OF THE ARGUMENT

BP apparently does not oppose Plaintiffs' motion to sever; thus, the Court should grant the motion to sever.

There was sufficient evidence to support the jury's finding of gross negligence.  There was overwhelming evidence that the conditions at the BP Texas City Refinery posed an extreme risk and that BP was subjectively aware of this risk, yet chose to ignore it.  Further, the Texas state law statutory cap on punitive damages does not apply, as BP violated Sections 22.02 and 32.46 of the Texas Penal Code, which are statutory exceptions to the cap.  Finally, due process does not require a reduction of the award, regardless of whether the Texas state caps apply.

## II.    ARGUMENT AND AUTHORITIES

A.    The Motion To Sever Is Unopposed.

In neither its initial Response (Docket Entry No. 287), nor its subsequent Memorandum of Law (Docket Entry No. 289) did BP oppose Plaintiffs' Motion to Sever.  Therefore, Plaintiffs respectfully request that this Court grant the motion.

B.    The Record Supports An Award of Punitive Damages.

Plaintiffs must, and did, prove gross negligence so as to justify an award of punitive damages.  The Texas Civil Practice and Remedies Code defines gross negligence as:

an act or omission:

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11).  A plaintiff must prove this gross negligence by clear and convincing evidence.[1]  *Id*. at § 41.003(a).  "Circumstantial evidence is sufficient to prove either element."  *Lee Lewis Constr. Inc., v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001).  An appellate court will "review all the evidence most favorable to the jury's finding, taking into account contrary undisputed facts, to determine whether reasonable jurors could have formed a firm belief or conviction regarding" gross negligence.  *Qwest Int'l Commc'ns v. AT&T Corp.*, 167 S.W. 324, 326 (Tex. 2005), *citing Southwestern Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 619 (Tex. 2004).  "Evidence of gross negligence is legally sufficient if, considered as a whole in the light most favorable to the prevailing party, it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions."  *Lee Lewis*, 70 S.W.3d at 785.  "Some evidence of care does not defeat a gross negligence finding."  *Id*.

Part (A) is an objective test and requires "not a remote possibility of injury or even a high probability of minor harm, but rather the likelihood of serious injury to the plaintiff."  *Id*.  BP's comparison of the events in this case to other cases involving false arrest,[2] denying insurance coverage[3] and cutting fiber-optic cables[4] is not appropriate.  Unlike the injuries in the cases cited

---

[1] Defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(2).

[2] *Dillard Dept. Stores, Inc. v. Silva*, 148 S.W.2d 370 (Tex. 1997).

[3] *Universal Life Ins. Co. v. Giles*, 950 S.W.2d 48 (Tex. 1997); *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1994).

by BP, exposure to toxic chemicals like those present at the BP Texas City facility (the "Refinery") can easily result in severe injury or death.  In fact, at high enough concentrations, Carbon Disulfide ("CS$_2$") can be fatal and it is far from being the most lethal chemical at the Refinery.   Also, the possibility of injury was anything but remote, as the record showed that BP had over 500 leaks, spills and releases at the Refinery in the five years preceding the incident at issue.

Part (B) is a subjective test that requires "that the defendant knew about the peril, but its acts or omissions demonstrated that it did not care."  *Id*.  The record is replete with evidence that BP was aware of the sheer number of leaks that occurred at its facility and the high potential for serious injury that these leaks presented.  Despite this, BP repeatedly exposed the individuals working there, particularly the contract turnaround employees, to this extreme risk.  In fact, the night before the April 19, 2007 chemical release, there was another incident at Pipestill 3B and BP's own fire chief testified that it would be "crazy" to send people back into the area without identifying the source of the leaking substance that caused the odor.

### 1.    Plaintiffs proved gross negligence in regard to the SRU.

BP's claim that "the laws of physics dictate that any release of CS$_2$ from the SRU would have been accompanied by large quantities of much more deadly H$_2$S" is just that—BP's claim. In fact, this issue was in dispute at trial and the record does not show that this is an undisputed physical or scientific fact.  BP's "expert" from Cherry Point who testified that, if the SRU leaked CS$_2$, it would have leaked many more times Hydrogen Disulfide, when operating properly.  On cross examination, Plaintiffs proved that the SRU routinely malfunctioned, and thus did not operate properly.  Further, Plaintiffs established, from BP's own expert, that the SRU had a history of malfunctions, and had even leaked repeatedly.  At the end of the day, BP's expert

---

[4] *Qwest Int'l*, 167 S.W.3d at 327.

further bolstered Plaintiffs' case.

Further, *Viterbo v. Dow Chemical Co.,* 826 F.2d 420 (5ᵗʰ Cir. 1987), is inapplicable.  In *Viterbo*, the district court excluded the testimony of plaintiff's expert under FED. R. EVID. 703. *Id*. at 421-22.  As *Viterbo* did not address the post-verdict review of the sufficiency of the evidence, a different standard was applied.  In fact, BP twice challenged Dr. Schaezler's expert opinions and both times the court overruled the challenge.

Objectively speaking, the SRU was the home of many dangerous chemicals and the record showed that emissions had emanated from the SRU prior to this incident.  Subjectively, BP was aware of these prior facts and any "precautions" it took were wholly inadequate and superficial.  First, BP did not monitor for $CS_2$ and likely several other hazardous chemicals present at the SRU.  Second, BP's procedures and protocols, while sufficient on paper, were not followed.  As the record showed, the monitoring performed was frequently undertaken by individuals not trained in the devices and was therefore insufficient and unreliable.  There was no evacuation for the incident the night before--even though several individuals fell ill.  And, as noted above, BP consciously ignored any risk to their employees and contract workers by sending them back to the worksite without first indentifying the odor source.  All post-incident investigations performed prior to this incident, and those performed after as well, frequently failed to determine any source for the leaking substance that was causing the offending odor.  BP was well-aware of the grave risk posed by a chemical event emanating from the SRU, yet ignored the risk and instead chose to hide behind sham procedures and protocols.

**2.  Maintenance and investigative practices can prove gross negligence.**

Despite BP's implication, Plaintiffs are not using evidence of prior stubbed toes and car accidents at the Refinery to prove gross negligence.  The evidence presented was focused solely

on the hundreds of leaks, spills, releases and odor events that occurred at the Refinery in the five years preceding the April 19th event. This was not the "dissimilar out-of-state conduct" relied upon by the plaintiffs in *State Farm Mut. Auto Ins. Co. v. Campbell,* that troubled the Supreme Court. 538 U.S. 408, 414 (2003). These were similar events at the exact facility, in a narrowly defined time frame. BP's ineffective maintenance and inadequate investigations that followed the events is what proved BP's indifference to protecting workers at its facility from chemical exposures.

Further, *Diamond Shamrock Refining Co., L.P. v. Hall,* 168 S.W.3d 164, 172 (Tex. 2005), does not stand for the proposition that defendants that operate refineries are immune from claims of gross negligence simply because they "are by their nature very dangerous."   Instead, as the court determined that, because there was no evidence that the defendant was consciously indifferent to the risk of harm, there was insufficient evidence for a finding of gross negligence. *Id.* A plaintiff must still show objective and subjective knowledge of the particular risk, in this instance a chemical event, and the defendant's conscious indifference to it. Plaintiffs did so here.

C.   The Texas Statutory Caps Do Not Apply.

The Texas statutory caps on exemplary damages do not apply when the cause of action is based on conduct that was committed intentionally or knowingly[5] and is one of sixteen felonies enumerated in Section 41.008(c) of the Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(c). Included in this list of felonies are:

(4)   Section 22.02 (aggravated assault);
…
(11) Section 32.46 (securing execution of document by deception);

---

[5] "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. §6.03(b).

*Id*.  The Penal Code defines aggravated assault as an assault[6] that results in "serious bodily injury[7] to another."  TEX. PENAL CODE ANN. § 22.02(a)(1).

A person, or entity, violates Section 32.46 of the Penal Code if he:

with intent to defraud or harm any person, he, by deception: …

> (1) causes another to sign or execute any document affecting property or service or the pecuniary interest of any person; or

> (2) causes or induces a public servant to file or record any purported judgment or other document purporting to memorialize or evidence an act, an order, a directive, or process of:

>> (A) a purported court that is not expressly created or established under the constitution or the laws of this state or of the United States;

>> (B) a purported judicial entity that is not expressly created or established under the constitution or laws of this state or of the United States; or

>> (C) a purported judicial officer of a purported court or purported judicial entity described by Paragraph (A) or (B).

*Id*. at § 32.46(a).  The law is clear that the government qualifies as a "person" for the purposes of this section.  *See* TEX. PENAL CODE ANN. § 1.07(a)(38), (6) & (24); *see also Deleon v. State*, 1999 WL 125416, at *1 (Tex.App.—Austin Mar. 11, 1999, pet. ref'd).

---

[6] An assault occurs when:

the person:

> (1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;

> (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or

> (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

*Id*. § at 22.01(a).

[7] "[B]odily injury is that which creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."  *Id*. at § 1.07(a)(46).

9

The trial in this case lasted almost three weeks. In those three weeks, Plaintiffs demonstrated that more than 100 people were sent to the hospital for toxic exposure. Many were vomitting, even though BP denied that fact. Several people passed out, but BP denied that fact, too. Even when shown its own investigatory documents during the course of trial, which demonstrated that workers vomitted and passed out, BP again denied it. In the trial, BP claimed it performed an extensive two-week investigation, yet, BP's own documents demonstrated that within two hours of the event, BP had already reported to the Texas Commission on Environmental Quality (TCEQ), Occupational Safety and Health Administration (OSHA), and other authorities that no release had occurred at the Refinery. Through its lies, BP was able to obtain official documents from governmental authorities, which it offered at trial, stating that no release had occurred. BP obtained these documents through fraud. BP's fraud was made most clear through the testimony of Jeremy Gracia. Jeremy Gracia's father was a member of management. While on the witness stand, Jeremy Gracia related how, a mere day after the release, his father told him that there had been a release at BP that caused the 100 people to be taken to the hospital. Several of the witnesses were also told the night of the incident that a release on site had occurred. One was even given information from BP telling her that she had been exposed to benzene. Despite this compelling evidence, OSHA, TCEQ, and other authorities executed documents exonerating BP for the release. Indeed, BP crowed again and again during the trial that OSHA had not found evidence of a release, and had "cleared" BP for the April 19th incident. BP's obtaining official documents about the release in question was fraud. Any capping of punitive damages is thus inappropriate.

BP also conducted a sham investigation, with results provided to the authorities, again to prevent any action by OSHA, TCEQ, and the other applicable agencies against BP. BP's

"investigation" was led by a very inexperienced investigator, and with little effort.  Plaintiffs'
counsel was able to show time and again in front of the jury that the investigation was nothing
more than window dressing, which purposely left out many key facts and failed to even attempt
to investigate any possible source of the continued leaks in the area.

Most importantly, during the trial, it was made clear that BP was reckless, and knowingly
sent workers into a work area where exposure was sure to occur.  Specifically, it was established
through documents and testimony that less than twenty hours prior to the event at issue, five
people were made sick by the same substance with the same odor, in the same area.  Despite two
of these individuals being medically treated, absolutely no investigation was performed, and
instead, the workers were sent immediately back into the same area where the release had
occurred.  When questioned, BP's own fire chief was aghast at BP's conduct.  After prompting,
the fire chief admitted that sending the workers back into this area without any investigation was
"crazy" and ridiculous.  BP's conduct constituted aggravated assault.  Capping of punitive
damages is therefore inappropriate.

D.     The Punitive Damages Verdict Does Not Violate The Due Process Clause.

To determine whether an award of punitive damages is so excessive or unreasonable as to
violate the 14th Amendment of the U.S. Constitution, the U.S. Supreme Court created three
guideposts: 1) the reprehensibility of the defendant's conduct, 2) the ratio of punitive damages to
compensatory damages, and 3) the difference between the award and comparable civil and
criminal penalties for similar conduct.  *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-
85 (1996).  While BP places great emphasis on the second factor, it is just one part of the due
process analysis, and perhaps not even the most important.  Analysis all three of the Supreme
Court's guideposts favor a finding that the jury's punitive damage award should be upheld.

11

### 1.     BP's conduct was reprehensible.

The first and "[p]erhaps the most important indicium of the reasonable of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id*. at 575.  When determining the reprehensibility of the defendant's conduct, a court is to consider whether:

1)  the harm caused was physical as opposed to economic;

2)  the tortious conduct evinced an indifference to or a reckless disregard of the health or safety or others;

3)  the target of the conduct had financial vulnerability;

4)  the conduct involved repeated actions or was an isolated incident; and

5)  the harm was the result of intentional malice, trickery, or deceit or mere accident.

*Campbell*, 538 U.S. at 419, *citing Gore*, 517 U.S. at 576-577.

BP's briefing was apparently being done by attorneys who did not sit through the three week trial and the grueling display of BP's horrific record, both before the incident in question, and after.  Despite BP's claims to the contrary, the record is replete with evidence that BP's conduct in this instance was reprehensible.  First, it is undisputed that the harm was physical rather than economic.  Second, the evidence showed that BP put up a façade of safety, relied on by BP's contractors.  Third, the record shows that at least some of the plaintiffs were scared to work in refineries and chemicals plants as a result of this incident and attempted to find employment elsewhere, which resulted in a financial loss.  Fourth, this was hardly the first incident that has occurred at the Refinery, or even the first event involving the SRU; in fact, the records shows repeated chemical releases emanating from the SRU and hundreds of "release events" that occurred at the Refinery in the past decade.  Fifth, as noted above, BP misled governmental authorities about the severity and scope of this event and the fact that this event

even occurred is the result of BP's systematic pattern of deceiving investigating governmental authorities.

For the foregoing reasons and the ample evidence contained in the record, it is clear that BP's conduct is of "the high degree of culpability that warrants a substantial punitive damages award." *Gore*, 517 U.S. at 580.

**2.    The ratio of punitive to compensatory damages is appropriate in this circumstance.**

The second guidepost is the ratio between punitive damages and compensatory damages. *Id*. at 580-83.  The Court has repeatedly held that there is no magic ratio that comports with the due process clause.  *Campbell*, 538 U.S. at 425; *Gore*, 517 U.S. at 582; *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 458 (1993); *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 17 (1991).  While the Supreme Court has noted that "single digit ratios" will generally pass due process muster, the Court has made it clear that "ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'"  *Campbell*, 538 U.S. at 425, *citing Gore*, 517 U.S. at 582. The Supreme Court also noted that "[a] higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Gore*, 517 U.S. at 582.  This is such a case.

BP's analysis focus on the actual compensatory damage awards is not consistent with the Supreme Court's due process analysis.  In fact:

> that the proper inquiry is ''whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred.''

*Gore*, 517 U.S. at 581, *citing TXO*, 509 U.S. at 460 (emphasis in original).  The Supreme Court went on to note that:

> [i]t is appropriate to consider the magnitude of the *potential harm* that defendant's conduct would have cause to its intended victim if the wrongful plan had succeeded, as well as the **possible harm to other victims** that might have resulted if similar future behavior were not deterred.

*TXO*, 509 U.S. at 460 (first emphasis in original; second emphasis added).   Based on this analysis, the Supreme Court upheld an award of $10 million in punitive damages even though the jury only awarded $19,000 in compensatory damages[8] (a ratio of over 526:1).   *Id.*

It should also be noted that, unlike the present case, most of the Supreme Court's recent decisions on punitive damages and substantive due process involve economic injury and not physical injuries.[9]   Everyone involved here was extremely lucky that many of the injuries that resulted from this incident were relatively minor.   However, the BP Texas City facility is the home of many highly toxic chemicals; a future release could result in numerous severe injuries or even multiple fatalities.   And, as the evidence presented at trial showed, this chemical release was hardly an isolated event.   Further, March 2005 (in which 15 people died) is a good indicator of the harm that could occur when things go really wrong at the Refinery---BP has paid over $2 billion in settlements related to this explosion.   *See* Erwin Serba, *BP Texas refinery hit with record safety fine*, *available at* http://www.businessspectator.com.au/bs.nsf/Article/UPDATE-2-US-hits-BP-with-record-fine-for-Texas-ref-XBK8L?OpenDocument, attached as **Exhibit A**.   Considering this very real potential for great harm, "the disparity between the punitive award and the potential harm does not, in our view, 'jar one's constitutional sensibilities.'"   *TXO,* 509 U.S. at 462, *citing Haslip*, 499 U.S. at 18.

---

[8] The Supreme Court noted that the jury could have easily found that potential harm could have been $1 million or more.  *TXO*, 509 U.S. at 462.

[9] *See, e.g., Gore*, 517 U.S. at 563 (fraud); *TXO*, 509 U.S. at 446 (slander to title); *Haslip*, 499 U.S. at 5-6 (several claims including fraud).  While the plaintiffs received an award for mental anguish in *Campbell*, the Court noted that "[t]he harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries."  *Campbell*, 538 U.S. at 426.  The Court in *Campbell* also noted that "[t]he compensatory award [of $1 million] in this case was substantial", unlike the compensatory damages in the present matter.  *Id.*

Despite BP's repeated reliance on it, the Supreme Court's recent decision in *Exxon Shipping Co. v. Baker* is all but inapplicable to the present case.  ___ U.S. ___, 128 S.Ct. 2605 (2008).  First, *Exxon* involved "a mandatory class of all plaintiffs seeking punitive damages, whose number topped 32,000."  *Id*. at 2613.  The present case involves just ten trial plaintiffs, with fewer than two hundred remaining in this litigation.  However, and far more importantly, the Supreme Court in *Exxon* noted that:

> [t]oday's enquiry differs from due process review because the case arises under federal maritime jurisdiction, and *we are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process*; we are examining the verdict in the exercise of federal maritime common law authority, which precedes and should obviate any application of the constitutional standard.

*Id*. at 2626 (emphasis added).  The Court then noted that "a 1:1 ratio … is a fair upper limit in *such maritime cases*."  *Id*. at 2633 (emphasis added).

**3.      Comparable Sanctions.**

The final *Gore* guidepost "compar[es] the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct."  *Gore*, 517 U.S. at 583.  In addition to the civil penalties cited by BP, BP would also be liable for a penalty under the Occupational Safety and Health Act.  *See* 19 U.S.C. § 666.  As a repeat offender, this could easily result in a fine of up to $70,000 per violation.  *Id*. at § 666(a).  For example, in October 2009, OSHA fined BP a record $87.4 million for failing to correct safety problems related to the March 2005 explosion at the Refinery.  *See* **Exhibit A**.

Additionally, the negligent release of chemicals listed in 42 U.S.C. §7412 (a list that includes $CS_2$) can result in criminal penalties, including but not limited to up to a year in prison for the first offense.  42 U.S.C. § 7413(c)(4).  Repeat offenders can face up to two years in prison.  *Id*.  Knowing releases can result in imprisonment of up to 15 years, or a fine of up to $1

million for a corporation. *Id*. at § 7413(c)(5).  In *Haslip*, the Supreme Court noted that the punitive damage award was "much in excess of the fine that could be imposed for insurance fraud"; imprisonment was also a possible penalty. *Haslip*, 499 U.S. at 23.  BP also recently paid a $50 million fine as part of a guilty plea related to the 2005 explosion at the Refinery. *See* Plea Agreement, attached as **Exhibit B**.

III.   **CONCLUSION AND PRAYER**

This Court sat through the three week trial and heard all of the evidence.  The jury did as well, and felt it appropriate to render a verdict of more than $100 million.  Plaintiffs' counsel is routinely in the present position: arguing to uphold a verdict against new lawyers who have convinced the losing defendant that they can come in and "fix" all of the losing defendant's problems with clever briefing.  The trouble is that BP's new attorneys did not sit through the trial, and are not privy to the mountain of evidence that crushed BP at trial, and served as the basis for the jury's findings.

BP is a bad actor.  It lacks a meaningful inspection and maintenance program.  It fails to investigate leaks, even when people are injured and are sent to the hospital.  BP misleads, and even lies to, governmental authorities to avoid formal investigations.  BP recklessly endangers workers, again and again.  More than eighteen people have been killed at BP in less than four years.  Workers are exposed to toxic substances due to leaks, spills, and releases on a weekly basis.  Yet, nothing changes at the Refinery.

The jury made an effort to force BP to change.  The jury's verdict should thus be entered in the form of a judgment.  Wherefore, Trial Plaintiffs respectfully request that the Court sever their claims and enter judgment in the form previously submitted.

Respectfully submitted,


        /s/ Anthony Buzbee
ANTHONY G. BUZBEE
SBN: 24001820
S.D. Tex. No. 22679
JPMorgan Chase Tower
600 Travis Street, Suite 7300
Houston, Texas 77002
Tel.:   (713) 223-5393
Fax.:   (713) 223-5909
www.txattorneys.com

OF COUNSEL:
**THE BUZBEE LAW FIRM**
SEAN E. O'ROURKE
SBN: 24046547

**Arnold & Itkin, LLP**
Kurt B. Arnold
State Bar No. 24036150
Southern District of Texas No. 36185
5 Houston Center
1401 McKinney Street, Suite 2550
Houston, Texas 77010
Telephone:     (713) 222-3800
Facsimile:     (713) 222-3850
karnold@arnolditkin.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document will be served or has been served on all interested parties in accordance with the Federal Rules of Civil Procedure on January 18, 2010.  Service on E-Filing Users will be automatically accomplished through the Notice of Electronic Filing; non-Filing Users will be served by certified mail, return receipt requested and/or via facsimile.

James B. Galbraith
MCLEOD, ALEXANDER, POWEL & APFFEL
802 Rosenberg
P.O. Box 629
Galveston, Texas 77553

Scott A. Brister
ANDREWS KURTH LLP
111 Congress Ave., Suite 1700
Austin, Texas 78701

Thomas W. Taylor
Kendall M. Gray
ANDREWS KURTH LLP
600 Travis Street, Suite 4200
Houston, Texas 77002

Kurt B. Arnold
ARNOLD & ITKIN LLP
5 Houston Center
1401 McKinney Street, Suite 2550
Houston, TX 77010

_/s/ Anthony Buzbee_
ANTHONY G. BUZBEE