1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF TEXAS
2                        GALVESTON DIVISION

3   AARON WILSON GARNER            .
                                   .  G-07-CV-221
4          vs.                     .  GALVESTON, TEXAS
                                   .  DECEMBER 1, 2009
5                                  .  8:36 A.M.
    BP AMOCO CHEMICAL COMPANY      .
6   BP AMOCO POLYMERS, INC.,       .
    BP CORPORATION NORTH           .
7   AMERICA, INC.                  .
    . . . . . . . . . . . . . .    .
8

9                    TRANSCRIPT OF JURY TRIAL
               BEFORE THE HONORABLE KENNETH HOYT
10                UNITED STATES DISTRICT JUDGE
                         DAY 1 OF 13
11

12  A P P E A R A N C E S:

13  FOR THE PLAINTIFFS:

14        Anthony Buzbee
          Sean O'Rourke
15        Peter Kelley Taaffe
          Nick Simon
16        The Buzbee Law Firm
          600 Travis Street
17        Suite 7300
          Houston, Texas 77002
18
          Gabe Vick
19        Arnold & Itkin, LLP
          1401 McKinney Street
20        Suite 2550
          Houston, Texas  77010
21

22

23  Proceedings recorded by mechanical stenography, transcript
    produced by computer-aided transcription.
24                          - - - - -

25

1    A P P E A R A N C E S:  (Continued)

2    FOR THE DEFENDANTS:

3        Jim Galbraith
         Lyle Courtney
4        Anthony Brown
         McLeod Alexander Powel & Apffel
5        PO Box 629
         Galveston, Texas 77553

6

7    OFFICIAL COURT REPORTER:

8        Cheryll K. Barron, CSR, CM, FCRR
         U.S. District Court
         515 Rusk Street
9        Houston, Texas  77002

10   ALSO PRESENT:

11       Ken Panozzo

12                          - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX

PAGE

PLAINTIFFS' WITNESSES

Teresa Dobbins

   Direct Examination by Mr. Buzbee     236

   Cross-Examination by Mr. Galbraith    252

   Redirect Examination by Mr. Buzbee   263

Paula Jowell

   Direct Examination by Mr. Buzbee     266

   Cross-Examination by Mr. Galbraith    279

   Redirect Examination by Mr. Buzbee   289

- - - - -

1                        P R O C E E D I N G S

2        *(Jury panel not present)*

3              THE COURT:  Good morning.  Please be seated.

4              MR. BUZBEE:  Good morning, sir.  How are you?

08:36   5              THE COURT:  Please be seated.

6                   All right, gentlemen.  How you-all doing this

7     morning?

8              MR. BUZBEE:  Well, we're surviving it, your Honor.

9              THE COURT:  Well, better to have an inside job, isn't

08:36   10    it?

11             MR. GALBRAITH:  Most days.

12             THE COURT:  That we're not working on the highways and

13    stuff like that, it's not so bad.

14             MR. BUZBEE:  That's true.

08:36   15             THE COURT:  All right.  While we're waiting on a

16    count, do we have any members -- anybody in the courtroom who

17    has been called to jury duty?  Anybody in the courtroom on jury

18    duty?

19                  All of these are your witnesses and/or your

08:36   20    witnesses and spectators, I gather.

21             MR. BUZBEE:  Yes, sir.

22             THE COURT:  All right.  Good deal.

23                  All right, gentlemen.  Let's see.  I had planned

24    to issue an order regarding some of the issues that we had

08:37   25    discussed.

08:37  1              Am I coming through?  I can't really tell if

2    I'm --

3              MR. BUZBEE:  I can hear you, but I don't know if

4    you're --

08:37  5              THE COURT:  -- projecting or not.

6              MR. BUZBEE:  -- on the mic.

7              THE COURT:  If I'm on -- I'm on now, I guess.

8              MR. SIMON:  I can hear you, your Honor, but not on the

9    system.

08:37 10             THE COURT:  You're not hearing me on the system?

11             See if there's something there.

12             MR. BUZBEE:  This one is working here.  Do you have a

13   switch here, like this one?

14             THE COURT:  Oh, there we are.  I'm coming through

08:37 15   really clear now.  I think too clear.  Yeah, that's the control

16   there, Diane.  Thank you.

17             I think that there were some matters that we

18   needed to take up now, while we're waiting on our count from

19   the panel, that I did not address -- I did not put in a

08:38 20   particular order.  But I'll state what I have here from my

21   notes, and we'll see what remains.

22             There was pending the defendant's motion to

23   exclude the supplemental report and opinion of the plaintiffs'

24   expert Donald S-C-H-A-G-L-E-R [sic], "Schaezler," I believe --

08:38 25   or "Schaezler."  I believe that's Instrument Number 172 in our

08:38   1   docket entries.  And that -- that motion is going to be denied.

2        It appears -- and I'm just reading from my

3   notes -- that defendant's argument is that the supplemental

4   opinions are based on, number one, the Armstrong test, which

08:38   5   had to do with one mask, and that -- and that mask was

6   improperly preserved and, therefore, the underlying data is not

7   reliable.

8        The Court is of the opinion that the test

9   demonstrates that the chemical release occurred -- and I

08:39   10  believe that's the notice aspect -- and I say to the extent

11  that a jury believes it -- that the opinion relies on other

12  factors -- that is, the ultimate opinion relies on other

13  factors, other than the Armstrong test.  And the Court is,

14  therefore, of the opinion that the Armstrong test is not fatal

08:39   15  or -- and the fact finder may determine that it has some weight

16  and then determine what weight, if any, to give to that -- to

17  that -- the opinion of Schaezler.

18        How do you pronounce his name?

19        MR. BUZBEE:  "Schaezler."

08:39   20        THE COURT:  S-C-H-A-E-Z-L-E-R.

21        MR. BUZBEE:  Yes, sir.

22        THE COURT:  "Schaezler"?

23        MR. BUZBEE:  Yes, sir.

24        THE COURT:  All right.  As well, there were pretrial

08:39   25  rulings previously made in this case -- and I think I might

08:39   1   have stated this at our previous hearing, that the pretrial

2   rulings that were made, I believe by Judge Gilmore, when those

3   are combined with the motion to revisit that I authorized Judge

4   Froeschner to do, when you look at those together, all of those

08:40   5   pretrial rulings previously made in this case will be sustained

6   as relates to your motions in limine.

7          Now, that doesn't mean that those matters are not

8   evidentiary -- from an evidentiary perspective, significant and

9   that you should not seek to offer into evidence what you

08:40   10   believe to be relevant and proper evidence within the context

11   of the evidence as it's being developed.  Because I'm not

12   really sure where that will go at this point.

13          So, the Court reserves the right to revisit those

14   evidentiary rulings in the context of the evidence.  And if I

08:40   15   determine that our rulings have been erroneous, the Court will

16   certainly make the modifications or changes.

17          The pretrial rulings regarding other incidences,

18   including those allegations of criminal charges, the -- the

19   plaintiffs' counsel has argued that -- that the character of BP

08:41   20   is in question, I gather, relative to the criminal conviction.

21          I'm not sure if that was criminal or civil or how

22   it was fashioned.  Was it a criminal --

23          MR. BUZBEE:  Criminal.

24          THE COURT:  -- criminal determination?

08:41   25          All right.  And, so, the question of whether or

08:41  1   not that criminal conviction is admissible, to some extent
       2   should be driven by the -- by the same standards as those
       3   standards that would be admissible under the circumstances
       4   where an individual is either the plaintiff or the defendant in
08:41  5   the case and -- and would then find himself or herself facing a
       6   credibility issue.

       7               I think the way to deal with that is by
       8   instruction.  And I'm not sure -- I talked originally about the
       9   bifurcation of this case, but I'm not sure that I can actually
08:42 10   bifurcate this case in a way that would not essentially be
      11   reversible error at some point.  If I'm going to commit error,
      12   I guess I need to commit it so that it's plain and clear.

      13               Because to try to carve the case or fashion the
      14   evidence in a certain way seems to me to set myself up for an
08:42 15   opinion, assuming that one side or the other disagrees, from
      16   the Circuit Court, that would never really get us to the point
      17   where we have a final determination.

      18               So, I'm concerned about what evidence ought to be
      19   admitted; but I'm also concerned about limiting evidence to the
08:42 20   point that we don't know or a jury cannot make a determination
      21   based on that evidence.  So, all of that to say this, that I
      22   think that bifurcation may be appropriate in some respects but
      23   I'm not sure at this point that I want to do that.

      24               I've still -- we still have to qualify this jury
08:43 25   to receive and determine, if any -- if appropriate, punitive

_Cheryll K. Barron, CSR, CM, FCRR_                    _713.250.5585_

08:43   1   damages.  And that's on the front side, irrespective as to

2   whether it's bifurcated or not.  So, again, I reserve the right

3   to -- to determine, within the context, what the evidence ought

4   to be.  And we're talking to some extent about what the

08:43   5   plaintiff has presented as substantially similar kind of

6   testing.  That's really the area we're talking about.

7           Here's my concern.  Mr. Galbraith, you indicated

8   that if the plaintiff is permitted to go into this area that

9   that opens up a Pandora's box and now you've got to try each of

08:43   10   these, quote, "releases," let's call it.  My concern is this,

11   that plaintiff has based some of his -- seems to me the

12   majority of his case on instances where BP has said there was

13   no release or that there was no indication of a -- of a --

14           MR. GALBRAITH:  Source.

08:44   15           THE COURT:  -- source.  If there is -- if that's BP's

16   position, I'm not sure that there is a basis for, quote, the

17   trial of each of these instances.  There certainly could be

18   testimony and cross-examination as to what BP understood.  You

19   could certainly be -- BP could certainly say, "Well, we

08:44   20   received a report, but we don't have a -- we could not confirm

21   a source.  We have the report, but no source or -- and,

22   therefore, we're obligated to report these incidences or events

23   irrespective as to whether or not we can identify the source."

24           I think that's the lay of the land, it seems to

08:44   25   me.  And I'm not sure how much proof is appropriate there.  I

08:44   1   think that what I would say and what I would like to do is

        2   this, limit the plaintiff to those instances where there is

        3   a -- there has to be testimony, it seems to me, that there has

        4   been, as in this case, as alleged by the plaintiffs, a source

08:45   5   and that that source, in their opinion, is BP and that source

        6   is identified, I believe, to a particular area in that plant.

        7           And the question is whether or not the evidence

        8   should be limited to other events in that particular plant

        9   area.  And I don't know -- I'm not -- I don't know the

08:45   10  definition -- that is, I don't know what the parameters of this

        11  location is in relationship to the whole of the plant.  The

        12  question is whether or not those -- whether or not the

        13  plaintiff should be limited to events that occurred within that

        14  framework, within that particular plant.

08:45   15          And I believe -- I believe the plaintiff has

        16  identified that as -- let's see if I got it for the record, a

        17  name for it -- the Pipestill 3B, I guess, area.  That's my

        18  leaning, that plaintiff should be permitted to put on evidence

        19  of events that occurred before the April 19 I believe event,

08:46   20  that are particularly identified as events occurring in that

        21  area, whether they are confirmed or not by BP.

        22          There's a concern about notice and opportunity

        23  there, and I think that's appropriate.  In terms of just simply

        24  the overall plant, I'm not sure that that's relevant to the --

08:46   25  to the case, except plaintiff argues that this is a -- I guess

08:46   1   in way, that this is an attitudinal problem; that is,

2   attitudinal in the sense -- in the sense that BP has taken a

3   position apparently or at least rests itself in the position

4   that -- in such a way that there is no distinction between the

08:47   5   way it treats events in one place and events in another and

6   simply just waits on an event.  I think that's what the

7   plaintiff would say, "They wait on an event and they go in and

8   they repair it.  They don't -- there's no proactive effort on

9   BP's part."  That's part of what is being argued.

08:47   10           So, tell me, Mr. Galbraith, what evidence are you

11   talking about putting on in terms of, quote, proving I

12   gather -- or evidence of proof that -- that these events did

13   not occur or not as reported?

14           MR. GALBRAITH:  Well, first thing I wanted to say,

08:47   15   your Honor, is that for two years we have been repeatedly

16   told -- you mentioned prior rulings.  We have been repeatedly

17   told for two years that what we are trying here today is

18   April 19th, 2007, what is in plaintiffs' petition, and nothing

19   else.  We have been told that repeatedly by the courts.

08:48   20           And we still don't have this other incidence that

21   you're referring to, in my mind, identified.  So, we don't know

22   exactly what events we're defending against because for two

23   years we've been told, "You don't have to worry about those.

24   We're trying April 19th and April 19th only."  And, quite

08:48   25   frankly, I don't think I'm in a position -- I need to put it on

08:48  1    the record.  I don't think I'm in a position now to defend now

2    a sudden change in the scope of discovery, a sudden change in

3    the scope of evidence that this jury may hear, without now even

4    yet knowing what events I'm being called upon to defend.

08:48  5         The second thing is that the law says that for

6    another incident to be admissible -- Rule 404(b), the Federal

7    Rules -- it must be substantially similar.  That case law says

8    substantially similar in time, geography, and detail.  And

9    there are cases that we have cited in our briefs that led to

08:49  10   those prior rulings, that say you have to show it was a common

11   product or it was a common piece of equipment that failed, not

12   necessarily a unit, which is a city block.

13        Anything that happened prior in a city block area

14   does not necessarily, in our minds, at all satisfy the

08:49  15   requirements for similarity.  What could happen in a city block

16   where you live could -- there's a million different things that

17   are dissimilar that could cause a fire or that could cause an

18   odor or that could cause anything.  That's certainly the case

19   in the BP Texas City refinery.

08:49  20        You don't have similar just because you restrict

21   it in geography to Pipestill 3B Unit, which is a city block.

22   The other thing is, in time, what timetable; and we still don't

23   know what timetable is arguably relevant to us defending

24   ourselves.

08:50  25        My concern, your Honor, is that it's awfully late

08:50  1   to switch horses in midstream.  As you said in our last

2   hearing, "I'm not sure we're trying what you think we're

3   trying.  We're trying April 19th" were, I believe, your words

4   at our last hearing.  That's what we're prepared to do.  That's

08:50  5   what we've been told we need to prepare to do.

6        THE COURT:  Let me just step in here.  I had the

7   opportunity certainly to do some reading since that time and to

8   come to -- hopefully to some appreciation for what the

9   plaintiff is seeking to do.  And it's not my opinion that the

08:50  10  plaintiff is trying to prove similar events in the sense of a

11  particular kind of leak, like a pipe 300 leak, "We've had 20

12  pipe 300 leaks."  That's not what I think the plaintiff is

13  doing.

14       Based on what the plaintiff says in their

08:50  15  requests for admissibility of various areas or various matters,

16  is that the like or similar events that the plaintiff seeks to

17  present have to do with lack or no maintenance.  So, when we're

18  talking about 404(b) material, we're not just talking about a

19  specific event that we can put our hand on.  Just as in a

08:51  20  criminal case, a person who commits a bank robbery today and

21  commits some other crime tomorrow and then commits another

22  crime the next day, and these are not all bank robberies,

23  doesn't mean that there's not a pattern of conduct involved

24  here.  That's what we're talking about.

08:51  25       That's what the plaintiff is saying, this is a

08:51   1   pattern of conduct: poor maintenance, insufficient training,
        2   faulty equipment, improper use of equipment.  That doesn't have
        3   to do with a particular piece of equipment or how a particular
        4   piece of equipment failed.  It has to do with an attitude, as I
08:51   5   said earlier; that is, a course of conduct that suggests that
        6   BP is not really interested in maintaining the plant in a safe
        7   manner.  So, that is the similarity of conduct.
        8           Now, how do you prove that?  You can prove
        9   similarity of conduct by showing that events occurred
08:52  10   sequentially or over and over again in a particular area, that
       11   it's -- it's not maintained or that it is maintained in a poor
       12   manner or that the equipment is not really fully repaired when
       13   it's repaired, I mean, any number of things that -- and it
       14   would not require and does not require a trial on every event
08:52  15   that occurred.
       16           We're talking about testimony about events that
       17   were documented by somebody, whether they were -- whether the
       18   source could be identified or whether the specific gas could be
       19   identified or not.
08:52  20           So, I think when we talk about like or similar
       21   conduct or similar -- substantially similar events, it seems to
       22   me that the -- that the determination that I need to make for
       23   404(b) purposes are not whether or not there were pipe leaks on
       24   the same pipe.  That's not really relevant at all, at least
08:53  25   from my perspective, if you're talking about looking at a

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

08:53  1    historical picture.

2               What I would be concerned about for similarity is

3    whether or not like or similar conduct gives rise to these

4    particular events.  And that's what the plaintiff has indicated

08:53  5    in their papers as I understand it.

6         MR. GALBRAITH:  If I could respond, your Honor, the

7    concern that I have with that is these particular events.  And

8    what I believe is allowable pursuant to the law and Rule 404(b)

9    is that you could show -- what I believe the law says is that

08:53  10    you could show a lack of maintenance led to this pump seal

11    failing over and over and over and over again.  That's the same

12    source --

13         THE COURT:  That's one way.

14         MR. GALBRAITH:  -- of the event of April 19th, 2007.

08:53  15         THE COURT:  But that's one way to show it, that the

16    same seal failed.

17         MR. GALBRAITH:  Right.  But my point is you can show

18    faulty maintenance or a course of conduct but it has to be a

19    course of conduct resulting in substantially similar, quote,

08:54  20    other incidents, close quote, before the law will allow them

21    into evidence.

22               My understanding is that you can do that if you

23    know the source of this one and you can show that these others

24    that reportedly establish this pattern were substantially

08:54  25    similar.  If they're not substantially similar, the law seems

08:54   1    to me to say there is no pattern, there is no pattern you can

        2    show.

        3          THE COURT:  Well, when we're talking about course of

        4    conduct, counsel, we're not talking about a particular pipe.

08:54   5    We're talking about people.

        6          MR. GALBRAITH:  No.  I agree we're not talking about a

        7    particular pipe.  But I think the law says the incident, the

        8    event, has to be deemed and shown to be substantially similar

        9    before it can be a dot on the scale, a blip on the Richter

08:54  10    Scale so to speak, a data point to show a course of conduct.

       11          I believe that's the law.  I believe that's what

       12    the other judges have said.  I believe that's what heretofore

       13    has been said, that you -- to show this course of conduct, this

       14    pattern, you have to know the source of this one and show that

08:54  15    these other events are substantially similar.

       16          THE COURT:  Well, if they know the source, if

       17    everybody knows the source, we wouldn't be here.  See, that --

       18          MR. GALBRAITH:  I agree.

       19          THE COURT:  -- that problem would have been resolved.

08:55  20          MR. GALBRAITH:  I agree.  If everybody knew the

       21    source, we wouldn't be a defendant.

       22          THE COURT:  Well, maybe not.  But the point I'm

       23    making, though, is that that's not something I need to know;

       24    that's something the jury needs to decide.

08:55  25          MR. GALBRAITH:  Well, the plaintiffs assumed that

08:55    1    burden when they filed their petition.

         2          THE COURT:  Well, and they're permitted to put on

         3    evidence.  They've got to be able to put on evidence.  Whether

         4    the jury believes it or not and whether or not it makes sense

08:55    5    or not, they have to be able to put on evidence that this was

         6    the source of this event of April 19.  And that's what they're

         7    going to present to the jury.

         8          Now, once they present that evidence of the

         9    source, the question is whether or not that source is

08:55   10    indicative of a course of conduct that BP has engaged in

        11    historically.  It doesn't matter whether that pipe was the same

        12    pipe or whether or not that particular kind of leak occurred or

        13    whether or not that particular gas that somebody might claim

        14    was emitted was released.

08:56   15          So, there is a -- there is more than one way for

        16    a course of conduct to be determined, and course of conduct is

        17    not determined necessarily by people engaging or the events in

        18    parallel or lining up in some way.  The course of conduct has

        19    to do, in this instance, with an issue of negligence and the

08:56   20    course and the manner in which the company has maintained or

        21    failed to maintain its product -- I mean, it's equipment.

        22    That's all I see is happening here.

        23          You know, you'll never be able to prove -- or

        24    nobody would ever be able to prove that each of these events or

08:56   25    disprove that each of these events ever occurred.  Nobody would

08:56  1   be able to do that.  Except that you've got documentation
       2   indicating there were reports.
       3           Now, how do you prove it?  Hey, it's already
       4   disappeared into the air; so, who can say whether it occurred
08:56  5   or not.  So, this is credibility that has to be determined and
       6   dictated by the testimony of the witnesses and so on.
       7           Mr. Buzbee?
       8           MR. BUZBEE:  Thank you, your Honor.  Your Honor, I --
       9   that's -- as I argued it last week, we -- we're going to
08:56 10   prove -- I mean, our allegation is the reason there's so many
      11   leaks, spills, and emissions is because they don't maintain
      12   their plant.  And I think you hit it right on the head.  And I
      13   think the only issue I thought you asked was how should we
      14   limit it -- or should we limit it, like, should we limit it --
08:57 15           THE COURT:  That's what I'm trying to figure out.
      16           MR. BUZBEE:  That was -- that was your question; and
      17   he's arguing, I think, back at the threshold issue.  I think
      18   you've already -- you've already --
      19           THE COURT:  Well, let me just say this.  I disagree
08:57 20   with counsel that my statement or -- and if Judge Gilmore has
      21   ruled some way, I can't just simply try a case based on what
      22   some other judge says --
      23           MR. BUZBEE:  Exactly.
      24           THE COURT:  -- or does.  I can't do that.  I mean,
08:57 25   that would be foolish on my part.  And if I'm going to make

08:57    1    mistakes, I should make my own mistakes since I'm going to have

2    to live with mine and not with hers, I hope.

3            But let's be clear.  The course of conduct -- and

4    I don't even know if she understood the case or if anybody

08:57    5    understood the development of the case.  I know that there's a

6    lot has been developed over the last six months, probably the

7    last -- yeah, probably the last six months.

8            And there certainly was a reason that Judge

9    Froeschner opened the door -- or reopened that door, because of

08:58   10    discussions that he and I had about Judge Gilmore's rulings.

11    Not because I disagree with her, but because I don't want to be

12    locked into whatever her thinking might be, whether it's

13    appropriate or not.

14            And that's not to say that she did not make a

08:58   15    right choice or decision.  It's simply to say that the door has

16    to be open.  So, I disagree with you that anybody has misled

17    you or presented the -- and, certainly, I haven't, because I

18    don't know what the plaintiffs' case is -- presented these

19    events in such a way that the defendant has been misled to

08:58   20    believe something different than what's being reported to the

21    Court.  I'm reading the same papers you're reading, and that's

22    all I can say about that.

23            MR. BUZBEE:  Your Honor, two issues with regard to

24    how -- all the documents that we intend to offer, if you allow

08:58   25    them, have been listed as exhibits for a long time.  And these

08:58   1    are BP's documents, number one.

2              Number two, with regard to your question, which

3    is, "Should I limit it to this Pipestill 3B or is it plant

4    wide, because really this is indicative of a plant attitude,

08:58   5    not just Pipestill 3B," obviously, my opinion is this -- and I

6    think the case law supports me -- is that BP -- Keith Casey

7    will be here as the plant manager.

8              And I think I'm entitled to ask him -- he doesn't

9    just manage 3B.  He manages the plant.  And this is a plant

08:59   10   wide attitude, a plant wide -- they don't have a Pipestill 3B

11   maintenance program.  They got a plant maintenance program.

12   So, I think limiting it to that, as he called it, a city block,

13   whatnot, you know -- he can say what he wants, but the fact of

14   the matter is this is a plant issue.

08:59   15             This is -- we're not talking about their problems

16   in Alaska.  We're not talking about their problems in the Gulf

17   of Mexico.  We're talking about their problem at the BP Texas

18   City plant.  It's a plant wide problem.  It's been well

19   recognized and we have the documents to show it.

08:59   20             So, I would urge you, your Honor, that it's not a

21   Pipestill 3B issue.  I think it would be inappropriate,

22   respectfully, to limit it to that.  I think it's a plant wide

23   issue.

24             Thank you, sir.

08:59   25             THE COURT:  Well, that's where I am.

08:59   1          MR. BUZBEE:  Thank you.

        2          MR. GALBRAITH:  I would like to say couple of things.

        3          THE COURT:  Sure.

        4          MR. GALBRAITH:  One of the things we talked with about

09:00   5   with Judge Froeschner when he took away our exclusion of any

        6   other incident evidence was he said, "I still recognize that

        7   they have to show the source of this event so that they can

        8   show any other incident substantially similar," and I don't

        9   think they can do that.

09:00   10          Now, you today have said the preamble or the --

        11   the first thing that has to happen to render this pattern, you

        12   have to show that is one of those data points, you have to show

        13   this source.  And I want to make sure I understand what -- are

        14   you saying that they have to identify the source of this

09:00   15   particular release of April 19th, 2007, before they get to any

        16   other incidents that they --

        17          THE COURT:  Well, here's what the law says about like

        18   or similar events.  It says that the plaintiff has to put on

        19   some evidence of the source of this particular -- this

09:00   20   particular release.

        21          Now, does that mean it's to your satisfaction or

        22   my satisfaction?  The answer is generally no, because the jury

        23   has to decide that issue as well.  If the plaintiff -- and if

        24   the evidence is that they don't know what the source is or they

09:01   25   can't identify the source in the sense of, "We don't know where

1    it came from.  All we know is this occurred," then there might

2    be some point at which you would stand and say, "Judge, before

3    we hear any evidence about these other events, I would like to

4    have you rule or determine and tell me" or whatever your motion

5    might say, "that there has been some evidence that an event

6    occurred and that it's identifiable, it's localized, we can see

7    a basis now for going forward with like or similar conduct or

8    course of conduct."

9              And, so, yes, it would be just like in a criminal

10   case or in a civil case where somebody is saying a person

11   committed an act and, therefore, we should be able to put on

12   evidence of other like or similar acts, to show that this

13   wasn't a mistake.  That's really what we're talking about.

14             MR. GALBRAITH:  Well, we -- part of, I think, the

15   background for these kind of discussions leading before today,

16   was the fact that we've deposed the plaintiffs themselves, we

17   deposed the plaintiffs' experts, and they all have admitted

18   that they do not know the source for April 19th, 2007.

19             We anticipate and I'm going to tell the jury that

20   we believe the evidence will show that nobody knows the source

21   of this.  It could have well come from off site BP, didn't have

22   to come from any particular geography on site, any particular

23   pump or any piece of "Pipe 300" or anything like that, because

24   nobody knows and there's not likely to be that evidence.

25             I think that's a significant foible in their case

09:02   1   that's -- that's dispositive, in my mind.  If that's -- if
        2   those -- if that evidence doesn't change, if they're true to
        3   what they've said under oath heretofore, I will be moving for a
        4   directed verdict on that basis.  But I certainly also think
09:02   5   that before they can point to other incidents and allege that
        6   they are similar they have to establish what the source was for
        7   this --
        8           THE COURT:  Well, here's the point.  If this were a
        9   conspiracy case, I can't wait until the end of the case, until
09:03  10   the plaintiff finishes his case and say, "Now I've seen some
       11   evidence of conspiracy.  Now let's go back and we'll permit him
       12   to put on this, quote, hearsay evidence."  We'll be here for a
       13   month or two.
       14           All of this evidence is evidence, and it comes
09:03  15   in.  And lawyers have to rely upon the Court to be able to make
       16   the distinction between the two.  In other words, at the end of
       17   the plaintiffs' case you will certainly have a right to make
       18   that motion; and I have got the responsibility and duty to say
       19   that it is or it is not.  Now, that's all I can do.
09:03  20           I can't say how it should come in.  I can't
       21   fashion it in a way that it fits the way I would like to see
       22   it, because I don't have a way.  I know the plaintiff has a way
       23   that they want to go.  I know you have a way that you want to
       24   go or don't want the plaintiff to go.
09:03  25           And the point is, like or similar evidence has to

09:03   1   come in -- or is permitted to come in at a point where there is

2   some evidence that an event occurred that can be attributable

3   to that particular plant.

4               Now, if there is no evidence, then the Court will

09:03   5   do several things -- one of two things.  It will either strike

6   all the evidence that simply just puts the fluff on the cake or

7   it will say, you know, there's no evidence so your case is over

8   and we go home or it will say there is some evidence and this

9   evidence that has been presented or permitted in terms of what

09:04   10  is called course of conduct is not going to be struck and the

11  jury will be able to consider it.  That's all I can do.

12          MR. GALBRAITH:  Okay.  To make it clear, because you

13  had also told us that the motion in limines stand and that they

14  govern attorney conduct at least until there is evidence of a

09:04   15  source here.

16          THE COURT:  Sure.

17          MR. GALBRAITH:  So, that would control -- the motion

18  in limines control our opening statements, for example, and at

19  least until there is some evidence of the source?

09:04   20          THE COURT:  Right.  And I don't know -- and I'm going

21  to have to be coached by both sides in this respect as to what

22  the documents show.  Because that -- the documents that have

23  not been excluded are admitted.  So, there's some evidence in

24  the record that I don't even know the content or the quality or

09:05   25  the nature of.

09:05  1          Now, to say that until the plaintiff has put on
2    some evidence that an event occurred you can't put on other
3    source evidence of course of conduct is simply to streamline or
4    cut me off from hearing evidence and the jury from hearing
09:05  5    evidence that might be stricken.  And I'm telling you now,
6    under the rules, those -- that evidence is probably going to
7    come in over your objections until such time as I'm convinced
8    that he doesn't have a case.
9          I don't have a way of saying I got to wait until
09:05  10    I think he makes a case.  I don't know -- I can't say if -- I
11    mean, for example, let's assume that his expert were to get on
12    the witness stand and say, "We can identify the source because
13    we know the chemicals that are being generated in that plant,"
14    or somebody.  What if that's Witness Number 30 and we're
09:05  15    somewhere in next week?  What am I going to do?
16          I mean, I have to let the evidence in in the
17    manner in which it's being presented and then rule on that
18    evidence.  Now, the motion in limine simply says that
19    counsel -- and this is what I told you-all at the outset.  I
09:06  20    cannot rule on an evidentiary point without hearing the
21    evidence.
22          So, I'm telling counsel, if you've got some
23    evidence that you're presenting that falls into these areas
24    where there has been a motion in limine asserted, then you need
09:06  25    to let me know that, "This is going into that area, Judge."

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:06  1              And I can say, "Go forward" or "What's your

     2    response?"

     3              And when you give me your response, I can say "Go

     4    forward" or "No."  That's basically where we are.

09:06  5         MR. BUZBEE:  May --

     6         MR. GALBRAITH:  One thing you mentioned is that all

     7    evidence that hasn't heretofore been excluded is hereby

     8    admitted, I think, or something to that extent.  And what I

     9    believe you --

09:06 10         THE COURT:  That's not excluded.  You've given me

    11    your --

    12         MR. GALBRAITH:  Our objections.

    13         THE COURT:  You marked the plaintiffs' exhibit list,

    14    for example.  And on the first page, let's say, are 10

09:06 15    exhibits.  You -- you've objected to one of them, Number 7.

    16         MR. GALBRAITH:  Right.

    17         THE COURT:  That means that 1 through 6 and 8 through

    18    10 are, from the Court's point of view, admitted.  Now, the

    19    Court is going to speak to that in just a minute.

09:07 20              I'm going to admit all of these evidence, all the

    21    evidence that has not been excluded or objected to, because I

    22    need to have that in place without us having to go through this

    23    old fashioned way of presenting and throwing papers up in front

    24    of the jury and arguing about whether it's been admitted or

09:07 25    not.

09:07    1              Now, there's certain evidence that I expect that

2    probably might be withdrawn at some point because it's not of

3    any use.  It's not going to be relevant.  So, that's what I am

4    saying when I said there is some evidence that will be in the

09:07    5    case before the jury even gets picked, because I'm going to

6    admit it.

7            MR. GALBRAITH:  In other words, all I was just trying

8    to clarify is that if there is an objection on file you're

9    going to rule in the future and it may be admitted or may be

09:07   10    excluded.

11            THE COURT:  Absolutely.  Yeah.

12            MR. GALBRAITH:  And I have -- since you asked us what

13    else was relevant for us to --

14            THE COURT:  Well, let me make sure we close this door

09:07   15    before we do that.

16            MR. BUZBEE:  Yes, your Honor.  As you said, you're

17    obviously going to preadmit those exhibits that have not been

18    objected to.

19            THE COURT:  Yes.  Right.

09:07   20            MR. BUZBEE:  I think the threshold has been met.  I

21    mean, what he's trying to do is hamstring me in my opening

22    statement --

23            THE COURT:  Well, I don't know if it's you; but I

24    don't want to be hamstringed.  I'm just going to be the arbiter

09:08   25    here.  I'm calling balls and strikes, you know.

09:08    1         MR. BUZBEE:  Right.  I think you've denied his motion

2   in limine on that; and I would like to be able to do my opening

3   statement just like you outlined, with these events -- he can

4   argue about them or not.  But I think that -- you know, if you

09:08    5   deny the motion in limine, which you've done, I don't know why

6   he's trying to now tell me I can't talk about them in opening

7   statement.  That is my case.

8         And, obviously, if you're going to preadmit the

9   exhibits, the -- whatever threshold he's talking about is --

09:08   10   that's some evidence that this came from this plant.  So, I

11   think I'm in good shape.  But I don't want you to yell at, you

12   know --

13         THE COURT:  I don't yell --

14         MR. BUZBEE:  I know you -- I asked her --

09:08   15         THE COURT:  -- I don't think.

16         MR. BUZBEE:  No, sir.  But anyway --

17         THE COURT:  Am I yelling?

18         MR. BUZBEE:  No.  No, you're not.

19         THE COURT:  Not yet.

09:08   20         MR. BUZBEE:  I'm sorry.

21         Anyway, your Honor, I just want to make it clear

22   that I do intend to -- I do have an expert that's going to

23   pinpoint the leak, that's going to talk about the improper

24   maintenance.

09:08   25         THE COURT:  Well, I don't need to get into what the

09:08  1    evidence is.

2              MR. BUZBEE:  Right.  But I just want to talk about

3    that in my opening statement, is all I'm making clear.

4              THE COURT:  Well, if you got some witness who is going

09:09  5    to testify to that, then there's no basis for counsel to

6    object --

7              MR. BUZBEE:  Absolutely.

8              THE COURT:  -- if he wants to object.  And he can do

9    that, and there's nothing I can do except overrule it or

09:09  10   sustain it --

11             MR. BUZBEE:  Gotcha.  Thank you.

12             THE COURT:  -- and we'll go from there.

13                  What else is there, Mr. Galbraith?

14             MR. GALBRAITH:  Your Honor, my understanding is there

09:09  15   are a number of subpoena requests that have gone out; and we

16   filed a motion to quash those subpoenas.  One he mentioned was

17   to Keith Casey, the plant manager.

18                  This is an apex deposition.  And I recognize

19   we're in federal court; but still, there's been no showing of a

09:09  20   need for the apex of the plant, no showing of the particular

21   need or --

22             THE COURT:  Well, let me just say this.  I'm not going

23   to quash any subpoenas now.  I'll take -- I'll probably take

24   this matter up on you-all's lunch hour.  I hope you brought

09:09  25   your lunch, because I'm not going to spend my time and the

09:09  1   jury's time where we argue about these things.

2          If you-all got something to argue about and get

3   here in the morning, we'll start at 7:00 o'clock, we'll argue

4   with you about that till 8:30.  And we're going to try this

09:09  5   case to the jury starting at 8:30 if we can make sure we got

6   the folks in here.  So, let me just say right now, without

7   disregard and disrespect for your motion, I will not rule upon

8   any motions to quash before we pick this jury.

9          When we get this jury picked, we'll probably take

09:10  10  a break or some in between and we can talk about some of these

11  things.

12          MR. GALBRAITH:  Thank you, your Honor.

13          THE COURT:  All right?

14          Now, before we bring the jury panel in, let's

09:10  15  just take a look at the plaintiffs' third amended exhibit list.

16          How are we looking, Diane?

17          *(Sotto voce discussion at bench with court staff)*

18          THE COURT:  Exhibits 1 through 6 and 8, 9, and 10 are

19  admitted; Exhibits 11 and 14 through 26 are admitted;

09:10  20  Exhibit 40 through Exhibit 46, admitted; Exhibit 106 and 107,

21  admitted; Exhibit 108 through 114, admitted; 18 -- 118 and 120,

22  admitted; 122, 125, '26, 127, admitted; 129 through 132,

23  admitted; 134 admitted; 136 and '37, admitted; 139, 142, 144,

24  and 146, admitted; 148, 150, 152, and '53, 154, '55, '56 -- I'm

09:12  25  sorry -- '55, '56, '57 -- excluding 154 -- 159, '60, '61, and

```
09:12   1   '62, admitted; 164 through 171 are admitted; 175 is admitted;

        2   177, 180, 181, 183, 185, admitted; 187, '89, '90, '91, '94, '96

        3   and 198 are admitted; 200 through 202, admitted; 204, 206, 208,

        4   210, 212, admitted; 214, 217, '18, and '19, admitted; 221, 225,

09:13   5   and 226, admitted.

        6           And I believe -- yeah, that's it.  Those are the

        7   plaintiffs' exhibits admitted.

        8           Mr. Buzbee, I don't have your strike -- or

        9   objections to the defendant's exhibit list unless I -- unless

09:13  10   it's in Houston.

       11           MR. BUZBEE:  We filed it and e-mailed it back --

       12           THE COURT:  Oh, did you?

       13           MR. BUZBEE:  If I can approach, I'll hand it to you.

       14           THE COURT:  You need to probably come around on this

09:13  15   side to hand it to me.  I'm not sure how you --

       16           MR. BUZBEE:  I'm sorry.  It's not bound, your Honor;

       17   but here is --

       18           THE COURT:  Okay.

       19           MR. BUZBEE:  Thank you, sir.

09:14  20           THE COURT:  All right.  This could go on a little

       21   while.  Let me see how many exhibits we have objected to

       22   generally.

       23           Quite a few, right?

       24           MR. BUZBEE:  Yes, sir.

09:14  25           THE COURT:  Okay.  Let's see if we can get through
```

09:14  1   this.  The defendant's second amended exhibit list -- is that
       2   the right list, Mr. Galbraith?
       3            MR. GALBRAITH:  That's our current list, your Honor.
       4            THE COURT:  All right.  Exhibits 1 through 8,
09:14  5   admitted; 15 through 18, admitted; 19, 20, and 31 through 40,
       6   admitted; 44, admitted; 78, admitted; 100 through 104,
       7   admitted; 107, 110, 111, admitted; 122, 124, 125, 126,
       8   admitted; 138 and 139, 142, 143, 144, admitted; 186 through
       9   190, admitted; 91, admitted; 223 through 230, admitted.
09:16 10            And if I'm -- if there's something been withdrawn
      11   in between, I'm not checking that.  I'm just going straight
      12   forward.
      13            231 through 244, admitted; 245 through 258, 259
      14   through 272, 273 through 285, 286 through 292, all admitted;
09:16 15   293A, 294, and 295, admitted.
      16            MR. O'ROURKE:  Your Honor, we objected to the rest of
      17   that.
      18            THE COURT:  The rest of them are objected to?
      19            MR. O'ROURKE:  Yes, your Honor.
09:17 20            THE COURT:  All right.  Let's see if I can find out
      21   where I stopped, then.
      22            Let's see.  I believe I stopped at two --
      23            MR. O'ROURKE:  295, your Honor?
      24            THE COURT:  -- 295.
09:17 25            So, Exhibits 296, and without regard for any

09:17   1   missed numbers in between, any excluded numbers, through 5616

2   are objected to.  And certainly there are some numbers that

3   have been skipped in between there, but I don't think that I

4   need to address that at this point.

09:17   5          All right, gentlemen.  Let's see.

6          All right.  You're standing.

7          MR. GALBRAITH:  Yes.

8          THE COURT:  That means you have something more to say.

9          MR. GALBRAITH:  When we first addressed the

09:18  10   questionnaire, you had outlined a procedure whereby we would

11   get to look at them overnight and then talk to them before voir

12   dire, to see if there's any obvious --

13          THE COURT:  No.  I want to talk to you, is there any

14   obvious disqualifications from you.  I'm not going to look at

09:18  15   the panel until I -- I mean, I don't want you to talk to the

16   panel at all right now.

17          MR. GALBRAITH:  No.  No.  There's -- I don't think

18   there's any panel busters --

19          THE COURT:  Okay.

09:18  20          MR. GALBRAITH:  -- at least in my point of view.

21   That's the first thing.

22          THE COURT:  Okay.  By "panel busters," you mean

23   persons who, let's say, are currently working for BP or

24   something obvious like that?

09:18  25          MR. GALBRAITH:  Well, or any -- any shared

09:18  1 characteristics that would wipe out 20 people or 15 people at
       2 once.
       3          THE COURT:  I don't have my list yet, but go ahead and
       4 tell me.
09:18  5                No, no, I don't need the list.  You give me the
       6 numbers, because we're talking 1 through 35.  And I'll be able
       7 to make notes.
       8          MR. GALBRAITH:  There is Juror Number 7 --
       9          THE COURT:  Okay.  Hold on just one second.
09:19 10          MR. GALBRAITH:  -- is a stated hardship yesterday.
      11 She has a minor son, 8 years old.  And she was working hard
      12 yesterday not to have to return today.  Basically --
      13          THE COURT:  What's the hardship?  That she has this
      14 son or that --
09:19 15          MR. GALBRAITH:  Yes.  She's apparently sole care for
      16 that -- she's a single parent, sole care.  And she was pretty
      17 adamant about that hardship, and she -- her point was it's
      18 automatic if --
      19          THE COURT:  I don't automatically grant them, but
09:19 20 we'll talk with her about it.
      21          MR. GALBRAITH:  Okay.
      22          THE COURT:  And in the context of what the other panel
      23 looks likes.  I'm not going to mistreat anybody.  We'll all be
      24 in trouble.
09:19 25          MR. GALBRAITH:  There are also but -- four people, 4,

09:19   1   7, 19, and 33, who indicate -- just for an example, I'll look
        2   at Question 46 to Juror Number 19.
        3              "Is there anything about what you have read,
        4   heard, or learned from others regarding accidents or other
09:20   5   incidents at the BP refinery in Texas City or do you have a
        6   strong personal belief that has already caused you to believe
        7   that you could not be fair to BP in this present legal
        8   dispute?"
        9              Nineteen answered "yes," those other three
09:20  10   answered "yes," they could not be fair to BP --
       11              THE COURT:  Numbers 4, 7 and 19 and 13, did you say?
       12              MR. GALBRAITH:  And 33.
       13              THE COURT:  Oh, and 33.
       14              MR. GALBRAITH:  4, 7, 19, and 33.
09:20  15              Nineteen, for example, wrote in there, for
       16   example, "I have friends who have left to work in other
       17   plants."
       18              THE COURT:  In other words, they're saying they cannot
       19   be fair?
09:20  20              MR. GALBRAITH:  Those four and only those four --
       21              MR. BUZBEE:  What question --
       22              THE COURT:  Yeah, that's what I'm asking.
       23              MR. GALBRAITH:  Forty-six.
       24              Numbers 4, 7, 19, and 33 said, by virtue of --
09:20  25   one said "TV news coverage"; one said, "What I've learned from

09:20  1    friends who are out there."

2              THE COURT:  All right.

3              MR. GALBRAITH:  All have a strong belief -- "a strong

4    personal belief that has already caused me to believe I could

09:21  5    not be fair to BP in this present legal dispute."

6              That's only four, thank goodness; but there are

7    four who have indicated --

8              THE COURT:  And 7 -- Number 7 in that slot is the same

9    Number 7 that says she has a hardship.  Is that right?

09:21  10             MR. GALBRAITH:  Yes, your Honor.

11             THE COURT:  Okay.  Any others that just come to mind

12    right away?

13             MR. GALBRAITH:  No, your Honor.

14             THE COURT:  Plaintiff?

09:21  15             MR. BUZBEE:  Yes, sir, there are.  You know, one of

16    the issues, your Honor, is -- where is my -- we talked about is

17    bifurcating this trial.  And it looks like we're not going to

18    do that, which I obviously agree with.

19             But there are several jurors that flat out say

09:21  20    they do not believe in punitive damages, will not give punitive

21    damages.  And I'm not -- I've never done a voir dire with you,

22    but I would just like to flag some of these folks.  And it

23    could be that some questions at the bench will convince you

24    that they should be stricken.  So, if you don't mind, I would

09:21  25    just like to give you the numbers.

09:21   1          THE COURT:  What are those numbers?

2          MR. BUZBEE:  Let me just start with Number 1 -- and

3 each of these people either have an issue with they won't give

4 punitive damages or they don't believe in mental anguish

09:22   5 damages and they basically have a damage issue problem.

6          I'm trying to use these tabs, which aren't really

7 user friendly.

8          Can you just give me the numbers so I don't have

9 to go through this?

09:22   10          MR. TAAFFE:  It's 1 --

11          MR. BUZBEE:  One.

12          MR. TAAFFE:  -- 5 --

13          MR. BUZBEE:  Five.

14          MR. TAAFFE:  -- 6; 8; 9; 11; 12; 13; 16; 17; 19, which

09:22   15 is one that defendants expressed reservation on; 20; 21; 23 did

16 not provide a response on the punitive damages question at all,

17 sir -- they need to be questioned -- 24; 25; 27; 28 is another

18 on that just provided no answers to any of the questions on

19 those issues; 29; 31; 33.

09:23   20          MR. BUZBEE:  And, your Honor, just as an example, each

21 of these -- when we read through these questionnaires -- and

22 this is just an example for you.  Page 5 of Juror Number 1, it

23 says, "If supported by the evidence and instructed by the judge

24 to do so, could you consider compensation for the following

09:23   25 damages:  Mental anguish?"

09:23  1          "No."  So, this person is saying, even if you

2     told them to do it, even if the law requires it, they won't do

3     it.  And I think that is a strike for cause and that's -- and

4     this same person says, "Would you give punitive damages?"

09:24  5          "No.  They're absolutely absurd."

6          I think that disqualify -- not "disqualifies,"

7     but, obviously, is a strike for cause.

8          And this is the ones we've identified, and I

9     wanted to provide you that example.

09:24  10         THE COURT:  All right.  Anything else obviously we

11    need to think about?  Or I need to think about?

12         MR. GALBRAITH:  You're going to rule on these issues

13    after voir dire?

14         THE COURT:  Yes.  In fact, it very well might be that

09:24  15    we need to take some of these people off to the side.  And I

16    generally use my little conference area there to question them

17    individually so that they're not embarrassed or humiliated.

18    And I have no reason to want to do that, any of us, for that

19    matter.

09:24  20         So, I just want to make sure that they understood

21    the question and -- and, so, what we might do is a general voir

22    dire.  When we complete that, then we, you and I -- you, being

23    the lawyers and I -- will open that door and we'll sit in there

24    and we'll bring them in one at a time until we go through and

09:25  25    make sure that the people are saying what they -- what we think

09:25  1    they're saying.  And without -- and I'm not sure that I'm going

2    to permit you to ask them any questions.  If I do, it would be

3    very limited.  And the reason is I don't want to make it seem

4    as though there's a choosing of sides.  I just want to know

09:25  5    what they understand their answers to be.  And we'll go from

6    there.

7              MR. BUZBEE:  Okay.

8              MR. GALBRAITH:  Thank you, your Honor.

9              THE COURT:  Okay.  Does that get us to a point where

09:25  10   we might be ready to start with the panel?

11             MR. BUZBEE:  I think so.

12             THE COURT:  All right.  We've got 35 -- 6, 12 and 12,

13   24, 36.

14             We're going to need the first three rows and

09:25  15   we're going to need the row behind that row vacant, as well.

16   In other words, I don't want anybody -- and it may be that you

17   need to take the last --

18             Ladies and gentlemen, you need to take the last

19   two rows first.  Fill up the last two rows across first.  And,

09:25  20   then, anyone else on the second to the last row -- I need as

21   much space between the panel as possible because -- it's for

22   their own benefit, and they're not interested in having any

23   contact.

24             Thank you very much.

09:27  25             All right.  Let me ask, gentlemen, regarding the

09:27   1   witnesses in this case, do we have any way to do this other

2   than go through the list?

3        MR. GALBRAITH:  You mean we -- we have talked to them

4   about giving each other 48 hours' notice of who you're going to

09:27   5   call just so there won't be --

6        THE COURT:  No, that's not what I'm talking about.

7   I'm talking about the panel.  What we don't want is for

8   somebody to show up on the list of witnesses, who -- who has an

9   interest in the case and that person is at the courthouse, for

09:27  10   example, and now they get associated with the plaintiffs.

11        So, in other words, we've got people here --

12   we've got people that can be identified -- and I think I can

13   exclude this by asking whether or not they know of any person

14   who is currently in litigation or currently has any claim

09:28  15   against any oil company without specifically identifying BP at

16   the first and then try to make sure that they don't know the

17   individuals that -- certainly the plaintiffs, they don't know

18   the plaintiffs that are involved.

19        But I'm not sure that I want to go through the

09:28  20   entire list.  So, I'm going to ask you if you would get your

21   list of plaintiffs together, make sure you've got that list of

22   plaintiffs.  There are some -- let's see what I've got.  There

23   are some -- there are some other type of witnesses, BP

24   witnesses, and there are business locations -- I think I might

09:29  25   have left my paperwork -- business locations that -- or

09:29   1   doctors' places that need to be identified.  And we're going to

2   have to expect you-all to identify physicians who might have

3   done treatments so we can make sure that none of the persons on

4   the panel are being treated by those same physicians.  So,

09:29   5   start pulling that information out.

6           MR. GALBRAITH:  Your Honor, on the questionnaire, just

7   so you are aware, the questionnaire on Question 26 asked, "Have

8   you or someone close to you ever worked for or owned stock in

9   any the following companies?"  And it listed BP and the various

09:29   10  contractors who employed the plaintiffs: PS2, ISI, Gulf Coast

11  Gunite, Tray-Tec, Gulf States, and Hydrochem.

12          And, then, 27 said, "Do you know any of the

13  following plaintiffs or their attorneys," and it listed the

14  ten: Rosa Claudio, Jose --

09:30   15          THE COURT REPORTER:  I'm sorry?

16          THE COURT:  Call those names out again, please.

17          THE CASE MANAGER:  She can't hear you.

18          THE COURT:  What did it -- it listed the names of the

19  plaintiffs?

09:30   20          MR. GALBRAITH:  Yes, your Honor.

21          THE COURT:  All right.

22          MR. GALBRAITH:  The ten plaintiffs' names are listed

23  and attorneys Tony Buzbee and Sean O'Rourke.

24          THE COURT:  Those are question numbers what now?

09:30   25          MR. GALBRAITH:  It's 26 and 27.

```
09:30   1              THE COURT:  Okay.  Yeah, some did not answer any of
        2    that.
        3                   All right.  That might not be a problem, then.
        4                   The question, then, is whether or not we've got
09:31   5    other entities that need to be identified that might -- that
        6    might need to be presented to the panel.  So, let me get you to
        7    think about that, anyway.  Okay?
        8                   All right.  Are you both comfortable with the
        9    statement of the case as set out in the -- in the -- not much,
09:32  10    but --
       11              MR. GALBRAITH:  Joint pretrial order?
       12              THE COURT:  -- joint pretrial order?
       13                   Probably speak to some -- several of what the
       14    plaintiff claims to be their contentions as well as the
09:32  15    defendant's positions on those, as well.
       16              MR. BUZBEE:  The plaintiff is comfortable with that
       17    statement, your Honor.
       18              THE COURT:  Okay.  All right.
       19                   Okay.  I think we're ready for the panel.
09:32  20       (Jury panel present)
       21              THE COURT:  All right.  Ladies and gentlemen, how
       22    you-all doing this morning?
       23              THE JURORS:  (In unison)  Fine.
       24              THE COURT:  You think it's okay?  Now, you could -- we
09:37  25    could all have jobs on the highway, and I told the lawyers
```

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:37   1   earlier it's good to have a job that brings us inside
        2   occasionally.  And this kind of weather out there is tough.
        3   So, we're happy to have you here.
        4                  I'm one of 20 federal judges who work in what we
09:37   5   refer to and what is described as the Southern District of
        6   Texas, the Galveston Division being one of seven divisions.
        7   You probably know enough about Texas to know that -- that we
        8   have -- that those other divisions -- where they're located.
        9                  One, certainly, is in Houston.  There's another
09:38  10   in Corpus Christi, Victoria, Brownsville, McAllen.  And if
       11   that's not seven, that's close enough.  But that's the
       12   spanse -- the expanse of this district.  And, of course,
       13   Galveston is a significant part of that.  I believe Galveston
       14   has about four counties in its division.
09:38  15                  And we're certainly happy to have you here today,
       16   and we appreciate your coming.  I know you were here yesterday.
       17   And you did a lot of the work for us that we needed to have
       18   done by filling out the questionnaires and giving us an
       19   opportunity to kind of visit with you outside of your presence,
09:38  20   to read your thoughts and minds about the work that is
       21   necessary.
       22                  And I think it's important that we start out with
       23   that idea, with the notion that -- that the trial by jury and
       24   the justice system is one that doesn't work without people.
09:39  25   And, certainly, we could have a system that -- without having

09:39  1  citizens involved.  And we know exactly how those systems work.

2  All of us probably had at least one universal network or

3  television station where we can see how things happen around

4  the world.

09:39  5         And the distinction between us and the rest of

6  the world is singular.  We call it the "rule of law."  We

7  respect the law; we abide by the law.  And sometimes I even

8  speed, but the point is I know the law is out there.  And I

9  know that you believe in that same process; that is, the rule

09:39  10  of law.  That distinguishes the United States of America from

11  all of the rest of the world.

12         And we do this -- or we handle or we utilize or we

13  put in play this rule of law generally through judges and

14  juries.  And juries are judges, as well.  You are judges of the

09:40  15  facts of a case.  And your job as jurors is to decide the

16  disputed fact issues, not to know everything that possibly

17  could know, but to decide what is disputed between the parties.

18         And once the disputed areas of the law -- or the

19  facts are developed and determined, the law then can be applied

09:40  20  to those undisputed facts; and we get what we call a

21  "judgment."  Does that make sense?  Yeah.

22         So, where there is a dispute -- you know, all of

23  us have children, I suspect.  If you don't, you were a child at

24  some point.  And you know that the best way to resolve any

09:40  25  problem, the best way to move forward, should I say, on any

problem is to resolve the factual disputes.  After all, when
two children run up to you and they both tell you different
stories, are telling you different things, the way you move
forward is you determine as best you can what the dispute is
and you determine how that dispute and those facts ought to be
resolved and then you plan to go forward from that.

          That's what we do here in court.  This is not a
strange venue, even though we operate by more rules than you
would necessarily operate by in a home setting or on your job.
For there are rules on your job.  And if there were not rules,
we would be in trouble.

          I would hate to think of anybody needing brain
surgery and the doctors not have rules that they follow.  You
can imagine that it would just be a hit and miss situation.  I
would hate to think that when I take my car to a mechanic that
there are not a set of rules by which that mechanic operates
and does his work.  Otherwise, I would probably never get my
car out of the shop.  Or at least I would be back every week,
having it repaired over and over again.

          So, just as there are rules in science and in
mathematics and in mechanics and in surgery, there are rules of
law that a court -- that govern our conduct and how we go about
doing things in a court of law.

          Are there any lawyers on the panel?

          Got one.

09:42  1          All right.  And how about others that might have
       2   studied law?  Any of you studied law?
       3          All right.  Number -- let's -- before we get too
       4   deeply, let's see who Number 10 is.
09:42  5          What do you do for a living, Number 10?
       6          You are Number 10, aren't you?
       7       A JUROR:  Yes.
       8       THE COURT:  I'm going to call you by number because
       9   I'd never get the names correctly.  And when I call you -- you
09:42  10   know, we're back in elementary school for the time being.
      11   You're going to have to stand, because the court reporter needs
      12   to take your answer.
      13       A JUROR:  All right.
      14       THE COURT:  And this might seem to be embarrassing,
09:42  15   but it's really not.  It gives you a chance to stand up and
      16   stand out.  Thank you.
      17          Number 10.
      18       A JUROR:  I work for the State.  I'm an attorney for
      19   the State.  I work for the agency that investigates child abuse
09:43  20   and neglect and elder abuse and neglect.
      21       THE COURT:  Okay.  Very good.  And you have been
      22   working with them and practicing law for how long?
      23       A JUROR:  Over 25 years.
      24       THE COURT:  So, you do understand the significance of
09:43  25   rules, don't you?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

09:43   1          A JUROR:  Yes, I do.

2          THE COURT:  And you're in the business of enforcing

3    and making sure that the rules and regulations of the State of

4    Texas are followed.

09:43   5          A JUROR:  That's correct.

6          THE COURT:  And, of course, rules and regulations

7    sound -- might sound bad; but they help us to correct and

8    change our conduct, don't they?

9          A JUROR:  I believe they do.

09:43   10          THE COURT:  Yeah.  And, so, you would be a proponent

11    of this notion that we need rules, would you not?

12          A JUROR:  Yes, I would.

13          THE COURT:  Okay.  I probably will pick on you a

14    little bit more than the rest.  So, go ahead and take a seat.

09:43   15    We're going to come back to you.

16              And what I want to do is I would like to teach a

17    few general principles of law that we're going to be bound by.

18    And I might want to use this lawyer to help me.  See, because

19    she's not going to disagree with me.  Even if she thinks I'm

09:44   20    wrong, she probably won't disagree with me.

21          A JUROR:  That's true.

22          THE COURT:  But I want to teach a few principles, and

23    we're going to get to those in just a few minutes.

24              Let me start out once again by welcoming you and

09:44   25    telling you my name is Kenneth Hoyt.  I'm one of 20 judges, as

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

09:44  1   I said earlier, that work throughout the Southern District of

2   Texas.  I'm particularly and specifically assigned to the

3   Galveston Division.

4            So, you know, I don't know that you'll

09:44  5   necessarily see me or meet me any particular place; but if you

6   need to know me or know something or report something, you

7   certainly have the duty and responsibility of contacting the

8   clerk's office or contacting the court personnel; and we'll

9   work as best we can.

09:44  10           During your stay here, your contact, your direct

11   contact, will be through the clerk's office.  They will have --

12   or give you a number where you can reach them, and you can

13   certainly talk to them about any challenges or difficulties

14   that you may be having.

09:44  15           Now, I've been in this business for a little

16   while.  I started back in 1981.  And, so, I've been trying to

17   be a judge for a long time.  I'm about to learn it, now that

18   I've gotten to a point where I could probably step away from

19   it.

09:45  20           I came to the State trial bench in 1981, in

21   Harris County.  And I served on the Court of Appeals, which

22   included Galveston, in the mid Eighties.  And I've been on the

23   federal bench since 1988.

24           So, let me ask, do any of you know me, know about

09:45  25   me, or have any business dealings or had any business dealings

09:45  1   with me over the last 28 years?

2          All right.  I take it from your silence that if

3   you had a memory it's faded.  I wasn't so, so bad.

4          All right.  I ask that because it's important.

09:45  5   We are a team in a sense.  You have your separate functions,

6   and I have mine; but we work together as a team.  Your job is

7   to determine what the rules -- determine what the facts are in

8   a case.  And you can imagine, my job as judge is to make sure

9   that the rules of law are followed and applied.

09:46  10          So, you know, a general way of appreciating this

11   is by the way that the architecture is established here in the

12   courtroom.  If you notice, where you're sitting now as opposed

13   to where you will be sitting when you become jurors, you'll be

14   sitting in the box over there, with elevated seats.  And

09:46  15   they're not elevated simply because they need to make you

16   taller.  They're elevated because your responsibility has been

17   elevated.  And it's elevated above the responsibility that the

18   lawyers have, who are sitting in what I call the "well" of the

19   court, in the place where the action occurs, where the battle

09:46  20   is fought.

21          The gladiators fight out in the arena, don't

22   they?  You've seen that movie.  The gladiators fight out in the

23   arena.  And the lawyers are the gladiators in that sense.  But

24   there are people who are sitting in the well -- I mean, above

09:46  25   the well of the court, who make judgment, who make decisions

09:47  1    about whether they prevail or not.  That's what you're doing as
       2    jurors and as judges in this case.
       3              But there's ultimately one person who does the
       4    thumb up or thumb down in all these situations, isn't it?
09:47  5    That's the man or the woman who holds the scepter, who holds
       6    the rule of law.  And that's the role I play.  My seat is
       7    elevated even higher than your seats because the -- no one is
       8    above the rule of law.  No one is above the law, not even as I
       9    sit here.
09:47  10             The point is that we, you and I, play this
       11   reciprocity role.  I permit certain evidence into the case.
       12   The lawyers present it, I permit it or not, and then you
       13   receive.  I then give you instructions on how you should handle
       14   that evidence, and you decide that evidence.  And then I make
09:47  15   the application of the law to that evidence, which ends up
       16   being a judgment in a case.
       17             Now, that happens in every court in this country.
       18   It might be a federal court or a municipal court or a family
       19   law court or a juvenile court, but it happens in every court in
09:48  20   this country.  We -- that's the pattern.  And the pattern
       21   should not and is not going to be broken, because the rule of
       22   law says that it is not.
       23             So, that's what you will be doing this morning.
       24   And that gives you some sense of the importance of the work
09:48  25   that you're doing.

09:48  1          There's one thing that I probably need to tell

2   you about this.  Once you move from those seats to those seats,

3   you sort of shed some of your -- some of your covering, as we

4   say.  Or maybe you put on some other different covering.  And

09:48  5   what do I mean by that?

6           As judges, you're not to bring your political

7   agendas, you're not to bring your biases and prejudices and

8   your feelings and likes and dislikes into the courtroom.  You

9   would expect that of any judge.  You want to come before a

09:48  10   judge who is going to be fair and equitable and to permit you

11   to have your say or to permit you to present your case and

12   treat you in a fair and equitable way.

13           But that's what's expected of you, which means

14   that I can't go out, for example, or you can't go out and

09:49  15   investigate some event to find out on your own what it is that

16   you want to know about an event.  You have to -- you are -- and

17   you are bound by, you have to bind yourselves as a group and to

18   the Court as a -- as a unit, to the evidence that is presented

19   here.  That's what you're bound to do.

09:49  20           You take an oath that, "I will not go out and do

21   my own investigation.  I won't call my brother-in-law or my

22   sister-in-law and get their opinion.  I won't let my husband or

23   wife tell me what they think.  I will not be bound by outside

24   forces.  I'll be bound only by the evidence as presented and

09:49  25   the rule of law that is given to me in this court."  That's the

oath that you take.  That's the oath that I take.  And neither
of us can walk away from it and do as we please.

Otherwise, we might as well be laying on the
table and the surgeon walks in and says, "Who is this person
and where do you want me to cut?"  Because that's what we put
ourselves at risk of; that is, the risk of just simply
haphazardly doing things, not according to law but according to
the way we feel.  It renders the whole process worthless
because we don't know from day-to-day what to expect from the
judiciary, from the judges.  And the judges are also you, the
jury.

We want that predictability, and that's what the
rule of law gives to us.  That's what you signed up for as
citizens.  You don't remember that, do you?

Well, when the doctor delivered you, he said,
probably the first words, "Welcome to this United States of
America."  Do you remember that?  You became a citizen of the
United States; and you signed up for this awesome
responsibility, the envy of the world.  And, so, I hope that
you appreciate the importance of the work that you do.

You don't have to like people to do right, do
you?  I've got a lot of relatives I don't like.  I love them,
though.  And by that I mean I treat them right.  But I
certainly don't like them, and I don't hang around them either.
That's part of loving them, is not letting myself hang around

09:51  1    them too much.

      2              I say that for the benefit of all the lawyers in
      3    the world, including Number 10.  People find reasons to dislike
      4    lawyers, and then they go out and hire them anyway, "I need a
09:51  5    lawyer to help me with this case."  So, you like your lawyer
      6    but you don't like anybody else's.  Well, you have to put that
      7    aside as judges, and so do I.

      8              I run into a lot of lawyers that I wouldn't eat
      9    lunch with but they get respect in this courtroom and they're
09:51 10    going to be treated fairly in this courtroom and they would not
     11    know that I wouldn't have lunch with them.  That's the point of
     12    being judges.

     13              That's how we operate in this arena.  We don't
     14    have to like the people we work for and work with.  You got
09:52 15    some people that work with you that you don't like; and you
     16    show up every day and, of course, I hope that you get along
     17    with them.

     18              The point of all of this is to say that this
     19    courtroom is a workplace where we apply rules and where it
09:52 20    doesn't matter that you don't like lawyers.  It doesn't matter
     21    that you don't like doctors, it doesn't matter that you don't
     22    like anybody, because you're going to leave that problem
     23    outside the courtroom.  When you come in here, you choose to
     24    take an oath and you take an oath that you're going to follow
09:52 25    the rule of law as presented and facts -- and determine the

09:52   1   facts as presented to you.

2            This case is a bit complex in the sense that it's

3   going to be a little bit longer than some of the cases that

4   you've probably sat on before.  Let's see a show of hands of

09:52   5   you who have sat on a jury panel before on civil case.  Just

6   raise your hands if you sat, and hold them up for just a few

7   minutes.  I know you've already answered the question.  If

8   you've been on a jury panel before, a civil jury panel, raise

9   your hands.  Just a few of you.

09:53   10            Was it State court?  Probably?  Here in Galveston

11   or another --

12            A JUROR:  I think it was the County.

13            THE COURT:  County court?  All right.

14            And what's the longest case that you've sat on,

09:53   15   Number 2?

16            A JUROR:  Three days.

17            THE COURT:  Three days?

18            I saw a hand in back.  Looks like Number 14.

19            A JUROR:  Fourteen.  Two days.

09:53   20            THE COURT:  Two days.  All right.

21            This case is going to last a little bit longer

22   than that, more than two days, more than three days, more than

23   six days.  It's probably going to last somewhere in the range

24   of eight or ten working days, maybe a little bit more.

09:53   25            Now, I don't say that to frighten you.  We get to

09:53  1    know each other real well when we work together closely.  And

2    that doesn't mean I'll be chatting with you.  It just simply

3    means you'll recognize me when you see me.  But we work very

4    well together when we make up our minds at the outset that this

09:53  5    is a job that has to be done.

6              And you would not have been called had you not

7    been capable of performing.  So, that's the premise, that you

8    would not be here if you were not called and you would not be

9    here if you were not capable.

09:54  10             Any of you have any surgery planned over the next

11   two or three weeks?

12             Number 3.  All right.

13             Anybody got any -- what's your number, sir?

14        A JUROR:  Thirty-three.

09:54  15        THE COURT:  I'm sorry?

16        A JUROR:  Thirty-three.

17        THE COURT:  Is it 33?

18        A JUROR:  Yeah.

19        THE COURT:  You got some surgery planned?

09:54  20        A JUROR:  This week my wife has two surgeries, this

21   Friday.

22             THE COURT:  Okay.  All right.  We'll talk to you about

23   that.

24             Let's see.  All right.  Did I see any other

09:54  25   hands?

09:54    1          All right.  Well, we certainly don't want to miss

         2    brain surgery at this hour, would we?  You've got to remember

         3    that you've got an operation if you have one.

         4          How about some other events that are very

09:54    5    important to you?  What is it that's going to happen in the

         6    next two or three weeks that you think is more important than

         7    being on a jury?

         8          All right.  We got a lot of hands.  All right.

         9          All right.  Let's take those hands down where you

09:55   10    think it's going to work.  Let's see those hands again.  Going

        11    to work is important.

        12          A JUROR:  Work.

        13          THE COURT:  All right.  What's your -- Number 8?

        14          A JUROR:  Eight.

09:55   15          THE COURT:  Yes, ma'am, please stand.

        16          A JUROR:  I talked to my boss yesterday, and they are

        17    not going to pay me for missing work.  And I'm the breadwinner,

        18    and I can't -- I'm not going to be able to pay my bills.

        19          THE COURT:  Who is your boss?  Who is your boss?

09:55   20          A JUROR:  John and Lynne Averett is their names.  They

        21    live in Houston.  I work for a married couple.  I work on

        22    Broadway, at a shop called The Frog at Home.  It's furniture

        23    and interior designs.

        24          THE COURT:  Okay.  Small company?

09:55   25          A JUROR:  Yes.

09:55   1          THE COURT:  All right.

        2                 Let's see.  I saw another hand, I believe.

        3    Number 4?

        4          A JUROR:  Yeah.  My sister -- my mother, she's

09:55   5    elderly.  My sister is her major caregiver, you know, the

        6    caregiver, takes care of her.  And we worked it out so where

        7    she can go to take vacation and I go up there and take care of

        8    my mother.  She's elderly.

        9          THE COURT:  Where is "up there"?

09:56  10          A JUROR:  New Jersey.

       11                 In any case, we had the tickets for a long time;

       12    and it would be a financial hardship for me to lose out, you

       13    know.  I'm going out the 28th.

       14          THE COURT:  I'm sorry.  I missed that.

09:56  15          A JUROR:  I'm leaving -- I have tickets for the 28th.

       16          THE COURT:  28th of December?

       17          A JUROR:  Yes, sir.

       18          THE COURT:  All right.  If we're not done by

       19    Christmas, Santa Claus is not going to come see any of us.

09:56  20          A JUROR:  In any case, I thought I would mention that.

       21          THE COURT:  I appreciate that.

       22          A JUROR:  Thank you.

       23          THE COURT:  It puts it in perspective, too.  We

       24    certainly expect to be home before Christmas.  This is -- today

09:56  25    is the first day of December, right?

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

09:56    1           A JUROR:  Yes.

         2           THE COURT:  I didn't miss anything.

         3           A JUROR:  I know.  I just --

         4           THE COURT:  You know, Rip Van Winkle slept through a

09:56    5    revolution.  When he fell asleep, King George was on the

         6    throne.  Next thing you know President George Washington was --

         7    so, we certainly don't want to miss our -- miss the --

         8           A JUROR:  I just don't want to be up here the 27th,

         9    you know, still be here.

09:57   10           THE COURT:  Oh, no.  We'll be long gone before that.

        11           I think I saw hand behind -- Number 15, is it?

        12    I'm sorry.  What is that?

        13           A JUROR:  Sixteen.

        14           THE COURT:  Sixteen.

09:57   15           A JUROR:  Yeah.  I have exams this whole next two

        16    weeks, and I'd miss school.  So, it would be really hard to

        17    come and be a juror.  So --

        18           THE COURT:  Well, don't you study for those exams?

        19           A JUROR:  Yeah.  But I have to, you know, miss them if

09:57   20    I'm coming here.  So --

        21           THE COURT:  Where are you in school?

        22           A JUROR:  I'm at U of H main campus.

        23           THE COURT:  U of H main?

        24           A JUROR:  Yes.

09:57   25           THE COURT:  My goodness.  That's a pretty good drive,

09:57  1    isn't it?

2                    A JUROR:  Yeah, I know.

3                    THE COURT:  All right.  How many tests do you have?

4                        See, you might be taking tests on the very days

09:57  5    we're going to take off.

6                    A JUROR:  I have three tests.

7                    THE COURT:  I'm hopeful here.

8                    A JUROR:  Three tests.

9                    THE COURT:  Okay.

09:57  10                   A JUROR:  The first one starts on Wednesday and --

11                   THE COURT:  Wednesday of next week?

12                   A JUROR:  This week.

13                   THE COURT:  Wednesday of this week.  Okay.

14                   A JUROR:  Uh-huh.

09:58  15                   THE COURT:  And --

16                   A JUROR:  And the next one is Thursday of next week.

17                   THE COURT:  Thursday of next week.

18                   A JUROR:  Yeah.

19                   THE COURT:  Nothing on Monday?

09:58  20                   A JUROR:  No.  The -- I have two tests on Thursday.

21    I'm sorry.  But the -- yeah.  So --

22                   THE COURT:  Okay.  I see.  Okay.  Very good.

23                       Did I see another hand?

24                       All right.  You're sitting next to Number 16; so,

09:58  25    you must be 17.

09:58   1              A JUROR:  Yes.

2              THE COURT:  All right.

3              A JUROR:  I'm an educational diagnostician.  I work at

4    Pasadena ISD.  And I'd be putting the school district out of

09:58   5    compliance, because I have to have my reports written and go to

6    an annual ARD meetings within a certain amount of time.  I

7    would be breaking the federal mandated laws of the school --

8    school law.

9              THE COURT:  Can't be breaking federal law if you're in

09:58  10   court.

11             A JUROR:  School law.  You know, there's not enough

12   people --

13             THE COURT:  Well, you said the ARD?  These are -- this

14   is not some special education, is it?

09:58  15             A JUROR:  Yes.

16             THE COURT:  Oh, this is special?

17             A JUROR:  Yes, it's for special education.  I evaluate

18   children for disability.

19             THE COURT:  I understand.

09:59  20                 Did I see another hand?

21                 I'm taking notes.  And you must be -- you're

22   across the aisle; so, you're Number 19?

23             A JUROR:  Yes, sir, Number 19.

24             THE COURT:  Okay.

09:59  25             A JUROR:  I have an MRI scheduled and a carotid scan

09:59   1    scheduled in the next two days.

        2            THE COURT:  When you say "the next two days," you're

        3    talking about this week?

        4            A JUROR:  Yes, sir.

09:59   5            THE COURT:  All right.

        6            You've already held up your hand once.  You

        7    change your mind?

        8            A JUROR:  If I am going to this, they are not paying

        9    for me, somebody not paying anybody.

09:59   10           THE COURT:  Who is the company you work for?

        11           A JUROR:  Piping Technology and Products, in quality.

        12           THE COURT:  All right.  Let me write that down.

        13   Number 33.

        14           Okay.  How many other hands did I miss?  Oh, one,

09:59   15   two.  Yeah, Number 7?  Yes?

        16           A JUROR:  I have some lumbar issues, and I'm currently

        17   getting treatment for it.  I have a letter from the person, the

        18   doctor, that I'm getting treatment for.  And, so, it's

        19   difficult for me to sit for prolonged periods of time.

10:00   20           THE COURT:  What do you do every day?

        21           A JUROR:  I'm a physical therapist assistant.  So, I'm

        22   always moving and walking around.

        23           THE COURT:  All right.

        24           A JUROR:  And I'm also the head of my household.  I'm

10:00   25   a single parent.  I have an 8 year old son.  And, so, if in

10:00   1   case of an event where I need to go pick him up from school,

2   I'm really the only person that can do that.  I don't have

3   family members that --

4           THE COURT:  Sir, you're going to have to hold up.

10:00   5           All right.  Yeah.  I have that, Number 7.  Yeah.

6   Okay.  Thank you very much.

7           Number?

8       A JUROR:  Eleven.

9       THE COURT:  Eleven?

10:00   10      A JUROR:  Yes, sir.

11      THE COURT:  Yeah.  Okay.

12      A JUROR:  I just would like the Court to know that,

13  you know, during the Christmas holidays -- hopefully this will

14  be ended, but the 20th I'm flying out to San Diego.

10:00   15      THE COURT:  If we're not done we're all going to go

16  with you.

17      A JUROR:  Thank you.

18      THE COURT:  All right.

19          All right.  Did I get all the hands?  No cheap

10:01   20  tickets that you want to trade to me and let me give you a

21  voucher or something?

22          Yes, ma'am, all the way to the back, what's your

23  number?

24      A JUROR:  Twenty-eight.

10:01   25      THE COURT:  Twenty-eight.

10:01  1        A JUROR:  Is the 18th is a realistic date for us to be

       2  done, because I do have a flight out of the country on the

       3  18th?

       4        THE COURT:  What is the 18th?

10:01  5        A JUROR:  A Thursday.

       6        THE COURT:  Thursday?  Thursday at the 18th you're

       7  planning to leave the country?

       8        A JUROR:  Yes, sir.

       9        THE COURT:  All right.

10:01  10        A JUROR:  No.  It's a Friday.  I'm sorry.

      11        THE COURT:  Well, if she doesn't know --

      12        A JUROR:  I don't know.  It's the 18th.

      13        THE COURT:  I bet she knows.  I'm just kidding.  Is it

      14  Thursday or Friday?

10:01  15        A JUROR:  It's a Friday.

      16        THE COURT:  All right.  I think I've got all the

      17  statements regarding the next two or three weeks, I think I

      18  said, right?

      19             And, so, let's talk a little bit about the case.

10:02  20  Let me just introduce the case to you.  There are several

      21  plaintiffs named as plaintiffs in this lawsuit.  The name that

      22  I will give to you is simply one of the plaintiffs.

      23             I'll ask counsel for the plaintiffs to be

      24  introduced by name.  And you may have already seen these, but

10:02  25  I'll ask counsel to introduce by name the plaintiffs who will

10:02   1   be presented in this trial as plaintiffs.

2                  And I'll introduce the defendant -- or give you

3   the name, and then I'll have counsel for the defendant

4   introduce himself and his co-counsel as well as any

10:02   5   representatives that are with him.

6                  The style of the case -- when we say "style," the

7   way it's set up is "Aaron Wilson Garner versus BP Products

8   North America, Incorporated."  Garner and others are the

9   plaintiffs in the case.  BP Products North America is the

10:03  10   defendant.  So, you might hear us referring to the "plaintiffs"

11   or the "defendants," the plaintiffs being the parties bringing

12   the lawsuit, the defendants the parties responding to the

13   lawsuit.

14                  Now, here's what the plaintiff -- the plaintiffs

10:03  15   contend -- or at least what I think the parties agreed that

16   is -- has -- is the basis of this lawsuit.  This is referred to

17   as a personal injury case, that involves the allegation -- that

18   is, the plaintiffs allege that they were exposed to toxic

19   substances at the petrochemical refinery that belongs to BP

10:03  20   Products North America, the defendant; that this event occurred

21   on April 19 of 2007, somewhere in the evening between 8:45 p.m.

22   and 9:00 p.m.

23                  The workers were in the -- what is referred to as

24   the Pipestill B, PS B3 Unit, of that plant at the BP Texas City

10:04  25   refinery.  And they began reporting what they claim to be

10:04   1   adverse physical reactions to what is called an airborne

2   chemical; that is, something transmitted by air.  The workers

3   claim to have experienced various symptoms requiring medical

4   evaluation.

10:04   5           They now bring this suit for what we call

6   "personal injuries."  The plaintiffs have a number of subclaims

7   about how this occurred, and those will be -- you'll get

8   those -- those will be spoken to at a later point.

9           BP claims or would say that -- that the

10:04   10   plaintiffs did not -- or that there was no evidence, should I

11   say, of a toxic release or a substance released on that

12   particular occasion and, if it was, if there was, they're

13   claiming that the source is not BP or cannot be identified as

14   being a BP exposure.

10:05   15           I will not try to explain or discuss with you the

16   full extent of the parties' claims here and their defenses; but

17   I'll permit them to make opening statements to them, certainly,

18   at the appropriate time.

19           Here's what I need to know from you, and I think

10:05   20   most of you have answered these questions already.  Is there

21   anything about what I've just said that causes you some concern

22   about your ability to be fair and impartial in a trial of this

23   nature?  Anything about what I've said so far?

24           And by "fair and impartial" I mean you can listen

10:05   25   to the evidence, make a determination of whether the

10:05  1   plaintiffs' claims are more likely than not, and then return a

2   verdict on that basis, without regard for the plaintiffs

3   individually and without regard for BP as a corporation.

4               Because BP has a right to be treated fairly just

10:06  5   as the plaintiffs do, and the plaintiffs have a right to be

6   treated fairly just as BP does.  There is no distinction to be

7   made between parties in a court of law.  That's a rule.  That

8   is, whether they're corporate or individuals, they're entitled

9   to a fair trial.  That makes sense.  None of us are

10:06  10  corporations.  We all want to be treated fairly, and we don't

11  want to think somehow a corporation has an advantage.  And the

12  corporation certainly doesn't want to think it has a

13  disadvantage.  So, that's the rule.

14              Anybody disagree with that rule or can't follow

10:06  15  that rule?

16              Number 8, is it getting warm to you?

17         A JUROR:  I can't focus or concentrate because all I

18  can think about is how I'm going to pay my bills.

19         THE COURT:  Well, we don't need to worry about that

10:06  20  right now.  You're going to get the minimum wage today.  I'm

21  saying that facetiously.  But the point is that we'll discuss

22  that.

23              So, let's not fret out and concern ourselves

24  right now with what you need to deal with tomorrow.  We have

10:07  25  enough trouble right now, today.  Just deal with today, and

10:07   1    we'll get through our process here; and we'll see whether or

2    not you're qualified to serve on this panel.  And that applies

3    to everyone here.

4               So, anything anyone else have any concerns about

10:07   5    that -- that's going to block out their ability to answer my

6    questions?  Because I need to have your attention.  Because if

7    I can't get your attention, the lawyers are going to be in

8    trouble later on.  They won't have it either.  Okay?

9               All right.  So, let's -- let's focus on what we

10:07  10    have to do here, and I think we'll be all right.  Okay?

11              All right.  Temperature is okay in the room,

12    right?

13          THE JURORS:  (In unison)  Yes.

14          THE COURT:  All right.  Good deal.  I know I have some

10:07  15    air blowing past me, and I want to make sure that there's no

16    overheating.

17              All right.  So, my question basically is fair

18    trial.  I think -- I didn't get any hands saying that you

19    couldn't be fair.

10:07  20              So, now, what constitutes fairness, though, can

21    be -- we can all have opinions about; and that's why we're in a

22    court of law.  The rules dictate what fairness is.  And, so,

23    we'll talk about that in just a minute.  But before we get any

24    further, then, let me have the lawyers introduce themselves.

10:08  25              Counsel for plaintiff, would you please stand,

10:08  1    introduce yourself?

       2              And, ladies and gentlemen, I would like to know

       3    if you know the persons who are standing, personally or

       4    professionally; and, if you know them personally or

10:08  5    professionally, I might need to know how you know them.

       6              And I don't want to embarrass you; but if there

       7    is something we need to know, you need to tell us now.

       8              Go ahead, counsel.

       9         MR. BUZBEE:  I'm Tony Buzbee.  I represent the 10

10:08  10   plaintiffs in this case.

       11             This is Sean O'Rourke and --

       12        MR. VICK:  My name is Gabe Vick.  I represent three of

       13   the plaintiffs in this case.

       14        MR. BUZBEE:  And you'll also see Peter Taaffe, another

10:08  15   lawyer from my firm.

       16             I'm a Galveston County lawyer.

       17        THE COURT:  Any of you know Mr. Buzbee or his

       18   associates?

       19             I know you've seen his advertising.

10:08  20        MR. BUZBEE:  I hope so.

       21        THE COURT:  And I'm saying that not to be facetious;

       22   but I don't want you to sit here and say, "No, I never heard of

       23   the guy.  I don't know anything about him."

       24             I want to know if you know him, whether it's just

10:09  25   in passing or whether it's simply you've seen advertising that

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:09  1   he's done or whether you've seen simply -- you know, whether or

2   not you've had business with him or whether he represented you

3   or a member of your family.  That's where I am going with this.

4           Number 1?

10:09  5           A JUROR:  Just from living here, I've seen his ads.

6           THE COURT:  All right.  Is that it?

7           A JUROR:  Same here.

8           THE COURT:  Same?

9           All right.  Anyone else?

10:09  10           What's your number, sir?

11           A JUROR:  Twelve.

12           THE COURT:  Twenty-four?

13           A JUROR:  Twenty-four.  Same, advertisements.

14           THE COURT:  Same.  Okay.  But no one knows him

10:09  15   professionally; that is, you don't have cases with him or he's

16   not your lawyer or that -- those kinds of things?  I take that

17   to be your answer.

18           All right.  Are the plaintiffs in the courtroom,

19   counsel?

10:09  20           MR. BUZBEE:  They are, your Honor.

21           THE COURT:  Would you call their names --

22           MR. BUZBEE:  I will.

23           THE COURT:  -- if you have the list there and have

24   them stand?

10:09  25           Ladies and gentlemen, this is going to be a

```
10:09   1    little bit of an acrobatic thing here.  And what I would like
        2    the plaintiffs to do is stand and come forward enough so the
        3    panel doesn't have to twist too much to see them, because we
        4    need to make sure that they're not your relatives or friends.
10:10   5    All right?  That's where we were going with this.  Okay?
        6            MR. BUZBEE:  Rosa Claudio.
        7            THE COURT:  Would you please stand?
        8               Can you all see Rosa?
        9               All right.  You may sit.
10:10  10            MR. BUZBEE:  Jose Estrada.
       11            THE COURT:  All right.
       12            MR. BUZBEE:  Eleno Guerra, Wayne Jefferson, Gregorio
       13    Fuentes, Willie Mays, Edwin Munoz, Trey Pearson [sic].
       14            THE COURT:  Step out.
10:10  15               All right.  Go ahead.
       16            MR. BUZBEE:  Charles Taylor, Gilbert Cantu.  Those are
       17    the 10 in this case, your Honor.
       18            THE COURT:  All right.  Do you recognize any of those
       19    persons, ladies and gentlemen?  If you do, raise your hand.  If
10:11  20    you don't, it's no problem.
       21               All right.  Do you recognize that you -- by name,
       22    do you have friends or relatives or neighbors who might be
       23    relatives of these individuals as far as you know?
       24               All right.  I take it from your silence you
10:11  25    don't.
```

*Cheryll K. Barron, CSR, CM, FCRR*                      *713.250.5585*

10:11  1              All right, counsel, Mr. Galbraith.

2              MR. GALBRAITH:  Thank you, your Honor.

3              I'm Jim Galbraith for BP.  With me here from my

4       office is Lyle Courtney and Tony Brown.

10:11  5              These are representatives of BP, Ken Panozzo,

6       Mary Clark Kees.  And in the back is Joe Trapp.

7              THE COURT:  All right.  Recognize any of those

8       individuals?

9              Mr. Galbraith, what's the name of your firm?

10:11 10              MR. GALBRAITH:  McLeod, Alexander, Powel & Apffel,

11      here in town.

12              THE COURT:  Say that slower.

13              MR. GALBRAITH:  I'm sorry.  McLeod, Alexander, Powel &

14      Apffel.

10:11 15              THE COURT:  The question is whether or not you know

16      the members of the firm, whether they've done work for you,

17      whether or not you've had some associations with any of the

18      members of the firm or know any of the persons in the courtroom

19      that are representatives of either BP or the law firm.  If so,

10:11 20      please raise your hand.

21              All right.  I see one hand.

22              Please stand.  Number 21, is it?

23              A JUROR:  Twenty-one.

24              THE COURT:  Twenty-one.  Yes, ma'am?

10:12 25              A JUROR:  I recognize Tony Brown.  I worked at the

district clerk's office at the Galveston County courthouse.
And I recognize the other gentleman, but I've never had any
dealings with him.

     THE COURT:  All right.  And what would be the
recognition?  Just seeing them come and go?

     A JUROR:  Yes, sir.

     THE COURT:  And what is your job?

     A JUROR:  Right now I'm a substitute teacher, and I'm
running for district clerk.

     THE COURT:  All right.  But you apparently worked at
the district clerk's office?

     A JUROR:  I worked there for 15 years, yes, sir.

     THE COURT:  And, so, you got to see a lot of faces,
not necessarily these faces, but some of these faces --

     A JUROR:  That's correct.

     THE COURT:  -- as they would come in and file
documents, I gather.

     A JUROR:  Yes, sir.

     THE COURT:  Any particular relationship that you
developed with any firm, particularly this firm?

     A JUROR:  No, sir.

     THE COURT:  Or Mr. Buzbee's firm?

     A JUROR:  No, sir.

     THE COURT:  And I gather that your knowledge or
recognition of them is simply facial; that is, you've seen the

10:12  1    faces frequently or what is it?

2         A JUROR:  Yes, sir, when I was working there.

3         THE COURT:  Okay.  Meaning there's no -- in other

4    words, you didn't go to their Christmas parties.  That's where

10:13  5    I am coming from.

6         A JUROR:  No.  Never was invited.

7         THE COURT:  Well, and I have to be plain and clear

8    because we forget about things.  You know, we get invitations

9    to stuff and we show up and we don't remember.  And I know

10:13  10   that -- I know that from time to time the clerk's office might

11   even have a Christmas party; and they might invite all the

12   lawyers in town, whether they show up or not.  But the point is

13   that we have opportunities for contact with each other, and I'm

14   trying to make sure that we know what contacts we've had in the

10:13  15   past.  All right.  I take it --

16            Yes, ma'am, Number 10?

17        A JUROR:  It's very remote, but I think the Apffel

18   family lives in my neighborhood and that Mr. Apffel may have

19   represented my brother's son, but I'm not positive.

10:13  20        THE COURT:  How long ago?

21        A JUROR:  Probably two years ago.

22        THE COURT:  Okay.  And did you have any connection --

23   before you shake your head, let me finish the question.

24        A JUROR:  Oh, okay.

10:13  25        THE COURT:  Did you have any opportunity to interface

10:14   1    with him or with whoever was from the firm that might have

        2    represented a member of your -- this is a member of your

        3    family?

        4            A JUROR:  Correct.

10:14   5                 No, I have not.

        6            THE COURT:  And I think you said your brother?

        7            A JUROR:  My brother's son.

        8            THE COURT:  Your brother's son.

        9            A JUROR:  Uh-huh.

10:14   10           THE COURT:  Okay.  So, you had no contact with them.

        11                And over the years, being in the profession that

        12   you're in, have you had any contact otherwise with any member

        13   of the family or any of the members of the firm?

        14           A JUROR:  No, I have not.  My practice has not been in

10:14   15   Galveston.

        16           THE COURT:  Okay.  Where do you practice law, by the

        17   way?

        18           A JUROR:  In Austin.

        19           THE COURT:  What are you doing in Galveston?

10:14   20           A JUROR:  I live here.

        21           THE COURT:  You got a helicopter or something?

        22           A JUROR:  Sort of.

        23           THE COURT:  Sort of.  Okay.

        24           A JUROR:  Yeah.

10:14   25           THE COURT:  That's not as close as Houston.  That's

10:14   1   why I am being facetious here.

2                A JUROR:  No, it's not.  No.  I retired from the State

3   in '96, and I've gone back to work.  But I continue to work and

4   live here.

10:14   5           THE COURT:  I see.  Okay.  That helps me.  Thank you

6   very much for that.

7                A JUROR:  In 2006.  Excuse me.

8                THE COURT:  But the kind of work you're doing now, I

9   gather, Number 10, is the same kind of work you did before you

10:15   10  retired?

11               A JUROR:  Yes, it is.  That's correct.

12               THE COURT:  And you're not in the general practice of

13  law in that sense?

14               A JUROR:  No, I'm not.

10:15   15          THE COURT:  All right.  Very good.

16               MR. GALBRAITH:  There was one other hand, your Honor.

17               THE COURT:  Oh, I missed it.  I'm sorry.

18                   Where is that hand?

19                   Yes, please.  Don't be shy.  Hold up your hand.

10:15   20          A JUROR:  I'm Number 18.  I recognize Mary Clark.

21               THE COURT:  You recognize who?

22               A JUROR:  Mary Clark.

23               THE COURT:  Mary Clark?  And how do you know her?  Is

24  it embarrassing or do you want me to take it to the side or

10:15   25  what?

10:15  1             A JUROR:  I do contract work for BP.

       2             THE COURT:  Oh, you do?  And are you currently doing

       3  that?

       4             A JUROR:  Yes.

10:15  5             THE COURT:  And what do you call "contract work?"

       6  Where you, as an individual, go in for a certain period of time

       7  for a particular job or what?

       8             A JUROR:  Yes.  I do document control.

       9             THE COURT:  Say it again.

10:15 10             A JUROR:  I do document control.

      11             THE COURT:  "Document control"?

      12             A JUROR:  Yes.

      13             THE COURT:  That sounds like you're wrapping your arms

      14  around something.  What are you doing?

10:16 15             A JUROR:  I am putting different drawings and stuff

      16  into the vault.

      17             THE COURT:  Okay.  So, you've -- you have a kind of a

      18  clerical responsibility in storing documents, maintaining

      19  documents, etcetera?

10:16 20             A JUROR:  That's correct.

      21             THE COURT:  Sort of, I guess.

      22             A JUROR:  Yes.

      23             THE COURT:  And how do you know her?  Did she hire you

      24  or you work for her or how does that come about?

10:16 25             A JUROR:  No.  I've seen her around.

10:16  1          THE COURT:  All right.  And does she have any

2     relationship -- do you have any relationship with her at all

3     beyond just simply seeing her?

4          A JUROR:  Not unless she calls to ask about documents.

10:16  5          THE COURT:  Okay.  That's what I mean.

6          A JUROR:  But, no.

7          THE COURT:  How do you relate to her, let's say on a

8     daily basis or weekly basis?  Does she have you performing

9     certain roles and functions?

10:16  10         A JUROR:  No, she does not.

11         THE COURT:  Okay.  Why would she call you, then?

12         A JUROR:  In case they needed a document.

13         THE COURT:  Okay.  You would be the person who

14    retrieved that document for her or for anybody else in the

10:16  15    company or in that particular --

16         A JUROR:  That's correct.

17         THE COURT:  Okay.  And have you done that for her on

18    few or many occasions?

19         A JUROR:  On some occasions.

10:17  20         THE COURT:  Are you still working and contracting with

21    BP now?

22         A JUROR:  I am.

23         THE COURT:  What's your number again?

24         A JUROR:  Eighteen.

10:17  25         THE COURT:  Number 18.  All right.  Thank you, ma'am.

10:17  1    If we need some other questions, we'll come back to you.

2                    Anyone else?

3                    All right.  Do we need to take a break?  Any of

4    you need to take a break?

10:17  5            A JUROR:  No.

6            THE COURT:  Not yet?

7            A JUROR:  Let's keep going.

8            THE COURT:  Anybody here diabetic?  Several -- one or

9    two.

10:17 10                   Do you need special lunch time and things like

11    that, Number 2?

12           A JUROR:  No.

13           THE COURT:  What about Number 15?

14           A JUROR:  No.

10:17 15           THE COURT:  Okay.  All right.  We'll take a break in

16    just a few minutes.

17                   And let me just say, when you take your break,

18    just make sure you stay away from witnesses and parties.

19                   And I'm going to ask that the parties -- that is,

10:18 20    the lawyers involved, that they kind of make way for you, so

21    you don't have to worry about running into them in the

22    facilities out there, and give you, you know, reign of the

23    floor.  The lawyers go someplace else.  All right?

24                   Number 18 contracts with BP.  Anybody else on the

10:18 25    panel contracting currently with BP?

10:18  1            How about in the past, you have a contractual or

2       employment relationship with BP in the past?

3            What about your -- okay.  Number 23 and 24.  And

4       I'm sure you have something on your questionnaire about this.

10:19  5            Would you please stand, 23, and just give me a

6       sense of what that was in the past?

7            A JUROR:  It was just briefly in 1980 -- 1989, 1990.

8            THE COURT:  All right.  And you did what?

9            A JUROR:  Inspection.

10:19  10            THE COURT:  And as -- and give me some sense of what

11       that's about.  Electrical --

12            A JUROR:  No.  Piping inspection, vessel inspection.

13            THE COURT:  Did you leave on good terms or --

14            A JUROR:  I think so, yes, sir.

10:19  15            THE COURT:  Okay.  Any problems with your employment

16       that caused you to leave?

17            A JUROR:  Uh-uh.  No, sir.

18            THE COURT:  And I ask it that way because I would like

19       to know whether or not you've got an ax to grind with BP.

10:19  20            A JUROR:  Say it again.

21            THE COURT:  That came out funny, didn't it?

22            I said I just want to know if you've got an ax to

23       grind with BP.

24            A JUROR:  No, sir.

10:19  25            THE COURT:  None?

10:19    1              A JUROR:  No, sir.

         2              THE COURT:  All right.  And we -- and, certainly, it's

         3      important that if you have some concerns about your employment

         4      past there and how you were treated, you know, we need to

10:20    5      explore that.  That's all.  Nothing personal.  We're not trying

         6      to pick on you here or anything like that.

         7                   Do you now or continue to work in this kind of

         8      capacity someplace else?

         9              A JUROR:  Yes, sir.  I work contract right across the

10:20   10      street from BP, at Valero.

        11              THE COURT:  Okay.  Was that contract work you were

        12      doing at BP?

        13              A JUROR:  Yes, sir.

        14              THE COURT:  Okay.  All right.  And any other

10:20   15      connections at all that you can remember that you had with BP?

        16              A JUROR:  No, sir.

        17              THE COURT:  Family members?

        18              A JUROR:  (Shaking head).

        19              THE COURT:  All right.  Thank you, sir.  We'll contact

10:20   20      you if we need you.

        21                   Number 24?

        22              A JUROR:  I'm a retired operations manager for an

        23      industrial gas company called Praxair.  We entered into a

        24      contract with BP Texas City refinery for building a hydrogen

10:20   25      plant, and then we went ahead and built two more as a result of

10:20  1  that.

2           THE COURT:  Did they build it for you?

3           A JUROR:  No.  We built it for them.

4           THE COURT:  I mean, did you build it for them?  I'm

10:21  5  sorry.

6           A JUROR:  We built it on their site.  We built it on

7  their site.

8           THE COURT:  Okay.  And you completed that

9  approximately when?

10:21  10          A JUROR:  About five years ago.

11          THE COURT:  And, so, you built not one but what?

12  Three?

13          A JUROR:  There's actually three on site right now.

14          THE COURT:  Okay.  And you participated in all three?

10:21  15          A JUROR:  Two.

16          THE COURT:  In two of those three?

17          Did you report to anybody at BP or did you report

18  up the ladder in your company?

19          A JUROR:  No.  We had a contact that I dealt with

10:21  20  regularly, Terry Harkenroad [phonetic], if that --

21          THE COURT:  At BP?

22          A JUROR:  At BP, yes.

23          THE COURT:  And how did that go?  Did you have a good

24  experience?

10:21  25          A JUROR:  Very positive experience.

10:21  1          THE COURT:  All right.  So, I take that to mean that

2     there's no fallout as a result of that, as far as you're

3     concerned?

4          A JUROR:  Not as far as I'm concerned.

10:21  5          THE COURT:  And you didn't make so much money that you

6     would love to do them a favor either, did you?

7          A JUROR:  No.  Guarantee you that.

8          THE COURT:  That's a funny way of putting it on the

9     other side.  One side is to fall out with them for mistreating

10:22 10     you, and the other side is to love them so much that you'd like

11     to go back.  So, there's no unfair advantage, is what I am

12     asking, for BP in this case, if you're on the panel?

13          A JUROR:  That's fair to say.

14          THE COURT:  Okay.  Anything about that experience,

10:22 15     that you are aware of, that would cause you some concern about

16     your ability to be fair and impartial in this case?

17          A JUROR:  I would have to say no.  No.

18          THE COURT:  All right.  Did you at any point during

19     this -- when did this -- you said this ended what?  About five

10:22 20     years ago?

21          A JUROR:  We finished building the last plant about

22     three years ago.  We started the first plant about five years

23     ago maybe.

24          THE COURT:  I think we might need to come back to you

10:22 25     and ask you some individual questions, but we'll do that if

10:22   1   necessary.  Thank you.

2                   Any of you ever visit any particular plant, like

3       a BP plant -- oh, I'm sorry.

4                   Number 9, yes?

10:23   5           A JUROR:  Yes, sir.  When I worked for GE Oil and Gas

6       I did some work at the BP plant in Wando, South Carolina, and

7       also at the Chocolate Bayou plant as a field service

8       representative for AC compressors.

9               THE COURT:  Any experience there that would -- that

10:23   10      should cause the plaintiff or the defendant to be concerned

11      about your ability to be fair and impartial?

12              A JUROR:  No, sir, not that I can think of.

13              THE COURT:  You worked for another company, and

14      you-all had a contract to do work, I guess?

10:23   15          A JUROR:  Yes.  Yes, sir.

16              THE COURT:  Was -- did your contract get fulfilled?  I

17      mean, it was -- in other words, I'm asking were you terminated,

18      fired, anything of that nature.

19              A JUROR:  No.  I finished the job.

10:23   20          THE COURT:  You finished it.  All right.

21                  And there's nothing about that, I gather, that

22      causes you any concern about your ability to be fair and

23      impartial?

24              A JUROR:  No, sir.

10:23   25          THE COURT:  All right.  Thank you, sir.

10:24  1                 I think I asked whether or not you had any

2     contract or -- I'm sorry.  I still missed your hand.  I

3     apologize.

4                 A JUROR:  I'm sorry, sir.

10:24  5                 THE COURT:  What's your number?

6                 A JUROR:  Thirty-four.

7                 THE COURT:  Yes, sir.

8                 A JUROR:  Just to let you know, I am a member of the

9     Port of Texas City security council.

10:24  10                THE COURT:  Port of what?

11                A JUROR:  Port of Texas City.

12                THE COURT:  Oh, Texas City.  Okay.

13                A JUROR:  Yes, sir.  The security council.  BP also

14    has representatives there that's also members of that security

10:24  15    council.  I just wanted --

16                THE COURT:  What does the security council do, if it's

17    not a secret?

18                A JUROR:  No, sir, it's not a secret.

19                THE COURT:  What do you do?

10:24  20                A JUROR:  All of the companies that are within the

21    Port of Texas City came together and created this security

22    council that oversees all the security of the Port of Texas

23    City.  And I'm -- I'm a member there, as well as BP is,

24    Marathon --

10:25  25                THE COURT:  You're concerned about sabotage?

10:25   1              A JUROR:  Yes, sir, and access -- access to --

        2              THE COURT:  Access?

        3              A JUROR:  -- to the port.

        4              THE COURT:  Sure, sure.  And, so, on that council are

10:25   5    members -- and what company did you say you worked for?

        6              A JUROR:  I work for Bollinger Shipyard.

        7              THE COURT:  Okay.  On that council would be members

        8    from -- or persons from other corporations --

        9              A JUROR:  Yes, sir.

10:25   10             THE COURT:  -- who have an interest or like interest

        11   in security of that -- of the plants and/or community?

        12             A JUROR:  Yes, sir.

        13             THE COURT:  So, what -- how many people make up this

        14   council?

10:25   15             A JUROR:  There are -- I believe there are 10 or 12

        16   companies.

        17             THE COURT:  And who chairs the meetings?

        18             A JUROR:  Our chairman is Jason Haeley.  He works for

        19   the Port of Texas City.  And co-chair is Dan Buchanan with

10:26   20   Marathon.

        21             THE COURT:  All right.  And you, as you said, are,

        22   quote, a member only of the council?

        23             A JUROR:  Yes, sir.  Yes, sir.

        24             THE COURT:  You don't hold any position other than

10:26   25   member?

10:26   1          A JUROR:  That's correct.  I'm a voting member.

2          THE COURT:  Okay.  Does anybody from BP hold a

3     position of status to whom you would have to report --

4          A JUROR:  No, sir.

10:26   5          THE COURT:  -- or make any --

6          A JUROR:  No, sir.

7          THE COURT:  All right.  And, so, how many BP personnel

8     are on this council?

9          A JUROR:  Just one.  There's one from each company.

10:26  10          THE COURT:  And how often do you meet?

11          A JUROR:  Quarterly.  Actually, a little more often

12     than quarterly here lately.

13          THE COURT:  Sure.  And the relationship that you've

14     developed with the council in general and individual members,

10:26  15     do you play golf, eat dinner, and hang out with anyone in

16     particular?

17          A JUROR:  No, not at all.

18          THE COURT:  All right.  Thank you, sir.

19              All right.  Any other indirect relationships that

10:27  20     any of you have, as far as you know, with BP?

21              All right.  I take it that -- well, I shouldn't

22     take it.  Let me ask.

23              How many of you have children or grandchildren

24     that work for BP?

10:27  25              Children?

10:27   1              A JUROR:  No.

2              THE COURT:  Grandchildren?

3              A JUROR:  No.

4              THE COURT:  Husband?

10:27   5              A JUROR:  Wife.

6              THE COURT:  You wanted to hold up your hand, 3.  Go

7      ahead.

8              A JUROR:  Brother-in-law used to work for them.  He

9      used to work for BP.

10:27   10             THE COURT:  You were thinking I might get to that at

11     some point?

12             A JUROR:  Yeah.

13             THE COURT:  Brother-in-law.  All right.  And he works

14     for BP?

10:27   15             A JUROR:  He used to work for BP in Texas City.

16             THE COURT:  How long and when did he work for them?

17             A JUROR:  Up until about five years -- four or five

18     years ago.

19             THE COURT:  What was the term?  How many years, do you

10:27   20     think?

21             A JUROR:  Eight, nine years.

22             THE COURT:  Eight to nine years ending probably in

23     2003, 2004 --

24             A JUROR:  Yes.

10:27   25             THE COURT:  -- somewhere in there?

10:27   1           A JUROR:  Uh-huh.

2           THE COURT:  All right.  Did he ever report anything to

3  you about his working conditions or say anything to you about

4  any of the plants, that you recollect?

10:28   5           A JUROR:  Yes, all the time.

6           THE COURT:  All the time.  And, so, let me just come

7  back to you on that.

8             Number -- who was that it -- oh, Number 1 --

9           A JUROR:  (Shaking head).

10:28  10         THE COURT:  -- you were about to hold your hand up.  I

11  didn't get to the right relationship.  It's not brother-in-law,

12  not sister-in-law?

13          A JUROR:  No, sir.  You said "children," and I raised

14  my hand.  None.

10:28  15         THE COURT:  None?

16         A JUROR:  None.

17         THE COURT:  How many, if any, of you have ever worked

18  in a refinery?  Three?

19            And what's your number, sir?

10:28  20        A JUROR:  Fifteen.  Fifteen.

21         THE COURT:  Fifteen.

22           And Number 12, 9, 13, and 14.

23         A JUROR:  Thirty-three, too.

24         THE COURT:  I'm sorry.  Yeah, 32 and 33, I believe.

10:29  25        A JUROR:  Does that include chemical plants?

*Cheryll K. Barron, CSR, CM, FCRR*        *713.250.5585*

10:29   1              THE COURT:  Absolutely.

        2                   All right.  Well, refineries, do -- and I -- that

        3       would probably be my next, refineries, chemical plants.

        4                   What's your number, sir?

10:29   5              A JUROR:  Thirteen.

        6              THE COURT:  Thirteen?  And 14 and I saw two -- yeah, I

        7       got 14.

        8                   What's your number sir?

        9              A JUROR:  Twenty-seven.

10:29  10              THE COURT:  Twenty-seven?

       11              A JUROR:  Twenty-seven.

       12              THE COURT:  And?

       13              A JUROR:  Thirty.

       14              THE COURT:  Thirty.  Okay.  Quite a number of you.

10:29  15                   Oh, I'm sorry.  I did get 23 and 24, I think.

       16       Maybe I didn't.  Let me write that down, 23 and 24.  I guess I

       17       assumed that for some reason.

       18                   Have any of you ever been a -- have any of you

       19       ever been a -- what you consider to be a victim of some kind of

10:29  20       accident at a refinery or chemical plant or shipyard or

       21       wherever you might have worked in that area?

       22                   You were there, something happened, and you were

       23       either injured, made ill, or had some -- something to occur

       24       that is memorable to you in that respect?

10:30  25                   None of you?  All right.

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:30   1          A JUROR:  I have.

2          THE COURT:  Okay.  Number 9?

3          A JUROR:  Well, it was just a minor accident; but,

4    yeah, I had a problem with my hand.  There was no consequences

10:30   5    from it, just a cut; but it was an accident.

6          THE COURT:  All right.  And that was an accident in

7    the sense of your handling something or --

8          A JUROR:  Yes.  I was assembling a compressor.

9          THE COURT:  Okay.  And something happened?

10:30  10          A JUROR:  Right.  I --

11          THE COURT:  All right.  What about chemical releases?

12              Number 23, I'm sorry.

13          A JUROR:  Just I burnt my hand is basically it, had

14    first aid and --

10:30  15          THE COURT:  Okay.  What about a chemical release or an

16    explosion or something of that nature?  We need to know if you

17    were involved in any of that.

18              Number 30, you were?  Which was it?

19              Please stand.

10:30  20          A JUROR:  Well, I work in a chlorine production plant

21    where we have chlorine releases on occasion and, obviously,

22    exposures that go along with that.

23          THE COURT:  Sure.  Have you been treated for that in

24    the past?

10:31  25          A JUROR:  No, I have not.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:31   1          THE COURT:  And how long have you worked at that

2      plant?

3          A JUROR:  Twenty-five years.

4          THE COURT:  Twenty-five years.  Have you witnessed or

10:31   5      seen what others might claim to be injuries that they have

6      sustained as a result of any release?

7          A JUROR:  Numerous times.

8          THE COURT:  Yeah.  In other words, there are other

9      people who might have been someplace there and said they

10:31   10     experienced something; you might have been in the same place or

11     a different place and say you did not?

12         A JUROR:  Exactly.

13         THE COURT:  All right.  All right.  Thank you.

14             Number 14?

10:31   15         A JUROR:  I'm the same.  I work in a plant that has

16     had chemical releases.

17         THE COURT:  And were you exposed?

18         A JUROR:  No.

19         THE COURT:  But you have seen people who claim they

10:31   20     were, or not?

21         A JUROR:  No.  No.

22         THE COURT:  Okay.  All right.

23             And as far as those releases are concerned, what

24     I am trying to find out is whether or not anybody claimed to

10:32   25     have been injured or in any way made ill by the release.

10:32   1              A JUROR:  No.

        2              THE COURT:  Okay.  Thank you.

        3                 I saw another hand back there.  Number 15?

        4              A JUROR:  Yes.  I've been in releases and explosions,

10:32   5       and I also was -- I worked at Shell.  I was exposed to some --

        6       some release on some acid that -- but I was treated and

        7       released.  It wasn't nothing, any lawsuit or anything else, a

        8       sustained medical condition or anything like that.

        9              THE COURT:  And that occurred about when?

10:32  10              A JUROR:  Probably back around '85.

       11              THE COURT:  Okay.  And, so, there was nothing that

       12       carried over; and, even today, you would not --

       13              A JUROR:  No.

       14              THE COURT:  Okay.  Very good.  Thank you.

10:32  15                 Anyone else?

       16                 All right.  How many of you have worked with a

       17       lawyer before as a secretary, paralegal, associate lawyer?

       18                 Number 3, what did you do?

       19              A JUROR:  I worked for --

10:33  20              THE COURT:  Please stand.  I'm sorry.

       21              A JUROR:  I worked for the law firm for Exxon Mobil.

       22       I did --

       23              THE COURT:  Exxon Mobil has its own legal unit?

       24              A JUROR:  Right.

10:33  25              THE COURT:  So, this is in-house lawyers?

10:33    1              A JUROR:  Right.

         2              THE COURT:  Okay.  What did you do?

         3              A JUROR:  I prepared documents for patent --

         4              THE COURT:  Filings?

10:33    5              A JUROR:  Yes.

         6              THE COURT:  Okay.  And, so, did you have technical

         7      skills or were they simply fill in the blank?

         8                   And I don't want to make it seem light, but I

         9      want to know what your knowledge is.

10:33   10              A JUROR:  I don't have extensive knowledge, because I

        11      was only doing temp work there for two years at the law firm.

        12              THE COURT:  So, it was temporary work for two years?

        13              A JUROR:  Uh-huh.

        14              THE COURT:  Did you get involved in any of the

10:33   15      litigation where, for example, Exxon's patents or any other

        16      patents might have been the subject of the litigation?

        17              A JUROR:  I pulled the documents and stuff that they

        18      needed for it.

        19              THE COURT:  Okay.

10:34   20              A JUROR:  I typed some of the documents.

        21              THE COURT:  Okay.  Thank you very much.

        22                   Anyone else?

        23                   Number 32?

        24              A JUROR:  I worked for Gibson Dunn and Crutcher one

10:34   25      summer in Alaska following the Exxon Valdez spill.  Basically

10:34   1   just -- I was in college, just made copies of lots and lots of

2   documents around that.

3        THE COURT:  All right.  And you don't have any

4   particular expertise in the chemicals or what was done there;

10:34   5   you were mainly helping to put together, I guess, the

6   documentation and maintain it?

7        A JUROR:  Yeah.  My involvement or angle on that was

8   basically -- I was a college student, was looking to explore

9   whether I wanted to be a lawyer at that point in time.

10:34   10        My dad was COO of Alyeska Pipeline, which BP is a

11   part of; but he came up through Atlantic Richfield, which

12   subsequently has been bought by BP.  But my dad never worked

13   for BP.  He was always with Arco.

14        THE COURT:  Is he still there?

10:35   15        A JUROR:  No.  He's retired.

16        The only very indirect connection is that BP

17   probably, in some form or another, has stayed associated with

18   his retirement, because of him being an Arco employee.

19        THE COURT:  Sure.  They eventually bought the company.

10:35   20        Well, don't keep us in suspense.  What did you

21   decide?

22        A JUROR:  What did I decide about the -- the Alyeska

23   event?

24        THE COURT:  No, about becoming a lawyer.

10:35   25        A JUROR:  Oh.

10:35   1          THE COURT:  Alaska?  Man, I'm talking about being a

2      lawyer.

3                A JUROR:  Alaska is beautiful.  That would be my

4      number one thing.

10:35   5                No.  I moved into finance and banking.

6          THE COURT:  Okay.  Closer to the money than being a

7      lawyer, isn't it?

8                Okay.  Thank you very much.

9                Anyone else?

10:35  10                All right.  Oh, I'm sorry.  Yes, ma'am?

11     Number --

12          A JUROR:  Twenty-one.

13          THE COURT:  Twenty-one.  Okay.

14                I'll get these numbers right after awhile.

10:35  15          A JUROR:  I've done some reception work for an

16     attorney by the name of Bill de la Garza and Kenneth Kay.

17          THE COURT:  Any you didn't expand that into becoming a

18     paralegal, did you?

19          A JUROR:  No, sir.

10:36  20          THE COURT:  It was mainly --

21          A JUROR:  Just answering phones mostly.

22          THE COURT:  Okay.  Thank you very much.

23                Anyone else?

24                Number 23?

10:36  25                There's certain numbers that keep coming up.

10:36  1              Twenty-three, go ahead, sir.

2              A JUROR:  I also went up on the north slope during the

3    spill for --

4              THE COURT:  Did you?

10:36  5              A JUROR:  -- for BP --

6              THE COURT:  Okay.

7              A JUROR:  -- and did inspection work on the pipelines.

8              THE COURT:  Okay.  And how long were you there?

9              A JUROR:  Approximately three weeks.

10:36  10             THE COURT:  Okay.  And that was as a contractor, was

11   it not?

12             A JUROR:  Right, yeah.

13             THE COURT:  So, when that contract -- or when your

14   services were no longer needed, you either -- either enjoyed

10:36  15   the beauty of Alaska or you came back to the lower 48, as they

16   sometimes call it?

17             A JUROR:  Correct.

18             THE COURT:  Okay.  Anything about that experience that

19   would cause you any concern about your ability to be fair and

10:36  20   impartial?

21             A JUROR:  No, sir.

22             THE COURT:  And what I mean by that is your

23   relationship in that contract with BP.

24             A JUROR:  No, sir.

10:36  25             THE COURT:  Okay.  Thank you, sir.

10:36   1          A JUROR:  Your Honor, I have --

2          THE COURT:  Yes, sir.  I'm sorry, Number 1.

3          A JUROR:  When I lived in Alaska, BP hired our little

4   company to come in and provide flu shots --

10:37   5          THE COURT:  Oh, okay.  How about that?

6          A JUROR:  -- one time.  They normally had done it

7   in-house; but they couldn't get any, and I did.  So -- but it

8   was in their headquarters building in Anchorage.

9          THE COURT:  Okay.

10:37  10          A JUROR:  That was a long time ago, sir.

11          THE COURT:  So, what do you do now?

12          A JUROR:  I have my own little company here on the

13   island.

14          THE COURT:  Okay.  Good deal.  Not giving flu shots,

10:37  15   are you?

16          A JUROR:  No, sir.

17          THE COURT:  I know there was some concern about the

18   availability.  I was just curious about that.

19               Anything in your experience in that contract that

10:37  20   causes you any concern about your ability to be fair and

21   impartial to BP or to the plaintiff?

22          A JUROR:  No, sir.  It's all positive.

23          THE COURT:  Thank you.

24          A JUROR:  They paid their bill.

10:37  25          THE COURT:  All right.  Any other hands?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:38   1              You have a small business, you say, here on the
        2   island, Number 1?
        3              A JUROR:  Yes, sir, just started it.
        4              THE COURT:  What does it do?
10:38   5              A JUROR:  We install an interior window system for
        6   insulation and noise reduction.
        7              THE COURT:  Okay.  And is this owned by you and others
        8   or --
        9              A JUROR:  I'm the dealer for --
10:38  10              THE COURT:  You're the dealer -- okay -- for the
       11   manufacturer.
       12              A JUROR:  Yes, sir.  This is my territory here.
       13              THE COURT:  Okay.  Thank you.
       14              Anyone else on the first row in business for
10:38  15   themselves right now?
       16              One through 6?
       17              How about 7 through 12?
       18              Thirteen through 20 something?
       19              You're in business for yourself?  Number 15?
10:38  20              A JUROR:  Fifteen.
       21              THE COURT:  What business are you in?
       22              A JUROR:  I own an insulation company --
       23              THE COURT:  Okay.
       24              A JUROR:  -- that -- I work mostly on chill water
10:39  25   piping, and I have done some industrial insulation inside

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:39    1    refineries.

2            And I spent 30 years working in refineries all up

3    and down the Gulf Coast but never in BP.

4       THE COURT:  Okay.  Very good.  Thank you.

10:39    5            Any other persons own their own business?  I'll

6    just go for the whole block.

7            Yes, ma'am?

8       A JUROR:  Twenty-eight.

9       THE COURT:  Number --

10:39    10       A JUROR:  Twenty-eight.

11       THE COURT:  -- 28.  Yes, ma'am, what kind of business

12    are you in?

13       A JUROR:  I own a real estate company.

14       THE COURT:  Real estate?

10:39    15       A JUROR:  (Nodding head).

16       THE COURT:  All right.  You don't have any -- any

17    property that you're managing or handling for BP or any of its

18    affiliates, that you're aware of?

19       A JUROR:  No, sir.

10:39    20       THE COURT:  Okay.  Thank you.

21            Do any of you know or recall the event that the

22    plaintiffs claim occurred on April 19 at the BP plant in Texas

23    City?  Do any of you recall?

24            And I'm talking about now newspapers that you

10:40    25    might have read or -- or any other thing that triggers that

10:40  1   particular date in your mind.  Plaintiffs claim this event

2   occurred on April 19, 2007, at the BP plant in Texas City.

3               All right.  Let me ask Number -- what's your

4   number, sir?  Number 35, is it?

10:40  5               A JUROR:  Thirty-four?

6               THE COURT:  Thirty-four, would you please stand?

7               A JUROR:  Yes, sir.

8               THE COURT:  On the council, would you get reports from

9   various entities about anything of this nature, on the council?

10:40  10              A JUROR:  Normally not.  We do have an emergency alert

11   system --

12              THE COURT:  Right.

13              A JUROR:  -- but it's normally for security related

14   events.

10:40  15              THE COURT:  So, a breach of security would trigger

16   this alarm, such --

17              A JUROR:  Yes, sir.  Yes, sir.  If there was a bad,

18   let's say, release or something, they would also use that same

19   alert system and that's --

10:41  20              THE COURT:  Or an explosion, that might set it off, as

21   well?

22              A JUROR:  Yes, sir.  Yes, sir.  But I --

23              THE COURT:  Okay.  But that's not something that you

24   would necessarily take up in your meeting unless it was a

10:41  25   security issue?

10:41   1          A JUROR:  That's correct.

2          THE COURT:  Okay.  Thank you, sir.

3               How many of you, if any, have ever suffered an

4     injury by inhaling some chemical?  I just want to see a show of

10:41   5     hands.

6               You know, I remember an incident where I stuck my

7     nose in something in the chemistry lab in high school.  Any of

8     you ever do that?

9               You know, the teacher tells you, "Do not stick

10:41   10    your nose in that vial" or in that whatever.  And the first

11    thing you do when the teacher turns his back is you stick your

12    nose in the vial and you come up with something almost like a

13    chemical pneumonia if you're not careful, like a hydrogen

14    something or whatever.

10:42   15              You didn't have that experience.  What did you

16    stick your nose in?

17          A JUROR:  Chlorine.

18          THE COURT:  Chlorine.  Okay.  Chlorine.  Hydrochloric

19    acid will do that, won't it?

10:42   20          A JUROR:  And I dropped the vial, and they evacuated

21    the wing.

22          THE COURT:  Okay.

23          A JUROR:  And better --

24          THE COURT:  That's your experience?

10:42   25          A JUROR:  Yes.

10:42  1      THE COURT:  Let's see if anyone else has had a -- not

2  necessarily a lab experience in high school but any experience

3  where you had an inhalation of a chemical, like a hydrochloric

4  acid or something, that would -- or any other chemical, for

10:42  5  that matter, that might cause you some distress.

6            Number -- what's your number, sir?

7      A JUROR:  Fifteen.

8      THE COURT:  Number 15?

9      A JUROR:  Chlorine, benzene, phenol, different

10:42  10  exposure for --

11     THE COURT:  I would expect those who worked in a plant

12  probably have smelled something at some point or had some

13  experience at some point.  But I'm talking primarily about

14  something that's pretty strong, in your mind.

10:42  15            Number 15.

16            What was your number, sir?

17     A JUROR:  Fifteen.

18     THE COURT:  No.  I got you, 15.

19            But you're Number --

10:43  20     A JUROR:  Thirteen.

21     THE COURT:  Thirteen, Number 13.

22     A JUROR:  I got in some ammonia.

23     THE COURT:  Ammonia?

24     A JUROR:  Yes, sir.

10:43  25     THE COURT:  And I've had that experience with ammonia.

10:43  1   I'm trying to figure out how to keep the dogs and the opossums

2   out of my garbage.  I think I got worst of it.

3             What's your number, ma'am?

4             A JUROR:  Number 17.

10:43  5             THE COURT:  Number 17?

6             A JUROR:  One of our students at Queens Intermediate

7   brought -- his older brother left a -- something from the war

8   on the refrigerator.  He brought it to school and released

9   the -- I don't know what it was.  I can't remember what it was

10:43  10  called.  It was a few years back.  So, I had that chemical

11  experience.  We just had to evacuate the school, and all the

12  kids had to be treated and --

13            THE COURT:  All right.  All right.  Thank you.

14            I saw a hand or two over on this side.  I think

10:43  15  Number -- please stand.

16            A JUROR:  Twenty-one.

17            THE COURT:  Twenty-one?

18            A JUROR:  Is asbestos a --

19            THE COURT:  I don't think -- I don't know.  I don't

10:43  20  know how you would -- I think asbestos is more of -- it

21  certainly can be airborne, but I don't know that you have a

22  chemical reaction.

23            A JUROR:  Well, they were replacing the ceiling at the

24  courthouse, on the fourth floor; and it was dropping on our

10:44  25  heads.  And the district clerk called OSHA; and they shut us

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:44   1   down within two hours, made us go home.

2           THE COURT:  All right.  But that's the kind of

3   experience you had?

4           A JUROR:  Yes.

10:44   5           THE COURT:  Number 23?

6           A JUROR:  Phosgene.  Phosgene.

7           THE COURT:  Was that the chemical?

8           A JUROR:  Right, that's the chemical.

9           THE COURT:  Was there any reaction to it?

10:44  10           A JUROR:  Just -- yeah, burning sensation of the nose,

11   I mean --

12           THE COURT:  All right.  Thank you, sir.

13               Oh, I'm sorry.  Yes, Number 20?

14           A JUROR:  Twenty.  Teargas in the marine corps, it was

10:44  15   part of our training.

16           THE COURT:  Boy, you sure are waking up a lot of

17   memories.  So, they made you take your gas mask off, too?

18           A JUROR:  Oh, yes, sir.

19           THE COURT:  I suspect that happened to everybody in

10:44  20   the military; so, I'm not going to ask that question.

21               Beyond those, have any of you suffered any

22   injuries that you now are being treated for?

23               All right.  Thank you.

24               Have any of you had any bad experience -- and I'm

10:45  25   just opening up the whole universe of thinking here -- had any

10:45  1    bad experience that you attribute to BP?

     2             All right.  How about any other oil company, a

     3    bad experience that you attribute to any oil company, that

     4    you're aware of?  Other than the price of gas, of course, the

10:45  5    up and down of gas prices.

     6             How many of you are members of the -- currently

     7    or past members of a labor union?  And I'm asking for a

     8    particular reason, because I want to know whether or not you've

     9    lobbied for, had sought legislation, negotiated a contract that

10:46 10    might impact employees in a certain way, union employees and

    11    non union employees for that matter.

    12             Number 10?

    13        A JUROR:  Well, the -- it's a public employees union.

    14        THE COURT:  SCIU or something like that, Service

10:46 15    Employees or one of the other?

    16        A JUROR:  One of those.  I don't remember the name.

    17        THE COURT:  What did you do?

    18        A JUROR:  Nothing.  Nothing.  I'm just a member; so, I

    19    get information.  And they lobby on our behalf with the

10:46 20    legislation.

    21        THE COURT:  Okay.  Very good.

    22             I saw a hand in back.

    23        A JUROR:  Twenty-seven.

    24        THE COURT:  Twenty-seven?

10:46 25        A JUROR:  You want union members or just --

10:46   1          THE COURT:  If you are a union member or was a union

        2    member.

        3          A JUROR:  Still am.

        4          THE COURT:  You were and still are?

10:46   5          A JUROR:  (Nodding head).

        6          THE COURT:  Do you participate in any of the lobbying

        7    legislation or negotiations?

        8          A JUROR:  No, sir.

        9          THE COURT:  Okay.  Thank you, sir.

10:46  10          By that, I guess I should expand it to dealing in

       11    regulations.  Do you have anything to do with regulations at

       12    the company?

       13          A JUROR:  No, sir.

       14          THE COURT:  All right.  Same with you, Number 10?

10:46  15          A JUROR:  Regulations?

       16          THE COURT:  Oh, I don't know.  I guess I'm thinking

       17    more of a refinery, but you are not in that area.

       18          A JUROR:  No.  We regulate child care.

       19          THE COURT:  Okay.  Let's leave that for a minute,

10:47  20    then, because that would not necessarily be relevant.

       21          How many, if any, of you have ever worked for a

       22    regulatory agency, other than Number 10, and particularly where

       23    you would be regulating industry or something that that

       24    industry might be doing?  Any of you done that?

10:47  25          I take it from your silence you have not.

10:47    1          How many of you have been plaintiffs in a

2   lawsuit?  Let's see a show of hands if you filed a lawsuit for

3   some reason.

4          Your neighbor keeps cutting your yard and he cuts

10:47    5   it too close and he keeps -- and he won't cut a straight line,

6   whatever the situation is, I want to know if you've been

7   involved in some litigation.

8          Number 10?

9       A JUROR:  In a personal capacity, not in a --

10:48   10       THE COURT:  Please stand.  You project better, and I

11   can hear.  I have --

12       A JUROR:  In a personal --

13       THE COURT:  I spent six years in a tank in the

14   military --

10:48   15       A JUROR:  I'm sorry.

16       THE COURT:  -- and sometimes I don't hear well.  So, I

17   apologize for that.

18          But go ahead.

19       A JUROR:  Well, in a personal capacity, only in a

10:48   20   divorce, uncontested divorce.

21       THE COURT:  Okay.  Yeah, I understand that.

22          I saw another hand.  Number -- yes, ma'am, please

23   stand, Number 17.

24       A JUROR:  I was involved in a car accident where I had

10:48   25   to -- I sued the other person's insurance company in order to

10:48   1   pay my medical bills.

2           THE COURT:  Did you settle it?

3           A JUROR:  It settled.

4           THE COURT:  Did you go to trial?  How did it turn out?

10:48   5   A JUROR:  It was settled out of court.

6           THE COURT:  All right.  Did you hire a lawyer?

7           A JUROR:  Yes, I did.

8           THE COURT:  Thank you very much.

9           How many of you have been a defendant -- oh, I'm

10:48   10  sorry.

11          A JUROR:  I don't know how relevant it is.

12          THE COURT:  Number 32?

13          A JUROR:  Yeah.  Back, trying to get a payment from a

14  fellow student that hit my car, had to, you know, file in small

10:48   15  claims court.  Never went to trial, finally paid me.

16          THE COURT:  Well, here's what I am getting at.  You

17  had that experience as a plaintiff.  That's what I am concerned

18  about.

19          I shouldn't say "concerned."  That's what I'm

10:49   20  getting at.  You had that experience as a plaintiff.

21          I also want to know if any of you have had an

22  experience as a defendant, you've been sued.  All right?

23          Let's stand and deliver.

24          Tell me what -- tell me how you got sued.

10:49   25  A JUROR:  It didn't go to court.  It got dropped.

10:49   1          THE COURT:  It's the real estate business?

2          A JUROR:  Correct.

3          THE COURT:  That sometimes occurs, where people think

4   that their contracts have been --

10:49   5          A JUROR:  It was another broker wanting a commission

6   for something.  So, when my attorney responded, he dropped the

7   case.

8          THE COURT:  Oh, okay.  And you did hire an attorney,

9   and you've been a defendant.

10:49   10          Now, anyone else?

11          Okay.  Please have a seat.

12          Number 9?

13          A JUROR:  Sir, my -- well, I don't know if I was sued.

14   My son was in a wreck; and, of course, I had the insurance.  He

10:49   15   had to go to court.  I didn't but --

16          THE COURT:  You didn't hire an attorney?

17          A JUROR:  Well, it was insurance company's attorney

18   that was representing him.

19          THE COURT:  All right.

10:50   20          Number 10?

21          A JUROR:  Yes.  I was sued in small claims court by a

22   woman who ran into me.  And she was on a Moped, and she ran

23   into my car.

24          THE COURT:  All right.  Did you hire a lawyer, or did

10:50   25   you act as your own?

10:50   1            A JUROR:  The insurance company represented me.

2            THE COURT:  Okay.

3                 Number 33?

4            A JUROR:  Last year, before the Thanksgiving Day last

10:50   5   year --

6            THE COURT:  Okay.

7            A JUROR:  -- I go to the parking lot for going to

8   lunch.  That time there was one small maybe 3 inch length of

9   pipe under the wheel, above the ground.  I hit in the pipe, and

10:50   10  I fell and this -- all this area is broken.

11           THE COURT:  You tripped over a pipe --

12           A JUROR:  Yeah, had three teeth come out.

13           THE COURT:  -- and lost your top teeth?

14           A JUROR:  Immediately, the secretary of the department

10:50   15  called the ambulance.  They take me to Hermann Memorial.  They

16  didn't do anything.  They only that -- they fix it back.  They

17  didn't do anything.  After that, I start having too much pain.

18           Then one week after, I got another appointment in

19  another hospital.  Then I going and personally I pay the money,

10:51   20  everything.

21           The immediate -- that emergency room department,

22  they charge more than $5,000.  My personal insurance, they paid

23  3,000.  Now, again and again they are sending the bill.  Now I

24  am suffering for that paying the payment.

10:51   25           THE COURT:  So, are you being sued?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:51   1          A JUROR:  Company not pay.  Actually, company that

2    day, our safety man, a safety inspector, he didn't make the

3    accident report or anything.

4          THE COURT:  Did you get sued?  Or did you sue them?

10:51   5          A JUROR:  No.  I didn't pay the ambulance bill.  I

6    paid the remaining balance.

7          THE COURT:  I heard that part.  I'm just trying to

8    figure out if you got sued.  Did you get sued by the people for

9    the balance of the money?

10:51   10          A JUROR:  No.  They didn't pay.

11          THE COURT:  Did you sue the company where you tripped

12    over the pipe?

13          A JUROR:  No.

14          THE COURT:  Okay.  But you had this -- this is a claim

10:52   15    that you're talking about your experience?

16          A JUROR:  Yes.

17          THE COURT:  Okay.  Very good.  Thank you, sir.

18                Number -- let's go --

19          A JUROR:  Twenty-one.

10:52   20          THE COURT:  Twenty-one.

21          A JUROR:  I forgot I was involved in a class action

22    lawsuit against State Farm.

23          THE COURT:  And that was when?

24          A JUROR:  I was in a car accident, and they didn't

10:52   25    pay --

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

10:52   1            THE COURT:  How long ago was that?

        2            A JUROR:  1994.

        3            THE COURT:  Okay.  And this was kind of a rebate of

        4       premium or something?

10:52   5            A JUROR:  Yes.  If you got in a wreck with an at-fault

        6       driver and they only had liability, my hundred thousand dollars

        7       should have kicked in.  And State Farm did not give me that

        8       money, and a class action lawsuit was started a few years

        9       later.

10:52  10            THE COURT:  And you participated in that?

       11            A JUROR:  Yes, sir.  I had to go to Dallas before some

       12       judges, and I was awarded some more money.

       13            THE COURT:  Okay.  Very good.  Thank you.

       14              Number 7?

10:52  15            A JUROR:  I was involved in a hit and run about a year

       16       and a half ago, and it's now going through the courts right

       17       now.

       18            THE COURT:  Okay.

       19            A JUROR:  As far as I know, the attorney's told me

10:53  20       that he doesn't need me to be a witness.  They're trying to

       21       settle it.

       22            THE COURT:  Okay.  You -- have you -- have your claims

       23       or if there were any injuries or damages, has all that been

       24       resolved?

10:53  25            A JUROR:  Yes.

                    *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:53   1          THE COURT:  So, the hit and run part had to do with

2      making sure that the person who did it is held responsible?

3          A JUROR:  Exactly.

4          THE COURT:  And you're not -- you won't be needed in

10:53   5      that except as a witness maybe?

6          A JUROR:  Maybe.

7          THE COURT:  All right.  Anything about that experience

8      that causes you any concern about your ability to be fair and

9      impartial here?

10:53   10         A JUROR:  No.

11         THE COURT:  Okay.  Thank you very much.

12             Let's see.  No other hands?

13             You-all have a way of sticking your hand up right

14     after I drop my head to look for the next question.  I don't

10:53   15     know if you-all are testing me or not.

16             All right.  Let's see.  I'm just about close to

17     the end of my questions.  And we might have some other

18     questions to ask you, but I'm probably going to need to take a

19     break.  How many of you have a degree in chemistry, biology, or

10:54   20     environmental science?  Let's see a show of hands.

21             What's your degree in, sir, Number 30?

22         A JUROR:  Associate's degree in chemistry.

23         THE COURT:  Okay.  Anyone else?

24             All right.  Do you have any familiarity --

10:54   25     Associate's degree in chemistry, do you handle any chemicals

10:54   1    other than -- we're away from the classroom now.  Do you handle
        2    chemicals on a daily or weekly basis?
        3              A JUROR:  Only in the fact that I'm in a plant that
        4    produces them.  I don't handle --
10:54   5              THE COURT:  Are you familiar with hydrogen sulfide?
        6              A JUROR:  Yes.
        7              THE COURT:  Do you-all produce that or make that in
        8    the making of other chemicals?
        9              A JUROR:  Not in my plants.
10:54  10              THE COURT:  How are you familiar with it?
       11              A JUROR:  Just from chemistry and previous lab work.
       12              THE COURT:  All right.  Thank you, sir.
       13              Anyone else?  Anyone have any experience handling
       14    or working with hydrogen sulfide?
10:55  15              All right.  Is that clock right up there?
       16              MR. BUZBEE:  It's an hour off.
       17              MR. GALBRAITH:  I don't think it's been updated.
       18              A JUROR:  It's not.
       19              THE COURT:  It's not quite noon?  It's 11:00 o'clock,
10:55  20    close to 11:00.
       21              A JUROR:  It's almost 11:00.
       22              THE COURT:  Okay.  Good shot.  Good thing.
       23              All right.  I tell you what.  Let's take about a
       24    15 minute break, give you a chance to stretch your legs.
10:55  25              Please, lawyers, keep your seats for the time

10:55  1    being, keep your seats.

2               The lawyers are more anxious than I am.  I want

3    you-all to be out of here before they get out of here.  Let's

4    take about a 15 minute break.  Let's make it 11:00 -- well,

10:55  5    that clock is past 12:00.  Let's make it 12:15.  That's about

6    20 minutes, give everybody a chance to kind of walk and stretch

7    and take advantage of any facilities we have on the floor.

8               And when you're done, come back here and take a

9    seat.  That means I don't want to have to look for you, right?

10:56  10   You're not being excused.  Come back here; otherwise, I'll have

11   to come looking for you.

12               Thank you very much.  Go ahead and take that

13   break.

14   *(Recess was taken from 10:56 to 11:23 a.m.)*

11:23  15   *(Jury present)*

16        THE COURT:  All right.  Please be seated.

17               All right, ladies and gentlemen.  We have a

18   few -- I have a few other questions I need to go through,

19   discuss with you.

11:24  20               Let me ask, do you have any questions of me

21   before I go further?  Any questions you need to ask of me?

22               You don't know any questions to ask of me yet?

23               Okay.  Well, let me just say this.  If you think

24   somehow you're going to escape being on this panel, you should

11:24  25   rethink that.  You should.  Because generally what happens is

*Cheryll K. Barron, CSR, CM, FCRR*                     *713.250.5585*

11:24  1   people get selected and the first thing that happens is they

2   sit in the box and they say, "You know what?  I thought I

3   was -- I really didn't think I was going to get picked.  Judge,

4   let me tell you, I have two tickets to Las Vegas Thursday."

11:24  5       And then I'm going to say, "Give them to me,"

6   because now you've permitted yourself to get selected.  Not

7   that you wouldn't have been selected, in the first place; but

8   you've permitted yourself to get selected in a situation where

9   you thought you could avoid being selected just by keeping your

11:25  10  mouth shut.  That never gets you out of anything.

11      And I say, "It never gets you out of anything."

12  I don't mean you're getting into something here.  This is going

13  to be a wonderful experience.  I'm looking forward to it.

14      So, how many of you, by raising your hand, are

11:25  15  anticipating, just can't wait to get on this panel?  Let me see

16  a show of hands.

17      All right.  Well, I'll tell you this.  You will

18  be selected and you will serve on this panel.  Not because I'm

19  saying so, but what I am saying is if you have something you

11:25  20  need to ask me or something you need to bring to my attention,

21  this is the time to do it.  Because, otherwise, I have no basis

22  upon which to speak with the lawyers about whether there is a

23  basis for you to be excused.  I have no basis to believe or

24  know you, for example, have surgery or somebody in your family

11:25  25  has surgery scheduled for tomorrow morning.  I have no way of

11:25  1    knowing it.  I can't read your minds.

2              And, so, that's -- this is critical and important

3    and the case itself and every case, including any case that you

4    might have been involved in, is so important.  The process of

11:26  5    truth finding begins with you.  Doesn't sound right, does it?

6    But that's right.

7              If you can't be honest and forthright and get on

8    the panel and do your job, how do you expect the witnesses to

9    be honest and truthful?

11:26  10            You can't.  Because you take essentially the same

11   oath that they take.  Your oath is to be true to the evidence

12   that is presented.  Their oath is to give you truthful

13   evidence.  So, it works together.  And that's the mystery that

14   none of us have ever been able to figure out, and we don't want

11:26  15   to.

16            But it is a great way to appreciate the justice

17   system; that is, all of these steps are dependent and they lead

18   to the next step.  When we start with you, we start with the

19   fact finding.  Actually, starting with me.  I've taken an oath,

11:26  20   and my job is to make sure I do what I'm supposed to do in the

21   correct way.

22            We select another set of judges, and those judges

23   ought to do their job.  And then the witnesses come in, and

24   they're to speak the truth as they understand it.  Now,

11:27  25   sometimes people speak things, we say, "That's not true"; and

11:27   1   it may not be true or it may be the way they understand it or

2   have seen it.  Two people can look at the same thing and see

3   things differently.  And their disagreement doesn't mean that

4   either of them is intentionally misleading you, but it does

11:27   5   mean that you have to be a discerning person.

6                And I guarantee you, you are discerning if you

7   raise children.  Because you know when you're getting to the

8   bottom of something when your children come to you and make

9   statements -- and even other relatives and friends.  And, so,

11:27   10  we know how to discern truth.  And we can look people in the

11  eyes, we can look them over, we can listen to what they say and

12  how they say it, and we can tell when people are being straight

13  with us.  That's your job.

14                It's not a hard job, but it is a job that

11:27   15  requires patience.  And most of all it requires paying

16  attention.  So, your attention is more important than anything

17  else in this case.  The things we tell our children -- that is,

18  sit up, pay attention -- that's what I will be saying to you

19  throughout this case.  And you watch me and I'll watch you and

11:28   20  we'll all watch the witnesses and that's how we'll get through

21  this trial.

22                So, you don't have any questions?  Okay.  Good

23  thing.

24                Let's talk about something that sometimes seems

11:28   25  to be difficult for us in civil cases, difficult because we

11:28  1  don't all understand it, difficult because until we have a

2  situation that's personal to us we don't think about it too

3  much.  We generally have a knee-jerk reaction to certain

4  things.  And that's damages.

11:28  5  The plaintiffs in this case are not here to get

6  tickets to a game or earn some kind of a prize.  They're here

7  because they claim they've been injured and they're claiming

8  that they're entitled to damages.

9  Now, here's the point.  If the plaintiffs prevail

11:28  10  in their case, you are obligated to consider what an

11  appropriate amount of damages are.  You don't have an option if

12  they prevail.  If you find the plaintiffs have prevailed, you

13  have the duty to go to the next section and say what damages,

14  if any, are appropriate in this case.

11:29  15  And they can't be based on how you feel.  They

16  have to be based on the evidence.  They have to be based upon

17  the evidence.  So, when you consider the evidence, not that

18  you're going to figure out at the end, "Well, I don't want the

19  plaintiffs to win.  Therefore, I won't find that there was any

11:29  20  fault or any liability."  That's not the way to do it.

21  You make sure you follow the instructions of the

22  Court; that is, you answer the questions that are presented to

23  you, in the order that they are presented; and you follow those

24  instructions as you go through.  It's important to follow the

11:29  25  instructions that the Court gives you.

11:29  1      Isn't that true, Number 19?

  2    A JUROR:  Yes, sir.

  3    THE COURT:  All right.  Because instructions mean that

  4 we continue in a progressive way to get to where we're trying

11:29  5 to go.  We're on a journey, and the journey is to get to the

  6 end of the case and make a resolution of a problem that exists

  7 between plaintiffs and defendants.  Not to become a part of the

  8 problem but to resolve the problem.  So, that's the push back

  9 you and I have to do.  We push back from the plaintiffs, we

11:30  10 push back from the defendants, and we make a determination as

  11 to where the facts are, where the truth lies as best we can

  12 discern it from the evidence that is being presented.

  13    So, when it comes to damages, we shouldn't be

  14 concerned about what the plaintiffs ask for or what the

11:30  15 defendants say they should not receive or whether the

  16 defendants say they shouldn't have any damages at all.  We

  17 should be concerned about the evidence, and the evidence should

  18 lead us on a path to a conclusion.

  19    Whether that's favorable to the plaintiffs or to

11:30  20 the defendants is really not our concern right now.  Because

  21 when you finish this case you should be able to walk away and

  22 say, "I didn't do anything for the plaintiffs.  I didn't do

  23 anything for the defendants.  I did something for the proper

  24 and just administration of justice."  And if the plaintiffs

11:30  25 prevail, sobeit; and if the defendants prevail, sobeit.

11:31   1          That's what I have -- that's what I do as a

2    judge.  I try to make sure that I don't get so close to the

3    problem that I become the problem.  Now, having said that,

4    here's the question regarding damages.

11:31   5          The law permits the plaintiff not only to ask for

6    but, if proven, to receive damages for what we call "actual

7    damages."

8          Now, "actual damages," in most of our language

9    and understanding, might certainly seem to be, "Well, how

11:31   10   much -- what was the doctor bill, what was the this or what" --

11   the specific items that we can put our hands on.  They're

12   tangible.  We can identify a piece of paper and say, "These are

13   actual damages."  That's what the plaintiff is entitled to.

14         But the plaintiff is entitled for you to consider

11:31   15   more than what you see.  The plaintiff is entitled for you to

16   consider the whole panorama of damages that the law permits,

17   whether it be mental anguish, whether it be punitive damages,

18   whether it be these other kinds of compensatory damages that

19   are sometimes difficult to determine.

11:32   20         Just because it's difficult doesn't mean you

21   shouldn't do it.  Just because it's difficult doesn't mean the

22   plaintiff is not entitled to damages.  And the fact that it's

23   easy doesn't mean the plaintiff is entitled to damages either.

24         What I am suggesting to you is that it's

11:32   25   important that you, as you consider the question -- assuming

11:32  1    that you get to it, as you consider the question of damages,

2    you have to be open to the rule of law that says all of the

3    above elements may be considered in determining what damages

4    ought to be.

11:32  5          Now, I know -- and I'm giving you this little

6    speech because I know that some of you have already answered

7    questions in certain respects.  For example, you might say, "I

8    don't believe in punitive damages."  Well, it's been believed

9    in for over 2,500 years.  Five hundred years before the turn

11:33  10   the century, punitive damages existed.  You kill my cow

11   intentionally, you gore my ox intentionally, you might have to

12   give me two oxes.

13          Not because I'm entitled to two oxes.  Because

14   your conduct is such that you should not be able to do what you

11:33  15   did and simply replace what you destroyed.  That's the rule of

16   law.  That's the law that we adopted, you know, 200 years ago,

17   that we brought in from England and England brought in from

18   some time eternity past, it seems.

19          So, we're not talking about something that's been

11:33  20   invented.  We're not talking about damages that somebody made

21   up.  We're talking about what the law permits.  And that's your

22   job, to determine whether or not the plaintiff, first, is

23   entitled to recover and then, second, to determine whether or

24   not and what damages, if any, should be paid.  And those are

11:33  25   the steps.

11:33 1      You don't go to the damages before you decide

2    that the plaintiff is entitled to recover.  You determine

3    things in order.  Just like brain surgery, auto mechanics, and

4    other kinds of disciplines that we recognize and respect.  The

11:34 5    law has its own discipline, and we must be bound by it.

6      Now, having said that, I know that some of you

7    have answered questions in such a way that might lead me to

8    believe that you cannot or will not -- not "cannot."  "Cannot"

9    sounds as though you just -- even if I bent your hand, you

11:34 10   wouldn't do it.  That's not the kind of "cannot" that I'm

11   talking about.

12     The "cannot" that I'm talking about is that you

13   believe or don't believe that certain damages ought to be

14   awarded.  Sobeit.  Nothing wrong with that belief.  Some years

11:34 15   ago, when the speed limit was 70 miles per hour, I believed in

16   that.  Then they changed it.  I had to change my belief.  No, I

17   didn't.  I changed my conduct.  That's what I am talking about.

18   See, I don't speed 70 miles per hour.  Not because I can't, and

19   I don't do it because I want to.  I don't do it because there

11:35 20   is something that tells me that I shouldn't do it; and that is

21   the rule has changed.

22     Now, that's all we're talking about here when we

23   talk about damages.  That's all we're talking about when we're

24   talking about finding for or against the plaintiff.  We're

11:35 25   talking about the rule.  And once we understand that the rule

11:35    1    of law controls what our personal beliefs are, what our

2    personal, political, or social beliefs are, whatever our

3    cultural beliefs are, those things are pushed aside so that we

4    can keep the rule of law in place.

11:35    5         If you recall my comments at the beginning, we

6    have to have a rule of law; otherwise, we don't have a rule of

7    law, we have rules of men.  And men cannot rule without a rule

8    of law.  That's where we are.

9         So, having said that, there's some specific

11:35   10    questions we might have asked -- might ask of some of you.  But

11    let me just ask -- I know that some of you have already made a

12    statement.  But let me ask, of those who don't believe or have

13    such a strong belief that, for example, mental anguish or

14    punitive damages can never be awarded, let me see a show of

11:36   15    hands, they should never be awarded.

16         Okay.  Number 25, I think it is.

17         All right.  Anyone else?  Number 1?

18         All right.  Anyone else?

19         And I'm talking about never be awarded, there are

11:36   20    no circumstances under which they should be awarded.  Okay?

21         I'm sorry.  Number 1, you change your mind a

22    little bit?

23         A JUROR:  "Never" is --

24         THE COURT:  I don't mean changed your mind, but --

11:36   25         A JUROR:  "Never" is an absolute.  Seldom -- no, sir.

11:36   1    There would be some instances where I would consider that they

2    might be appropriate.

3             THE COURT:  Well, and whether or not they would be

4    appropriate would depend upon the situation, wouldn't it?

11:37   5             A JUROR:  Yes, sir, it sure would.

6             THE COURT:  Thank you.

7                  Number 25, absolutely?

8             A JUROR:  Absolutely.

9             THE COURT:  You're fixed?

11:37  10             A JUROR:  (Nodding head).

11             THE COURT:  Okay.  I don't want to change your mind.

12    And by that I mean if I have to persuade you that you need to

13    do something because the law requires it then you shouldn't be

14    on the panel.  That's the point.  Because you have to be open

11:37  15    to the rule of law in order to qualify as a juror.  You have to

16    be open to all of the law as instructed by the Court in order

17    to be -- in order to be a juror.

18                  Otherwise, you're not serving as a juror.  You're

19    going to get on the panel and you're going to twist and

11:37  20    persuade or attempt to persuade someone else that your point of

21    view is correct, and then you become more than a judge.  You

22    become the arbiter of all events.

23                  All right.  Any questions from any of you?

24                  Let me ask the lawyers to approach the bench,

11:38  25    please.

11:38   1      *(At the bench with all counsel)*

2              THE COURT:  Let's see.  One of you stand there so they

3      can't read my lips.  In Houston they've got people in the

4      courtroom that can read your lips, and you have to be very

11:38   5      careful what you say or how you say it.

6              Now, let me say this, gentlemen.  I did not ask

7      those questions to try to figure out how to overcome anybody's

8      answers.  I said it -- I did what I did to try to figure out

9      and make sure I could clear up maybe some misconceptions or

11:38   10     misunderstandings.

11             We'll go through these numbers perhaps -- us,

12     we'll go through those numbers and figure out whether or not we

13     should disqualify any or all of the names that you've given,

14     any or all of the names that you, the defendant, has given.

11:39   15     And then if we have some concerns about any of the rulings, we

16     can perhaps bring some people in individually and talk with

17     them.

18             Now, what I need to know -- and I think you're

19     pushing something at me.

11:39   20             MR. BUZBEE:  I wasn't -- well, yes, sir.  I didn't

21     know if you had that and you just chose -- you didn't want to

22     do it.  But that's something you told us I could file, and I

23     did.

24             THE COURT:  Yeah, you did.  But I don't ask certain

11:39   25     questions.  Let me see what these are.

11:39    1                    MR. BUZBEE:  Okay.  All right.

         2                    THE COURT:  How many --

         3                    MR. BUZBEE:  Two.

         4                    THE COURT:  -- how many people -- how many angels can

11:39    5      stand on a pin head?

         6                    MR. BUZBEE:  Well, you know how I am, your Honor.

         7                    THE COURT:  The question is, "How many of you believe

         8      that when you work at a plant you should just expect to be

         9      exposed to chemicals and should not sue for it?"  That's a

11:39   10      stiff question.

        11                    Second question, "How many of you fear that if BP

        12      is sued too much it will close down and jobs and tax revenues

        13      would be lost?"

        14                    We don't have any employees here.  Let me think

11:40   15      about that.

        16                    MR. BUZBEE:  Yes, sir.

        17                    THE COURT:  Do you have any questions?

        18                    MR. GALBRAITH:  I think those questions are

        19      argumentative.  For example, the second one, I don't know that

11:40   20      anybody could say "no" to that.  If somebody is sued too much,

        21      would it jeopardize their business?  The obvious answer is

        22      "yes," to anybody.  I don't think they're honest inquiries into

        23      attitudes.  I think they're argumentative.

        24                    But I do want to know just what is the judge's

11:40   25      feeling now about certain jurors, because we've got certain

11:40  1    things either clarified or established.  For example, what is

2    your thought about the people who answered your questions,

3    indicating that they had medical situations of significance?

4    And there weren't a whole bunch of them.

11:41  5         THE COURT:  No.  I think there would be one or two

6    hardships.

7         MR. GALBRAITH:  It was 3, 7, 19, and 33 that indicated

8    they had either a major medical problems -- 3 had a surgery; 33

9    had a surgery; 19 had the carotid scan and the MRI later this

11:41  10   week, Thursday, I believe; and then 7 had the doctor's letter

11   saying she can't sit and she has lumbar problems.  She also is

12   the one who is the single parent who does not have alternative

13   arrangements.

14        THE COURT:  That's Number 7?

11:41  15        MR. GALBRAITH:  Yes.

16        THE COURT:  No.  I intend to deal with those.

17        MR. GALBRAITH:  Can we do that now?

18        THE COURT:  No.  What I want to do is to make sure I

19   get your minds ready to deal with what I would call strikes for

11:41  20   cause, what you believe to be strikes for cause.

21             When you've given me those numbers that you think

22   should be struck for cause, if I agree with you, then I'll

23   strike them.  If I disagree with you, we might have to discuss

24   some of those.

11:42  25        MR. BUZBEE:  Okay.

11:42   1          THE COURT:  Once I make that determination, then I

2    will move next to the numbers that deal with -- that we deal

3    with as far as hardships are concerned.

4          MR. GALBRAITH:  Okay.

11:42   5          THE COURT:  Just to comfort your mind a little bit,

6    there's no way we're going to let Number 7 on this panel, if

7    that's what you're concerned about.  We don't want her to have

8    a nervous breakdown.

9          MR. BUZBEE:  Number 8.  She's Number 8.  The one that

11:42  10    was crying is Number 8.

11          THE COURT:  Oh, is she Number 8?  Okay.

12          MR. GALBRAITH:  Yeah.

13          THE COURT:  Okay.  That's right.

14          MR. GALBRAITH:  Seven and eight are --

11:42  15          MR. BUZBEE:  Nobody wants her on the panel.

16          THE COURT:  Well, I thought Number 7, but I'll look at

17    Number 7 again.  But whatever her number is, the one that seems

18    to have a serious concern about her child and her work

19    environment.

11:42  20          MR. GALBRAITH:  That is 7, the one with the child and

21    the lumbar excuse.

22              Eight was the one who was the breadwinner and her

23    bosses said they weren't going to pay her, at The Frog.

24          MR. BUZBEE:  She was crying and --

11:42  25          THE COURT:  Okay.  Well, Number 8, then, I'll change

11:42  1   my -- Number 8, for sure Number 8 is not going to be on the

2   panel.  So --

3          MR. BUZBEE:  Outside of the questionnaire, which I

4   guess we'll bring up, but just based on your questions, I would

11:43  5   move to strike for cause Number 25 --

6          THE COURT:  Hold on just a minute.  Let me write those

7   numbers down so that I can -- I'll just write them down, first.

8              Number 25?

9          MR. BUZBEE:  Number 25 on the basis of -- even after,

11:43  10  I thought, a really appropriate lecture on what the law

11  requires, Number 25 still said, "Under no circumstances."

12         THE COURT:  Okay.

13         MR. BUZBEE:  And then I would strike for cause

14  Number 18.  If we need to question her, do so.  But she is the

11:43  15  one that works with document retention at BP and she clearly

16  has some affinity Ms. Clark or whatever her name is.

17             What else based on questions?

18             And those are just based on your questions.  And,

19  frankly, I would -- because I don't think you can rehabilitate

11:43  20  a juror, I think, based on questions, the previous numbers I've

21  set forward all should be stricken for cause, in my view.  But

22  we can talk about those individuals if you choose.

23         THE COURT:  Okay.  Did you have any particular ones

24  that you want to strike for cause?

11:44  25         MR. GALBRAITH:  Yes, your Honor.  The ones who

11:44  1  indicated as a result of their experiences prior to this trial

2  that they have arrived at strong personal convictions that, in

3  their mind, cause them to conclude that they could not be fair

4  to BP are Panel Members Number 4, 7, 19, and 33.

11:44  5  THE COURT:  So, 4, 7, 19, and 33.  Are you familiar

6  with those numbers?

7  MR. BUZBEE:  Yes, sir.

8  THE COURT:  And what number are you referring to,

9  Mr. Galbraith?

11:44  10  MR. GALBRAITH:  Question 46.  For example,

11  Number 19 --

12  THE COURT:  Here's Number 4.  Let's look at that one.

13  MR. GALBRAITH:  Okay.

14  THE COURT:  Number 46, "Is there anything about what

11:44  15  you've read" -- let's see -- "believe that you could not be

16  fair to BP?"

17  And they say, "Yes," and they say, "TV."

18  Okay.  That's the type of question you're talking

19  about?

11:45  20  MR. GALBRAITH:  Yes, your Honor.  Number -- well, the

21  point is, as we've talked about before, BP has been the subject

22  of quite a bit of publicity and --

23  THE COURT:  Sure.  Sure.  No, I'm not questioning

24  anything that you've said at this point.  I'm just simply

11:45  25  trying to get a sense of what you understand those -- the basis

11:45  1    for the cause to be.

2                MR. GALBRAITH:  Right.

3                THE COURT:  So, right now, except for your general

4    "for cause" claims you have made, specifically the plaintiff

11:45  5    would claim 25 and 18 and the defendant would claim 4, 7, 19

6    and 33.

7                MR. BUZBEE:  Right.

8                But he's basing his not on your oral voir dire

9    but on the questionnaire.

11:45  10               THE COURT:  Certainly.

11               MR. BUZBEE:  I just want to point out again that --

12   since he's arguing the questionnaire, that -- the ones I've

13   previously listed to you.

14               THE COURT:  I'm not sure that we've had any case law

11:45  15   on this.  Here's my concern.  And I'm not sure that the case

16   law should -- should ever turn on this, except where there's a

17   strong showing that the person who is answering has an

18   understanding of the rule of law and then sticks with an answer

19   given.

11:46  20               Because we're asking them at a point in time when

21   certainly they've been asked to give truthful answers, under

22   oath, to questions.  They've been qualified.  In other words,

23   the jurors are brought in and they are qualified to serve as

24   jurors; and then they're questioned, and then we qualify them

11:46  25   to serve as jurors.

11:46  1           So, I'm not sure where the law would be on that.

2     But I think that perhaps a little bit of discussion about these

3     other -- whether they're on the paper or in the courtroom --

4     disqualifications might be appropriate.

11:46  5           MR. BUZBEE:  Okay.

6           MR. GALBRAITH:  Well --

7           THE COURT:  Anything else, other than the hardships,

8     that we'll get to later on?

9           MR. GALBRAITH:  Well --

11:46  10          THE COURT:  We're just going to have to have a

11    conference.  That's what we're going to do.  We're going to

12    have a conference in a few minutes.

13          But I just want to do two things.  I want to kind

14    of get a sense of where you are on these disqualifications; but

11:46  15    I also want to get a sense of what other questions, if any, we

16    need to cover, some other areas we need to cover.  I know that

17    I haven't tried to cover all of the general areas, but I tried

18    to make sure I covered those areas that are tough and difficult

19    for both sides.

11:47  20          MR. GALBRAITH:  Nothing further, your Honor.

21          MR. BUZBEE:  Nothing from this side.

22          THE COURT:  Just ask these two?

23          MR. BUZBEE:  Just those two, yes, sir.

24          THE COURT:  Yeah, right.  I'm going to look over them.

11:47  25          MR. BUZBEE:  Okay.

```
11:47   1              THE COURT:  Okay.  Thank you.
        2          (In open court)
        3              THE COURT:  All right.  Ladies and gentlemen, just a
        4      couple of other areas; and then here's what I think we should
11:47   5      do.  Even though you had a break a few minutes ago, I'm going
        6      to have to give you another break so that I can confer with the
        7      lawyers about the panel.  And this is not unusual.
        8              We have to discuss any claims of hardship; we
        9      have to discuss any issues that might be of concern to either
11:48   10     side -- or either side in this case as it relates to questions
        11     that you might have answered.  And we need to do that outside
        12     of your presence, obviously.  So, that's what we need to do
        13     after I complete this.  And that probably might take 15 to 30
        14     minutes.
11:48   15             Then the lawyers are going to make their strikes.
        16     They'll make their strikes, and I mean panel strikes.  They'll
        17     turn those strike lists in to me, or at least to the clerk of
        18     court.  We will then compile the jury -- or then compose the
        19     jury, seat that panel, swear the panel in, and release the
11:48   20     remainder of you to return to your humdrum jobs.  That's what I
        21     call them.
        22             This is an exciting world we're in.  You better
        23     take advantage of it and appreciate it.  You know, I've learned
        24     more about other people's business than I know about my own.  I
11:49   25     know more about mechanics, and I never fixed a car.  I can talk
```

11:49   1   about computers, and I can't even start one up.  But I know how

2   to do all this stuff because lawyers have taught me.  So, this

3   is a great world.  And this is an opportunity, a learning

4   experience.

11:49   5          Now, back to the more serious.  I think I asked

6   this question earlier.  Do you have any questions you need to

7   ask of me?

8          If not, let me give you a few more instructions.

9   In a lawsuit where the claim is negligence or a claim is for

11:49   10  damages, we have what I said, plaintiff on one side and the

11  defendant on the other side.  It is the plaintiff's burden of

12  proof; that is, the plaintiff must prove the worth -- I'll use

13  that term -- of its lawsuit by a standard.  And that standard

14  is called "preponderance of the evidence."

11:50   15         Now, a "preponderance of the evidence" simply

16  means the greater weight and degree of credible or believable

17  evidence.

18         Am I right, Number 10?

19         A JUROR:  Yes, you are, your Honor.

11:50   20         THE COURT:  All right.  I need a witness, and I just

21  need to make sure I'm talking to someone who understands.  And

22  then she can help me to help you understand, as well.

23         So, that greater weight and degree of credible

24  evidence is what the plaintiff's burden is, unlike a criminal

11:50   25  case, where the burden of proof is proof beyond a reasonable

1  doubt.

2         Or, if you ever watch Perry Mason, proof beyond a

3  shadow of a doubt, that's not the standard.

4         How many of you ever saw Perry Mason?  Did he

5  ever lose a case, by the way?

6         A JUROR:  One.

7         THE COURT:  One.  And that was when he -- they took

8  him off the air.

9         But the standard of proof in a civil case is

10 "preponderance of the evidence."  And, so, we need to make sure

11 that you don't disagree with that principle.  Anyone disagree?

12        I can't change it.  Congress has to change it.

13 It's been the rule of law since the beginning of time.  And I

14 don't know that Congress would change it.  But that's the rule

15 of law.  Anyone disagree with it?

16        All right.  So, here's the way the matter

17 proceeds.  How many of you work a crossword puzzle?

18        All right.  Good.  Because this is what we're

19 dealing with.  We're dealing with pieces of evidence.  And you

20 can't cheat, now.  You can't look at the picture on the box.

21 Because in this crossword puzzle, the lawyers have the

22 responsibility of giving you the pieces.

23        You and I have the responsibility of making sure

24 that they're fitting in the place that they should fit and that

25 the picture turns out either the way that the plaintiff claims

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:51   1   that it is or, maybe not, maybe it's the way that the defendant

2   says it is.

3          But you can see by that that you will not have

4   all of the, quote, evidence at one time.  We can't just drop it

11:51   5   into your brain and say, "All right.  Go off and think about

6   this."  You get it piece by piece.  That means witness by

7   witness, question by question, answer by answer.  That's how

8   the evidence comes to you, in piecemeal.

9          The plaintiff, having the burden of proof, has

11:52   10   the privilege and the right to go forward first.  Now, that

11   doesn't give the plaintiff an advantage with you or with me,

12   because your job is to wait until you hear all of the evidence

13   before you make up your mind about anything.  And you should be

14   open to discussion with your other jurors at the time that you

11:52   15   are sent to deliberate.

16          So, let's go back to the beginning.  Plaintiff

17   has the burden of proof.  Plaintiff gets to put on his

18   witnesses -- or their witnesses first.  The defense gets to

19   cross-examine or question those witnesses.

11:52   20          At some point the defense will put on witnesses.

21   The plaintiff gets a chance to cross-examine those witnesses.

22   And that back and forth is what makes for the putting together

23   of this puzzle.  That's how this evidence comes together.

24          At the end of the case, you should have

11:53   25   sufficient pieces to make the puzzle work one way or the other.

11:53  1   You should have sufficient pieces of evidence, but you have to

2   be patient and you have to wait and you have to listen and then

3   you have to talk with each other at the end of the case.

4   Anyone can't do that?

11:53  5            All right.  We have opening statements at the

6   front side of it; we have the testimony and the evidence in the

7   middle; and then we have closing statements at the end.  And

8   those of you who have had a chance to serve on juries

9   understand that process, whether it's a civil case or a

11:53  10  criminal case, that the bookends are opening and closing.

11           Now, there may be times when I need to rule

12  against certain evidence.  I'm not ruling against BP, and I'm

13  not ruling against the plaintiff.  I'm making a ruling based on

14  a rules of evidence and my best judgment as to whether or not

11:54  15  that evidence should be admitted under the rules.  So, the

16  ruling is to protect you from something that the law does not

17  permit either side -- or the other side, maybe, to present in

18  the manner that it's being presented.  And it should not

19  reflect upon the lawyers at all.

11:54  20           Lawyers have a duty to try to get in evidence

21  what they believe to be appropriate, even if it disagrees --

22  even if they disagree with me about that.  That's not my

23  problem, and that's not your problem.  The problem is if you

24  take it to mean that somehow one side or the other is, quote,

11:54  25  not getting his case across or losing it and you make up your

11:54  1    mind based on the action in the courtroom.  Then you will be

2    lost.  You will be lost and the case will not be properly

3    decided.

4               So, you'll base your verdict upon the evidence

11:55  5    that is admitted in the courtroom, not based upon what you

6    heard or saw someplace else -- and I certainly hope you

7    don't -- not based upon any investigation that you've done --

8    and you shouldn't, because you take an oath not to -- and not

9    based upon your going on the Internet and looking up

11:55  10   something -- because you don't have the right or duty to do

11   that -- not based upon what your husband or wife told you you

12   should think when you go home this evening.  That's not right.

13              It's this one thing: the evidence in the

14   courtroom.

11:55  15              Anyone disagree with that, those principles, in

16   other words?

17              All right.  Have I missed anything, Number 10?

18         A JUROR:  Of course, not, your Honor.

19         THE COURT:  All right.  She'll tell me later what I

11:55  20   did miss, probably.

21              All right.  I think what we need to do at this

22   point is to have my little session with the lawyers, and we're

23   going to step into this little side room here.  And don't

24   you-all tear the place up while we're gone.  You can stand and

11:56  25   take a break or we can --

11:56   1          A JUROR:  Eat?

2          THE COURT:  I'm sorry?

3                Today is the day that you ought to order pizza,

4     right?  You don't want to go anywhere today.

11:56   5                Here's what I think we ought to do.  Would you

6     prefer taking about an hour and getting lunch and come back

7     rather than sitting here while we work through this?

8          A JUROR:  Yes, sir.

9          THE COURT:  Do you speak for the entire body?

11:56   10               I don't have a problem with that.  And I think it

11    may be wise because -- we do not have a cafeteria in this

12    building, by the way.  So, you're going to have to bring your

13    lunch -- and I'm saying this for the benefit of the jurors.

14    You're going to have to bring your lunch or you're going to

11:56   15    have to go someplace quick because we will not be taking long

16    lunch breaks once we get this case started.

17               So, is it five minutes of 12:00 right now?  Is

18    that what the time is?

19               How long a break do you take for lunch, Number 1?

11:57   20         A JUROR:  Twenty minutes.

21         THE COURT:  All right.  That will get you out of the

22    building.  Then you turn around and come back in.

23         A JUROR:  My dog, I left her inside because it's

24    raining today.  And I would like to make sure my carpets are --

11:57   25         THE COURT:  Yeah, I agree with you on that one.  How

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:57   1   long does it take you to take lunch, Number -- you haven't said
        2   anything.  Stand up.
        3           A JUROR:  Me?
        4           THE COURT:  Yes.
11:57   5           A JUROR:  Number 35.
        6           THE COURT:  Thirty-five.  I haven't heard you say a
        7   word.  How long --
        8           A JUROR:  Thirty minutes.
        9           THE COURT:  Where is the closest place?
11:57   10          A JUROR:  I don't know here in Galveston.  Sometimes
        11  it takes longer.  You know, you ask me, I would rather stay
        12  here, let you guys get your process over with, and then pick
        13  the jury, then let the rest of us go.
        14          THE COURT:  I see.  It's going to take 30 or 40
11:57   15  minutes for us to do that whether you're here or not.
        16          A JUROR:  Okay.  We can do that.
        17          THE COURT:  So, yeah, I understand that choice.  You
        18  can certainly do that.
        19              Anyone else have any comment about this?
11:58   20              Number 2?
        21          A JUROR:  I'm -- I'm not saying a thing.
        22          THE COURT:  Well, if I authorize one of you to speak
        23  for the entire group, who would that be?
        24          A JUROR:  This one.
11:58   25          THE COURT:  Number -- what's your number?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

11:58   1           A JUROR:  Seventeen.

2           THE COURT:  Number 17, please stand.

3           A JUROR:  Well, we only get 30 minutes in school

4    systems, everybody.  So, we can -- you can go.  Sometimes I

11:58   5    leave where I work and come back, and I do it within the 30

6    minutes.  So, we can do it now, we can all go.

7           THE COURT:  All right.  Here's what we're going to do,

8    then.

9                Well, let me ask one other question.  Is there

11:58   10   anyone on this panel who has any religious or conscientious

11   objection or basis why they cannot sit as a juror in this case?

12               Now, look around.  Anybody on this panel you

13   know?  Do you know any of the other people on this panel?  Do

14   you work together, shop together, attend the same church,

11:59   15   synagogue?

16               Number 7, who do you know?

17          A JUROR:  The gentlemen behind me, George.

18          THE COURT:  Who is George?

19          A JUROR:  Number 13.

11:59   20          THE COURT:  George, you're not going to tell us you

21   know Number 7?

22          A JUROR:  I know Number 7.

23          THE COURT:  Please stand.  Your number is?

24          A JUROR:  Nineteen.

11:59   25          THE COURT:  Nineteen.

11:59   1          All right.  How do you know Number 7?  You want
        2   to tell me privately or publicly?
        3          A JUROR:  No.
        4          THE COURT:  Okay.
11:59   5          A JUROR:  I had to have shoulder surgery about five
        6   years ago, and she was my physical therapist --
        7          THE COURT:  Okay.
        8          A JUROR:  -- in my recuperation.
        9          THE COURT:  Okay.  Is that how you know him, Number 7?
11:59  10          A JUROR:  Yes, sir.
       11          THE COURT:  You're a physical therapist?
       12          A JUROR:  Yes.
       13          THE COURT:  That's what you're going to say?
       14          A JUROR:  Yes.
11:59  15          THE COURT:  Has that series of sessions concluded?
       16          A JUROR:  Oh, yes, sir.
       17          A JUROR:  Yes.
       18          THE COURT:  Okay.  And let me ask, if you two are
       19   serving on the same panel, can the other jurors on that panel
11:59  20   trust you to be fair and open minded and not come together in a
       21   way that would be detrimental to their thinking?
       22          In other words, it's kind of like having a
       23   sergeant and a private in the military and the sergeant stands
       24   up and the private salutes.  Okay?
12:00  25          So, is there anybody on the panel that --

```
12:00    1              That's not the relationship you have, right?
         2         A JUROR:  Correct.
         3         THE COURT:  I mean, you're certainly independent of
         4    each other?
12:00    5         A JUROR:  Right.
         6         THE COURT:  And you can think for yourself, obviously,
         7    both of you.  The question is whether or not there's any
         8    influence, any basis for you to have to be influencing each
         9    other in a situation like this.
12:00   10         A JUROR:  No influence.
        11         THE COURT:  None?
        12         A JUROR:  None.
        13         A JUROR:  No.
        14         THE COURT:  Okay.  Thank you.
12:00   15              Number 20 -- is that 30?  What's your number,
        16    sir?
        17         A JUROR:  Number 30.
        18         THE COURT:  Number 30, who is it that you know?
        19         A JUROR:  I know C███████ A██████.
12:00   20         A JUROR:  Number 14.
        21         A JUROR:  We work together, same company.
        22         THE COURT:  Where do you-all work?
        23         A JUROR:  Dow Chemical.
        24         A JUROR:  Dow Chemical.
12:00   25         THE COURT:  Okay.  And does she report to you or you
```

12:00  1    report to her?

2          A JUROR:  Neither.

3          THE COURT:  All right.  Different departments?

4          A JUROR:  Yes.

12:01  5    THE COURT:  But you-all see each other from time to

6    time?

7          A JUROR:  Actually, her office is across from my

8    boss'.

9          THE COURT:  Okay.  And that's how you would --

12:01 10    A JUROR:  I haven't seen him in five years, probably,

11   or before that.  So --

12         THE COURT:  But that's how you would see each other --

13         A JUROR:  Yes.

14         THE COURT:  -- you would be visiting, for example,

12:01 15   needing to go to the boss or something in that building or that

16   location --

17         A JUROR:  No.

18         THE COURT:  -- and you would see her or she, in turn,

19   would be coming to your department?

12:01 20    A JUROR:  I have a different supervisor.  So, it's

21   just --

22         THE COURT:  Yeah, but when I say "see you," I mean

23   just in passing, I guess.

24         A JUROR:  Right.

12:01 25    THE COURT:  You're in an office someplace and he

*Cheryll K. Barron, CSR, CM, FCRR*                          *713.250.5585*

12:01  1    passes and that's how you would see him?

2              A JUROR:  That's right.

3              A JUROR:  That's it.

4              THE COURT:  But you'll have no working relationship

12:01  5    with each other that brings you together for any functions.

6              A JUROR:  No.

7              THE COURT:  I'm saying it, but I'm asking really.

8              A JUROR:  No.

9              THE COURT:  In other words, you don't have to do work

12:01  10   and present it to her and then she then approves it --

11             A JUROR:  No.

12             THE COURT:  -- gets it back to you or disapproves it

13   and that kind of thing.

14             A JUROR:  No.

12:01  15            A JUROR:  Not at all.

16             THE COURT:  What about if your boss left?

17             A JUROR:  No, nothing there either.

18             THE COURT:  Okay.

19             A JUROR:  It's a huge company.  So --

12:02  20            THE COURT:  But it's a small world.

21             A JUROR:  That's true.

22             THE COURT:  And we seem to keep coming together.  I

23   remember one panel I had a most unlikely thing, but I didn't

24   ask that -- I almost didn't ask that question.  And it turns

12:02  25   out that there were two people on the panel, who were dating.

12:02  1   I mean, how would you figure that?  You get -- you know, the

2   lady you had lunch with or dinner last night, she's on the

3   panel with you.  That's kind of a strange small world

4   situation.

12:02  5          So, we never really know who we're on the panel

6   with unless we ask.  So, I guess I should go a step further.

7          Are you related to anybody on this panel?

8   Anybody related to anyone else?

9          How about this one.  Anybody on the panel -- is

12:02  10  there anybody on the panel who in the past has been in charge

11  of or served as a supervisor for any other person on the panel?

12          All right.  I think I've just about exhausted

13  that, then.

14          Okay.  It's high noon, and that's a good time to

12:03  15  take about a 30 or 40 minute break.  Feel free to leave the

16  building and get lunch if you choose to and come back.

17          I think there's a snack bar maybe on the second

18  floor.  Am I correct?

19          THE CASE MANAGER:  Vending machines.

12:03  20          THE COURT:  Vending machines, not a snack bar, vending

21  machines on the second floor if you're of a mind to do that.

22          But I need you back in here no later than

23  1:00 o'clock.  You've got to be back at 1:00 o'clock.  If you

24  don't think you can do that, don't leave.  All right?

12:03  25          All right.  Let's do it now.

```
 1        (Recess was taken from 12:03 to 12:42 p.m.)
 2        (Jury not present)
 3        (At the bench with all counsel).
 4           THE COURT:  Okay.  Gentlemen, if you'd get your
 5    paperwork, please.  Start with the long list, I think.  And
 6    that's the plaintiffs' list.
 7              Number 1?
 8           MR. BUZBEE:  Me?
 9           THE COURT:  Yes.
10           MR. BUZBEE:  Your Honor, we -- based on the answers to
11    questionnaire, we had moved -- I'm making this record of
12    course.  We had moved to strike for cause Numbers 1 --
13           THE COURT:  Let's deal with Number 1.
14           MR. BUZBEE:  Okay.
15           THE COURT:  What's your basis for it now, the answer
16    to Question Number what?
17           MR. BUZBEE:  The answer to Question Number 49 in his
18    questionnaire, where he's asked about punitive damages and his
19    response is that they are totally absurd.
20           THE COURT:  Okay.
21           MR. BUZBEE:  Moreover, when asked about whether he
22    would award even if instructed by this Court to award mental
23    anguish damages, he said no.
24              And then the Court -- I gave -- gave what I
25    considered to be an appropriate lecture on what the damages
```

12:43    1    are, what the purpose of them are.  And even then, when he

2    stood up, you could tell his mind had not been changed.

3            And I think he's a strike for cause.

4        THE COURT:  Any responses?

12:44    5        MR. GALBRAITH:  Yes, your Honor.  We don't think he's

6    a strike for cause.  He's, we think, the classic example of

7    someone who gave an answer on the questionnaire that was

8    strong, one of the more strong answers in the questionnaire, at

9    a time before anything had been explained to him.  And, yet,

12:44    10    after the Court had delivered instructions to Juror Number 1

11    and clarified what we were asking, he's the guy who said, "I

12    can't say never.  I have to say it depends on the evidence."

13            Well, that's exactly what we ask of a juror.

14    That's not a strike for cause.  That's not a disqualification.

12:44    15    If, after explanation of the Court's instructions he says, "It

16    depends on the evidence," that's exactly what we're looking

17    for.  And, so, we don't think that should be granted.

18        THE COURT:  Well, we'll go, then, to Number 5.

19            I'll make my ruling at the end of all of this.

12:44    20    I'm not going to rule --

21            I think Number 5 is next, Mr. Buzbee.

22        MR. BUZBEE:  Yes, sir.  Number 5, I'm going to

23    withdraw.

24        THE COURT:  Okay.  Number 9?

12:45    25        MR. BUZBEE:  Number 9?

12:45  1          THE COURT:  Uh-huh.

2          MR. BUZBEE:  Same issue, your Honor.  Question 47, a

3   juror -- Venire Panel Member Number 9's questionnaire, when

4   asked about mental anguish damages, even if instructed by the

12:45  5   judge and supported by the evidence, the answer was, "No."  And

6   I think that is a classic case of someone making their mind up

7   before we ever start.  So, in other words, one of the largest

8   elements of damage that we're going to ask for, this juror has

9   already made up her mind on.

12:45  10          And I'd also mention this, your Honor.  I think

11   there was -- there was a reference as to whether questionnaires

12   such as this one are sufficient for strikes for cause and --

13          THE COURT:  Go ahead.

14          MR. BUZBEE:  -- and I believe they are, and I believe

12:46  15   there's cases to support that.  As you probably know, I've used

16   questionnaires many times; and they've always been sufficient

17   for a strike for cause.  So, I only reference that because you

18   did make --

19          THE COURT:  You you're at Number 9, and you're looking

12:46  20   at Question Number what?

21          MR. BUZBEE:  Forty-seven, where it asks --

22          THE COURT:  Okay.  Forty-seven.

23          MR. BUZBEE:  Yes, sir.

24          THE COURT:  Okay.

12:46  25          All right.  Response?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:46   1          MR. GALBRAITH:  I do have a response, your Honor.

2      This is another one of those where the questionnaire shows some

3      lack of understanding.  It's qualified even by the panel

4      member, Number 9, prior to this Court's instructions.  But this

12:46   5      is another example of one who, after you gave those

6      instructions, you asked them, "Could you comply with the rule

7      of law as I have outlined it, as I have explained it?  And if

8      you have any problem with that, let me know now," and Number 9

9      did not.  And as you have said, "I take it by your silence that

12:47   10      you don't have a problem with doing what we instruct."  And

11      this is another example of that.

12          THE COURT:  All right.  Number 11?

13          MR. BUZBEE:  Number 11, your Honor, Question -- and,

14      again, in the questionnaire, Number 47, when asked about mental

12:47   15      anguish, flat out, "No."

16          And then in Question 49, when asked about

17      punitive damages, this is what this person said, "No, I do not

18      agree," exclamation point, "Should not be fined to punish that

19      person, because they would not have gotten hurt or planned a

12:47   20      situation to hurt themselves or another employee."

21          So, this person is essentially saying, in two of

22      the critical elements of damages in this case, they've made

23      there mind up before we've put in one document.

24          THE COURT:  All right.  Response.

12:47   25          MR. GALBRAITH:  This is another example of the same

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:47   1   principle, because there are so many people who answer

2   questions one way without instruction or explanation and, after

3   the Court's instructions, they indicated their understanding

4   that they -- that it would depend on the circumstances and that

12:48   5   they could follow the Court's instructions and that they could

6   award damages.  This is another one of those.

7           The explanation in 49 is a little bit instructive

8   to me.  In other words, they're wrestling with it at that time.

9   They have not -- they're searching for that explanation.  That

12:48   10  explanation shows that it's a true inquiry on their part.

11  After you have explained it to them, they didn't have a problem

12  with it.

13          There's no -- there should be no strike for cause

14  for that juror.

12:48   15          THE COURT:  Number 12?

16          MR. BUZBEE:  Number 12.

17          THE COURT:  I believe that's the next one.

18          MR. BUZBEE:  Yes, sir.  Your Honor, I'm withdrawing

19  12.

12:48   20          THE COURT:  All right.  Number --

21          MR. BUZBEE:  Thirteen.

22          THE COURT:  -- 13.

23          MR. GALBRAITH:  So, pardon me.  For my record, we got

24  1, 9, 11 so far?

12:48   25          THE COURT:  Yeah.  And Number 12, withdrawn.  We're

12:48  1   going now to Number 13.

2   MR. BUZBEE:  I want to -- I'm going to withdraw that

3   one, I think, your Honor.

4   THE COURT:  Number 13?

12:49  5   MR. BUZBEE:  Yes, sir.

6   THE COURT:  All right.

7   MR. BUZBEE:  I mean, I think there is a distinction in

8   these questionnaires, with the people who -- who aren't

9   clear -- for instance, just as an example, Number 13, on this

12:49 10   mental anguish question, he said "Not sure of definition."

11   Now, there is a person who's considering the

12   question, is unclear; whereas, there's other people that

13   understand it and simply say, "I'm not going to give these

14   damages."

12:49 15   THE COURT:  All right.  Number 17.

16   MR. BUZBEE:  Seventeen, your Honor, again, Question 47

17   asked about mental anguish damages and also asked about damages

18   for physical pain and suffering.  Even if instructed by the

19   Court, this person has already decided that he or she will not

12:49 20   give those types of damages.

21   THE COURT:  Okay.  Response?

22   MR. GALBRAITH:  Response?  This one is a good example

23   of the same thing; but it is a little different, as well.

24   First of all, their answer to 49, for example, they said it

12:50 25   would depend on the circumstances.

12:50   1          In answer to 48 they said, "The amount should

2    cover the costs and expenses."

3          That seems to me like somebody who is thinking

4    about it, who's wrestling with it, but who understands.   In

12:50   5    answer to 47, they said, "Temporary"; in other words, it

6    depends.   An answer saying "temporary" means, "However long it

7    lasts is however long I could award it."

8          I think that's an answer that, in effect, is

9    depending upon the circumstances, which is exactly what we

12:50  10    require of jurors.   After your explanations, they answered your

11    questions here today, indicating they could follow those

12    directions, abide by those rules, and serve.

13          I don't think they're disqualified for cause.

14          THE COURT:   Number 20?

12:50  15          MR. BUZBEE:   Withdrawing 20, your Honor.

16          THE COURT:   All right.   Then go to 21.

17          MR. BUZBEE:   I'm going to withdraw that one, as well.

18          THE COURT:   All right.   Then I think the next one is

19    27.

12:50  20          MR. BUZBEE:   Yes, sir.   Your Honor, 27, again, on this

21    issue of punitive damages, this person states, "Should not be

22    any additions."   I think that, at the least, we should ask that

23    question.

24          And, again, with all these, your Honor, just for

12:51  25    the record, I do think that there should be an individual

12:51  1    inquiry, no more than a couple of questions, so we can truly --

2    instead of guessing about whether these folks understood the

3    question -- we're arguing about what these people understood or

4    didn't understand.

12:51  5           And I'd also point out that after you -- you gave

6    the instruction about damages and what the law is and put your

7    personal feelings aside and your political persuasion -- with

8    all due respect, I think that these people -- at least we

9    should have two or three individualized questions from this

12:51  10   Court to ferret that out before the Court rules on these

11   objections.

12          THE COURT:  All right.   Number 31.

13          MR. BUZBEE:  Yes, sir.

14          THE COURT:  Oh, I'm sorry.  Let me have your response

12:52  15   to Number 27.

16          MR. GALBRAITH:  Okay.  Did I have in my notes that

17   this is one you had stricken for some other reason perhaps?  I

18   had in my notes that --

19          THE COURT:  You sure do.  That does show Number 27

12:52  20   was --

21          MR. BUZBEE:  Gone.

22          THE COURT:  -- one that I had said that I thought --

23   but I said I would permit you to make your objection.

24          MR. GALBRAITH:  Okay.  In other words, it was for this

12:52  25   reason; it wasn't for some other reason?

12:52   1          THE COURT:  I don't recall now.

2          MR. GALBRAITH:  I don't recall.  I just have that in

3   my notes.

4                  Twenty-seven is another one of those who answered

12:52   5   questions, "If it can be explained," "If it can be explained,"

6   "If it can be explained," "The amount should be equal to the

7   injury."

8                  So, I'm thinking that these questions prior to

9   instructions, supplemented by your answers today after

12:52   10   instructions, Number 27 should not be stricken for cause.

11          THE COURT:  All right.  And it may be that 27 was on

12   the basis of some other reason but, as well, I believe the

13   stated basis, at least now on the record, in addition to any

14   other reason, would be the answers to the damage issues.

12:53   15                  And the final one is 31.

16          MR. BUZBEE:  I withdraw it.

17          THE COURT:  Okay.  All right.  What we have remaining

18   are Numbers 3 and 4.  And 3 is the surgery, and 4 is the --

19          MR. GALBRAITH:  "I can't be fair to BP.  I've already

12:53   20   made up my mind."

21          THE COURT:  All right.

22          MR. GALBRAITH:  Those are the two we're going to ask

23   questions of individually?

24          THE COURT:  Well, I don't know that I want ask any

12:53   25   questions of 3 and 4 necessarily, but I do -- I mean, of

12:53   1    Number 4 necessarily but -- because I think that if he says it

   2    he probably means it.  And if there is some reason, we can

   3    certainly bring him up --

   4              MR. BUZBEE:  Your Honor --

12:53   5              THE COURT:  -- give us an explanation for --

   6              MR. BUZBEE:  -- can I be heard on 4?

   7              THE COURT:  Number 4 --

   8              MR. BUZBEE:  Yes, sir.

   9              THE COURT:  -- would be -- yeah.  I said if you want

12:53  10    to bring him up we can bring him up, but I'm concerned about

  11    that.

  12              Here's what I am going to rule as relates to

  13    these, if you would mark these, gentlemen.  Then, if you have

  14    some -- some basis for -- you've already stated your objection

12:54  15    and reasons.

  16              If you believe that somehow some person should be

  17    brought up for some reason, then you need to tell me that.  But

  18    not because I've ruled against you but because there's

  19    something you think I have missed.

12:54  20              Because, certainly, I think that, as a general

  21    premise, it's fairly difficult, if not impossible, to

  22    rehabilitate a witness.  And I don't want to make the mistake

  23    of thinking that a person who writes something down don't mean

  24    what they say.  In fact, I think they're more deliberative when

12:54  25    they're sitting and thinking about what they're writing than

12:54    1   when they're simply answering the question, quote, off the

         2   cuff.

         3          And what I've done is I've read through each of

         4   the requested strikes for cause the plaintiff and defendant

12:54    5   have stated; and I believe that there is some area of plausible

         6   explanation for some of the answers, that doesn't disqualify.

         7          These I believe are disqualified: 1, 4, 9, 11,

         8   and 27.  So, 1, 4, 9, 11, and 27.

         9          Now, 3 is the surgery, I believe.  And 4 is

12:55   10   the -- is a man who also said to one of the clerks on yesterday

        11   that he didn't think he could judge this case, he didn't think

        12   he could judge anyone, or something to that effect.

        13          MR. BUZBEE:  Which one was that, your Honor?

        14          THE COURT:  Number 4.  That sort of prompted me to ask

12:55   15   this question.  You notice at the end I said, "Is there any

        16   religious or other reason why you would not be able to judge

        17   this case?"  And I was thinking that might draw him out and see

        18   if that was something -- I'm not sure if he's changed his mind;

        19   but I think in light of that comment to the clerk of court it

12:55   20   may be we need to ask him that question, whether or not there

        21   was some conscientious objection or -- if he's just saying,

        22   "Well, I don't think I'm educated enough," then that's one

        23   thing.  But if he's saying, "I have some critical thinking that

        24   prevents me from doing this," then that would be the concern.

12:56   25          MR. GALBRAITH:  Just so the --

12:56    1              THE COURT:  There we are.

         2              MR. GALBRAITH:  Just so the record -- I mean, I think

         3     we talked about some others that aren't on the record yet.  For

         4     example, Number 7 I think is one that you indicated was going

12:56    5     to be stricken for cause.

         6              THE COURT:  I'm not sure if I've listed that already

         7     or not; but if I did not, I think, yeah.

         8              MR. GALBRAITH:  And Number --

         9              MR. O'ROURKE:  That was 8.

12:56   10              THE COURT:  No.  Seven is --

        11              MR. GALBRAITH:  The three strikes.

        12              THE COURT:  -- is the third -- and 8 is the lady who

        13     has the child.

        14              MR. GALBRAITH:  No.  Eight doesn't have the child.

12:56   15     But 8 is the one who works at The Frog and her boss isn't going

        16     to pay her and she was crying.

        17              THE COURT:  Okay.

        18              MR. BUZBEE:  That's the one I -- I objected to 7.

        19              THE COURT:  You objected to 7.  Okay.

12:56   20              MR. BUZBEE:  And I think that we --

        21              THE COURT:  I have not -- then I have not ruled on 7

        22     yet.

        23              MR. BUZBEE:  Right.  That's right.

        24              MR. GALBRAITH:  I thought you had indicated 7 was

12:56   25     gone.

12:56  1          THE COURT:  No.  I think I did -- I think I initially
       2     discussed that with you and I said that I, you know, might
       3     agree with you on that; but I know that you opposed it --
       4          MR. BUZBEE:  Right.
12:57  5          THE COURT:  The plaintiff opposed it, and I think he
       6     opposed 3, 4, and 7; and I wrote that down and that's --
       7          MR. BUZBEE:  Correct.
       8          THE COURT:  So, Number 7 is one.
       9               Who else is there, Mr. Galbraith, that you think
12:57  10    we might have missed that you think should have been or that I
       11    might have already --
       12         MR. GALBRAITH:  Can I just read the ones that I think
       13    you've indicated are stricken?
       14         THE COURT:  I tell you what.  Why don't you just let
12:57  15    me go from my list?
       16         MR. GALBRAITH:  Okay.
       17         THE COURT:  And then --
       18         MR. GALBRAITH:  We'll do it again.
       19         THE COURT:  Yeah.
12:57  20         MR. GALBRAITH:  Good.
       21         THE COURT:  Diane, do you have my list of what I've
       22    already had you to strike?
       23         THE CASE MANAGER:  Yes.
       24         THE COURT:  Okay.  Let's go from -- let's go from this
12:57  25    list and -- okay.  So, get you a clean piece of paper.  These

12:57  1    are the people who are still on the panel:  2, 3 -- and I still

2    have 4 on there.  I'm going to call 4 still on there.

3              MR. BUZBEE:  All right.

4              MR. GALBRAITH:  You're going to call 4 still on there?

12:58  5              THE COURT:  Yes.

6              MR. BUZBEE:  Yes.

7              THE COURT:  Four is the gentlemen that we're going to

8    ask -- I'm sorry.  I take that back.  I'm sorry.  I granted a

9    strike on 4 --

12:58 10              MR. GALBRAITH:  Right.

11              THE COURT:  -- based on your motion.

12              MR. GALBRAITH:  Yes.

13              THE COURT:  Did I get that in error?

14              MR. BUZBEE:  No.  That's error, yes, sir, that's --

12:58 15              THE COURT:  That's in error?

16              MR. BUZBEE:  Yes, sir, that's in error.

17              THE COURT:  Okay.  Okay.

18              MR. BUZBEE:  I don't oppose 4.  I want him on the

19   panel.  And I'll just say one other thing about him.  I didn't

12:58 20   know he was a juror, but I rode up in the elevator with him.

21   And he made a comment to someone else, says, "I'm going to get

22   off this panel, somehow get off the panel."

23              So, just for full clarity, comprehension, I know

24   he made a statement to some of the court personnel; but that's

12:58 25   the statement I heard him make.  So, it seems to me he's just

12:58    1   trying to get off the panel, period.

         2            THE COURT:  Well, I'll find out if that's real or not.

         3   Let's go -- let's start again.  Two, 3, 4, 5, 6, and I'm still

         4   showing 7, 10, 12, 13, 14, 15, 17, 20, 21, 22, 23, 24, 26, 28,

12:59    5   29, 30, 31, 32, 34 and 35.  We show those still on the panel.

         6            Now, if you look at your list and tell me what

         7   you think, if any -- I know Number 7 is a defendant's concern,

         8   and Number 4 and Number 3.  I know those are the three concerns

         9   that the defense has.

01:00   10            MR. GALBRAITH:  Our issues, your Honor, are with 3, 4,

        11   and 7.

        12            THE COURT:  I got those.

        13            MR. GALBRAITH:  And I don't have any others.

        14            THE COURT:  Okay.  Now, beyond the ones that I might

01:00   15   have overruled inferentially --

        16            MR. BUZBEE:  Right.

        17            THE COURT:  -- tell me what else you think is --

        18            MR. BUZBEE:  That's it.

        19            THE COURT:  Okay.  So, we need to deal with 3, 4 and

01:00   20   7.

        21            MR. GALBRAITH:  Your Honor?

        22            THE COURT:  Yes, sir.

        23            MR. GALBRAITH:  Could I -- could I raise Number 9

        24   because --

01:00   25            THE COURT:  I struck Number 9, and you made your

01:00 1 objection to it already.

2       MR. GALBRAITH:  Okay.  Thank you.

3       THE COURT:  All right.  Anything else that we have not

4 addressed?

01:00 5       All right, gentlemen.  Let's do this.  Our panel

6 will be back --

7       MR. BUZBEE:  Right now.

8       THE COURT:  -- right now.  And, so, when they are

9 ready, let's bring them in; and we'll deal with -- I tell you

01:00 10 what we need to do.

11       We'll bring them over to the sidebar on this

12 side.  We'll bring Numbers 3, 4, and 7 to the sidebar.

13       MR. BUZBEE:  Okay.

14       THE COURT:  Okay?

01:04 15   *(Jury present)*

16       THE COURT:  All right, gentlemen.  If you would be

17 seated, please.  Let's see.

18       Is your neighbor where he or she ought to be?

19       THE JURORS:  (In unison.)  Yes.

01:04 20       THE COURT:  Who is it that doesn't have a neighbor?

21       So, we have all 35?

22       All right.  How was the weather out there?

23       A JUROR:  (In Unison.)  Wet.

24       THE COURT:  Wet?  Still wet?

01:04 25       A JUROR:  It's trying to stop.

01:04   1          THE COURT:  It's trying to stop.  I think this is a

2      big event this weekend.  Don't you have the Dickens on the

3      Strand?

4              We got to make sure we get some special weather

01:05   5      here for that; otherwise, it's going to be tough.

6              Okay.  We need to talk on the sidebar with three

7      of you; but before we do that, I need to make sure none of you

8      need to talk to me about some matter that you would like to

9      discuss privately.

01:05   10             Is there anything that you need to bring to my

11     attention privately?

12             I'm not suggesting anything.  I'm just asking.

13     I'm just asking.

14             All right.  Number 3 -- yes, Number 3, please.

01:05   15             Counsel, if you would join me here.

16             Number 3, if you would come up, please, ma'am.

17        *(Discussion off the record)*

18        *(At the bench with all counsel and juror)*

19          THE COURT:  Good evening.  How you doing?

01:06   20          A JUROR:  Good afternoon, your Honor.

21          THE COURT:  Well, it is afternoon.  Not quite evening,

22     is it?

23          A JUROR:  Yeah.

24          THE COURT:  You mentioned, I believe -- did you

01:06   25     mention you had surgery scheduled?

01:06  1           A JUROR:  I have surgery scheduled for Friday.

2           THE COURT:  Okay.  Somebody said that there's -- the

3    only minor surgery is surgery that somebody else is going

4    through and not you.

01:06  5               So, what do you say?

6           A JUROR:  Well, I can't -- I've tried already calling

7    to reschedule it.  And they're going to put me off through

8    February, and I really don't want to do that.

9           THE COURT:  Okay.  So, it's sufficiently important

01:06  10   that you need to get it done.

11          A JUROR:  Yes.

12          THE COURT:  And, number two, it's going to be

13   difficult to get it done any time if you miss this appointment.

14          A JUROR:  Right.

01:06  15          THE COURT:  All right.  Thank you very much.  Go ahead

16   and have your seat, please.

17       *(At the bench with all counsel)*

18          THE COURT:  Okay.  As relates to 3, you can strike

19   that.  She's hardship.

01:06  20       *(In open court)*

21          THE COURT:  Number 4?

22       *(At the bench with all counsel and a juror)*

23          THE COURT:  How you doing this afternoon?

24          A JUROR:  Great.  How are you, sir?

01:07  25          THE COURT:  Pretty good.  You mentioned on yesterday,

01:07    1    when questionnaires were being done, that you had some concern

2    about your ability to serve as a juror.

3             A JUROR:  Yeah.

4             THE COURT:  Can you tell us what that's about?

01:07    5             A JUROR:  Well, the more I heard you talk today about

6    being biased and if I could be fair and un-judgmental, I

7    can't --

8             THE COURT:  No.  You got to be judgmental.  That's

9    what you're here to do.  But not biased.

01:07   10             A JUROR:  Biased, I mean.  I don't want to be, but I

11   am biased.  I hate chemical plants.  I hate riding by BP.  It

12   stinks.  I mean, I work with chemicals, finishes, and cleaning

13   materials.  And I avoid it much as possible.

14             THE COURT:  What do you do, by the way?

01:07   15             A JUROR:  Housekeeping.

16                 You know, I believe in the system and all; but I

17   just -- you know, as far as being biased --

18             THE COURT:  You're not just trying to get off this

19   jury panel, are you?

01:08   20             A JUROR:  Yeah, but I'm also being honest.

21             THE COURT:  Okay.  That's what I mean.  If you're

22   being honest, that's one thing.  But if you just have something

23   to do, like take the kids to the zoo, that's something

24   different.

01:08   25             A JUROR:  No, no.  I mean, outside of that trip the

01:08  1    28th, the end of the month.

       2                Could I ask you one question?

       3        THE COURT:  Sure.

       4        A JUROR:  Would we get out of here daily like maybe

01:08  5    3:30 or how does that work?

       6        THE COURT:  Probably be working a little bit later

       7    than 3:30.  You got kids to pick up?

       8        A JUROR:  Yeah, school.

       9        THE COURT:  All right.  Thank you, sir.

01:08  10      *(At the bench with all counsel)*

       11       THE COURT:  I think he said it, he meant it.  He's

       12   off.

       13       MR. GALBRAITH:  So, he's stricken?

       14       THE COURT:  Yes.

01:08  15      *(In open court)*

       16       THE COURT:  Number 7.

       17      *(At the bench with all counsel and a juror)*

       18       THE COURT:  How you doing this afternoon?

       19       A JUROR:  Good.

01:09  20       THE COURT:  You had mentioned as part of your

       21   questioning -- as part of your questionnaire that you -- and

       22   maybe standing here you also mentioned the fact that you're a

       23   physical therapist and that you have problems with your back.

       24       A JUROR:  Yes.

01:09  25       THE COURT:  What's the longest period of time that you

01:09   1   sit?  I mean, today it's been a little while but --

2          A JUROR:  Uh-huh.  It's kind of hard to say, because

3   in my job I rarely sit.  I would say no later than an hour.

4   Because what happens is I start getting radicular symptoms down

01:09   5   my leg.  Like, today I have reduced sensation because of that.

6          THE COURT:  Okay.

7          A JUROR:  But now it's better because I've been

8   walking around, I've been moving around, and I've been

9   stretching it out, which is the whole reason why I'm seeing a

01:09   10   chiropractor.

11          THE COURT:  Do you take medication for this back?

12          A JUROR:  No.

13          THE COURT:  It's just physical therapy and exercise.

14          A JUROR:  Right.  And just me -- I need to move around

01:10   15   every hour.

16          THE COURT:  Yeah, that's what I mean.  When I say

17   "exercise," I mean you need to get up and walk and move the

18   back around a little bit.

19          A JUROR:  Yes.

01:10   20          THE COURT:  So, the most that you can generally sit as

21   a -- if you were sitting as a juror or even at work would be

22   about an hour at a time and you would need to get up and move

23   around?

24          A JUROR:  Correct.

01:10   25          THE COURT:  Okay.  Do you have any questions?

01:10    1          MR. GALBRAITH:  Yes.  May I question her?

         2          THE COURT:  Yes.  Depends on what you're going to ask.

         3    Go ahead.

         4          MR. GALBRAITH:  Okay.  Subject to the Court's

01:10    5    approval.

         6          THE COURT:  Sure.

         7          MR. GALBRAITH:  You had indicated two other concerns

         8    that you had, and I just wanted to ask about them.  What is the

         9    situation -- you're -- as I understand it, you told us you're a

01:10   10    single parent.

        11          A JUROR:  Yes.

        12          MR. GALBRAITH:  You have a child --

        13          A JUROR:  Yes.

        14          MR. GALBRAITH:  -- who is under the age of 10?

01:10   15          A JUROR:  Yes.

        16          MR. GALBRAITH:  And you don't have family in the area,

        17    and you're the sole support?

        18          A JUROR:  Right.

        19          MR. GALBRAITH:  And that there -- so, you don't have

01:10   20    capacity to make alternate arrangements for child care?

        21          A JUROR:  I could, but I don't know -- it's not -- I

        22    mean, I have friends that could help; but it's not definite.  I

        23    would have to rely on my friends.  I'm going to give an

        24    example.

01:11   25          Last month my son was in school.  He was at

01:11   1   recess and he fell and he split his eyebrow.  And they called

2   me at work and it was -- it was fine because I was able to

3   leave, and I had to take him to the ER.

4          Now, if there were a situation like that here, I

01:11   5   would have to rely on friends.

6          MR. GALBRAITH:  Do you have good resources for that or

7   not?

8          THE COURT:  Well --

9          A JUROR:  It's un -- questionable.  I don't know.

01:11   10  Like --

11         THE COURT:  -- when you say "resources," you're

12  talking about whether she has somebody who can for cover her,

13  that kind of thing?

14         MR. GALBRAITH:  Yes.

01:11   15  THE COURT:  Okay.  Go ahead.

16         A JUROR:  Like, I have a friend, a very close friend;

17  but she's a nurse.  So, what -- God forbid something happened.

18  And if they called her, I don't know if she would be able to

19  leave work, because she's a nurse.  Same situation with a

01:11   20  neighbor.  She's an occupational therapist, and I don't know if

21  she would be able to do that.

22         MR. GALBRAITH:  Okay.

23         THE COURT:  You have a question, any question?

24         MR. BUZBEE:  How old is your child?

01:12   25  A JUROR:  He's 8.

01:12  1          MR. BUZBEE:  He goes to school full time during the

       2   days?

       3          A JUROR:  Yes.  Yes, sir.

       4          MR. BUZBEE:  You're saying that your biggest concern,

01:12  5   though, is really if there was an emergency at school?

       6          A JUROR:  Correct.

       7          MR. BUZBEE:  That's the real issue, like all of us

       8   parents would have, basically.

       9          A JUROR:  Right.

01:12  10          MR. BUZBEE:  Okay.

      11          THE COURT:  Your son doesn't have any particular

      12   physical attributes that would cause him to be more accidental

      13   than normal --

      14          A JUROR:  No.

01:12  15          THE COURT:  -- than a regular guy, regular boy?

      16          A JUROR:  No.

      17          THE COURT:  Okay.  Sometimes that's the case.

      18          MR. GALBRAITH:  There was a third area if I might,

      19   your Honor?

01:12  20          THE COURT:  Okay.  Sure.

      21          MR. GALBRAITH:  In an answer to the questionnaire, you

      22   indicated that based on what you had seen and heard before this

      23   trial, before today, that you had come to have a strong

      24   personal belief that had already caused you to believe that you

01:12  25   could not be fair to BP in this present legal dispute and you

01:12   1   had said, "yes," correct?

        2               A JUROR:  Oh, okay.  Okay.  Can you read the question

        3   again?

        4               MR. GALBRAITH:  Sure.  Can I show it to --

01:13   5               THE COURT:  Show it to her.

        6               MR. GALBRAITH:  It's your questionnaire --

        7               THE COURT:  Just let her read it.

        8               MR. GALBRAITH:  -- Number 46 --

        9               THE COURT:  Hold on a minute.  Is that her answer?

01:13  10               Okay.  That will be her questionnaire.

       11               A JUROR:  Okay.  "Is there anything about what you

       12   have read, heard, and learned from other -- regarding the

       13   accident -- at the BP or do you have a strong personal belief

       14   that has already caused you to believe" -- oh, I'm sorry.  I

01:13  15   probably was fatigued at the end.  It was a lot of questions,

       16   and it was -- I was tired.  But, no, I don't --

       17               THE COURT:  Checked the wrong box?

       18               A JUROR:  I would be fair.  I would be fair.

       19               MR. GALBRAITH:  Okay.  Thank you.

01:13  20               A JUROR:  Sorry about that.

       21               MR. GALBRAITH:  That's all right.

       22               THE COURT:  Okay.  Thank you very much.  You may have

       23   a seat.

       24        (At the bench with all counsel)

01:13  25               MR. GALBRAITH:  We would move to strike her, your

01:13  1    Honor, for the three reasons stated.

2         THE COURT:  And you oppose?

3              I'm not going to strike her.

4         MR. BUZBEE:  I have four kids in school, too.

01:13  5         THE COURT:  I'm not going to strike her.  I think

6    that -- I have a back problem, and many people may have limited

7    back problems.  But we can work with her back problem.

8              There is an automatic -- not an automatic, but a

9    disqualification -- or one she can claim where her child is

01:14  10   under a certain age.  She did not make that claim and so -- and

11   I've forgotten what that age is.  But that would generally get

12   her off the panel, from that perspective, if she'd make the

13   claim.  When you're working and you're not taking care of the

14   child full time, I believe you waive it.

15   *(In open court)*

16        THE COURT:  Number 19.

17   *(At the bench with all counsel)*

18        MR. GALBRAITH:  He's already stricken.

19        MR. BUZBEE:  He's stricken.

01:14  20        THE COURT:  I know.  But he raised his hand.  If I

21   don't bring him up, he'll think I ignored him and he'll throw

22   his hand up again.

23   *(At the bench with all counsel and a juror)*

24        THE COURT:  How are you doing this evening or -- this

01:14  25   afternoon.  I keep saying "evening."  Seems like it's evening.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:14     1    It's afternoon.

          2                      How you doing?

          3              A JUROR:  Fine.

          4              THE COURT:  You have some surgical -- not surgical but

01:15     5    some procedures that you're getting ready to have done.

          6              A JUROR:  (Indicating).

          7              THE COURT:  I don't need to see your paperwork.

          8                      Is that the reason you wanted to come up?

          9              A JUROR:  Yes, sir.  I'm going to have an MRI as well

01:15    10    as scans of my carotids for numbness in my face and headaches

         11    and those things there.  So --

         12              THE COURT:  All right.  Well, thank you very much.

         13                      Anything else, gentlemen?

         14              MR. GALBRAITH:  No, your Honor.

01:15    15              MR. BUZBEE:  (Shaking head).

         16              THE COURT:  Okay.

         17         (At the bench with all counsel)

         18              THE COURT:  Would you verify your -- Diane, would you

         19    step over, please?  I'm sorry.

01:15    20                      Strike through 3 and 4.  Did you get those two?

         21              THE CASE MANAGER:  Yes, sir.

         22              THE COURT:  Seven is staying on the panel, and that's

         23    it.  And I think we already have 19.  Verify that.

         24              THE CASE MANAGER:  Yes, I --

01:15    25              THE COURT:  Okay.  Good.

01:15   1                     Gentlemen?

2                     MR. GALBRAITH:  Could we reread on the record your

3       final rulings so we can know --

4                     THE COURT:  Final rulings or final names?

01:15   5                     MR. GALBRAITH:  Yes.

6                     THE COURT:  I can't go back and remember all my

7       rulings.

8                     MR. GALBRAITH:  Yes.

9                     THE COURT:  Okay.  Let's do that, then.

01:16   10                    Remaining on the panel are 2, 5, 6, 7, 10, 12,

11      13, 14, 15, 17, 20, 21, 22, 23 and 24, 26, 28, 29, 30, 31 and

12      32.  That constitutes the panel.

13                    You have three strikes each.

14                    MR. GALBRAITH:  Okay.

01:16   15                    THE COURT:  One, two, three -- hold on just a minute.

16      Three, six, seven, nine, ten, eleven, twelve -- okay.  We got

17      more than enough.

18                    So, how many do you want to seat?

19                    MR. BUZBEE:  Eight, at most.

01:17   20                    MR. GALBRAITH:  I think if we got ten we should seat

21      10, and I think we should.  I think we will.

22                    THE COURT:  We got more than 10.  I mean, when you say

23      if we got ten, we got more than ten remaining on the panel.

24      Right now, we have a total of 17 potential jurors without --

01:17   25      I'm sorry.

01:17  1    MR. GALBRAITH:  After strikes, in other words.

2    THE COURT:  No.  That's -- yeah, 17 -- well, that's

3    not right.  There are 12 strikes.

4    MR. GALBRAITH:  No.  There's six strikes.  Three a

01:17  5    side, right?

6    MR. BUZBEE:  Twenty-three.

7    THE COURT:  Be 23 remaining.  That's what we have, 23

8    remaining.  If we seat eight -- plus six is 14 -- that's still

9    within range.  If we seat 10, it's within range.

01:18  10    Any additional strikes needed?  Three and three?

11    MR. BUZBEE:  Three and three.

12    THE COURT:  And we're going to seat -- I think -- I

13    don't want to seat too many people, but I think if we seat

14    eight we've got a good panel.  I'm concerned about the weather.

01:18  15    That's the main thing.  Or somebody getting sick.

16    Very well.  Three and three, and let's seat

17    eight.

18    MR. BUZBEE:  Yes, sir.

19    MR. GALBRAITH:  Will we have maybe a 20 minute break

01:18  20    to kick this around?

21    THE COURT:  I'm going to let you do that now.

22    MR. GALBRAITH:  Yes.

23    THE COURT:  Did you want to do it in the courtroom or

24    did you want to step out?

01:18  25    MR. GALBRAITH:  I would like to step out.

01:18    1              THE COURT:  Okay.  There's a jury room -- I'm sorry.
         2    There's a --
         3              MR. GALBRAITH:  Clerk's room.
         4              THE COURT:  -- room at the back --
01:18    5              MR. GALBRAITH:  Yeah.  Okay.
         6              THE COURT:  -- right here, and there's also the law
         7    clerk's chambers over there.  So, you-all choose what --
         8              MR. BUZBEE:  We'll take the chambers.  That's where my
         9    sandwich is.
01:18   10              THE COURT:  Okay.  We'll call for you.
        11         (Recess was taken from 1:18 to 1:42 p.m.)
        12         (Jury panel present)
        13              THE COURT:  Ladies and gentlemen, the strikes have
        14    been completed.  We have a panel.  We'll ask you to come
01:42   15    forward.
        16              And if the first four of you would -- the first
        17    four names come forward in the order which you're called.  The
        18    first four of you should take the front row and the second four
        19    the back row, and we'll give you instructions if you get turned
01:42   20    around there.
        21              THE CASE MANAGER:  Do you want them to start here?
        22              THE COURT:  Yes.
        23              THE CASE MANAGER:  Okay.
        24              Number 1, H██████, S████; Number 2 D████;
01:43   25    Number 3, S██████.  It's I██ S██████.

01:43   1                    A JUROR:  Number 7?

     2                    THE CASE MANAGER:  Yes.  This is your new number,

     3       actually.

     4                    A JUROR:  This way?

01:43   5                    THE CASE MANAGER:  No.  This way.

     6                    A JUROR:  Excuse me.  I'm stepping on your feet.

     7                       All the way?

     8                    THE CASE MANAGER:  Yes.

     9                    H█████; D████; Number 4 is Number 10, K█████;

01:43  10       Number 5 is A██████, who was 14; Number 6 is R██████, who was

    11       17; Number 7 is 21, L██████; and Number 8, M██████, who was 22.

    12                    THE COURT:  All right.  Gentlemen, any objections

    13       other than what you might have already stated on the record or

    14       what you might have stated in your papers?

01:44  15                       And by that I mean looking at the strike list if

    16       you need to, that you prepared and presented to me, have we

    17       made a mistake, first?

    18                    MR. BUZBEE:  Not from our side, your Honor.

    19                    THE COURT:  All right.

01:44  20                    MR. GALBRAITH:  None from our side, your Honor.

    21                    THE COURT:  All right.  Any motions regarding any

    22       panel members at this time or the panel itself that you have?

    23                    MR. BUZBEE:  Not from the plaintiffs.

    24                    MR. GALBRAITH:  None, your Honor.

01:45  25                    THE COURT:  Thank you very much.

01:45  1          Ladies and gentlemen -- I'm sorry.  All right.

2   No men in the house.  Ladies, would you please stand and raise

3   your right hand at this time?

4          THE CASE MANAGER:  Do each of you solemnly swear that

01:45  5   in the case of Garner versus BP Amoco you will a true verdict

6   render according to the law as it may be given to you in charge

7   by the Court and to the evidence submitted to you under the

8   rulings of the Court, so help you God?

9          THE JURORS:  (In unison.)   I do.

01:45  10          THE CASE MANAGER:  Thank you.

11          THE COURT:  Thank you very much.  Please be seated.

12          Ladies and gentlemen, you have tolerated me well,

13   didn't throw any eggs or rocks or anything of that nature; so,

14   apparently I didn't do too badly.

01:45  15          Let me just say in behalf of the federal

16   judiciary that we appreciate your presence.  We know that your

17   time is valuable.  We know that you have what you claim to be

18   important things to do, and I know they are important.

19          But we don't want to drift too far from the

01:46  20   anchor and forget what really anchors us all in this process,

21   the reason we can go to work every day and the reason we can do

22   the things we do.  We sometimes need to pause just to remember

23   that and remember just how important it is that we look out for

24   each other.  And looking out for each other sometimes means

01:46  25   we're serving on jury panels.

01:46  1          Have a good day.  Thank you very much.  I'll see
       2  you next week.
       3          All right.  We're going to take a break.  I'm
       4  going to admonish the panel a little bit, and then we're going
01:47  5  to have to take a break.
       6          I don't know if you-all got a snack or anything.
       7  Some of you might have, but we did not.  We were tied up.  We
       8  need 15 to 20 minutes to do that.
       9          Let me give you some instruction.
01:47 10          Gentlemen, have a seat.
      11          Let me just give you some general instructions,
      12  and then we'll see if there are some other things.  You know,
      13  I've been in this business, I think I said, almost 30 years, 25
      14  or so years.  And I think, in the federal judiciary, this is
01:47 15  probably the second time -- only the second time that I've had
      16  a panel constituted of all women.  And that's not a reflection
      17  on you or me.  It's just something that happens occasionally.
      18          And, so, let me just say that we appreciate your
      19  service; and we expect that you will enjoy your work and
01:47 20  service with us.  We're going to do everything we can to make
      21  sure it's convenient.  We don't want to sit too long in one
      22  place; and we're going to do our best to be aware of and
      23  responsive to any emergencies, if any, that you might have.
      24          Now, I know that we're going to be in trial
01:48 25  almost every day; except there are a couple of days when we're

01:48  1  going to have either a half day off or a full day off.  And let

2  me just inform you now that this Friday we will work until noon

3  and we'll break until the following Monday, I believe.  And I

4  think we might start that Monday at noon.

01:48  5          Diane, do you have the real truth here?

6          All right.  Here we go.  We'll recess at noon on

7  December -- yeah, December 4.  We're in December already.

8  Isn't that amazing?

9          On Monday of the following week, we'll begin at

01:48  10  1:30.  So, you'll have a half day.

11          On the 14th, the following Monday, you will have

12  a full day.  We will not be coming in on that day, and we'll

13  begin that Tuesday at 1:30.  And the reason is this.  There are

14  some commitments that I have made in another court, that I need

01:49  15  to fulfill in Houston.  I have a docket up there, and I have

16  some things I need to do there.  That's part of it.

17          And, so, blame me if you're going to blame

18  somebody for these delays.  And on Wednesday, we -- if

19  necessary, we'll start at 1:30.  So, we're talking the 4th,

01:49  20  7th, 14th, 15th, and 16th where we'll be working pretty much

21  half days.

22          Now, I'm of the opinion that we can complete this

23  case within that time frame and without difficulty.  And, so,

24  we'll work together starting hopefully at 8:30.

01:49  25          Let me see.  Do we have any long distance drivers

01:49  1  on the panel here?

2  A JUROR:  What do you call "long distance"?

3  THE COURT:  Takes more than 30 or 40 minutes to get

4  here?

01:49  5  A JUROR:  Yeah.

6  THE COURT:  How far are you driving, Number 5?

7  A JUROR:  Pearland.

8  A JUROR:  Oh, so, am I.

9  THE COURT:  Okay.  Is that 30 minutes?  Is it an hour?

01:49  10  A JUROR:  No.  It's an hour.

11  THE COURT:  How about, Number 2, you're from Pearland,

12  as well?

13  A JUROR:  I'm from -- Number 2, from Pearland, too.

14  THE COURT:  Okay.

01:50  15  What about 14?

16  A JUROR:  Lake Jackson.

17  THE COURT:  That's on the back; and that's a pretty

18  good distance, too.  So, that's about 70 miles.

19  A JUROR:  About 60 miles.

01:50  20  THE COURT:  Yeah.  Here's the deal.  If you want to,

21  as they say, "put up" in Galveston, if you want to stay in

22  Galveston, we can make that arrangement for you, for a hotel,

23  someplace to stay.  It's up to you.  But you need to let me

24  know or let the case manager know so that -- if this distance

01:50  25  becomes a problem for you.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:50    1            A JUROR:  I'll take it day by day.  If it gets rough,
         2    I'll let you know.
         3            THE COURT:  Yeah, let us know that.  Okay?
         4                Yes, ma'am?
01:50    5            A JUROR:  Will we get a copy of the schedule that you
         6    just --
         7            THE COURT:  Yeah, we'll do that for you.  Absolutely.
         8                Yes, ma'am?
         9            A JUROR:  On the other days, what time should we be
01:50   10    here?
        11            THE COURT:  That's what I was saying, 8:30.
        12            A JUROR:  That's much better.
        13            THE COURT:  Typically, we'll start every morning at
        14    8:30.  And here's the logic.  I would like to get three hours
01:50   15    of work in in the morning and three hours of work in in the
        16    afternoon.
        17                We start at 8:30.  We take a break an hour and a
        18    half later for 30 minutes.  We do another hour and a half; and
        19    we take a lunch break for an hour, I believe.  We'll do an hour
01:51   20    and a half session in the evening, we'll take another 30 minute
        21    break, and do another hour and a half session.  That will put
        22    us out of here about 5:00 o'clock.
        23                Does that sound right?  Sounds late?
        24            A JUROR:  Will I be able to get a notice so I can give
01:51   25    to my job today to --

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:51   1          THE COURT:  Absolutely.

2          A JUROR:  I have a caseload of patients that they need

3     to --

4          THE COURT:  Absolutely.  We can give you an indication

01:51   5     as to where you are if you need something for your employer.

6     In fact, if I need to write a letter, I'll do that, as well.

7          A JUROR:  Okay.  Good.  Thank you.

8          THE COURT:  Yes, ma'am?

9          A JUROR:  I'll need to get something so I can try to

01:51  10     get someone to cover my evaluations that I have to do.

11          THE COURT:  Absolutely.  And, again, we can give you

12     something from the clerk's office.  But if that's not strong

13     enough, I'll give you a personal letter.  I've had to do that

14     in some instances and make sure employers appreciate and

01:51  15     understand that they can't be where they are if we can't be

16     here.  It's just that simple.

17              Any questions or concerns about the schedule or

18     about your travel?

19              And this can wear on you, I know, coming back and

01:52  20     forth.  That's a long way to drive, an hour and maybe 20

21     minutes each day.  Depending on the traffic, it can wear you

22     out.  And what we need most from you is your attention.  And

23     that can get hard when you -- you know, when you -- about 1:30

24     particularly.  That afternoon session is really difficult,

01:52  25     because that's after we've eaten.

01:52   1          Now, let me just give you some other thoughts.  I

2    recommend that you bring your lunch or find a place where you

3    can eat responsibly.  By "responsibly" I mean probably eating

4    less than what you would normally eat.  Because when you're

01:52   5    sitting, food tends to, you know, have its effect on us for

6    sure.  So, particularly at lunch, I would recommend that you

7    eat less than you probably would normally eat and do a little

8    snacking and maybe another snack at 2:30 or 3:00 o'clock,

9    whatever that time is.

01:53   10          I will not hold you here at night.  I will make

11   sure that you have -- if you're driving in, that we have

12   security to walk you to your vehicles.  And I believe most of

13   you are going to be parking probably in back.  Let's call it

14   the back.  It's behind the post office, so that we'll get you

01:53   15   safely to your vehicles and make sure that you're in good

16   shape.

17          Any other questions before I go further?

18          Yes, ma'am?

19          A JUROR:  I looked at the weather this morning.  They

01:53   20   were talking about flurries this Friday.  So, I was wondering

21   if it would -- I know --

22          THE COURT:  You talking about snow flurries?

23          A JUROR:  Yes, snow flurries, this Thursday and

24   Friday.

01:53   25          THE COURT:  Are you kidding?

01:53   1           A JUROR:  No, I'm not kidding.  I remember last year

        2   when it got cold and we got ice on the bridge and all the

        3   bridges were closed.  Would we be notified if --

        4           THE COURT:  Let me ask you this.  How many of you have

01:54   5   cell phones?  Okay.

        6           A JUROR:  So, is what -- we'll --

        7           THE COURT:  We're connected.

        8           A JUROR:  Are you going to call us or is there a

        9   number we can call?

01:54  10           THE COURT:  Well, I think if you run into a situation

       11   that's going to delay you or you cannot, then you need to call

       12   the case manager or court deputy, who will give you a number

       13   where you can reach them --

       14           A JUROR:  Okay.

01:54  15           THE COURT:  -- you know, early in the morning or late

       16   in the evening.

       17           A JUROR:  Okay.

       18           THE COURT:  Particularly early in the morning.  And,

       19   hopefully, we will not have that difficulty.  But if, for any

01:54  20   reason, you're delayed, you just give them a call and let us

       21   know where you are and how things are going.

       22           I don't advise you moving to Galveston; but if

       23   you need to get a hotel room, we need to do that, you know,

       24   just to make sure that you have -- and generally what happens

01:54  25   is when people -- you know, when I try cases in Houston, we've

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:54  1   had people from out of town.

2              They get to court on time great as long as
3   they're driving.  The minute they move in town, they sleep
4   late, come to court late.  They can't get it going, for some
01:55  5   reason.  So, hopefully -- if you have some challenges, please
6   let us know so we can make those arrangements for you and at
7   least cover you in that circumstance.

8              Now, I've said some things already about serving
9   as jurors.  Certainly, bias, prejudice, and sympathy have no
01:55  10   role to play in this process.  We listen to the testimony of
11   the witnesses; we make judgment calls about them in terms of
12   their credibility; and, of course, we compare notes -- you
13   compare notes.

14             By "notes" I don't mean you take notes.  You
01:55  15   compare notes at the end of the case in terms of whether you
16   believe or did not believe someone.  And, of course, in the
17   process of doing that, you come away with a verdict.

18             You decide the questions that are presented to
19   you.  You decide those questions, but you're the judges of the
01:56  20   credibility and the believability of the witnesses and the
21   weight that you want to give to their testimony.  You certainly
22   are not bound by the testimony of any one person.

23             During the course of this trial, you'll probably
24   hear persons testifying who say, "I'm an expert," or who are
01:56  25   presented to you as experts.  That testimony is not any more

01:56   1    credible or believable than any other testimony, except they're

        2    claiming to have expertise in a certain area.

        3            And you can give that testimony the weight you

        4    think it deserves, based on your experience, based on what

01:56   5    other witnesses have to say, and maybe even what other experts

        6    have to say.  So that simply having a title does not get you

        7    anyplace with us, the jury and the judge.

        8            I've often said this in other cases.  If the

        9    president comes in and decides he's going to take the witness

01:56  10    stand, he has to take an oath and his credibility or

       11    believability is on the line just like anyone else.  There is

       12    no granting -- or any deference to any person, based on his or

       13    her title.

       14            And, certainly, in terms of the trial of the case

01:57  15    and the back and forth, I think I said if you might want to

       16    bring your lunch or find that place but -- that you can get to

       17    and get back quickly, I think we generally -- if you've been in

       18    the jury room, you know that we have a coffee bar there.  We

       19    probably have some high cholesterol stuff, the kind of stuff

01:57  20    you don't want to have.  But we'll do our best to accommodate

       21    you.  Just in case you missed that wholesome breakfast, you'll

       22    have something in your stomach.  And, of course, we'll take

       23    breaks if we need to.

       24            And if, during the course of the trial, you need

01:57  25    to take a short break or something is going on, feel free to

01:57    1    raise your hand and let me know; and we'll take a short break

         2    and look out for you in that respect.

         3              I've already explained to you the procedure that

         4    will be followed; that is, opening statements, going into the

01:58    5    evidence, and all the way to the end, closing statements.  Now,

         6    if, for example, a person shows up in court here, that claims

         7    to be a plaintiff or a witness, that you know -- and, of

         8    course, there's no way sometimes to know that you know someone

         9    until you see them again.  If that happens, I would like you to

01:58   10    bring that to our attention so that we can talk to you about

        11    that.  You're not in trouble; we just need to make sure that we

        12    can cover -- or understand what that relationship is so that

        13    there is no breakdown in the trial process.

        14              Well, that's pretty close to what I need to say.

01:58   15    Let me ask counsel for the plaintiff, do you have any --

        16    anything that you need to bring to the Court's attention --

        17              MR. BUZBEE:  No, sir.

        18              THE COURT:  -- before we take a break?

        19              Mr. Galbraith?

01:58   20              MR. GALBRAITH:  No, your Honor.

        21              THE COURT:  All right.  We're going to take another

        22    exercise, another walking exercise, get some stretching in.

        23    It's 2:00 o'clock, I believe, by that clock on the wall.  I'm

        24    not reading that right.  It's 2:00 o'clock.  We're going to

01:59   25    take probably 30 minutes.  Take about 30 minutes to get a snack

01:59  1    and be ready to start at 2:30.

       2                Let me ask how many of you -- do any of you have

       3    childcare concerns now that you won't have tomorrow?  In other

       4    words, do you have to pick a child up before 5:00 o'clock?

01:59  5                A JUROR:  I need to call someone to pick my three

       6    children up by 3:00 o'clock.

       7                THE COURT:  Okay.  Let's do that.  And we should be

       8    out of here after the opening statements this afternoon.  We'll

       9    start the evidence first thing tomorrow morning.  So, that

01:59  10   means when you come back we'll take opening statements of the

       11   attorneys.  Well, we might be able to get some evidence in; but

       12   we'll work until 4:30 or 5:00.  Okay?

       13               All right.  So, let's take you where you'll be

       14   reporting to each morning.  We'll get you there, and that's

01:59  15   where you will congregate each morning.  And when you take a

       16   break, feel free to utilize that space.  Feel free to use that

       17   space for lunch.

       18               I don't know.  Do we have a refrigerator in

       19   there, Diane?

02:00  20               THE CASE MANAGER:  I don't remember seeing a

       21   refrigerator.

       22               THE COURT:  Yeah.  We'll see what we can get, if we

       23   need a microwave in there -- we'll see if we can get some stuff

       24   in there so that you don't have to run around the building

02:00  25   looking for these kinds of things.

02:00  1          And that's where we'll get you from when it's

2    time.  Okay?

3               Take about 30 minutes.

4          THE CASE MANAGER:  All rise.

5      (Recess was taken from 2:00 to 2:40 p.m.)

6      (Jury not present)

7          THE COURT:  Please be seated.  The panel will be down

8    shortly.

9          MR. GALBRAITH:  There's a housekeeping issue.  A

02:40  10   number of subpoenas have been served and -- on BP employees and

11   retirees, and they all asked for the employees to show up at

12   8:30 this morning.  And some have been served today, we think.

13   We don't have a complete list.  We don't know who all is the

14   subject of that.

02:40  15          But it doesn't seem right that they should have

16   to sit around here from 8:30 this morning.

17          THE COURT:  No, I don't no seem to have a problem with

18   that.  I think what we need -- I hope counsel will agree -- is

19   that he can indicate to you this afternoon when -- which, if

02:40  20   any, of those he needs.  And then I can swear in the rest of

21   the witnesses, and they can return -- and the two of you work

22   out the logistics of that, making sure that the witnesses

23   understand that they're not to take long trips or go places

24   that may make it difficult for us to have them present.

02:41  25          MR. BUZBEE:  Yes, sir.

02:41  1              Your Honor, two things with that -- and
       2   especially the retiree out there in the hallway.  I told him
       3   earlier, "Man, I'm going to try to raise this with the judge."
       4   He can be sworn in.  I would like to invoke Rule 615, swear him
02:41  5   in, invoke the rule, and we'll let him go.  And I'm going to
       6   work with counsel on that.
       7              THE COURT:  Is he the only one here right now?
       8              MR. BUZBEE:  No.  There's Mr. McLemore, the former
       9   fire chief; there's Joe Trapp; and I also served the plant
02:41 10   manager, Keith Casey, who didn't show up for some reason.
      11              THE COURT:  Okay.  Well, let's get them all in.  Who
      12   are you going to need this evening?
      13              MR. BUZBEE:  Neither of those two this evening.  So,
      14   if we can have Mr. Trapp come forward and Chief McLemore.
02:41 15              THE COURT:  Well, let's bring them in.  And we'll do
      16   that before we bring the panel in.
      17              MR. BUZBEE:  And with regard to invoking Rule 615, I
      18   raise that simply because I see that BP has two corporate reps
      19   and I think you're only supposed to have one.  So, that's
02:42 20   concerning to me.
      21              THE COURT:  You are entitled to one.
      22              MR. GALBRAITH:  In other words, I must designate one?
      23              THE COURT:  Yes.
      24              MR. GALBRAITH:  Is it possible, because of the
02:42 25   exigencies of BP, that I can --

02:42  1          THE COURT:  Where did the other gentleman go?

       2                Just hold it right there.

       3                Was it just two?

       4          MR. BUZBEE:  Yes, just two.  The other one didn't show

02:42  5  up.

       6          THE COURT:  Oh, okay.

       7                Okay.  Let's take this up.  Go ahead.  Go ahead.

       8          MR. GALBRAITH:  What I would like to reflect to the

       9  jury is that one or the other will be here serving as a

02:42  10  corporate rep.  I'm not sure that -- it doesn't seem fair to me

       11  that they both have to give up their day jobs full time for an

       12  extended period of time.

       13                I would like to suggest to the jury, if it's

       14  okay, that this is something we take seriously and one or the

02:42  15  other one will be here at all times.

       16          THE COURT:  I don't have any problem with alternating,

       17  if that's -- unless there's something that I'm not aware of --

       18          MR. BUZBEE:  I'm not sure.

       19          THE COURT:  -- alternating who the representative

02:42  20  might be.

       21                Now, here's a question.  Is either of them going

       22  to be testifying in this case?

       23          MR. GALBRAITH:  Mayhaps.

       24          THE COURT:  Well, I think if you're going to have them

02:43  25  alternating, that's going to be a problem unless you designate

02:43   1   one as a testifying witness.  Because the point is that

2   somebody might -- one of them would be here one day, let's say,

3   and one a different day.  And if you designate them both as

4   testifying, then for sure they cannot alternate.

02:43   5       MR. GALBRAITH:  Then I will make that decision and

6   designate by tomorrow morning, if that's okay.

7       THE COURT:  Certainly.  I don't think that's a

8   problem.

9           Gentlemen, you've been subpoenaed as witnesses.

02:43  10   Would you raise your right hand at this time?

11           And tell me your name for the record, sir.

12       MR. TRAPP:  Joseph Trapp.

13       THE COURT:  Joseph --

14       MR. TRAPP:  Trapp.

02:43  15       THE COURT:  T-R-A-P-P?

16       MR. TRAPP:  That's correct.

17       THE COURT:  And yours?

18       MR. McLEMORE:  John McLemore.

19       THE COURT:  Do you solemnly swear or affirm that any

02:43  20   testimony you'll give in this case will be the truth, the whole

21   truth, and nothing but the truth, so help you God?

22       MR. TRAPP:  I do.

23       MR. McLEMORE:  I do.

24       THE COURT:  All right.  Gentlemen, the rule has been

02:43  25   invoked, which means that you are not to talk to anyone about

02:43   1   the testimony that they have given; that is, you shouldn't

2   consult with others who have already given their testimony.

3          You shouldn't let people talk about their

4   testimony in your presence, and the lawyers understand fully

02:44   5   that they cannot coach you in the sense of telling you what

6   someone else has testified to as a way of influencing your

7   testimony.

8          Once you've given your testimony, you still

9   cannot talk about that testimony except with the lawyers unless

02:44   10   you are excused from the rule.  And in that instance, being

11   excused means that you're free to talk with anybody you choose,

12   as long as you're not talking to somebody else who is going to

13   testify in the case.  Because they're bound by the rule; and

14   you should not, directly or indirectly, violate the rule.

02:44   15          Understood?

16          MR. TRAPP:  Yes, sir.

17          THE COURT:  Thank you, gentlemen.  Your attorney,

18   Mr. Galbraith, will be in touch with you as you're needed.  So,

19   make sure that if you've got any plans or thoughts of leaving

02:44   20   the area that you let him know before so that he can coach you

21   as to when your testimony might be needed.  All right?

22          MR. TRAPP:  Okay.

23          THE COURT:  Okay.  Thank you.  You may be excused.

24          MR. GALBRAITH:  Can they stay around for the opening

02:45   25   statements?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:45  1        THE COURT:  No, not the opening statements either.

2             Let's see.  Do we have any other witnesses in the

3    courtroom, other than the plaintiffs?

4             Okay.  Good deal.

02:45  5        MR. VICK:  Your Honor, we do have one other issue.

6    One of our doctors, Dr. Kerry Laursen, who we would like to

7    call to testify, is not going to be available until next

8    Thursday or Friday because she had some travel plans, other

9    things going on.  So, we would just like to be able to take her

02:45  10   out of turn if that's not a problem.

11        THE COURT:  I don't seem to have a problem with any

12   witnesses being taken out of turn.  The evidence is the

13   evidence.  So, if that -- if you would simply make sure that

14   opposing counsel understands the order of witnesses that you're

02:45  15   planning to call, that's not a problem.

16             Now, if you're expecting that by that time you

17   will be done with your case and that the defense will be

18   calling witnesses, that might be a different problem, a

19   different concern.  So, do you think you'll be done before you

02:45  20   get to her?

21        MR. VICK:  Yeah, and that is my concern.  I'm afraid

22   that we will have finished putting on all the rest of our

23   evidence before then.

24        THE COURT:  Okay.  Concern about the witness

02:46  25   unavailability, taking it late?

02:46   1          MR. GALBRAITH:  I'm confident we can put them in

2      where -- you know, at a convenient time, in the middle of

3      somebody's case won't affect us at all.  I mean, we won't have

4      an objection on out of order.

02:46   5          THE COURT:  I can instruct the jury accordingly.

6          MR. BUZBEE:  I'm wondering if we could take her depo

7      in the evening hours and just play it.  Would you be willing to

8      do that?

9          MR. VICK:  I'll tell you, the only issue with that is

02:46  10      she's leaving town late tonight, early tomorrow morning.

11          MR. BUZBEE:  We'll work it out.

12          THE COURT:  It's been worked out as far as the Court

13      is concerned.  If you-all work out something different, that's

14      up to you.

02:46  15          MR. BUZBEE:  Thank you, your Honor.

16          MR. VICK:  Thank you, your Honor.

17      *(Jury present)*

18          THE COURT:  All right.  Please be seated.

19          Ladies and gentlemen -- let me ask, did you get

02:47  20      your phone call in?

21          A JUROR:  Yes.

22          THE COURT:  I think we're good to go.  And what I will

23      do now is take -- or permit the lawyers to make their opening

24      statements.

02:47  25          They have indicated to me what they believe to be

02:47  1    an appropriate time; and I will watch the clock to make sure

2    that they are in conformity, as best as I can, and go from

3    there.

4                As we have said earlier, the plaintiff gets the

02:48  5    privilege of going first; and plaintiffs' counsel will proceed

6    at this time.

7                MR. BUZBEE:  Thank, your Honor.  May it please the

8    Court.

9                THE COURT:  Sure.

02:48  10               MR. BUZBEE:  Hi, I'm Tony Buzbee.  We briefly met

11   before we started.  I'm really happy to see you-all here.  And

12   I want to talk to you today about responsibility.  And the

13   define -- it's funny.  We talk about responsibility a lot; but

14   the definition that I could find was "moral, legal, or mental

02:48  15   accountability."  Or as Truman used to say, "The buck stops

16   here."

17               When you work in a plant, you shouldn't expect to

18   be exposed to something -- and this is the general premise of

19   our case -- you shouldn't expect to be exposed to something

02:48  20   that sends you and over a hundred other people to the hospital,

21   two different hospitals, in ambulances, and then have the

22   company that owns the plant tell you later, "We don't know what

23   it was."  That's our case.

24               This is Garner versus BP Products.  You're going

02:49  25   to learn in this case that there has been a pattern of

02:49   1   unnecessary and unlawful emission events, poor operation and

2   maintenance at the BP Texas City plant.

3           When you drive down 45 --

4           MR. GALBRAITH:  Your Honor?

02:49   5           THE COURT:  Yes.

6           MR. GALBRAITH:  I have to interpose -- I believe I

7   have to interpose an objection at this time to -- subject to

8   your prior rulings and motion in limine and such, this is --

9   pattern of conduct is irrelevant and immaterial to this case

02:49   10  concerning itself with April 19, 2009 [sic].

11          There has been no proper predicate as of yet.  It

12  is improper character evidence.  There's been no showing of

13  similarity, substantial, reasonable, or otherwise.  It violates

14  this Court's prior rulings, Federal Rule 404(b), Federal Rule

02:49   15  403 --

16          THE COURT:  Well, as to whether or not it violates my

17  rule, let's leave that part out, because what you need to be

18  making is an objection.  And if that's your objection, then I

19  understand that.

02:50   20          But the Court's not going to permit counsel on

21  either side to remind the Court as to what my rulings might

22  have been.

23          MR. GALBRAITH:  Also, it's not reasonably restricted

24  to time, area, or scope.

02:50   25          THE COURT:  All right.  The objection is overruled.

02:50  1                    Let's proceed.

       2              MR. BUZBEE:  I'm going to try to move this case, from

       3    my side, with my team, as quickly as possible.  This is the

       4    most important case we've tried in this state this year.

02:50  5              On April 19th of 2007, 110 contract workers --

       6    that is, non BP employees, but people that worked at the

       7    plant -- were triaged and taken to two separate hospitals and

       8    decontaminated.

       9              More than 189 people smelled an odor that's been

02:50  10   described, you'll learn, a lot of different ways.  It's kind of

       11   like if the odor were here and I walked out the door and said,

       12   "Okay.  Each of you come and describe to me the odor."  You

       13   know the game; everybody is going to give a little different

       14   description.

02:51  15             The symptoms that the people had were burning

       16   eyes, nausea, burning throats, throwing up, and even some

       17   people passed out.

       18             BP, as I said, has never identified what the

       19   substance was that these hundred and ten or so odd people were

02:51  20   exposed to.

       21             We're going to prove to you in this case that BP

       22   is a serial polluter.

       23             MR. GALBRAITH:  Your Honor, I must interpose the same

       24   objection.

02:51  25             THE COURT:  It will be overruled.

_Cheryll K. Barron, CSR, CM, FCRR_                    _713.250.5585_

02:51    1           MR. GALBRAITH:  Thank you, sir.

2           MR. BUZBEE:  You know what they say about history:

3    History repeats itself because no one was listening the first

4    time.

02:51    5               In the five years leading up to this case, I'm

6    going to bring you proof that at BP there have been over 500

7    releases --

8           MR. GALBRAITH:  Your Honor --

9           MR. BUZBEE:  Oh, my goodness.

02:51   10           MR. GALBRAITH:  -- might I have a running objection to

11    this same line of testimony or questions regarding incidents

12    other than those related --

13           THE COURT:  Well, first of all, there's no testimony

14    and there are no questions.  This is an opening statement.

02:52   15               Let me just say to the ladies and gentlemen of

16    the jury it is the province of each of the lawyers to tell you

17    what they believe the evidence will be in the case.

18               Did my system go out on me?

19           MR. BUZBEE:  We can hear you, sir.

02:52   20           THE COURT:  Yeah.  It's something -- yeah, okay.

21               It's within the province of each counsel.  Both

22    plaintiffs and defendants will tell you what they believe the

23    evidence, from their perspective, will show.

24               This is not evidence.  Lawyers do not give you

02:52   25    evidence.  The evidence comes from the witness stand and it's

02:52   1   that evidence that the Court permits.  So, everything that
        2   lawyers say may or may not become evidence in the case.  It
        3   will have to come from the testimony as well as the exhibits
        4   that are admitted.

02:52   5           So, having said that, I'm not sure what a running
        6   objection does, because I have -- I'm concerned about that.
        7   The lawyers can say later on, "I had an objection to everything
        8   that was said."

        9           And if you want to object to the opening
02:52   10  statement that is being made, I'm overruling that objection
        11  because these are simply representations, in my view.  And the
        12  Court's view -- that is, the Court -- I mean, the law's view of
        13  what plaintiffs' counsel intends to show, whether he's
        14  permitted to do it or not.

02:53   15          And I'll say the same thing to him if he objects
        16  to your --

        17          MR. BUZBEE:  I won't.

        18          THE COURT:  -- opening.

        19          Let's proceed.

02:53   20          MR. BUZBEE:  I'm going to move this along.

        21          In the five years leading up to April 19th of
        22  '07, BP had 500 -- "500" -- leaks, spills, odor events, and
        23  releases, 45 of which were absolutely unlawful.

        24          You're going to hear from the BP fire chief, who
02:53   25  is sitting out in the hallway, before he retired in August that

02:53  1   BP was averaging one fire a week at that plant.

2              And you're going to hear this -- this phrase over

3   and over, "an odor event."  What it means is something has

4   released and it's so caustic or so toxic that it gets put into

02:54  5   BP's internal database.  And you're going to learn that over 70

6   percent of the time when one of these events occurs -- and I'm

7   talking about -- not just, you know, you drive down the freeway

8   and you smell something bad.  I'm not talking about that.

9              I'm talking about an incident that's serious

02:54  10  enough it goes into their database and they're supposed to

11  track it, investigate it, and source it.  You're going to learn

12  that over 70 percent of the time they don't do that.  And

13  that's what happened in this case.  This is one of these odor

14  events.  It just so happened it sent 110 people to the

02:54  15  hospital.

16             There's some terms we're going to talk about.  A

17  leak -- I mean, some of these -- it looks self-explanatory, but

18  there is -- there are some terms of art.  You probably know

19  this.  A "leak" means some sort of liquid left a pipe or a

02:54  20  vessel.  Okay?  A "spill" means a vessel turned over, a bucket

21  turned over, that sort of thing.

22             Let's make sure we're all on the same page.  A

23  "release" has to do with a vapor.  All right?  So, a pipe

24  busts, valve -- you're going to see valves all the time out

02:54  25  there because of poor maintenance, no inspection, no pipe

02:55   1   integrity program, and, frankly, spending no money on the

2   plant.  Releases occur all the time.  Vapors are in the air all

3   the time out there.  And, then, what is called an "odor event."

4           This is this the catchall category, you're going

02:55   5   to learn, where BP says, "Yep, we have people who were exposed

6   and they went to the hospital; but we don't know what it was.

7   And, so, we -- because we don't know, we don't have to

8   categorize it in A, B, or C and we don't have to tell the

9   authorities."

02:55   10           This is -- you're going to learn something about

11   something you may not have heard about.  Something you may not

12   have realized is that at BP their policy is this.  "If you

13   cannot source what leaked or what released or what spilled, you

14   don't have to report it."  So, you're going to learn that there

02:55   15   is an incentive there for them not to find out what spilled,

16   leaked, or released.

17           Because if they don't have to determine if it was

18   enough that requires reporting to, for instance, the TCEQ, then

19   they don't have to report it.  So, they can say, "Yeah.  Well,

02:56   20   hey, authorities, 110 people went to the hospital.  But we

21   don't know what it was; so, we -- you can't say we violated any

22   either EPA rule or the Texas Commission on Environmental

23   Quality rule, because we can't tell you what it was."

24           One thing I think is pretty commonsensical is

02:56   25   that lack of maintenance and inspections are what lead to

02:56   1   leaks, releases, and spills.  In other words, we're talking

2   about a plant, you'll learn, that's more than 50 years old.

3   Okay?

4        We're talking about a plant that you will learn

02:57   5   that for almost a nine year period no money -- "no" money was

6   spent on capital improvements, on revamping the maintenance

7   program, on piping replacement, on valve replacement, because

8   someone in England, London, made the decision that, "We don't

9   have the money for that."

02:57   10        And lack of maintenance, lack of spending money

11   on maintenance, and lack of an inspection program, what is

12   called a "piping integrity program," leads to leaks, releases,

13   and spills.  And you hear the lawyer over here talk to you,

14   say, "Well, I don't want talk about the 500 other ones that

02:57   15   happened leading up to this and I don't want to talk about the

16   one that happened immediately the night before or the two more

17   that happened the day before.  I just want to talk about this

18   one, because we didn't figure out what it was."

19        And I'm going to suggest to you in this case, as

02:57   20   you hear the evidence, that guess what?  Every single one of

21   those leaks, spills, and releases are relevant and are

22   important to you, as members of this jury, because it shows a

23   custom and practice, a course of conduct by BP that frankly

24   says, "Hey, a fire a week is par for the course.  Two -- two

02:58   25   leaks on average a day, hey, we're BP."

02:58  1          And I'm going to suggest to you that as members

2    of this jury -- at the end of the case, I'm going to suggest

3    that you, sitting in judgment, now elevated, as the judge said,

4    have not only the ability to do something about this but I'm

02:58  5    going to suggest at the end of the case you have a

6    responsibility to do something about this.

7          Now, we're talking about releases -- releases,

8    spills, and leaks.  You know, when I was -- I was in the

9    marines, and one of the things we had to do was go into the gas

02:58  10    chamber.  I think one of the guys mentioned it.  And we had to

11    go in there and exercise and take off our masks, and then we

12    got gassed.  And we'd run out, and everybody is puking and so

13    forth.  And that was -- I mean, that's what you have to do when

14    you're in the military, I suppose.

02:59  15          But we're not talking about that here.  We're not

16    talking about you driving down 45 and smelling something and

17    saying, "That stinks," or me living up in Friendswood and I'm

18    out playing with my children and smell something, say, "That's

19    Texas City."  That's not what we're talking about.

02:59  20          We're talking about spills and releases and leaks

21    that are so serious that you send somebody to the hospital to

22    be -- in fact, a lot of these men and women -- there's men and

23    women that were contract workers.  A lot of these folks were

24    not even allowed out of the ambulances or off a bus until they

02:59  25    had -- they had a decontamination station set up.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

02:59   1          We're talking about a serious event that occurred

2     in Galveston County, where over a hundred ten people -- and

3     we're talking about every authority responding, sending people

4     to not only Mainland Medical in Texas City but also to UTMB.

03:00   5     We're talking about toxic and hazardous chemicals, corrosive,

6     reactive, explosive, flammable; and we're talking about

7     polluting our air, our ground, and our water.  That's what

8     we're talking about in this case.

9          You're going to learn that -- and some of you

03:00   10    with experience at plants know this already.  The number one

11    rule, everybody will say -- you'll listen for this because I'm

12    going to ask every witness.  "Witness, what is the number one

13    rule at a chemical plant?"

14         "Keep it in the pipes."

03:00   15         Number one rule, keep it in the pipes.  And if it

16    leaves the pipes, something went wrong.  Simple as that.  From

17    January 1, 2005, to June 30, 2005, there was 76 leaks from

18    valves, three leaks from pumps, 16 leaks from connectors, a

19    total of 95 leaks in just a six-month period.  That's a lot of

03:00   20    leaks.  Thirty-three of those leaks were from the Cat 3 Unit,

21    which is immediately adjacent to where these folks were

22    working.  And 21 leaks were from the actual unit these folks

23    were working in.  That's in a six-month period.

24         The next six-month period, from July 1, '05, to

03:01   25    December, 184 leaks from valves, 48 leaks from pumps, a total

03:01  1    of 232 leaks in six months.  I mean, let that sink in here.  I

2    mean, we're not talking about, oh, you know, we know leaks

3    happen.  I mean, stuff happens.  You know what they say, stuff

4    happens.  It's not that.  This is something different.

03:01  5                This is a pattern and a course of conduct that

6    continues to get worse.  In six months, 232 leaks.  The next

7    six-month period, 123 leaks.  The next six-month period, 196

8    leaks.  We starting to see a course of conduct here and a

9    pattern?  There's a pattern.

03:01  10               From January 1, '07, to June 30th -- and we're

11   talking about leading right up to the incident in this case --

12   82 leaks, five of which from that Pipestill 3A Unit, which is

13   where these -- all these folks were working.  What happens

14   is -- as some of you know, probably a lot better than me in

03:02  15   some cases.

16               But at the BP plant there's certain -- you're

17   going to hear these terms like "pipestill" and "SRU Unit" and

18   "Alky 2 Unit."  And we're going to show -- I'm going to bring

19   you a little chart so we can all kind of orient ourselves about

03:02  20   what area of the plant -- because we're talking about a 2 mile

21   area, 1200 or so acres.

22               When you drive down 45 and you see the pipes over

23   there to your left, before you get to Galveston, take a whiff

24   of air.  That's it, that's BP Texas City.  And the reason

03:02  25   you're going to hear these terms, because I'm going to try to

orient you, and orient myself, quite frankly, about where these things are coming from so you can see that this is not one particular unit within BP or one particular area. We're talking about a plant wide problem. I mean, a plant wide problem that can be -- and you'll see that -- I'm going to bring you the documents.

It's not going to be Tony Buzbee from Friendswood telling you, "Here's the truth, ladies, women." It's going to be -- it's going to be BP's own documents. So, you don't have to believe -- I mean, I don't think I'm a liar; but you don't have to believe me. Believe their documents, thousands and thousands of them, that our folks went through and pulled all this information out.

Now, April 19th of 2007, the Pipestill 3B Unit was being what they call "turned around." That means it was down and they had about 450 or so contractors, non BP employees, non union employees, out there working in the middle of the night essentially, turning it around and getting it ready to be brought up, because -- brought back up online, because at the plant -- if the plant is not operating, BP's not making money. Simple as that.

At about 8:00 o'clock, you're going to hear that that was when the first -- a few minutes, really, before 8:00 o'clock -- I'll show you the document. That's when the first person up on a tower smelt something. And that person

1   was overwhelmed by the smell.

2          And it's not something that smelled foul.  It's

3   something that overwhelmed this person, almost made them pass

4   out.  And they started coming down.  And then the smell

5   continued to grow, and people started dropping.  I mean, it was

6   kind of like you see these military movies, you know, gas, gas,

7   gas, and, you know, some people freak out and some people, you

8   know, keep their heads.  And, so, it's kind of that situation.

9          We're talking about hundreds of people are

10  smelling this.  And that's when -- and then it took them

11  another -- you will learn, another hour to sound an alarm -- an

12  hour to even sound an alarm to tell everyone within the plant,

13  "Hey, there's something here.  People are passing out.  People

14  are reporting that their eyes are burning, that they can't

15  breathe.  They're coughing, they're throwing up," etcetera.  It

16  took an hour.

17         And we're going to focus in on why it took an

18  hour, and we're going to focus in on the alarm system.  And

19  we're going to focus in on the maintenance of the alarm system

20  even.  Because it's indicative, it's a good indication for you,

21  as jurors, of how BP looks at safety.

22         And that's why, when you walked through the hall

23  and saw Fire Chief McLemore, his testimony -- he's a nice

24  old -- older gentlemen, gray hair, you may have seen in the

25  hall.  His testimony is going to be so important, because he's

03:05  1    going to talk about the fight he personally had with BP, trying

2    and trying and trying to have them spend money on a plant wide

3    alarm that they simply were not going to spend the money for,

4    period.  For nine years, he had this fight.

03:05  5            You're going to learn in this case that not only

6    are there hundreds and hundreds of releases, of leaks every

7    year; but also, kind of more important for our purposes, is

8    that BP, when they have a leak, they don't investigate it

9    properly or thoroughly.

03:06  10           For instance -- this is just a -- what you call a

11   "for example."  I'm showing you there -- one, two, three, four,

12   five, six -- seven instances where -- exchanger release of a

13   hundred pounds of hydrocarbon, an exchanger release of

14   200 gallons of hydrocarbon, an exchanger release of 350,000

03:06  15   gallons of hydrocarbon, and so on and so forth, were not

16   investigated.  I mean -- I just mean it spills, it gets out of

17   the pipes, and they simply don't investigate.

18           Now, those of you that work in an industrial

19   setting, one thing you're going to learn in this case is

03:06  20   there's something called "critical factors" and "root cause."

21   And "root cause" is kind of like -- it's self-explanatory, but

22   it means, "What was it, what was the one thing that caused this

23   that if we fix in the future can keep this from happening

24   again?"  That's the "root cause."  No root cause, not found,

03:07  25   not even looked for.  That's just seven or eight examples.

03:07   1          Not only did they not investigate leaks and

2    spills and releases, but they also don't investigate odor

3    events.  And it's even easier not to the investigate an odor

4    event, because you have an odor which is obviously from some

03:07   5    chemical or substance in the air, it overcomes -- somebody gets

6    overcome, the wind eventually blows it away.

7          And then BP comes out, says, "Oh, I don't smell

8    anything.  We're not able to determine.  Chalk it off as

9    another odor event, no report needed."  That's a practice.

03:07  10    That's a course of conduct.  That happens all the time.  And

11   I've already explained it.  Why does that happen?  Because the

12   requirements are the way they are.

13          I'm going to show you BP's policy.  I'm going to

14   show you that any reasonable and fair minded person can look at

03:08  15   it and say, "Yes, that's a policy that dis-incentivizes people

16   to report."

17          I went through all the documents.  We talked

18   about how if you don't source it you don't have to report it.

19   And you can see there just one example of a -- like, a four

03:08  20   year period where -- identified odors versus non identified?

21          Now, we've --

22        THE COURT:  You've got ten minutes.

23        MR. BUZBEE:  Yes, sir.

24          You don't learn from history, you're bound to

03:08  25   repeat it.  Let's go through a few more of these things.

03:08    1          The pipestills where these men and women were

2    working have a history of unremitted problems.  There are

3    violations, twenty-one leaks in that area alone.  And, then, to

4    compound this, there was absolutely no maintenance -- not just

03:08    5    minimal maintenance, not just failure to maintain properly, but

6    no maintenance for over a year.

7          You're going to learn that the pipestill unit

8    where these folks were working is about -- oh, gosh -- 800,

9    900 feet away from the SRU Unit.  And we're going to prove to

03:09   10    you that where this hydrocarbon, this -- carbon disulfide is

11    what it was.  BP was ordered by the Court -- ordered by the

12    Court to identify it, and they failed to do it.

13          We went out and hired experts that are going to

14    come to you and identify for you the source of the leak.  And

03:09   15    we're going to tell you and prove to you that the source of the

16    leak was the SRU Unit.  That's where the carbon disulfide came

17    from.

18          We're going to prove to you that that particular

19    unit has a history of problems.  You can see what's leaked out

03:09   20    of that thing in that time frame.  Let's talk about in the days

21    leading up to the leak.

22          Now, listen.  We're talking about one month

23    before this happened.  In March -- let's start with January.

24    January, a couple of months before it happened, workers were

03:10   25    overcome by a strong odor causing nausea and sore throat.  Five

1    days before it happened, workers were overcome by the same
2    smell, causing nausea.
3              And, then, we're literally 24 hours before all
4    these folks went to the hospital -- why am I telling you this?
5    Because at some point you snap to and say, "Hey, wait a minute.
6    Something is happening here."
7              Small things lead to -- you know, small holes
8    sink big ships.  I mean, come on.  And no one at BP snapped to
9    and said, "There's a problem.  People are being overcome with
10   odors.  They're going to the hospital.  Are we going to look
11   into this?"  They didn't investigate these at all.
12             So, you can see, January 22nd, April 12, and then
13   24 hours -- less than 24 hours before, five workers overcome
14   by -- and you'll hear them say, "the same odor that we smelled
15   20-something hours later."  They did nothing.  Nothing.
16             That's BP's corporate philosophy, "If you ignore
17   it, maybe it will go away."  And it did go away.  It was blown
18   away by the wind eventually, after 110 people went to the
19   hospital.
20             Now, let me be clear with you something about
21   this [sic].  We'll get through -- let me just --
22             Nick, turn that off for a minute.
23             I've got a few more minutes.  I want to say this
24   to you.
25             This is not -- I'm not going to try to tell you,

try to convince you that -- that 110 people going to the
hospital, "Give me -- give me millions and millions and
millions of dollars."  It's not that.  That's not this case.
All right?

          These people were overcome.  They live with, "I
don't know what I was exposed to.  They won't tell me what I
was exposed to."  They missed three, four, five days of work.
Some of them are still having problems.  But I'm not going to
bring you a doctor that says, "This man, this woman is ruined
for life."  I'm not going to do that.  I've got more -- I mean,
myself, frankly, I feel like I have more credibility than that,
to try to prove to you these men and women are ruined for life.
That's not this case.  Let me tell you what this case is.

          At the end of the case, I'm going to ask you to
find that BP was negligent and caused that release; and then
I'm going to ask you to give these gentlemen and this lady
money for their hospital bills, for their follow-up pulmonary
treatment, for their days missed from work, some mental anguish
from not knowing what they were exposed to, for the cost they
had to go to to get to this point.  So, we're not talking about
millions and millions of dollars.

          But, then, the second phase is this.  You sit in
judgment.  This is the most important case, I'm telling you,
that will be tried in this state this year.  And at the end of
the case, I'm going to ask you to punish these people, this

company, and I mean "punish" them, because of what they're
doing, what they did to these people, my clients, but what
they're doing to our environment.

          And until someone stands up and says, "Enough.
The buck stops here," it will continue.  It will continue.
That's the reason we're here in this case.  Responsibility.
Along with that is accountability.  And at the end of the case,
I'm going to ask you to hold them accountable.

          Thank you very much.

          THE COURT:  All right.  Thank you, counsel.

          Mr. Galbraith.

          MR. GALBRAITH:  Yes, your Honor.

          Before I do anything else, I would like to tell
you what I think the evidence is going to show in this case,
why we're here, and what we stand for here today.

          On April 19th of 2007, when we first learned that
somebody was reporting an unusual odor, we responded.  We
jumped into action.  You're going to get a chance to see that.
I'm thankful for that.

          We did so because we wanted to find out, no one
more than us wanted to find out whether anybody was exposed to
any unsafe level of anything on our plant.  We checked out
people, we checked out air, we checked out our plant, we
checked out our equipment.

          And this case asks, "What did BP do wrong on

03:14  1   April 19, 2007?"  And our investigation will show you BP did
       2   nothing wrong on April 19th, 2007.  In fact, what I believe is
       3   going to be the evidence in this case is what we did on
       4   April 19, 2007, and over the next several weeks shows you that
03:14  5   we took this very seriously, that we wanted very much to find
       6   the answer.  Our response was immediate, it was real, it was
       7   sincere, it was honest, it was thorough, and it was vigorous.
       8            And I'm going to tell you that it will, in our
       9   minds and I hope in yours, satisfy you that we are running our
03:14 10   business right, we are devoting the proper resources to our
      11   business.  And it should give assurance to not only those
      12   people who were at the plants, answer their questions, but
      13   yours in the community, as well.
      14            Having said that, I'm Jim Galbraith.  I'd like to
03:15 15   formally introduce myself.  I've practiced law since 1978,
      16   about a block right down that way, right here in Galveston,
      17   with McLeod Alexander Powel & Apffel.  One of the first things
      18   I did in 1978 is I went to visit the BP Texas City refinery,
      19   and I've been going there for one initiative or another ever
03:15 20   since.  And I know those folks, and I'm glad that you're going
      21   to get a chance to meet some of those folks.
      22            And you're going to see the dedication they
      23   bring, the competence that they bring, the expertise that they
      24   bring.  They don't leave it at the office.  Many came out from
03:15 25   their homes that night.  You're going to get a chance to see

03:15   1   that.

2           This case presents serious allegations that BP

3   takes very seriously.  And we took them very seriously on

4   April 19th, 2007.  I indicated to you that you will get to see

03:16   5   BP's response to workers and their workers' stated concerns.

6   No worker concerns were ignored.  This case asks, "What

7   happened on the evening of April 19, 2007?  Did BP do anything

8   wrong?  What, if anything, caused a smell?"

9           To this day, it is an unknown smell from an

03:16   10   unknown source of an unknown cause in spite of it all, in spite

11   the plaintiffs' allegation.

12           What the plaintiffs also have to prove to you is

13   did we hurt anyone, even temporarily.  And still, to this day,

14   one reason why we're here is there's no proof BP did anything

03:16   15   wrong April 19th, 2007.

16           Now, the fact of the matter is they want to talk

17   about anything except April 19, 2007.  We're going to be

18   focusing on what their petition alleges, which is April 19,

19   2007, what did happen that day, what do we know about that day.

03:16   20           At about 8:45 to 9:00 p.m. there was a -- one

21   hole watch, safety watch, who was in the Pipestill 3B Unit; and

22   she reported that she smelled something unusual, not like a

23   typical refinery smell.  This is not like a refinery smell.

24   This is not like something that comes from a refinery.  This is

03:17   25   new and different.  But she reported it on her radio, which

03:17  1   means that a lot of people heard it.

2              Now -- okay.  BP's response was immediate.

3   Basically what we said was, "Okay.  Get your guys down.  Get

4   your people out.  Let's get to the safety muster points."

03:17  5   Workers headed to the safety muster points.

6              There were, as stated, about 450 workers in this

7   unit.  A hundred and some of them ultimately reported smelling

8   something.  Three hundred of them, in the same area, didn't

9   report smelling anything.

03:17  10             The other thing interesting about this is that so

11  we said, "Okay.  Everybody out.  Stop work.  Get down.

12  Somebody reported a smell.  Let's go get to the bottom of it.

13  Stop work.  Go to the safety muster points."  While they were

14  filing down, BP was going up.

03:18  15             Why were we going up?  We were going up because

16  BP has environmental air testing monitors that test the air in

17  the area.  This was on a Vacuum Tower in the Pipestill 3B Unit,

18  not the 3A, which is a block away, as Mr. Buzbee indicated

19  earlier.  It was Pipestill 3B.

03:18  20             It was down for a maintenance turnaround.  What

21  those guys did was to go upstairs to test those environmental

22  monitors to see if they registered anything.  We have monitors

23  on the ground, continuous operating monitors, that test the

24  air.  We have monitors up along this tower, different levels.

03:18  25  They went up to see if they registered anything.

03:18   1          These monitors test the air and they record and

2    they alarm.  Unfortunately -- I should say very, very, very

3    fortunately, none of those machines measured anything, ground

4    level or anywhere up this tower.

03:18   5          Okay.  What do we know?  This unit was shut down.

6    It had been shut down for months.  It had been purged, cleaned,

7    drained, washed out, opened up, and ventilated for months

8    before these workers -- before April 19, 2007.  Workers had

9    been working in and around this Pipestill 3B Unit and this

03:19   10   Vacuum Tower vessel for weeks.

11         Each shift, every day, the air is tested in a

12   specific test; and every day those tests gave us calm, not

13   alarm.  All that is good.  Okay.

14         By the way, those BP workers who were going up as

03:19   15   the others were coming down smelled no odor, saw no cloud, no

16   smoke, no dust particles, no anything.  They confirmed that the

17   monitors were working, were calibrated, were on the job, were

18   sentinels on duty; but they reported nothing.  That's all good.

19         Oh, by the way, some of them carried hand-held

03:19   20   monitors with them when they went up, a different kind, what

21   they call "five gas" or MultiRAE" monitors.  Those -- as they

22   were going up, they were reading their own monitors.  They

23   measured nothing.  That's all good; but, of course, we didn't

24   stop there.

03:20   25         Now, we said there were about 450 workers in this

03:20  1    unit.  Each one of those workers had, on their coveralls, a

2    personal monitor, a personal air testing monitor.  It's a kind

3    of a monitor that tests for sulfur, H2S specifically.  Each one

4    had one.  None of them, not one out of -- and by the way, they

03:20  5    are set to record and to alarm.

6                    There's two levels at which they alarm, what they

7    call the low and the high level alarm.  But even the high level

8    alarm is set to alarm well before anybody could be hurt, at

9    protective levels.  450 out of 450, none of them registered

03:20  10   anything, no sulfer problems.

11                   Okay.  We didn't stop there.  BP called the

12   surrounding units and said, "Hey, what is going on?  Is it

13   steady state?  Are you having any startups?  You having any

14   shutdowns?  Have you had any equipment failures?  Have you had

03:21  15   any spikes?  Have you had any excursions of temperature,

16   pressure, flow, product, anything that could say something

17   might have come from your unit?"

18                   And the answer was, "Steady state.  It's not us.

19   Didn't come from us."

03:21  20                   We didn't stop there.  That's good.  All this, so

21   far, is very common, very good; but we didn't stop there.  We

22   have people who we call our industrial hygiene team.  They were

23   called out, came out from their homes that night.  They -- they

24   have their own independent air monitoring, air testing

03:21  25   equipment.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:21  1        They first tested the unit, Pipestill 3B.  Then

2   they broadened their search and tested the plant, then

3   broadened their search and went out into the community.

4   Nothing registered.  They didn't find anything.

03:21  5        That's good, but we didn't stop there.  The City

6   of Texas City, not BP, the City of Texas City maintains and has

7   around the site a number of fixed base air monitoring stations.

8   Now, these are very sophisticated, very sensitive stations.

9   Most of them are evacuated canister stations that are -- that

03:22 10  can distinguish between a hundred thousand different

11  hydrocarbons, different potential things that could be

12  released.  We went and collected data from those City of Texas

13  City monitoring stations to see if they picked up anything that

14  could answer this.

03:22 15        We even went and got the data from before 8:45

16  when the first report came in.  We went back before and

17  collected their data.  And none of those monitoring stations

18  around Texas City, anywhere, picked up anything on that evening

19  of April 19th, 2007.

03:22 20        Okay.  That's good.  That's good, but we didn't

21  stop there.  Okay.  We called out a company, CTEH, that is in

22  the business of emergency response.  It's the Center for

23  Toxicology and Environmental Health.  They have monitors that

24  are very sophisticated, that can distinguish between a hundred

03:23 25  thousand different compounds.  They set up around Pipestill 3B

03:23  1   and monitored for weeks and even longer in some instances; and

2   they found nothing that could explain what was alleged or what

3   was reported April 19th, 2007.

4           Now, why did we test for that long?  Because in

03:23  5   our experience, if you have a leak of magnitude, that a lot of

6   folks smell, that covers a lot of geography, it's not the kind

7   of leak that fixes itself.  Generally speaking, if it's a pump

8   seal that blows, you can find it; if it's a tube bundle in a

9   heat exchanger blows, you can find it.

03:23  10          By the way, all those instances that they

11  mentioned, all those instances they mentioned, they know about

12  them because we document them, we report them, we investigate

13  them.  How do you know we investigate them?  Because he's got

14  the documents to prove it.  When it says we had a certain

03:24  15  quantity from a certain valve, that's because we investigated,

16  not because we didn't.  They know about it because we told

17  them.

18          Okay.  All right.  We didn't stop there.  After

19  CTEH that night, we called out that night our LDAR team.  Why?

03:24  20  These are guys whose sole job is leak detection and repair.

21  And they're armed with some pretty state-of-the-art, very

22  unusual equipment.  They have -- and I hope you're going to get

23  to see one of their cameras.  It's a hundred thousand dollar

24  camera.  Not too many plants have them.  We have them.

03:24  25          And they came out that night to monitor with

03:24  1    their infrared camera equipment, from their homes, again.  They

2    scoured the site -- by the way, this little camera, I think,

3    is -- I think it's amazing.  You can take a Bic lighter and put

4    out the flame, and you still got the butane that's coming out,

03:25  5    like a match; and from across the room, with that little

6    camera, you can see that.  You can see a leak of that

7    magnitude, that tiny a magnitude, if you will.

8         They scoured the site with it.  They used that

9    camera, and they found nothing.  Okay.  Again, that's a good

03:25  10   thing.  That's good.  We're doing okay.

11        Now, by this time, hundreds of people had come

12   down, had gone to the safety muster point, they had gone to the

13   lunch tent.  And by this time, there were a number of folks

14   complaining of a myriad of symptoms.  So, we called out our

03:25  15   emergency medical technicians, to get them checked out, to

16   document what they were complaining of, to document which ones

17   requested medical checkout, which ones did not.

18        Now, keep in mind, all of these folks work for

19   contractors who are sophisticated, who have their own policies

03:25  20   and procedures, and who are responsible for taking care of

21   their own workers if there's a claim for an on-the-job injury,

22   which this was.  So, we didn't override those employers who

23   were taking charge and taking responsibility.  We were

24   facilitating, not frustrating.  We were helping those employers

03:26  25   who had the responsibility to take care of their workers if

there's a complaint for an on-the-job injury.

They were there, too.  We were working with them.
But we supplied buses, and we took 85 in the buses.  A few more
went, otherwise; but 85 went in our buses to Mainland Center
Hospital and to UTMB.  All of those folks were seen and
released in stable condition.

There are two exceptions to that statement.  All
these people were seen and released, except one had admittedly
preexisting high blood pressure that had gotten out of whack.
He wasn't controlling it with his medication like he should
have.  They found it on these exams; and they said, "You need
to be kept overnight for observation, until we can get your
blood pressure corrected and your medication lined out."
Admittedly, reportedly, it had nothing to do with April 19,
2007.

The second exception is a guy who had diabetes,
long, preexisting diabetes.  His blood sugar had gotten out of
control.  It wasn't controlled as he should control it.  It had
gotten out of whack; and they said, "We need to observe you
overnight to get your blood sugar lined out," reportedly,
again, having nothing to do with April 19, 2007.

So, the point is these are real medical checks.
They did find some things, heart problems, high blood pressure,
and diabetes blood sugar problems, kept two workers.  The rest
of them, they said, "Go back to work.  Go back to work."

03:27   1          Okay.  All right.  You will -- I want to caution

2      you when you look at some of these medical records.  They said,

3      "Why are you here"; and they said, "Chemical exposure."  So,

4      you'll see on the medical records "chemical exposure."  That's

03:27   5      what you'll see.  But I also caution you that there are tests,

6      objective tests, which are designed to let us have some

7      information about whether there has been a significant

8      pulmonary irritant exposure, a lung exposure, is there edema on

9      the lungs, is there rales and rhonchi, are there abnormal

03:28  10      breath sounds, is there pulmonary function studies

11      abnormalities.

12          I want you to look because in all of these

13      records, every time there's a lab test, blood test, x-rays,

14      lung function tests, we don't get what we expect to find:

03:28  15      objective signs confirming any significant pulmonary irritant.

16      That's all good.  That's common, but we didn't stop there.

17          We gathered the meteorological data for Texas

18      City.  And as you might expect with the multitude of chemical

19      neighbors in Texas City, there's a multitude of wind data.  And

03:28  20      we gathered it.  Why?  Because we wanted to know what upwind

21      was looking like, we wanted to know direction.  And we found

22      it.

23          It suggests that the source was off of our

24      premises, upwind of our plants from somewhere around the

03:28  25      neighbors of -- of some of our neighbors, like StanTrans or the

03:28  1    Port of -- Texas City Terminal Railway or the docks, for
       2    example.  But the wind was out of the southeast, which is the
       3    predominant wind in this area.  It was about 4 or 5 or 6 miles
       4    an hour.  It wasn't calm; it wasn't gale force.  It was about 5
03:29  5    or 6 miles an hour that night, pretty steady.  That's good.
       6    That's good, but we didn't stop there.
       7              We appointed a formal investigation committee
       8    following April 19th, 2007.  Six people basically left their
       9    jobs.  They still had some remnants of their responsibilities;
03:29 10    but for five weeks they basically did nothing except try to get
      11    to the bottom of this and try to get to the answers, try to
      12    find the source.
      13              And in the course of that time, they took
      14    multiple interviews of workers, both contract workers, contract
03:29 15    supervisors, BP workers, BP supervisors.  They went to units.
      16    They collected supervisors' logbooks, operations logbooks,
      17    maintenance logbooks.  And they collected digital PI data.
      18              You're going to hear about digital PI data.  Many
      19    of these units are connected through computers to printouts.
03:29 20    And you can go back and you can look at a unit and you can see
      21    if this vessel -- you can see if it's had any temperature
      22    excursions or if there are any lineup problems with the
      23    equipment or whether they had any pressure excursions or flow
      24    rate excursions.  All these monitors that monitor these
03:30 25    parameters of these units can be printed out, and it's called

03:30  1    "digital PI data."  And you can get it, and you can look at it;

       2    and we did.

       3              And why did we do that?  We wanted to see if

       4    there was anything anywhere in any of the surrounding units,

03:30  5    any of the upwind units.  We didn't stop with the upwind units.

       6    We went to the downwind units, too, to say, "Is there any

       7    pressure excursion or temperature excursion that could explain

       8    this?"  And the answer is there was none.

       9              Okay.  All that our investigation committee could

03:30 10    do in its five weeks was -- and I think you're going to see

      11    this -- rule out all potential sources on BP's plant.  We have

      12    our own conclusion that it didn't come from us.

      13              There was no relief valve that popped; there was

      14    no leak; there was no -- what are the other words -- no

03:30 15    release, there was no upset, there was no pressure drop of a

      16    nature or of a kind that could explain this.  All we found is

      17    it couldn't have happened here.  It didn't happen to this piece

      18    of equipment.  It wasn't this unit.  BP took this very

      19    seriously.

03:31 20              Okay.  Now, the problem -- the plaintiffs do have

      21    an answer.  It hasn't been presented to you yet.  But the

      22    plaintiffs had a mask that one of the workers reportedly wore

      23    in the cloud.  And, so, they wanted to test this mask; and

      24    whatever they found on the mask had to be what the cloud

03:31 25    consisted of.  That's the premise.

03:31   1          Now, there's problems with that mask that are

2    myriad.  There was no chain of custody.  It set for months in a

3    cigar-smoking law office, unprotected.  It was damaged in

4    transit.  They didn't have a background control sample to test

03:31   5    for background.  But they conclude nonetheless that it had

6    carbon disulfide on the mask and therefore the exposure had to

7    be to carbon disulfide.

8          Now, there's a problem besides the chain of

9    custody and the like.  They don't tell you anything about where

03:31  10    the -- that doesn't tell you anything about where the CS2 came

11    from or its supposed source.  And the other funny thing about

12    that is we don't have CS2 of a quantity, in an area, of a kind

13    that could explain this release.  There's no -- generally, no

14    CS2 in refineries.

03:32  15          Chemical plants have them.  StanTrans' rail yard

16    ships, loads, and unloads it on occasion.  Port of Texas City

17    terminal railway loads it on occasion and unloads it on

18    occasion.  The docks have it coming in and out on occasion.

19    But we don't have it.

03:32  20          We have it momentarily, in the SRU, which was

21    downwind, which did not have any excursions, in a stream that

22    is heavy H2S, hydrogen sulfide.

23          Remember all those 450 badges that had --

24    hydrogen sulfide badges?  If it had come from there and somehow

03:32  25    gotten upstream without an upset, which it didn't, all 450

03:32  1   people would have smelled it, all 450 people would have big

2   time problems, and all 450 monitors would have gone ballistic.

3          Okay.  The other funny thing about that mask is

4   that they say the mask had carbon disulfide on it in an amount

03:33  5   that, in my mind, says -- equates to a 12 part per million

6   exposure to CS2, carbon disulfide, for up to 10 minutes, which

7   their -- their toxicologist agrees and concedes won't hurt a

8   flea.  That's their answer.  That's their explanation:  It had

9   to be CS2.

03:33  10         Okay.  We didn't stop there.  We want to know

11  where were these smellers located, so we could look upwind, so

12  we could get the magnitude of this release, so we could get the

13  geography of this release.  Initially what was reported is that

14  it was right around this Vacuum Tower in Pipestill 3B Unit.

03:33  15         After everybody was gathered together from

16  multiple locations, we got smellers reporting it from varied

17  sites.  Right in here is Pipestill 3B.  We got folks downwind.

18  We got folks over here at Cat 1.  Some of these plaintiffs were

19  at Cat 1.  They didn't report it for 24 hours; but they're --

03:34  20  as you can see, they're blocks -- city blocks away.

21         We've got people off site of our plant north, off

22  site of our plant east, off site of our plant due east.  We had

23  one plaintiff who complained from their home at 29th Street,

24  which is over a mile to the northeast.  And we had three who

03:34  25  complained -- they were security guards at the Mainland Center

03:34    1    Hospital, who claimed exposure on April 19th, 2007.

         2              So, what were we looking for?  Why did we want to

         3    know?  We wanted to know the magnitude of the releases.  We

         4    wanted to try to find out where it came from, by looking

03:34    5    upwind.  If we could get them grouped in a geography, that

         6    could hone us in on where we were looking for.  This gave us no

         7    help at all.

         8              Okay.  Now, we also tried to find out what was

         9    smelled.  And this is odor characterization; and there's going

03:34   10    to be some individual susceptibility, individual differences in

        11    odor characterization.  People are going to say some different

        12    characterizations.  But you expect some consistency; within

        13    that framework, you expect some consistency.

        14              Why did we ask that?  Why did we want to know

03:35   15    that?  Because we were honestly trying to find an answer to

        16    this.  Okay?  We were honestly trying to get to the bottom of

        17    this.  We expect consistency.  What did we get?

        18              Some people said it was sweet; some people said

        19    it was sour; some people said it smelled like syrup; some

03:35   20    people said it was irritating; some people said it smelled like

        21    nail polish; some people said it smelled like nail polish

        22    remover.  I want to talk about the nail polish remover.  That's

        23    another name for acetone.

        24              How many of you have -- I don't have any men on

03:35   25    the jury; so, I can say this.  How many of you have exposed

yourself to acetone before?  Not unusual.  By the way, quite a
few of the folks said it smelled like acetone.  That was a
common answer.  Acetone or nail polish remover was a common one
we got.

By the way, that night there were empty rail cars
at Texas -- Port of Texas City terminal railway, where our
meteorological data suggests this could have come from, that
were in acetone service.

Some said it smelled like food; some said it
smelled like dead people.  All over the map.  Smelled like --
we did get some rotten egg smells.  Everybody pretty much knows
that's hydrogen sulfide or a sulfide smell.  We got a few of
those.  Old air.

One of the most common responses was, "I worked
in a refinery for a long time, and I have never smelled a smell
like this coming from a refinery; this was something new and
different; this wasn't a refinery smell like you get from a
refinery."  I think that's very significant.  But the very
common description by the people in the group, "I didn't smell
anything."

Okay.  What complaints did this reportedly cause?
And, again, why are we asking this?  Why are we wanting to
know?  Because we were honestly trying to get some information
and learn from this so we could find out maybe where this came
from, who was at fault, what was the culprit.  We wanted to

03:36  1  know.  We expect consistency, again.

2      Why do we expect consistency?  Because certain

3  things, like H2S, can cause certain symptoms but not other

4  symptoms.  So, if you get all the same kind of symptoms that

03:36  5  can be caused by one thing, you think you've got a potential

6  answer and you go look for that.  But you expect consistency.

7  You don't expect across the board answers like you got in

8  this --

9      THE COURT:  You got about 10 minutes.

03:37  10     MR. GALBRAITH:  I'm sorry, your Honor?

11     THE COURT:  You've got about 10 minutes.

12     MR. GALBRAITH:  Thank you, your Honor.

13     What we got is that some people said, "It made me

14  lose my appetite" and others said, "It made me hungry."  Some

03:37  15  said, "It made me sleepy"; some said, "I couldn't sleep at

16  all."  Some said, "It made me talk incoherently"; and others

17  said "I couldn't talk at all.  I lost my voice."  Some said,

18  "It made my feet swell"; but it -- but others said it caused

19  dehydration.  Some said, "It made my mouth dry, cotton mouth"

03:37  20  others said, "It made me overproduce a bunch of saliva."  Some

21  said, "It made my tar" -- "my stool" --

22     THE COURT:  You need to slow down just a little bit,

23  counsel.

24     MR. GALBRAITH:  I'm sorry?

03:37  25     THE COURT:  You need to slow down just a little bit.

03:37    1            MR. GALBRAITH:  Okay.  I'm sorry.

         2            Some said, "It made my stool look -- act like

03:37    3    tar"; others said, "It gave me diarrhea."  Some said -- one

         4    said, "It made my ear numb, but only one ear."  One said, "It

03:37    5    made my right eye twitch, but only one eye."  "Lungs hurt" is

         6    one of these people here, but 75 people reported none.

         7            Okay.  We didn't stop there.  How long did the

         8    complaints last?  Why did we want to know that, again?  We're

         9    trying to figure out what this was.  We're trying to get to the

03:38   10    bottom of this.  Some things are capable of causing long term

        11    symptoms, some things aren't.

        12            I'm going to liken this to driving down a dirt

        13    road behind an 18-wheeler.  If you drive long enough behind an

        14    18-wheeler down a dirt road, you eyes might get scratchy, your

03:38   15    throat might get scratchy, you might even cough a little bit.

        16    But when you get back on the interstate, you're okay.  It won't

        17    cause you six months of symptoms.  Some things can, and some

        18    things can't.

        19            What we did was we went to the plaintiffs'

03:38   20    toxicologist, the plaintiffs' expert toxicologist.  And he

        21    says, "What we're dealing with here is not going to cause

        22    anything that's going to last any time at all.  It's going to

        23    be temporary, transient effects, hours or days, nothing longer

        24    than that, not weeks or months," which is the complaints up

03:38   25    until today that these plaintiffs have leveled against us.

03:38  1              Okay.  Through it all, the answer to this case

2       lies in the fact that there is no evidence that BP did anything

3       wrong on April 19, 2007.  Without that, plaintiffs can't

4       recover.  So, I'm going to tell you again.  This is a case that

03:39  5       presents serious questions and serious allegations that BP

6       takes quite seriously.  No worker concerns were ignored.  Our

7       response, we're proud of.  I think you can be proud of.  We

8       took it seriously.  Our response was vigorous and real and

9       honest and sincere.

03:39  10              And with that, I look forward to trying this case

11      in front of you.  And I promise I'll do everything I can not to

12      waste your time.  Thank you.

13              THE CASE MANAGER:  All rise.

14              THE COURT:  Take about five minutes.

03:39  15              We're going to use the podium for our questions.

16              And, ladies and gentlemen, if you want to stretch

17      for about five minutes and step outside and walk back, feel

18      free to do so.

19          *(Recess was taken from 3:39 to 3:49 p.m.)*

03:49  20          *(Jury present)*

21              THE COURT:  All right.  Please be seated.

22              All right, counsel.  Who is your first witness?

23              MR. BUZBEE:  Your Honor, we're going to call Teresa

24      Dobbins.

03:49  25              THE COURT:  Okay.

03:49  1          MR. BUZBEE:  She's right out in the hallway.

2          THE COURT:  Okay.

3     (Witness being summoned to the stand)

4          THE COURT:  Ms. Dobbins, please -- come forward,

03:49  5  please.  And if you'll come around to my left here, and I will

6  swear you in.

7               Raise your right hand, please, ma'am.

8               Do you solemnly swear or affirm that any

9  testimony you give in this case will be the truth, the whole

03:50 10  truth, and nothing but the truth, so help you God?

11          THE WITNESS:  I do.

12          THE COURT:  Please have a seat in the witness box.

13               All right.  I think there should be a microphone

14  close by there.  Make sure you have it aligned.  Okay?

03:50 15               Counsel, go ahead.

16          MR. BUZBEE:  Thank you, your Honor.

17          **TERESA DOBBINS, DULY SWORN, TESTIFIED:**

18                      **DIRECT EXAMINATION**

19  BY MR. BUZBEE:

03:50 20  Q.  Hi.  I'm Tony Buzbee.  We've never met, right?

21  A.  No.

22  Q.  Can you tell the ladies of the jury what your name is?

23  A.  Teresa Dobbins.

24  Q.  Okay.  You received a subpoena to come here?

03:50 25  A.  Yes.

03:50  1    Q.  What's your education, Ms. Dobbins?

       2    A.  A year and a half of college.

       3    Q.  Okay.  Do you ever -- do you know how to read a graph?

       4    A.  Oh, of course.

03:50  5    Q.  Okay.  Let's start with that.  Exhibit 2, which is already

       6    in evidence --

       7              MR. BUZBEE:  How do you do this Elmo?

       8              MR. SIMON:  Just turn it on.

       9              MR. BUZBEE:  Put up Page 19 of Exhibit 2, which is the

03:51  10   investigation report that --

       11   BY MR. BUZBEE:

       12   Q.  You weren't here, but the lawyer was talking about it

       13   before you came in.

       14   A.  Okay.

03:51  15             MR. BUZBEE:  I promised not to waste their time, Nick.

       16             I'm a liar from the very minute -- I just

       17   started, and I'm already a liar.

       18   BY MR. BUZBEE:

       19   Q.  Ms. Dobbins, while he's trying to get that together, let's

03:52  20   just go through some stuff real quick.  Let's go back to April

       21   19th of 2007.

       22             Who were you working for?

       23   A.  CSS.

       24   Q.  What's that?  What do they do?

03:52  25   A.  Certified Safety.  We're a safety specialist team.  We

03:52   1    specialize -- they train us to hole watch and fire watch for

2    different contractors in a refinery.

3    Q.   What is a "fire watch," for those of us who don't know?

4    A.   Fire watching is -- you're placed on a job to where you

03:52   5    keep your eye on a contractor for when they're welding and to

6    make sure there is no sparks to where a fire don't start.  If

7    it is, you are to notify someone.  If you can put the fire out,

8    put it out.  If it's too big, you notify the proper people to

9    come out and put the fire out.

03:52   10           "Hole watching" is where we hole watch for

11    someone who's in a room that's confined.  You go in one way and

12    come out one way, and we monitor them.  We write their names

13    down and the time they went in and the time they come out.

14    Q.   How long had you been doing this type of work?

03:53   15    A.   Since 2006.

16    Q.   Okay.  So, by that point, you had been doing it over a year

17    or so?

18    A.   Yes.

19    Q.   Where were you working, Ms. Dobbins?

03:53   20           Am I saying you're name right?  Is it "Dobbins"

21    or is it "Dobbins"?

22    A.   No.  It's "Dobbins," yes.

23    Q.   Where were you working?  Like, at the BP Texas City plant?

24    A.   BP Texas City.

03:53   25    Q.   We drive by it a lot, but I'm sure most of us have never

03:53  1   actually been on that plant.  And I have -- would it help

2   you -- a demonstrative aid help you orient the jurors about

3   where you were in the plant?  Would it help you if we use the

4   chart?

03:53  5   A.  Yes.

6   Q.  What I have here is just demonstrative evidence, won't be

7   offered into evidence.  What I have is a map of the BP Texas

8   City plant.

9           Can you see it from here?

03:53  10  A.  Yes.

11  Q.  Before you were here, I was telling the ladies of the jury

12  there's different units out there.

13  A.  Yes.

14  Q.  Like, there's at the Alky 2 and the Cat Unit and the

03:54  15  Pipestill 3B.  That's common terminology?

16  A.  Yes.

17  Q.  Could you tell us where were you doing this fire watch work

18  in April of 2007?

19  A.  Hole watcher.

03:54  20  Q.  Hole watch.  Sorry.

21  A.  Yes.  It was in Pipestill 3B.

22  Q.  And I'm going to just circle this demonstrative aid.  "PS

23  3B"?

24  A.  Yes.

03:54  25  Q.  So, that's on our little chart, here, towards the right;

03:54   1   and I've circled it where you are.  Okay?

2   A.  Okay.

3        MR. BUZBEE:  Now, you got that graph, Nick?

4   BY MR. BUZBEE:

03:54   5   Q.  You told us you know how to read graphs.  I'm pretty --

6   right?

7   A.  Yes.

8   Q.  Before you came in here, this lawyer for BP says there were

9   no pressure drops.  Would you look at this Page 19?  You see

03:54   10  the middle graph?

11  A.  Yes.

12  Q.  What does that say?

13  A.  It's a drop.

14  Q.  It says "Caustic tank pressures"?

03:54   15  A.  Yes.

16  Q.  What's that graph show?

17  A.  It shows that there is a drop.

18  Q.  Oh, okay.

19       MR. BUZBEE:  Thank you, Nick.

03:55   20  BY MR. BUZBEE:

21  Q.  Now, you don't have your own case?

22  A.  No.

23  Q.  You don't have a dog in the fight here?

24  A.  No.

03:55   25  Q.  You're not asking anybody for money?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

03:55    1    A.   Nope.

       2    Q.   You were subpoenaed to come here?

       3    A.   Yes.

       4    Q.   Probably not the nicest thing to be doing on a Tuesday

03:55    5    afternoon, right?

       6    A.   No, not at all.

       7    Q.   All right.  What was your work schedule when you were out

       8    there working?

       9    A.   6:00 to 6:00, 6:00 p.m. to 6:00 a.m.

03:55   10    Q.   Okay.  Is that called a "graveyard" or --

     11    A.   Yeah, we call it "graveyard" shift.

     12    Q.   Okay.  Yeah.  I thought so.

     13         Why don't you tell us, from your perspective,

     14    just what happened?

03:55   15    A.   The 19th?

     16    Q.   April 19th of '07.

     17    A.   We -- normal work night.  Went in to work.  I got my job

     18    request as far as to hole watch for a contractor, which was

     19    called Industrial Specialists, ISI.  And they were going to be

03:56   20    doing some sandblasting.

     21         So, I got with the supervisor and the foreman of

     22    that job, of that contractor.  We went to the site in Pipestill

     23    3B.  The workers set up their equipment, got ready to go to

     24    work.  They went on in, into the confined space, to work.  And

03:56   25    at that -- a little later, I started smelling an odor that --

1    actually, I had smelled the odor the day before.  So --

2    Q.  Ms. Dobbins, can I interrupt you right there?

3    A.  Yeah.

4    Q.  Because you weren't here but -- when I was telling the

5    ladies of the jury about this odor.  Do your best, if you can,

6    to describe it, not only what it smelled like, but how strong

7    was it.

8    A.  Well, the odor, to me, smelled like sulfa with a diesel

9    smell, you know.  And it was -- it was strong.  It was real

10   strong.  Because it left a bad aftertaste in my mouth.

11             And I got nauseated, dizzy.  The guys that also

12   were in the area, working, got real sick, also, you know, with

13   the same dizziness.  And some of them vomited and everything.

14   Q.  Okay.  So, it was strong enough to make you feel like you

15   were going to puke or throw up?

16   A.  Like I just wanted to pass out.

17   Q.  Once you had this odor and you felt like you were going to

18   pass out and you saw other people having the same reaction, do

19   you remember about what time that was?

20   A.  Close to 9:00 o'clock.

21   Q.  Okay.

22   A.  About 8:00 something, close to 9:00.

23   Q.  Okay.  So, somewhere between 8:00 and 9:00 o'clock?

24   A.  Yes, sir.

25   Q.  All right.  What happened after that?

03:57   1          I mean, you had the odor, you're feeling sick,

2      you're feeling like you're passing out.  There's other people

3      having the same reaction.  What happened next?

4      A.  Well, our -- with Certified Safety, you are to -- if you

03:57   5      feel anything that -- anything that -- or smell anything out of

6      the ordinary, we notify our foremens.  And, so, a couple of us

7      notified our foremens that we smelled an odor.

8          So, what they just -- you know, if we don't feel

9      safe, we pull the guys out, because anything can happen to

03:58   10     someone in a confined space because they're closed up.  So, we

11     pulled the guys out of the confined spaces to where we would

12     come down to the ground, to get to ground level.

13         And after that, we got a call from our -- one of

14     our foremens, to evacuate, you know, to pull the guys down and,

03:58   15     you know, come over to our hooch, you know, everybody -- just

16     evacuate, evacuate everybody from that area that we were in.

17     And that's what we did.

18     Q.  When you got to the -- you called it a "hooch," kind of

19     like a muster point or something?

03:58   20     A.  Well, we went to our hooch first; and then we were

21     evacuated to Muster Point 3.

22     Q.  Okay.  Once you got to the muster point, just tell us what

23     you kind of observed there with the other people there.

24     A.  Different contractors passing out, laying on the ground.

03:58   25     They were just -- couple of them, to me, looked unconscious

03:58  1  because -- a lot of them throwing up.  Most of the people just

2  sitting around, waiting to see what was going on.  Because we

3  were all confused.

4              You know, we didn't know what was going on.

03:59  5  Nobody said anything.  We were just evacuated.  We knew it was

6  something that we smelled.  But we were all evacuated, but

7  nobody notified us and told us anything.

8  Q.  Do you remember what the wind was?

9  A.  Not exactly.

03:59  10  Q.  But if it would have been blowing or something, would you

11  remember it?

12  A.  Yes.

13  Q.  Okay.  So, you don't remember it being gusty winds or

14  blowing winds?

03:59  15  A.  No.  That's so long ago --

16  Q.  Okay.  So, you're at the muster point; you're seeing all

17  these folks.  And it sounds like you're seeing a lot of

18  different reactions.

19  A.  Yes.

03:59  20  Q.  It's affecting people differently?

21  A.  Yeah.

22  Q.  What happened then?  Did you get taken to the hospital?

23  A.  I got took to -- I -- they had some ambulance come over to

24  the muster point and do our vital signs.  And they asked us did

03:59  25  we want to go to triage, which is the medic.  So, I went to

03:59   1    medic for the nausea and dizziness that I was having.  I did go

2    to the hospital.  I --

3    Q.  Which one did you go to, Ms. Dobbins?

4    A.  I went to the doctor's office, as far as our doctor's

04:00   5    office that -- with the company, Certified Safety.  They took

6    us in a van they -- you know, five at a time and took us to the

7    doctor's office.

8    Q.  Okay.

9    A.  And we all were seen by their doctor.

04:00  10    Q.  Okay.  After you were seen by the doctor, he or she checked

11    you out, what happened then?

12    A.  As far as just going back to work?

13    Q.  Yeah.  Did you go back to work that night or what --

14    A.  We returned back to work, but we were not let in.

04:00  15    Q.  They wouldn't let you in the plant?

16    A.  No, we were not let in.

17    Q.  Okay.  So, if somebody were to tell these women, these

18    ladies, go -- they went back to work, that ain't the fact at

19    all, is it?  Nobody was allowed back in there, were they?

04:00  20    A.  No, no one was allowed back into the plant.  We -- as far

21    as me, my company, we were told to come back to work as a

22    normal work day.  So, no matter where we live, we showed back

23    up to go to work.  But when we got to work, they were not

24    allowing anyone in the plant.  Nobody went in.

04:01  25    Q.  When did BP finally allow you and your coworkers back in

04:01  1    that plant?

2    A.   A couple of days later.

3    Q.   Okay.   So, it wasn't a situation where people got checked

4    out and they say, "Oh, there's nothing wrong with you.   Go back

04:01  5    to work," and you got on the bus and went back to work?

6    A.   No.

7    Q.   You didn't go back for several days?

8    A.   Yes.

9    Q.   Okay.   Now, I want to focus in on something real quickly,

04:01  10    Ms. Dobbins.   You said it in passing, but it's important to me.

11          You said you smelt something the night before?

12    A.   Yes.

13    Q.   Tell me about that.

14    A.   It was the same area where --

04:01  15    Q.   Pipestill 3B area?

16    A.   The same Pipestill 3B, the same area where my guys were to

17    sandblast.   They -- the same area, the same odor, it just

18    wasn't as strong --

19         MR. GALBRAITH:   Objection, your Honor.

04:02  20         THE COURT:   Excuse me.

21         Yes, sir.

22         MR. GALBRAITH:   I believe this is evidence; and we do

23    need to interpose that objection, that this is evidence of

24    other incidents not shown to be substantially similar to the

04:02  25    one in question raised by plaintiffs' pleading.   There's no

proper predicate.  It's improper character evidence, violates

Rules 404(b) and 403 of the Federal Rules.  It's not reasonably

restricted.

THE COURT:  Ladies and gentlemen, I'm going to

overrule the objection; but I'm going to instruct the jury in

this regard.

Ladies and gentlemen, in circumstances where

there is a question of other events or circumstances and the

plaintiff, for example, in this case may desire to use that to

substantiate a position on April 19 being the effective -- the

event date, then the Court may permit that as long as at some

point the evidence is connected up.

That's a question of law that I'll have to

decide, but I can't decide it without hearing the evidence.

And, so, I will give you instructions as are appropriate if I

need to ask you to disregard certain evidence, for example.

But in the meantime, I'm going to permit the

testimony; and I'll determine later on, as a matter of law,

whether or not that testimony was appropriate or whether or not

it's something you should disregard.

Let's proceed.

MR. BUZBEE:  Thank you, your Honor.

BY MR. BUZBEE:

Q.  You told us before the interruption that there -- it was

the same smell, you think?

04:03    1    A.  It was the exact same smell.

         2    Q.  Just not as strong?

         3    A.  Not as strong.  It was the exact same smell.

         4    Q.  Was it reported?

04:03    5    A.  Yes.

         6    Q.  Was it investigated?

         7    A.  We -- I don't know if it was investigated, but we were

         8    evacuated.

         9    Q.  You were evacuated?

04:03   10    A.  Yeah, we were evacuated.  The day before, we were

        11    evacuated.

        12    Q.  Now, when they finally let you back in the plant to work,

        13    did you smell the smell again at some point?

        14    A.  When I was let back in to work, I was pulled off my job.

04:03   15    Q.  Okay.

        16    A.  So, I had to go -- I was notified that I needed to go over

        17    to this building and write a statement on what I smelled and

        18    everything.  So, I wasn't in the unit that long to even know if

        19    there -- the smell was still there.

04:04   20            Because my supervisor told me that they were

        21    pulling us out alphabetically ordered to go do statements.  You

        22    know, so, I didn't stay in there.

        23    Q.  Okay.  Let me see if I can boil this down to one last

        24    question, hopefully.

04:04   25            In the two months after this April 19 incident

04:04   1   where everybody went to the hospital, were you ever involved in

2   the more than seven or eight --

3          MR. GALBRAITH:  Pardon me, your Honor.

4   BY MR. BUZBEE:

04:04   5   Q.  -- other incidents --

6          MR. GALBRAITH:  Could I ask that that exhibit be taken

7   down until we get a ruling?  Because I believe this is subject

8   to the Court's ruling that events subsequent are not relevant

9   and not to be admissible.

04:04   10          MR. BUZBEE:  May I be heard on that?

11          THE COURT:  What exhibit number is that?

12          MR. BUZBEE:  It's a demonstrative for now, your Honor.

13   I was just trying to lay the predicate to ask a question.

14          THE COURT:  All right.  It needs to be taken down.

04:05   15          MR. BUZBEE:  Yes, sir.

16          THE COURT:  And, then, let's go ahead and hear your

17   response.

18              Go ahead.

19              Your objection is that it's a future, quote,

04:05   20   event or --

21          MR. GALBRAITH:  Yes.

22          THE COURT:  -- some other reportings after the date of

23   the event April 19th and therefore should not be presented to

24   the jury.

04:05   25              Let's proceed on question and answer and -- and

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:05  1    I'm not going to permit you to use that demonstrative at this

2    time.

3                    MR. BUZBEE:  Okay.  Can I be heard on that, your

4    Honor?

04:05  5                    THE COURT:  Sure.  Go ahead.  I'm sorry.

6                    MR. BUZBEE:  Your Honor, this lawyer told these ladies

7    that there were no other incidents out there and they were

8    monitoring, when we know for a fact that there were at least

9    eight more in the next two months.  So, I think he opened the

04:05  10   door to it.  It was subject to your ruling, but he opened the

11   door by telling them that.  And he shouldn't have done that

12   because --

13                    THE COURT:  Well, I'm telling you to take the

14   demonstrative down.

04:05  15                    MR. BUZBEE:  Yes, sir.  Will do.  Absolutely.

16                    THE COURT:  If you want to ask questions, if he

17   objects to it, whatever that question is, I'll take a ruling --

18   make a ruling at that time.

19   BY MR. BUZBEE:

04:06  20   Q.  Ms. Dobbins, were you involved in any investigation or any

21   reporting of the eight more incidents that occurred within a

22   two-month period at Pipestill 3B?

23                    MR. GALBRAITH:  Your Honor, I object.  It assumes

24   facts not in evidence.  There is no evidence of that and

04:06  25   there --

*Cheryll K. Barron, CSR, CM, FCRR*                            *713.250.5585*

04:06   1           THE COURT:  I'll sustain it on assumes facts not in

2       evidence.

3       BY MR. BUZBEE:

4       Q.  Are you aware of any subsequent or later incidents of the

04:06   5       same kind of smell from leaks, emissions, releases after

6       April 19th of '07?

7               MR. GALBRAITH:  I have a similar objection, your

8       Honor.

9               THE COURT:  Well, it's not --

04:06  10               MR. GALBRAITH:  Not that it assumes facts not in

11      evidence.

12              THE COURT:  "Similar," what do you mean?

13              MR. BUZBEE:  But that -- the similar objection is that

14      it's irrelevant to the events of April 19 -- the cause of

04:06  15      anything that happened April 19th, 2007.  Because of the

16      allegations raised by plaintiff, it's prohibited by 404(b).

17      There's been no proper predicate showing --

18              THE COURT:  I'm going to overrule that objection in

19      light of the -- and if you would like for me to expand on that,

04:06  20      I will; but I'm going to overrule that objection at this time.

21                  Let's proceed.

22      BY MR. BUZBEE:

23      Q.  Okay.  Let me try it again.

24                  Were you involved in any either reporting, being

04:07  25      affected by, any -- any relation at all, in any incidents that

04:07  1    occurred after April 19 of '07?

2    A.  I was not.

3    Q.  Okay.

4    A.  If there was, I wasn't aware, you know.

04:07  5    Q.  Okay.

6    A.  But I was not.  I just know how -- I stay -- I continued in

7    Pipestill 3B for numerous -- for a good little while, until the

8    job ended.  But I did wind up sick --

9            THE COURT:  No.  Excuse me.  I think you answered it.

04:07  10   BY MR. BUZBEE:

11   Q.  No.  Let's don't talk about your sickness since, you know,

12   we're here -- we can't talk about that, unfortunately.

13           It's fair to say that no one from BP ever

14   informed you about any subsequent incidents in that same area?

04:07  15   A.  No.

16           MR. BUZBEE:  I pass the witness.

17           THE COURT:  All right.

18                        **CROSS-EXAMINATION**

19   BY MR. GALBRAITH:

04:08  20   Q.  Hi, Ms. Dobbins.  We've never meet either, have we?

21   A.  No.

22   Q.  I'm Jim Galbraith.  How are you?

23   A.  I'm fine.

24   Q.  We have -- the only thing that we have regarding your

04:08  25   testimony here today is that you mentioned coming back to work

04:08   1    several days later and, as a part of the post-accident

        2    investigation, post-incident investigation, you were called in

        3    to give a statement?

        4    A.  Uh-huh.

04:08   5    Q.  Is that right?

        6            THE COURT:  Is that right?

        7    A.  Yes.

        8    BY MR. GALBRAITH:

        9    Q.  Okay.  And you did that?

04:08   10   A.  Yes.

        11   Q.  Was that on April 21st of 2007?  Does that sound right?

        12   A.  Yes, sir.

        13   Q.  Okay.  Now, just a couple of things since you're first.

        14   One of the things that you have testified to is a that you were

04:08   15   employed -- an employee of CSS, Certified Safety Specialists?

        16   A.  Yes.

        17   Q.  That's an independent contractor --

        18   A.  Yes, sir.

        19   Q.  -- that was performing maintenance work on Pipestill 3B,

04:08   20   which had been shut down for a turnaround.

        21   A.  Yes.

        22   Q.  Is that right?

        23   A.  Yes.

        24   Q.  And as I understand it, this turnaround was a little

04:08   25   different.  It was not being controlled by BP specifically.  It

04:08    1  was controlled under -- by yet another contractor.  Fluor was
         2  the general contractor for that turnaround, correct?
         3  A.  I've met Fluor representatives.  I -- maybe.
         4  Q.  Okay.
04:09    5  A.  Maybe so.  They -- I don't know.  When I'm in a refinery,
         6  I'm there for that refinery, you know.
         7  Q.  Okay.  In other words, you got your instructions from your
         8  CSS foreman?
         9  A.  Yes.
04:09   10  Q.  And when you reported a smell or incident, it would be to
        11  your CSS foreman?
        12  A.  Yes.
        13  Q.  And CSS paid you your payroll?
        14  A.  Yes.
04:09   15  Q.  CSS gave you training?
        16  A.  Yes.
        17  Q.  Had safety people on site?
        18  A.  Yes.
        19  Q.  They had -- you've talked about how they had policies and
04:09   20  procedures for if you expected that -- or claimed that you had
        21  been exposed to something on the job and received an on-the-job
        22  injury; CSS had policies and procedures to provide for that?
        23  A.  Yes.
        24  Q.  To take care of you?
04:09   25  A.  Yes.

04:09 1   Q.  It was their concern, their responsibility, and they met

2   it?

3   A.  Yes.

4   Q.  And you talked about how we -- we have heard and -- were

04:09 5   you not aware that some of the contractors, with BP's help,

6   chose to send their employees, who were complaining of some

7   exposure, to Mainland Center Hospital emergency room?

8   A.  Yes.

9   Q.  Or to UTMB in Galveston's emergency room?

04:10 10  A.  Yes.

11  Q.  And yours, CSS, chose to send you to what doctor?

12  A.  It was off of the Beltway, like, going toward 225.  I don't

13  remember the doctor's office name.

14  Q.  And you were checked out?

04:10 15  A.  Yes.

16  Q.  What did they do?

17  A.  He checked -- he checked my -- he checked my throat.  He

18  checked my eyes, my nose, and my chest.  It was like a normal

19  physical that he done.  But, you know, he looked in my throat

04:10 20  and checked my nose and everything like that.

21          He swabbed -- did some swabbing and everything.

22  And from -- he said from what he looks like in -- it was

23  like -- like a sinus -- sinus infection, to where everything --

24  all my sinus cavity was burnt up and my throat was, you know,

04:11 25  sore and stuff.  So, he prescribed a prescription for that; and

04:11  1    that was it.

2    Q.  Okay.  Did he ask you to take a deep breath?

3    A.  Yes.

4    Q.  He put a stethoscope on you?

04:11  5    A.  Yes.

6    Q.  And listened to your lungs?

7    A.  Like a normal physical, where, you know, they do all that.

8    Q.  Okay.  Any blood studies, x-rays?

9    A.  No.

04:11  10   Q.  Did he force you to blow into anything, like a pulmonary

11   function test?

12   A.  No.

13   Q.  Okay.  He listened to your lungs and told you nothing about

14   any problems with your lungs, I take it?

04:11  15   A.  No.

16   Q.  Okay.  And when he was through, after all that exam, he

17   said, "You can go on back to work"?

18   A.  He just -- "You can go.  You're finished."  That was it.

19   Q.  What -- after him checking you out, did he place you on any

04:11  20   restrictions from work?

21   A.  No.

22   Q.  Okay.  So, he said, "You're free to go"?

23   A.  To go -- yeah.

24   Q.  Okay.  And that's when you and other CSS employees went

04:12  25   back to the plant, to check in with Fluor or whoever and go

1  back to the plant, go back to the 3B Unit, right?

2  A.  Well, no.  We were -- we didn't go back to the unit.

3  Q.  Okay.  You went back to the plant with the intent to go

4  back to work?

5  A.  Yeah.

6  Q.  Okay.  Okay.  And that's when an investigation was

7  underway.  They had not found the answer to this; and so they

8  did not allow you back on the unit, correct?

9  A.  I guess so.

10  Q.  Okay.  All right.  The --

11         MR. GALBRAITH:  May I approach the witness, your

12  Honor, with an exhibit?

13         THE COURT:  Yes, sir.

14         MR. GALBRAITH:  I have another copy --

15         THE COURT:  Would you tell us the number, please?

16         MR. GALBRAITH:  Yes.  BP's Exhibit 508401 -- -001.

17  BY MR. GALBRAITH:

18  Q.  Which is Teresa --

19         MR. GALBRAITH:  May I approach the witness, your

20  Honor?

21         THE COURT:  Yes, sir, you may.

22             It's 5-0 what?

23         MR. GALBRAITH:  84-001.

24         MR. BUZBEE:  No objection if he's offering that.

25         MR. GALBRAITH:  I'll tender it into evidence, your

04:13  1  Honor; but I want to predicate it.  I want to make sure

2  Ms. Dobbins vouches for it.

3        THE COURT:  You may approach the witness.

4  BY MR. GALBRAITH:

04:13  5  Q.  I think it's only fair you should see it.  Can I show you

6  what's been marked as Exhibit 5084-001.  Okay?

7  A.  Okay.

8  Q.  And that's your statement of April 21st, 2007, "Teresa

9  Dobbins," correct?

04:13  10  A.  Uh-huh.

11  Q.  Is that right?

12  A.  Yes.

13  Q.  You remember filling that out?

14  A.  Well, someone else wrote it; but I remember making the

04:13  15  statement, yes, I do.

16  Q.  Okay.  And one thing that you reported -- by the way, this

17  was on April 21st, several days later, when your statement was

18  recorded?

19  A.  Yes.

04:13  20  Q.  And you were back to work two days --

21  A.  We were standby.

22  Q.  Okay.

23  A.  We had -- CSS, regardless if we didn't work, they allowed

24  us -- we have to be on standby just in case they need us.

04:14  25  So --

*Cheryll K. Barron, CSR, CM, FCRR*        *713.250.5585*

04:14  1   Q.  So, even though you weren't on the plant, performing any

2   job, CSS was paying you, in other words?

3   A.  I didn't get paid.

4   Q.  I'm sorry?

04:14  5   A.  I'm sorry.  No, I didn't get paid.

6        THE WITNESS:  I'm sorry, your Honor.

7   A.  No, I didn't --

8   BY MR. GALBRAITH:

9   Q.  So, how long were you on standby?

04:14  10  A.  It was maybe just a couple of hours.  But the only time I

11  really got paid was to -- when I had to come and just go to the

12  doctor's office.  I mean, that's two hours.

13  Q.  Okay.  And then you said it was several days later before

14  you went back and they pulled you aside to make your statement?

04:14  15  A.  Yeah.

16  Q.  And you were getting paid by -- for that, right?  At least

17  you were on the job then?

18  A.  No.  I didn't get paid for it at all.

19  Q.  Okay.  When was it that you actually went back to work?

04:14  20  A.  We went -- when everybody was allowed to go back into the

21  plant, it was -- I don't know -- Monday, Tuesday.  I can't

22  remember.  It was just --

23  Q.  A few days, two or three days?

24  A.  It was -- yeah, a few days.  Not, like, a week or something

04:15  25  like that.

04:15   1    Q.  Okay.  And when you characterized this -- how long have you
        2    worked in refineries, let me say, or chemical plants?
        3    A.  Since 2006.
        4    Q.  Okay.  So, for quite a number of years?
04:15   5    A.  Yes.  I still work in a refinery.
        6    Q.  But at the time, April of '07, you hadn't worked there
        7    for -- about a year in the refinery?
        8    A.  Yes.
        9    Q.  Fairly new to the chemical plant, refinery business?
04:15  10    A.  Not new to it; but just being in it, yes.
       11    Q.  You characterized this -- this smell was something strange?
       12    A.  Yes.
       13    Q.  This was not something that you normally smell in a
       14    refinery?
04:15  15    A.  No.
       16    Q.  It came from somewhere else, based on your experience?
       17    A.  It -- yeah.  It wasn't -- it wasn't a typical smell that
       18    you would smell in a unit that's down, in other words.  If the
       19    unit is supposed to be down, it's not the normal smell you
04:15  20    would smell.  Because that's not the first plant I've been in.
       21    Q.  First, I just got to ask, you don't know anything about the
       22    source of the smell on April 19th, correct?
       23    A.  No.
       24    Q.  Where it came from, what caused it, anything like that?
04:16  25    A.  No.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:16  1    Q.  The smell that you are reporting, now, the night before,

2    you don't know anything about its source or where it came from,

3    correct?

4    A.  No.

04:16  5    Q.  Or what caused it?

6    A.  No.

7    Q.  Is that correct?

8    A.  That's correct.

9    Q.  And when you reported it the night before, it was to your

04:16  10   CSS supervisor?

11   A.  Yes.

12   Q.  Okay.  And you're saying you don't know whether they

13   investigated or not but you were evacuated?

14   A.  Yes, we were evacuated for some reason.

04:16  15   Q.  Okay.  What did they do while you were evacuated; do you

16   know?

17   A.  When -- that night that we evacuated, we just come out of

18   the unit and we would go to our hooches, you know, until

19   further notice if we needed to go to a muster point or to go to

04:16  20   the lunch tent.

21          Other than that, all the times, if you evacuate,

22   you don't necessarily have to leave the plant.  You would just

23   come out of the unit itself and go to your hooches, wherever

24   your station is as far as that contractor, you know.

04:17  25   Q.  And depending upon the event, you may be called upon to go

04:17    1    to your hooch, which is out of the plant, theoretically out of

         2    harm's way?

         3    A.  Yes.

         4    Q.  Or to a muster point, like Muster Point 3, which is a

04:17    5    safety muster point?

         6    A.  Yes.

         7    Q.  Or to the lunch tent?

         8    A.  Yes.

         9    Q.  Okay.  And those are pretty much -- and at the lunch tent,

04:17   10    you can get your safety meetings and training from your own

        11    employer and the like, right?

        12    A.  Yes.

        13    Q.  I've got that basically right?

        14    A.  (Indicating).

04:17   15           MR. GALBRAITH:  I think that's all I have.  Thank you,

        16    Ms. Dobbins.

        17           THE COURT:  Were you offering the exhibit or just

        18    simply --

        19           MR. GALBRAITH:  Yes, your Honor.  I tendered it at the

04:17   20    time.

        21           THE COURT:  And I think -- the objection is withdrawn

        22    or there's no objection?

        23           MR. BUZBEE:  No objection to that.

        24           THE COURT:  All right.  It's admitted.

04:17   25                Anything on redirect?

04:17  1          MR. BUZBEE:  Very briefly, sir.

2                    **REDIRECT EXAMINATION**

3    BY MR. BUZBEE:

4    Q.  He was asking you about the source, and I want to be sure

04:18  5    we're clear.  You're not saying it came from outside the plant?

6    A.  No, I'm not saying that, no.

7    Q.  I didn't think so.

8    A.  No.

9    Q.  The plant is in Texas City, right?

04:18  10   A.  Yes.

11   Q.  Was Texas City evacuated?

12   A.  No.

13   Q.  Did they evacuate the ship channel?

14   A.  No.

04:18  15   Q.  Okay.  They evacuated the plant where the odor was?

16   A.  They evacuated Pipestill 3B.

17          MR. BUZBEE:  Okay.  Your Honor, I pass the witness.

18          THE COURT:  You may step down, ma'am.

19          MR. GALBRAITH:  I have a brief recross, and it is

04:18  20   subject to the redirect.

21          THE COURT:  No, sir.

22              Here is the way we're going to operate.  We're

23   going to go plaintiff, defendant, plaintiff.  And then, when

24   it's your turn, we'll go defendant, plaintiff, defendant.

04:18  25              Now, let's approach the bench for just a second.

04:18   1    Let me make sure we're -- hold on just one second.

       2         *(At the bench with all counsel)*

       3              THE COURT:  Let me just make sure we got the house

       4    rules together here.  It's going to be Federal Rules, and we're

04:19   5    going to abide by those.  Number two, when a witness hits that

       6    witness stand, you can take that witness or you can reserve;

       7    but you can't do both.  And that applies both ways.

       8              Now, if you say, "I don't want to question that

       9    witness now.  That's my witness.  I'll call him later," that's

04:19   10   fine.  But you cannot let a witness hit the witness stand and

       11   say, "Well, I'm going to ask a few questions and I'm going to

       12   reserve a question."  There's no reservation here.  This is a

       13   federal reservation, not a lawyer reservation.  So, I want you

       14   to make sure that you take the witnesses as they come or you

04:19   15   reserve completely.  Okay?

       16              MR. BUZBEE:  Yes, sir.

       17              THE COURT:  All right.  What was your question, for

       18   the record?

       19              MR. GALBRAITH:  Where was she within Pipestill 3B.

04:19   20              THE COURT:  Okay.  I'm not going to permit that.

       21              Let's proceed.

       22         *(In open court)*

       23              THE COURT:  You may step down.

       24              Do you want to excuse this witness?

04:20   25              MR. BUZBEE:  Please, your Honor.

04:20   1              THE COURT:  You may be excused.

2              MR. BUZBEE:  Nice meet you.  Take care.

3              THE COURT:  Who is the next witness?

4              MR. BUZBEE:  The next witness, your Honor, is Paula

04:20   5    Jowell.

6         *(Witness being summoned to the stand)*

7              MR. BUZBEE:  I may be butchering her name.

8              THE COURT:  Spell the last name, if you would.

9              MR. BUZBEE:  J-O-W-E-L-L.

04:20   10             THE COURT:  Okay.  All right.

11             Is that Ms. Jowell coming now?

12             MR. BUZBEE:  That's her, your Honor.

13             THE COURT:  All right.  If you'd come around,

14   Ms. Jowell, I'll swear you in.

04:20   15             Right there.  I'm going to swear you in.  Raise

16   your right hand.

17             We're going to turn the air conditioning on in a

18   minute.

19             THE WITNESS:  It's cold.

04:20   20             THE COURT:  You must have come from outside.

21             THE WITNESS:  Yes, I was outside.

22             THE COURT:  It's a little bit cold.

23             You solemnly swear or affirm that any testimony

24   you give in this case will be the truth, the whole truth, and

04:20   25   nothing but the truth, so help you God?

*Cheryll K. Barron, CSR, CM, FCRR*                *713.250.5585*

04:20   1                    THE WITNESS:  I do.

         2                    THE COURT:  Please have a seat.

         3                    Let me ask, does the air conditioning that's

         4         dropping, is that causing you-all any problems at this point?

04:21   5                    I mean, over in the jury.

         6                    You don't feel anything?

         7                    A JUROR:  I'm hot.

         8                    MR. BUZBEE:  I think they're hot.

         9                    THE COURT:  Okay.  I'll turn the heat on, see if we

04:21  10         can feel something.

        11                    No.  If it is a little bit warm, we've already

        12         spoken to the folks.  One of the things this is -- just as an

        13         aside here, one of the things that obviously happened here in

        14         Galveston when we had that nameless hurricane come through here

04:21  15         is we took a lot of water in the basement.  It just wrecked our

        16         air conditioning system.

        17                    So, if you see our air conditioning on the truck

        18         around there, it's not going anywhere; but it might not be

        19         doing a lot.  But we're doing the best we can.

04:21  20                    All right.  Let's proceed.

        21                    **PAULA JOWELL, DULY SWORN, TESTIFIED:**

        22                          **DIRECT EXAMINATION**

        23         BY MR. BUZBEE:

        24         Q.  Ms. Jowell, I just met you in the hallway.  Could you

04:21  25         introduce yourself?

                      *Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:21   1                    Am I saying your name right?
        2   A.   It's Paula "Jowell."
        3   Q.   I'm sorry.  I apologize.
        4               Ms. Jowell, would you introduce yourself to the
04:21   5   ladies of this jury?
        6   A.   My name is Paula Jowell.
        7   Q.   Where do you live?
        8   A.   Nederland, Texas.
        9   Q.   Okay.  You have your own case.  Is that true?
04:22  10   A.   Yes.
       11   Q.   As a result of this release on April 19th of '07?
       12   A.   Yes.
       13   Q.   Okay.  That's just to make sure we have full disclosure.
       14               But you're not asking, obviously -- we only have
04:22  15   10 of the people who -- in this case, and you're not one of
       16   them?
       17   A.   Right.
       18   Q.   You're here to tell us about what you saw, heard, felt the
       19   night of April 19th of '07?
04:22  20   A.   Yes.
       21   Q.   Who were you working for on that date?
       22   A.   P2S.
       23   Q.   What is that?
       24   A.   Performance -- I just know P2S.
04:22  25   Q.   That's an acronym.  What do they do?  Let's try that.

04:22   1   A.  I'm a laborer.  I sweep and pick trash up, tools, things

2   like that, that are around on the ground, to make sure

3   everything is safe.

4   Q.  Okay.  How long had you worked for P2S?

04:22   5   A.  Since February.

6   Q.  So, this happened in April.  So, two or three months?

7   A.  Yes.

8   Q.  And you were working where?

9   A.  At the time?

04:23   10   Q.  Yes, ma'am.

11   A.  I was working on the south side of the -- the big hole

12   that -- I don't know, you know.  Really, we worked the whole

13   area, because we go around that whole unit.

14   Q.  Okay.

04:23   15   A.  And we'd pick all the trash up, and then we come back and

16   we'd start doing all of our cleanup and sweeping.

17   Q.  I see.

18   A.  But at the time of that, we were in the Pipestill B3.

19   Q.  Okay.

04:23   20   A.  And I was -- they had the big hole that's, you know --

21   where the buses pick us up.

22   Q.  Right.

23   A.  On the opposite side of the hole, on the south side, we

24   were in that area.

04:23   25   Q.  Okay.  Before -- before you were in here, Ms. Jowell, I

04:23  1   showed the ladies of the jury this diagram of the BP plant.

2   You've seen a diagram like that before?

3   A.   Yes.

4   Q.   And I circled what says "PS 3B."  Is that the area --

04:23  5   A.   That's it, yeah.

6   Q.   Okay.  And you said you were on the south side of that

7   unit?

8   A.   Of the hole, yeah.

9   Q.   The hole.  Okay.

04:24  10   A.   Around that area.  We've been everywhere already that --

11   Q.   In that unit?

12   A.   In that unit, yes.

13   Q.   Okay.

14   A.   But at the time when all this happened --

04:24  15   Q.   Right.

16   A.   -- we were on the opposite side, you know, somewheres

17   around, like -- about -- see where the wall is?  And the hole

18   was about right here, the big giant hole.

19   Q.   All right.  And you said the south side of Pipestill 3B?

04:24  20   A.   Yes.

21   Q.   And I think, if this is correct, north is pointing straight

22   up.  So, that would be this side, basically?

23   A.   Yes.  Uh-huh.

24   Q.   "Yes"?

04:24  25   A.   I think so, yes.

04:24  1   Q.  How big is Pipestill 3B, for those of us who never been in
       2   it?  Just ballpark it if you could.
       3   A.  How big is it?
       4   Q.  Yeah.  This lawyer kept saying that it was about a city
04:24  5   block in size.  Is that about right or not?
       6   A.  Yeah.
       7   Q.  Okay.  So, about a city block?
       8   A.  Yeah.  A little bit bigger maybe.
       9   Q.  Okay.  Now, so, you were basically a laborer picking up
04:24  10  trash?
       11  A.  Sweeping, yeah.
       12  Q.  Sweeping, that kind of stuff.  Tell me what happened that
       13  night.
       14  A.  Well, we were cleaning up.  And I started to smell
04:25  15  something and so did the lady that I was working with.
       16  Q.  Okay.
       17  A.  And I told her, I said -- you know, because the night
       18  before, I had got in it also but -- and I said, you know, I --
       19  when we were together that night, too, on the 18th.
04:25  20         So, I said, "Maria, I'm starting to feel sick
       21  again, you know; and I'm getting that taste in my mouth."
       22         She said, "Me, too.  Let's go outside and go to
       23  the restroom and take a break so -- and get some fresh air."
       24         So, we walked -- when we started to walk out of
04:25  25  the unit, people were just everywhere.  They were -- you know,

04:25  1  we didn't even -- you know, just sick everywhere, laying

2  everywhere, you know.  People were being sick, and there were

3  some of them throwing up.  I mean, it was just scary.  We knew

4  something happened.

04:25  5           We went to the restroom.  We come out.  Our

6  foreman started coming and gathering us all up, telling us to

7  stay right there.  Never heard the horn go off or anything like

8  that.

9  Q.  What is -- what do you mean?  When you say "horn," what are

04:26  10  you talking about?

11  A.  The --

12  Q.  Alarm?

13  A.  -- alarm, yeah, never heard that go off.

14  Q.  Never heard that go --

04:26  15  A.  Uh-uh, no.

16  Q.  And when you say, "go outside to get some fresh air," you

17  mean outside Pipestill 3B?

18  A.  Right.  That's where our restrooms are --

19  Q.  Okay.

04:26  20  A.  -- and everything are and our water.  So, we was going out

21  to maybe get some fresh air and, you know --

22  Q.  Now, did you -- we're going to focus on the night before;

23  but had you smelt that kind of smell before, other than the

24  night before?

04:26  25  A.  No.

04:26   1   Q.  Could you, for those of us that haven't smelt it -- and we
        2   may all get to smell it during this trial -- but could you
        3   describe it to the ladies of the jury?
        4   A.  You know, the first night it was so -- really, really
04:26   5   strong that night.  And, then, the next day, it wasn't as
        6   strong.  But I can't really -- I can't really tell you
        7   exactly -- I mean, I can't sit here and tell you it was sweet
        8   or -- you know, you smell this odor and you just want to get
        9   out of it.
04:27  10   Q.  Okay.  Offensive, very offensive?
       11   A.  I -- yes, a very bad smell.
       12   Q.  Okay.
       13   A.  Yes.
       14   Q.  Now, what did it do to your body?
04:27  15           And I'm not talking about a doctor's opinion, but
       16   just give me what it was doing to you.
       17   A.  The first night or the second night?
       18   Q.  Let's talk about the night of April 19th.
       19   A.  Okay.  It -- you got this metal taste in your mouth.  You
04:27  20   started getting -- your body started trembling inside.  You
       21   couldn't really breathe that good, and you got -- it's like
       22   something was happening to your vision.  Okay?  You know, and
       23   you got a real -- like your throat got real raw.
       24   Q.  Okay.
04:27  25   A.  That's how you feel.  You feel just real -- you know, real

04:27   1   jittery, nauseous.

2   Q.  Okay.  All right.  When you -- you said you and your

3   coworker, the supervisor got involved.  What happened then?

4   A.  Well, she got all -- you know, she has to get all the

04:27   5   laborers together.  And everybody kind of from the whole --

6   whoever else was in the unit or whatever, they were getting

7   them out.  We were all kind of getting all together.  And then

8   we went to the muster point.  We went there.

9   Q.  Okay.

04:28   10   A.  We stayed there for awhile.  We had told our foreman that

11   we had been in it and we were feeling kind of sick, and we got

12   loaded on the buses.  She said, "Wait.  When we get there,

13   there are going to be medical people there to look at all of

14   us," you know.

04:28   15   Q.  Okay.

16   A.  From there, we went to the tents; and they -- they looked

17   at us and took care of us.

18   Q.  What did they do?

19   A.  They took our blood pressure and all that, you know, and

04:28   20   just kind of watched us and asked us how we felt.

21   Q.  Did anybody give you a breathing test?

22   A.  No.

23   Q.  Okay.  Did anybody do an x-ray?

24   A.  No.

04:28   25   Q.  Okay.  They looked at your throat, they looked at your

04:28  1    eyes; did they do any of that?

2    A.   Uh-uh.

3    Q.   "No"?

4    A.   No.

04:28  5    Q.   Well, did they do anything?

6    A.   They just gave, you know, checked our blood pressure, just

7    asked us how we felt, "Are you sick?"  "Drink some water."

8    That's -- that's it.

9         I mean, even when we went to the hospital they

04:29  10   just made us -- they made us strip down and -- which was

11   humiliating.  We had to strip down.  They took our clothes.

12   They put us in a room with men and women, all of us together;

13   and they just basically monitored our blood pressure.  They

14   didn't want to take urine.  They didn't want to do anything,

04:29  15   take blood, do anything to check us out or anything.

16   Q.   Which hospital were you at?

17   A.   At Mainland.

18   Q.   In Texas City?

19   A.   Yeah, Mainland Medical.

04:29  20   Q.   So, they decontaminated you?

21   A.   That was it, yeah.

22   Q.   And they didn't segregate the women from the men?

23   A.   No.  And it was basically to -- put you into tears.  It was

24   very, very humiliating, yes.  I mean, even the men and these --

04:29  25   there were some of them, you know, large men, they were in

04:29   1   their little gowns, you know.

2             Here we are, all in gowns; and we're having to

3   stay in there with these men.  And we don't -- you know, I just

4   thought it was awful.  It was just an awful experience.

04:30   5   Q.  Were you concerned about your health?

6   A.  Yes, I was, because I have had breast cancer.  Okay?  And I

7   just -- I was scared.  I was really scared.

8   Q.  How long, Ms. Jowell, were you at the hospital, Mainland

9   Medical?

04:30   10  A.  They kept us there for about three hours and just watched

11  us.  And our blood pressures got down, they sent us home and

12  said that, you know, go see a doctor when -- they'll get us all

13  together and see their doctor.

14  Q.  Did that ever happen?

04:30   15  A.  Yes, we did -- they did -- they drug tested us.  That's

16  about it.

17  Q.  So, BP at some point sent you to one of their doctors?

18  A.  I guess that's who --

19            MR. GALBRAITH:  Excuse me, your Honor.

04:30   20            MR. BUZBEE:  Hold up, Ms. Jowell.

21            MR. GALBRAITH:  That assumes facts not in evidence.

22            MR. BUZBEE:  She's putting it in evidence.

23            THE COURT:  I think he asked a fair question, and I'm

24  going to overrule the objection.

04:30   25            MR. GALBRAITH:  Thank you.

04:30   1   BY MR. BUZBEE:

2   Q.   Go ahead, Ms. Jowell.  I'm sorry for the interruption.

3             Did BP ever provide a doctor for you?

4   A.   I think it was -- they sent all of us to a doctor.  I

04:31   5   didn't know if it was P2S or -- or BP.  All of us went; and we

6   all just took a drug test, basically.  They took a drug test

7   and asked us questions, and that was it.

8   Q.   So, there was no BP there making sure you had an x-ray or

9   breathing test or anything like that?

04:31   10   A.   No.

11   Q.   Was there any BP people there, even at the doctor, to make

12   sure you were okay?

13   A.   No.  Now, they sent us -- after we went to the doctor, they

14   sent us to a clinic.  And we were going to a clinic, and they

04:31   15   did do --

16   Q.   Are you talking about the clinic I sent you to?

17   A.   Yeah, that's it, you did.  See, I'm --

18   Q.   I understand.  I just want to be clear.

19   A.   I did have that there.

04:31   20   Q.   And the only reason I ask this, Ms. Jowell -- and I think

21   everybody here knows why -- is because there's been some

22   reference that BP had you x-rayed and all that.  That's flat

23   out false?

24   A.   Right.

04:32   25   Q.   Okay.  Now, did you go back to work that night?

1    A.   No.

2    Q.   Okay.   When did you go back to work?   Or did you go back to

3    work?

4    A.   I did go back to work.   I think when we all were supposed

5    to go back in, I went back in for a day, I think.   And the next

6    day, I went home --

7    Q.   Okay.   Explain --

8    A.   -- because I was still -- I was sick.

9    Q.   Okay.

10   A.   I just felt really sick.

11   Q.   Okay.

12   A.   And I did have a few problems.   You know, I was going to

13   the doctor and --

14   Q.   Right.

15   A.   -- you know, it was just making me feel sick.

16   Q.   Did you ever go back to work out there?

17   A.   Yes, I did.

18   Q.   When?

19   A.   I kept working till June, I think.

20              But, you know, after all -- for a couple of weeks

21   there, I was missing a little bit, going -- staying home, yeah.

22   Q.   I see.   Okay.

23   A.   But then I just went back, yeah.

24   Q.   Well, first off, let's just figure this out.   Did BP

25   ever -- anyone from BP ever identify to you what you had been

04:33   1   exposed to?

2   A.   Never.

3   Q.   Okay.   Let's go back the night before.   You talked about

4   there was a smell the night before.   Could you describe that

04:33   5   smell?

6   A.   It was very strong.

7   Q.   Where were you when you smelt it?

8   A.   Basically around that same place.   Because, you know, we

9   were going in that part -- we went into the north side, in

04:33   10   through there into the unit to take the garbage out, you know,

11   and -- because -- yeah.   And it -- the smell was so strong and

12   me and my friend, the lady that I was working for -- working

13   with, we were so -- the smell was so strong we basically had to

14   run out of there.

04:33   15             That -- the smell that was -- and when we got

16   out, we were -- I was shaking.   I mean, I've never had -- I've

17   never worked in a plant before, and I've never had that feel --

18   I really thought that -- I didn't know if I was going to die.

19   I mean, I didn't know what I just got into, you know.

04:33   20   Q.   When you say you walked into there, what did you walk into?

21   A.   We walked into the pipestill.

22   Q.   Oh, okay.

23   A.   Because we were on the main road, and you go in -- we take

24   our wheelbarrow and go in there.

04:34   25   Q.   I see.

A.  We went to take the garbage, empty the barrels.  And the smell was so strong; and I was, like, "Do you smell that?"

And she said, "Let's get out of here."  And we came out, and we went straight -- I started feeling so bad that I almost wanted to throw up.  We went straight to the foreman.  And then another foreman had come out of there, too.  He was sick.

So, it was me and another foreman and three other men, we -- all five of us went to the nurses station.  And they monitored us, made us stay there for about three hours, and told us to just keep drinking water and it would go away.

Q.  Did anybody ever identify that to you?

A.  No.

Q.  Were you ever questioned or an investigation done from BP about that?

A.  No.

Q.  Okay.  After you finally went back to work -- I know you said you worked intermittently because you were missing work -- did BP ever come to you or even your supervisors ever inform you about subsequent or additional releases?

A.  No.

MR. BUZBEE:  I pass the witness.

THE COURT:  All right.

**CROSS-EXAMINATION**

BY MR. GALBRAITH:

04:35  1    Q.  Hello, Ms. Jowell, how are you?

2    A.  Fine.

3    Q.  I'm Jim Galbraith.  We've never met before, right?

4    A.  Yes.

04:35  5    Q.  You're suing BP in this case, and you recognize that I'm

6    the lawyer for BP?

7    A.  Yes.

8    Q.  So, that puts me on the other side of the fence from you.

9    I just want to make that clear.  You understand?

04:35  10   A.  Yes.

11   Q.  You indicated you worked for P2S, right?

12   A.  Yes.

13   Q.  When you say you took the trash out, was this inside, like,

14   in the control rooms?

04:35  15   A.  No.  Just inside the unit, you know.

16   Q.  And the unit is -- the control room itself is a building.

17   You walk through a door, it's got air conditioning, it's got a

18   roof; you're inside of a room?

19   A.  No, nothing like that.

04:35  20   Q.  The control room, I'm talking about.

21   A.  Right.

22   Q.  But the unit is outdoors?

23   A.  Right.

24   Q.  Open air?

04:36  25   A.  Right.

04:36   1    Q.  Okay.  So, when you say you went into the unit, you were

2    still walking down an alleyway or down a road or something like

3    that --

4    A.  Yeah.

04:36   5    Q.  -- inside that --

6    A.  But it's so closed in, you're so -- you know, it's not like

7    you're -- it is outside, yes.

8    Q.  Okay.  All right.  You were on the ground when you smelled,

9    correct?

04:36   10   A.  Right.

11   Q.  Okay.  The wind, we've been led to understand that the wind

12   was from the southeast on the 19th.  Does that comport with

13   your recollection?

14   A.  I don't -- I don't even know -- I don't know what you -- I

04:36   15   don't know anything about no wind or -- I'm not -- I'm not good

16   at all that.

17   Q.  Do you know what the wind was doing on the 18th, whether it

18   was coming from the same direction?

19   A.  I have no idea.

04:36   20   Q.  All right.  You were wearing an H2S personal monitor

21   yourself, correct?

22   A.  Yes.

23   Q.  To monitor for sulfur, specifically H2S?

24   A.  Yes.

04:37   25   Q.  It did not alarm either time --

04:37  1    A.  No.

2    Q.  -- correct?

3    A.  Correct.

4    Q.  No sulfur was detected at either of the alarm levels,

04:37  5    correct?

6    A.  Correct.

7    Q.  You're trained in how to use those?

8    A.  Yes.

9    Q.  You understand that they have two alarm levels: a low alarm

04:37  10   and a high alarm?

11   A.  I guess, yeah.

12   Q.  Do you know that?

13   A.  I guess, yeah.

14   Q.  All right.  Where do you work now?

04:37  15   A.  I'm not working right now.

16   Q.  Okay.  How long have you worked in refineries or chemical

17   plants since then?

18   A.  I haven't.

19   Q.  Okay.  So, the sum total of your experience in refineries

04:37  20   was a couple of months?

21   A.  Yes.  I mean -- from that night?

22   Q.  Okay.

23   A.  Yeah, I --

24   Q.  Let me see --

04:37  25   A.  Yeah.

04:37   1    Q.  You said you were off maybe a couple of weeks because you

        2    felt sick and then you went back to work at your old job?

        3    A.  Right.

        4    Q.  How long did you work then?

04:37   5    A.  Till August.  Well, I quit in June; and then I than went

        6    back.  I went back in.

        7    Q.  For how long?  Months?

        8    A.  About six more weeks.

        9    Q.  Okay.  Ever smell anything like that again?

04:38  10    A.  Uh-uh.

       11    Q.  Refineries are capable of producing some smell, right?

       12    A.  Yes.

       13    Q.  But this was different?

       14    A.  Totally different.

04:38  15    Q.  Not like anything that comes from a refinery?

       16    A.  Right.

       17    Q.  All right.  You say that -- were you taken with a number of

       18    other P2S employees to the same medical facility, Mainland

       19    Medical Center Hospital emergency room?

04:38  20    A.  Yes.

       21    Q.  Okay.

       22    A.  No.  Yes.  Yes.  All of us went to different hospitals.

       23    Some of us went to Mainland, some of us went to somewheres

       24    else.

04:38  25    Q.  Did your P2S coworkers all go together to Mainland Center

04:38    1    Hospital?

2    A.  What do you mean?

3    Q.  Well --

4    A.  The lady that I was working with?

04:38    5    Q.  Okay.  Let's start there.

6    A.  No.  She would not go.

7    Q.  Okay.  She didn't go to get checked out?

8    A.  Uh-uh.

9    Q.  She said, "I don't need medical checkout"?

04:39   10    A.  She wouldn't do it.  She did feel sick.  She told her

11   supervisor, but she still did not go.

12   Q.  Okay.  I'm going to ask you one thing about the night

13   before, when you say you smelled something.  It was stronger

14   than April 19th?

04:39   15    A.  Yes, it was.

16   Q.  Okay.  And on April 19th you were on the south side of the

17   unit, correct?

18   A.  We walked in from the north, through -- to the --

19   Q.  To the far side, to the south side?

04:39   20    A.  Yes.

21   Q.  Okay.  If you're on the south edge of the Pipestill 3B Unit

22   and the wind is coming from the south, did -- would it appear

23   to you that, whatever was the source or the origin of the

24   smell, it wasn't from the unit, correct?

04:39   25    A.  I have no idea.

04:39  1    Q.  Okay.

2    A.  It's got just -- you know, when you go in it, it's got so

3    many different, you know, blocks, you know, different things

4    everywhere that, you know, it holds heat and everything inside

04:39  5    there because it -- you know, it's all closed in, kind of.

6    Q.  Did P2S take care of your medical bills?  Have you ever

7    been presented with any of those medical bills?

8    A.  I've sent -- I've been billed, yes.

9    Q.  Did you ship them in -- for the Mainland Center Hospital

04:40  10   checkup?

11   A.  For the Mainland, yeah.

12   Q.  Okay.  They billed you?

13   A.  They billed me.

14   Q.  Okay.  Was this something that you reported to your

04:40  15   employer as an on-the-job injury?

16   A.  Yes, we mentioned it.

17   Q.  Okay.  Your supervisors direct you to Mainland Center?

18   A.  What do you mean?

19   Q.  Well, what was the involvement of P2S?

04:40  20   A.  The involvement of?  I don't understand your question.

21   Q.  Okay.  I guess I'm talking about -- I'm asking about your

22   training, and I'm asking about how it was implemented that

23   night.

24           P2S had policies and procedures for what happens

04:40  25   when you smell something unusual, not like a refinery, on the

04:40  1   job, have symptoms, correct?

2   A.  Right.

3   Q.  And you're supposed to report it to P2S?

4   A.  Right.

04:40  5   Q.  And then take instruction from P2S, follow their orders.

6   Is that right?

7   A.  Right.  Right.

8   Q.  And -- okay.  And, so, what was -- who was it at P2S that

9   instructed you or directed you or took charge?

04:41  10  A.  My supervisor.

11  Q.  Who's that?

12  A.  Irene -- Irene Fernandez.

13  Q.  Okay.  And there was an Alfredo, as well?

14  A.  That was -- that was just a foreman that worked there.  He

04:41  15  did not -- you know, he wasn't my foreman.  He was just someone

16  there that came out of the unit.  I was already out of the

17  unit, and my supervisor was trying to get me some medical help

18  when he came out.  And he was sick also and said the smell was

19  in there.

04:41  20  Q.  Okay.  When -- when you talked about the decontamination

21  procedure, that was a procedure of Mainland Center Hospital,

22  right?

23  A.  I don't -- that, I don't know.  I guess so.

24  Q.  Well, I mean, you weren't asked to participate in any

04:41  25  decontamination procedure until you got to Mainland Center,

04:42  1   right?

2   A.  Well, there was -- one of the ladies that works with us,

3   she was in it -- in the worst part of the areas, and they

4   stripped her -- she's a big woman.  They stripped her down and

04:42  5   sprayed her down in front of everybody on the job site.  And

6   she was very, very humiliated over that.

7   Q.  Okay.  You say that they put you in a room with ladies and

8   men.  Weren't -- you said they stripped you down and put you in

9   a room with ladies and men together?

04:42  10  A.  Right.  They gave us gowns to put on; but still, a gown, a

11  hospital gown --

12  Q.  They're nasty, I agree.  Everybody will agree.

13  A.  Right.

14  Q.  But it wasn't naked.  It was in a hospital gown.

04:42  15  A.  Well, you didn't have nothing on underneath; and everybody

16  is sitting around.  It wasn't very comfortable.

17  Q.  Okay.  When you reported it the night before, did -- did

18  anybody report it to BP --

19  A.  Yes.

04:42  20  Q.  -- to your knowledge?

21  A.  Yes.

22  Q.  Okay.  Who did you report it to?

23  A.  First thing we did was go to my supervisor.

24  Q.  Okay.  And then he takes it from there or do you follow it

04:43  25  from there?

04:43 1   A.   They take it from there.

2   Q.   Okay.  Were you evacuated that night before, for an

3   investigation?

4   A.   Yeah.  We didn't go back in the unit for awhile.

04:43 5   Q.   Okay.  While tests were being run or machines were being

6   utilized?

7   A.   I guess while they were checking it out.

8   Q.   Do you know what the "checking it out" investigation

9   amounted to?

04:43 10   A.   No.

11   Q.   You know they checked it out with some kind of machines;

12   you don't know what?

13   A.   I have no idea.

14   Q.   Okay.  Who was it that said drink water and it would go

04:43 15   away?

16   A.   The nurses station, whoever works in the nurses station.

17   Q.   Okay.  So, was that an emergency medical technician?

18   A.   Yeah.

19   Q.   Or a paramedic?

04:43 20   A.   Whoever works for BP.

21   Q.   Okay.  It was a BP person that was tending you before you

22   went to Mainland Center?

23   A.   What, now?

24   Q.   The -- was it -- okay.  First of all, I guess I got to ask.

04:43 25   When somebody said, "Drink water and it should go away" --

04:44  1   okay?

2   A.  It was whoever the nurse -- whoever was in the office when

3   they sent us to the nurses station, whoever works in there.  I

4   don't know if it's -- if they're BP or if they're P2S.

04:44  5   Q.  Or a contractor or what?

6   A.  Right.

7   Q.  But they're the ones said, "Drink water and it should go

8   away"?

9   A.  "Just drink the water, and your symptoms will start going

04:44  10  away."

11          MR. GALBRAITH:  Pass the witness, your Honor.

12          MR. BUZBEE:  May I approach?

13          THE COURT:  Yes.

14                        **REDIRECT EXAMINATION**

04:44  15  BY MR. BUZBEE:

16  Q.  Ms. Jowell, we talked about it and we talked about you

17  reported the night before and I have here in front of you

18  Plaintiffs' Exhibit 38A, which is what is called a "Traction

19  Report," an actual report in BP's system.

04:44  20          Did you -- can you confirm to me, ma'am, that

21  here it says, "Employee experienced nausea after smelling odor

22  in furnace area"?

23          Were you in the furnace area when you reported

24  this?

04:45  25  A.  It could have been.  I just -- you know, I'm not really --

04:45  1   you know, I haven't -- like I said, I've never worked in a

2   plant --

3   Q.  Okay.

4   A.  -- and I don't really know all the things of all that

04:45  5   stuff.

6   Q.  But it has here the identification of who the person who

7   made the report was working for.  And it says who?

8   A.  "P2S."

9   Q.  Okay.  And this happened about what time?

04:45  10   A.  Between 9:00 and 10:00.

11   Q.  Okay.  And this report, looks like, was done about

12   3:00 a.m.  Does that look right?

13   A.  Right.

14                    Is this the 18th or 19th?

04:45  15   Q.  This is the night before the event we're here to talk about

16   in this case.  This is actual -- just so you know, this is your

17   report.

18   A.  This is the 19th or the 18th?

19   Q.  Well, remember, you were working the graveyard shift?

04:45  20   A.  Right.

21   Q.  So, it's kind of confusing as far as --

22   A.  Yeah, it is.

23   Q.  -- whether you were -- but I'm going to represent to you,

24   since I am your lawyer --

04:45  25   A.  Right.

04:45   1   Q.   -- that this is the report that was made.

2   A.   Okay.

3   Q.   Would you agree with me that it was done on the 19th at

4   about 3:00 a.m.?

04:46   5   A.   Yes.

6   Q.   That's when the report was made?

7   A.   Right.

8   Q.   And it has to do with a P2S employee --

9   A.   Right.

04:46   10   Q.   -- being overcome with a smell, right?

11   A.   Right.

12          MR. BUZBEE:   Your Honor, we offer Plaintiffs' Exhibit

13   38A.

14          THE COURT:   Take a look at that, tell us whether

04:46   15   you --

16          MR. GALBRAITH:   Have we seen this?

17          THE COURT:   -- have -- sustain an objection to it?

18          MR. BUZBEE:   This is the BP Traction report for the

19   incident that you just crossed this witness about.

04:46   20          MR. GALBRAITH:   Pardon me, your Honor.   I haven't seen

21   this.

22          MR. BUZBEE:   It's a BP document.

23          THE COURT:   What's the number?   Thirty what?

24          MR. GALBRAITH:   It's 38A.   It's a new sticker.

04:46   25          THE COURT:   Thirty-eight?

04:46  1          MR. BUZBEE:  It was part of 38, but I made it 38A

2  so -- thinking there would be no objection.

3          THE COURT:  All right.  Mr. Galbraith, take a look at

4  it.

04:47  5          MR. GALBRAITH:  I don't think I have any objection to

6  38A, your Honor.

7          THE COURT:  Are there particular Bates numbers that

8  identify that particular document?

9          MR. BUZBEE:  No, your Honor, there are not.

04:47  10         THE COURT:  Okay.

11         MR. BUZBEE:  But I intend to leave it here with your

12  case manager when we're done today.

13         THE COURT:  And what is it called, now?

14         MR. BUZBEE:  We're calling it 38A.

04:47  15         THE COURT:  What is the document?

16         MR. BUZBEE:  It's an incident report, a BP incident

17  report.

18         THE COURT:  All right.  Okay.  It's admitted.

19         MR. BUZBEE:  Nick, can you show me how to use this

04:48  20  Elmo, if you know?

21  BY MR. BUZBEE:

22  Q.  Who is Terrell Roddy, if you know, Ms. Jowell?

23  A.  I do not know.

24  Q.  Okay.  Do you see there that on 4-19-07 at 3:00 a.m.

04:48  25  somebody put into BP's system this incident report?  Do you see

04:48   1   that?

2   A.   Yes.

3   Q.   All right.   It says, "Three individuals got whiff of odor."

4               Would you -- if you were telling one of your

04:48   5   friends -- for instance, Maria or one of the people you were

6   talking about -- is that how you would describe what happened,

7   you got a whiff of an odor?

8               Or would you say, "I was overcome.   I almost

9   passed out from an odor"?

04:48   10   A.   Yes.   Yes.

11   Q.   Okay.   I thought so.   Now, you said there were about five

12   people or so involved?

13   A.   Yes.   There was five that I -- that I saw.

14   Q.   Okay.   This -- and for full disclosure, this is -- actually

04:49   15   two entries were made in 38A, three people in one entry and

16   then it has a second entry at the same time period.

17               And I think this is probably the one that refers

18   to you.   It says, "Employee experienced nausea after smelling

19   odor in furnace area."

04:49   20               I thought you told me that there -- that your

21   coworker also experienced nausea that night --

22   A.   Yes, she did.

23   Q.   -- that she was also overcome and became sick.

24   A.   Yes.

04:49   25   Q.   She also almost felt like she was going to pass out?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:49   1    A.  Yes.

2    Q.  But, for some reason, the actual report that was done, I

3    guess either references just you or just Maria, from this

4    document, doesn't it?

04:49   5    A.  It's -- right.

6    Q.  Is it true that Maria or you -- because we're talking about

7    you and Maria in this report, you know --

8    A.  Right.

9    Q.  -- had no reaction to the odor.  Is that true?

04:49  10    A.  No.

11    Q.  That's a false report, is it not?

12    A.  Right.

13    Q.  Okay.  But it is true that the operations moved everyone

14    out of the unit?

04:50  15    A.  Yes.

16    Q.  Okay.  And they, of course, could not find the cause?

17    A.  Right.

18    Q.  And no one ever told you what it was that you were exposed

19    to?

04:50  20    A.  No.

21    Q.  Either 24 hours before or the actual April 19th, where

22    everybody went to the hospital?

23    A.  Right.

24    Q.  And nobody from BP came to you and said, "Let me question

04:50  25    you.  Let me try to figure this out.  Let me" --

04:50  1              What was the phrase he used?  "We didn't stop

2     there.  We didn't stop there.  Let's sit you down and try to

3     figure out what happened," no one did that from BP, did they?

4     A.  No.

04:50  5     Q.  You told the lawyer for BP that you wear a badge?

6     A.  A little monitor, yes.

7     Q.  Okay.  What -- what kind of badge is that?  Or monitor,

8     what kind of monitor?

9              MR. GALBRAITH:  Judge, it's not a badge.  It's a

04:50  10    monitor.  There's a difference.  She understands the

11    difference.  She's answered that it was a monitor, not a badge.

12             THE COURT:  All right.

13    BY MR. BUZBEE:

14    Q.  Okay.  I'm sorry.  I don't -- we're going to figure this

04:51  15    out as we go.  But you wore a monitor?

16    A.  Right.

17    Q.  What kind of monitor was it?  A hydrogen sulfide monitor?

18    A.  Right.

19    Q.  It's not a carbon disulfide monitor, is it?

04:51  20    A.  No.

21    Q.  Okay.  And, finally, there's been some talk about the wind.

22    Do you remember the wind blowing real hard that night, the

23    night that everybody was evacuated?

24    A.  I don't.

04:51  25    Q.  If the wind had been blowing or gusting, would you have

04:51  1   remembered it?

2   A.   Probably.

3   Q.   Okay.   And I think you tried to say several times --

4   because none of us have actually been out there except for you.

04:51  5   I guess the BP lawyer has, but I haven't.

6              But you kept saying it's a closed in space.   Help

7   me understand what you mean by that.

8   A.   Well, I mean, it's, like, tall pieces that -- you know,

9   steel and just different -- you know, just different pieces of

04:51  10  the unit that's -- some of it is tall, some of it is not as

11  tall, like going in downtown, like, in a real --

12  Q.   Oh, okay.

13  A.   You know what I --

14  Q.   Yes, I understand.

04:52  15  A.   I mean, the wind don't really go through there, gusting,

16  you know.

17  Q.   Right.   Okay.   It's not like being out on a football field

18  where something --

19  A.   Right.

04:52  20  Q.   -- could release over here and it blows over and you smell

21  it?

22  A.   Right.

23  Q.   It's like you're in a confined space.

24  A.   Right.

04:52  25             MR. BUZBEE:   Pass the witness.

04:52  1          THE COURT:  You may step down.  Thank you very much.

2          MR. BUZBEE:  Thank you, Ms. Jowell.

3          THE COURT:  Tell you what.  Why don't we break?

4              I keep looking outside, see what time darkness

04:52  5    falls.  It's not going to be dark for awhile, but I do want you

6    to get a chance to get on the road.  So, why don't we break at

7    this point and pick up in the morning?

8              Is 8:30 a problem for anybody?  I generally get

9    up early.  Do you want to start earlier than that?

04:52  10         MR. BUZBEE:  Yes?  No?

11         THE COURT:  I knew I would get some yes's and some

12   no's with that, and that's why I asked the question.  We'll

13   keep it at 8:30.  Okay?

14         MR. BUZBEE:  Yes, sir.

04:52  15         THE COURT:  You-all have a good evening.  See you in

16   the morning.  And be careful out there.

17         THE CASE MANAGER:  All rise.

18   *(Jury not present)*

19         THE COURT:  All right.  Please be seated.  I just need

04:54  20   to verify before you leave that there -- that we're -- we don't

21   have anything we need to take up before we get started -- or

22   before we dismiss, should I say, this afternoon.

23         MR. BUZBEE:  May I be heard, your Honor?

24         THE COURT:  Yes.

04:54  25         MR. BUZBEE:  One thing we haven't resolved is the

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

04:54  1    deposition designation objection.

2          THE COURT:  That came back to me when you called this

3    witness, and I know we need to talk about that.

4          MR. BUZBEE:  And I -- just for the Court's

04:54  5    understanding or -- what's going to happen tomorrow, I do

6    intend to call Michael Yancy.

7          THE COURT:  Well, here's the thing that I'm concerned

8    about.

9          MR. BUZBEE:  Yes, sir.

04:54  10         THE COURT:  One of the -- I was prepared to sustain

11   your objections to the deposition excerpts because I was of the

12   opinion that it might not be proper to call the other

13   witnesses -- I mean, the other plaintiffs as witnesses in this

14   case.  I'm really concerned about that because what we're

04:55  15   actually doing -- and I'm not saying that it shouldn't be done.

16   My -- just my thinking, limited, narrow thinking was that --

17   was that we were going to try this case based upon the

18   testimony of these witnesses and determine whether or not these

19   witnesses' case would be sustained.

04:55  20         Now, I don't know how many other witnesses that

21   you plan to call.  Maybe we need to talk about that.  How many

22   do you plan to call who -- in this case, who are also

23   plaintiffs in this case?

24         MR. BUZBEE:  I have --

04:55  25         THE COURT:  If you know that at this time.

04:55   1          MR. BUZBEE:  I do know it, and I had intended to

   2   call --

   3          THE COURT:  Hold on just one second.  Let me see if I

   4   can find my list.

04:55   5          MR. BUZBEE:  -- looks like five others, sir.

   6          THE COURT:  Okay.  And I'll be -- are any of these

   7   witnesses that you plan to call, are they persons whose

   8   depositions have been taken for which excerpts --

   9          MR. BUZBEE:  No.

04:56   10          THE COURT:  Okay.  All right.  Now --

   11          MR. BUZBEE:  Michael Yancy, the one I was referring to

   12   as -- he was the team leader of the investigation.  We have a

   13   cut of about 58 minutes or so, and I was just giving you a

   14   heads up.  So, if we want to resolve that tomorrow morning

04:56   15   early, before we play it, my guy can make the cuts on the fly.

   16          THE COURT:  What's your objection to his offer?

   17   Because I think you have some objections to the defendant's

   18   offer of certain other plaintiffs' -- other plaintiffs'

   19   testimony excerpts?

04:56   20          MR. GALBRAITH:  Well, I don't know my --

   21          THE COURT:  No, no.  I thought the plaintiffs had

   22   objections to some of your offers.

   23          MR. GALBRAITH:  In the deposition of --

   24          THE COURT:  Yeah, deposition of certain others.

04:56   25                  Did you --

04:56  1        MR. BUZBEE:  No.  We -- our plaintiffs in this case,

2    they -- I don't know why they designated our plaintiffs in this

3    case.  Not the other hundred and so, but the 10.  That's what

4    our objection --

04:56  5        THE COURT:  Okay.  So, the objection that you made

6    goes to the 10 plaintiffs or some part of them --

7        MR. BUZBEE:  Right.

8        THE COURT:  -- that are in this case --

9        MR. BUZBEE:  Correct.

04:57  10       THE COURT:  -- and the designation?

11       MR. BUZBEE:  Yes, sir.

12       THE COURT:  Well, that's easy.  We're not -- certainly

13   not going to offer their depositions.

14       MR. BUZBEE:  No.

04:57  15       THE COURT:  It might be that they might be used for

16   impeachment purposes; but beyond that --

17       MR. BUZBEE:  Yes, sir.

18       THE COURT:  Now, let's go ahead with your concerns.

19       MR. GALBRAITH:  Okay.  Deposition objections was on my

04:57  20   list.  There's a couple of things.  There's a long list of

21   potential witnesses, a long list.

22       THE COURT:  Right.  Right.

23       MR. GALBRAITH:  I promised to give 24 hours' notice of

24   who I'm going to call.  If I could demand something similar,

04:57  25   because it's just not fair to have two witnesses I never

04:57  1  anticipated, never had reason to anticipate, and I've already

2  cross examined them.  I think I would ask for some kind of

3  accommodation.  I don't think it's unfair or unreasonable.  And

4  I promise to do a quid pro quo.

04:57  5           THE COURT:  Okay.

6           MR. BUZBEE:  We can work that out.  I have no problem

7  with that.

8           THE COURT:  You going to work it out today?

9           MR. BUZBEE:  We're going to work it out when we leave

04:57  10  here.

11           THE COURT:  Okay.

12           MR. BUZBEE:  We will work -- we're not going to bother

13  you with that, your Honor.  We're going to reach an agreement.

14  There will be no problem.

04:57  15           THE COURT:  Thank you.  Okay.

16           MR. GALBRAITH:  The second thing, other than the

17  deposition exhibits, is the outstanding subpoenas, however --

18  or whoever they may be.  My --

19           THE COURT:  Well, we know three.  We only have one

04:58  20  outstanding subpoena, because two have responded.

21           MR. GALBRAITH:  Right.  And I know -- I know that

22  there were efforts to serve that third one today or this

23  afternoon.  I'm not sure if --

24           THE COURT:  Is he on your list?

04:58  25           MR. GALBRAITH:  Keith Casey is not.

04:58   1          THE COURT:  He's not on anybody's list?

       2          MR. GALBRAITH:  No.

       3          MR. BUZBEE:  Your Honor, I'm sorry.  That's not

       4   factual.

04:58   5          MR. GALBRAITH:  Well --

       6          MR. BUZBEE:  He's been listed on their witness list

       7   until very recently they took him off.  He's the plant manager,

       8   been around forever, been listed as a person with knowledge,

       9   been listed on their witness list for a long time.  He's

04:58  10   obviously a key witness in the case.

      11          THE COURT:  Okay.  All right.  And who are the others,

      12   then, who you think --

      13          MR. GALBRAITH:  Well, I don't know.  That's the only

      14   one that I know about.  That's the only other one that I know

04:58  15   about.

      16          MR. BUZBEE:  There's three only.  It's the ones that I

      17   told you about, your Honor: Keith Casey and the two men that

      18   you just swore in --

      19          THE COURT:  Those are the only three subpoenas that

04:58  20   were issued?

      21          MR. BUZBEE:  That's it, correct.

      22          THE COURT:  Okay.  So, that covers that.

      23          MR. GALBRAITH:  Keith Casey is an apex deposition.  Of

      24   course, he was not --

04:58  25          THE COURT:  He is an apex deposition, meaning his

04:59   1    deposition was taken?

2              MR. BUZBEE:  No.

3              MR. GALBRAITH:  No, no.  He has not been deposed.  And

4    he has been a subject of a motion to quash his deposition.

04:59   5          They attempted to get his deposition.  And you

6    may remember that we talked about I don't even know if he was

7    on duty that night or if he was even in the plant that night.

8    And we had to go back and find out that he was not.  He was not

9    in the State of Texas that night.

04:59   10         And we confirmed that, which was the Court's

11   inquiry as to whether or not we were going to do this apex

12   deposition or not.  We confirmed that and reiterated it to you;

13   and they withdrew their deposition notice and rendered the

14   matter moot, I think, based upon the guidance from the Court.

04:59   15         Now they've subpoenaed him.  So, it brings back

16   the same issue.  We've been through this before.  He was not at

17   the plant; he was not on duty; he was not even in the state

18   that night; he is an apex.

19         For apex depositions, there should be some -- he

04:59   20   is -- I'm not going to say he's a very busy man, although he is

21   a tremendously busy man.  But I think that, at minimum, we

22   should beg for some accommodation.  But that's not the answer

23   to this.

24         The answer is that there should be some required

05:00   25   showing that you have to get from him something you can't get

05:00   1    elsewhere.  And, of course, I don't think they can ever do

2    that.  I don't think that can be done because obviously -- I

3    think it's to harass.  I think it's to get the head guy just

4    because he's the head guy, not because he knows some fact that

05:00   5    nobody else knows, because he doesn't.

6               THE COURT:  All right.

7               MR. BUZBEE:  Your Honor, first off, I -- just to clear

8    up probably unintentional misrepresentations, but this is their

9    witness list and Keith Casey's name is on it, even now, number

05:00   10   one.  That's their witness list, still on it.

11              Number two, as you can -- first off, I don't

12   harass anybody.  I think you realize that, your Honor.  Keith

13   Casey is the plant manager.  Keith Casey is the decision-maker

14   about maintenance, piping integrity, and inspections.  Keith

05:00   15   Casey is the guy that decides how much money will be spent here

16   and there, how much they're going to put in for this --

17              THE COURT:  Was it a 30 -- what is it -- a 30(b)(6)?

18   Was there a corporate deposition taken in this matter?

19              MR. BUZBEE:  Nope.

05:01   20              MR. GALBRAITH:  No, your Honor.

21              MR. BUZBEE:  No, your Honor.

22              THE COURT:  Except for the designations that are being

23   made here, there's no, quote, "responsible person" who claims

24   to be in charge of everything?

05:01   25              MR. BUZBEE:  Right.  He's the guy.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:01   1          And moreover, just, again, to correct -- and I

2    know the Court knew this already -- but "apex deposition,"

3    that's a state court thing.  That's not a federal court thing.

4          THE COURT:  Right.

05:01   5          MR. BUZBEE:  This guy is the plant manager.  He's the

6    head man, the buck stops here; and he's the guy that I am

7    entitled to ask about how much you spend on maintenance, are

8    you aware of the leaks.

9          And, remember, this is a punitive case, too.  So,

05:01   10   I'm -- I don't think they have any cases that support their

11   position.  I'm entitled to --

12         THE COURT:  Well, let me say this.  Whatever the

13   circumstances were that gave rise to the cancellation of the

14   deposition, I'm not going to say or rule that that ended the

05:01   15   possibility of that person being called as a witness, because

16   that simply would give lawyers in different circumstances too

17   many opportunities to hide witnesses and then not be able to

18   get them to court later on.  That's not the case here, of

19   course.

05:02   20         But what I will say is this.  If he's on a

21   witness list, been on a witness list, you're responsible for

22   him if he's on your witness list.

23         All I can say is this.  Work it out with counsel

24   as to when he needs him.  And then I'll let you make whatever

05:02   25   objections you think are appropriate at the beginning.  I

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

05:02    1    prefer that they be made before the jury is in the box.  And,

2    then, if you have objections specifically to questions, those

3    certainly you have to make during the course of the testimony.

4       MR. GALBRAITH:  Well, I don't think it's a

05:02    5    misrepresentation intentionally either.  He is on our witness

6    list, but that was called to our attention by them, saying, "If

7    he's on your witness list, we want his deposition."

8       And we wrote a letter saying, "We have no

9    intention of calling him.  And if we ever change that, we'll

05:02   10    give you plenty of notice and opportunity to depose him" --

11       THE COURT:  Well, but I can't let your decision

12    determine whether or not he is an appropriate witness or not at

13    this point in time.  I think without regard to how this could

14    have been handled or historically was handled, I think the

05:03   15    appropriate thing to do is to simply determine when you need

16    the witness and then the objection can be made at -- before as

17    to him being permitted -- or the Court's permitting him to be

18    called as a witness; and then there can be, certainly, your

19    usual objections or -- I say "usual" -- the evidentiary

05:03   20    objections during the course of the testimony itself.

21       MR. BUZBEE:  Yes, sir.

22       MR. GALBRAITH:  Yes, sir.

23       THE COURT:  All right.  Thank you, gentlemen.  You-all

24    have a good evening.  We'll see you tomorrow morning at 8:30.

05:03   25       MR. BROWN:  Your Honor?

05:03   1          THE COURT:  Yes, sir.

2          MR. BROWN:  There is one issue.  They mentioned they

3    want to call --

4          THE COURT:  State your name for the record.

05:03   5          MR. BROWN:  I'm sorry.  Tony Brown.

6          THE COURT:  Go ahead.

7          MR. BROWN:  I identified myself earlier.

8          THE COURT:  Yes.

9          MR. BROWN:  We have a deposition they intend to play

05:03  10    tomorrow, of Mr. Michael Yancy.  It was mentioned a few minutes

11    ago.  Plaintiffs made designations.  We filed objections to

12    specific questions and answers.  It's a long deposition.

13          THE COURT:  Whose deposition was it?

14          MR. BUZBEE:  Michael Yancy.

05:04  15          MR. BROWN:  Mr. Michael Yancy.

16          THE COURT:  No, no.  I mean, who called the

17    deposition?

18          MR. BROWN:  Plaintiff called the deposition.

19          THE COURT:  It was plaintiffs' deposition?

05:04  20          MR. BROWN:  Right.

21          THE COURT:  And you don't have any parts that you

22    designated?

23          MR. BROWN:  We have.  And they've objected to parts of

24    our offer, as well.

05:04  25          THE COURT:  So, we're just going to play the

05:04  1    deposition, right?

2              MR. BUZBEE:  Well --

3              THE COURT:  I'm not going to spend my night going

4    through this deposition.  How long is it?

05:04  5              MR. BUZBEE:  Our part is 58 minutes.

6              THE COURT:  How long is your part?

7              MR. BROWN:  About 40 minutes or so.

8              THE COURT:  So, we just play the whole thing.

9    Whatever it is that needs to be played, we are going to play it

05:04  10   all at one time unless you want to reserve your portion.

11             MR. GALBRAITH:  Could we have an opportunity to make

12   those objections subject to the Court's --

13             THE COURT:  You might be able to do it.  I guess this

14   is a video.  Is it a video deposition?

05:04  15             MR. BUZBEE:  It's video.

16             THE COURT:  I think we can probably make some of

17   those.  If you've got a printed copy and you designated on that

18   copy where your objections are, I generally will read ahead and

19   rule on the record as you approach that particular area.  I'll

05:04  20   do that, but you need to get that to me before.

21             MR. GALBRAITH:  We filed those of record already.  We

22   could produce some more copies tomorrow.

23             MR. BROWN:  You mean write it on the transcript

24   itself?

05:05  25             THE COURT:  No.  The transcript itself is going to

_Cheryll K. Barron, CSR, CM, FCRR_                          _713.250.5585_

05:05   1    have to show me where your objections are.

2            MR. BUZBEE:  I have one transcript --

3            THE COURT:  Not just give me -- not just give me a

4    list of designations and I have to go do all that work.

05:05   5            MR. BUZBEE:  No, sir.  I have one transcript, your

6    Honor, for the Court, to make it easier on you --

7            THE COURT:  All right.

8            MR. BUZBEE:  -- that has our designations highlighted

9    and theirs highlighted.

05:05   10           THE COURT:  But I need the objections, not the

11    designations.

12           MR. BUZBEE:  The objections, yeah.

13           THE COURT:  And that's the key to it.

14           MR. GALBRAITH:  We'll work on that tonight.

05:05   15           THE COURT:  All right.  So, who is your first witness

16    tomorrow morning?

17           MR. BUZBEE:  Tomorrow my first witness is going to

18    be -- is it Vernon Johnson or Brian Johnson or --

19           THE COURT:  It's not the deposition?

05:05   20           MR. BUZBEE:  Negative.

21           THE COURT:  Okay.  So, how long will it be before you

22    get to the deposition?

23           MR. BUZBEE:  I've got, like I said, five more of those

24    witnesses, about the same --

05:05   25           THE COURT:  Okay.  So, you got till probably 10:30 or

05:05   1   noon.

2                  MR. BUZBEE:  Exactly.

3                  THE COURT:  Yeah.  Okay.

4                  MR. GALBRAITH:  Could we ask for the identification of

05:05   5   at least those first five short ones?

6                  MR. BUZBEE:  I'll get with him after this, your Honor.

7   Like I said, we're going to work out a deal.

8                  THE COURT:  Okay.  All right, gentlemen.  Thank you

9   very much.  Have a good evening.

10         (Proceedings recessed for evening)

11                          *  *  *  *  *

12                COURT REPORTER'S CERTIFICATION

13         I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled cause.

14

15   Date:  January 25, 2010

16

17                          /s/   Cheryll K. Barron

18                     Cheryll K. Barron, CSR, CMR, FCRR
                       Official Court Reporter

19

20

21

22

23

24

25

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585