1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                         GALVESTON DIVISION

3    AARON WILSON GARNER              .
                                      . G-07-CV-221
4           vs.                       . GALVESTON, TEXAS
                                      . DECEMBER 17, 2009
5                                     . 10:31 A.M.
     BP AMOCO CHEMICAL COMPANY        .
6    BP AMOCO POLYMERS, INC.,         .
     BP CORPORATION NORTH             .
7    AMERICA, INC.                    .
     . . . . . . . . . . . . . .      .
8

9                    TRANSCRIPT OF JURY TRIAL
                BEFORE THE HONORABLE KENNETH HOYT
10              UNITED STATES DISTRICT JUDGE
                        DAY 12 OF 13
11

12   A P P E A R A N C E S:

13   FOR THE PLAINTIFFS:

14        Anthony Buzbee
          Sean O'Rourke
15        Peter Kelley Taaffe
          Nick Simon
16        The Buzbee Law Firm
          600 Travis Street
17        Suite 7300
          Houston, Texas 77002
18
          Gabe Vick
19        Arnold & Itkin, LLP
          1401 McKinney Street
20        Suite 2550
          Houston, Texas  77010
21

22

23   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
24                         - - - - -

25

```
 1    A P P E A R A N C E S:  (Continued)

 2    FOR THE DEFENDANTS:

 3         Jim Galbraith
           Lyle Courtney
 4         Anthony Brown
           April Marburger
 5         McLeod Alexander Powel & Apffel
           PO Box 629
 6         Galveston, Texas 77553

 7
      OFFICIAL COURT REPORTER:
 8
           Cheryll K. Barron, CSR, CM, FCRR
 9         U.S. District Court
           515 Rusk Street
10         Houston, Texas  77002

11    ALSO PRESENT:

12         Ken Panozzo

13                           - - - - -

14

15

16

17

18

19

20

21

22

23

24

25
```

1              P R O C E E D I N G S

2    *(Jury not present)*

3       THE COURT:  Please be seated.  Let me ask first how

4  the exhibit list challenge is coming.

10:31  5       MR. O'ROURKE:  Very well, your Honor.  We've only got

6  one issue in dispute on the plaintiffs'.  We've agreed to

7  everything else.

8       THE COURT:  All right.  Who's speaking for you --

9       MR. COURTNEY:  We're still working on ours, your

10:31  10  Honor; but I have --

11       THE COURT:  Is that true, that you have one issue with

12  the plaintiffs' side?

13       MR. COURTNEY:  That is correct.

14       THE COURT:  Okay.  Go ahead.  What about the defense,

10:31  15  now?

16       MR. COURTNEY:  We're still working on it.  We have, I

17  think, maybe five minutes; and we'll be done with it.

18       THE COURT:  Okay.  Go right ahead.  Just let me take a

19  look at what I have here in the charge.  I'm looking at the

10:31  20  charge.

21        Okay.  Let's see.

22    *(Sotto voce discussion at bench with court staff)*

23       THE COURT:  All right.  Let me look at your exhibit

24  list for the plaintiff.

10:33  25       Direct me now to the portion that you have a

10:33   1   problem with.

2   MR. O'ROURKE:  Well, your Honor, do you have a copy of

3   the fourth amended --

4   THE COURT:  I've got what you filed last night.

10:33   5   MR. O'ROURKE:  Great.  Great.  We managed to go

6   through and we've withdrawn a few additional things and we've

7   also -- they've agreed to allow a few things in, and there was

8   the one issue regarding the witness statements that are

9   Exhibits 247 to 260.

10:33   10   THE COURT:  247 to 260.  All right.  What is the --

11   what is it?  You want to offer them into evidence?

12   MR. O'ROURKE:  Yes, your Honor.

13   THE COURT:  Are these the plaintiffs' or just other

14   witnesses?

10:34   15   MR. O'ROURKE:  These are other witnesses, your Honor.

16   THE COURT:  All right.  What's the objection?

17   MR. COURTNEY:  Hearsay, your Honor.

18   THE COURT:  Certainly these would be hearsay.  My

19   question then would be whether or not these exhibits -- is

10:34   20   there a disagreement as to whether or not these exhibits were

21   utilized by plaintiff and/or defendant without objection during

22   the course of the testimony in the case.

23   MR. O'ROURKE:  They were used throughout the case and

24   without -- these are the witnesses statements that were

10:34   25   referred to multiple times to directly confront their witnesses

10:34  1  saying that they didn't have any knowledge in their

2  investigation of people passing out or throwing up.  That's why

3  they were used to show that either they didn't look or chose to

4  ignore these statements.  And they were referred to constantly

10:35  5  by both sides, your Honor.

6          THE COURT:  Okay.  And your objection would be?

7          MR. COURTNEY:  It's still hearsay, your Honor.

8          THE COURT:  Hearsay.

9          MR. O'ROURKE:  And, your Honor --

10:35  10          THE COURT:  Are there portions of these exhibits that

11  are -- that address issues that are not already before the

12  panel?

13              In other words, is there something that if they

14  were -- that if it were redacted it would make it less of a

10:35  15  problem for the defense?

16          MR. COURTNEY:  I'm not sure.

17          THE COURT:  Or is your objection just generally these

18  are --

19          MR. COURTNEY:  It's hearsay, Judge.  It's -- these are

10:35  20  the same kind of statements like Jerry Duke, the statement you

21  wouldn't let in a couple of days ago.

22          THE COURT:  Yeah, but that's for a different reason.

23          MR. COURTNEY:  These were taken during the same

24  course.

10:35  25          THE COURT:  Correct.

10:35    1          MR. COURTNEY:  So, it's still a hearsay.

2          MR. O'ROURKE:  And, your Honor, there's -- I mean,

3    technically, they're not hearsay since they're not being

4    offered for the truth of the matter that they're saying.  What

10:36    5    we're offering them for and the reason why they came in during

6    this trial is because their witnesses say, "As a part of our

7    investigation, we didn't know that people were complaining of

8    throwing up or passing out."

9          Well, these -- these are employee interviews that

10:36   10    were a part of their investigation, which should have -- and

11    they say they did consider during their investigation; and it

12    goes right to -- to disproving that point.

13          So, it's not necessarily to prove that somebody

14    did pass out, that that's true.  What it's going to show is

10:36   15    that they told BP they passed out, and it goes to knowledge.

16    And that's why it's relevant; and that's why it's technically

17    not hearsay, your Honor.

18         THE COURT:  I'm going to overrule the objection and

19    admit it.  And I will instruct the jury that Exhibits 247 to

10:36   20    260 are not admitted for the purposes of the truthfulness of

21    the statements but to simply provide notice to BP of a

22    condition that the plaintiffs and others were complaining

23    about.

24         MR. O'ROURKE:  And, then, your Honor, if we could -- I

10:36   25    think maybe the best way to proceed would be to go through the

10:36   1   rest of this fourth amended exhibit list and let you know what

2   has been withdrawn and what has been admitted.

3           THE COURT:  Well, the document will speak for itself

4   because we're going to file it.

10:37   5           MR. O'ROURKE:  Okay.  Well, since we filed it last

6   night, we've worked to iron out some other issues.  So, they've

7   agreed --

8           THE COURT:  I see.

9           MR. O'ROURKE:  -- they've agreed to let some things

10:37   10   in; and we've agreed to withdraw some other exhibits, your

11   Honor.

12           MR. COURTNEY:  How about at noon, or after lunch, we

13   just resubmit a new list?

14           THE COURT:  Well, I don't want to have the jury

10:37   15   sitting on the runway, waiting on a list.  So, let me ask you,

16   regarding the fourth amended -- I'm trying to understand what

17   you're saying.

18           MR. O'ROURKE:  Sure.

19           THE COURT:  Regarding the fourth amended exhibit list,

10:37   20   you've indicated to me all those exhibits that have been

21   admitted and, whether over objections or not, they're indicated

22   as having been admitted.

23           MR. O'ROURKE:  Yes, your Honor.

24           THE COURT:  There's certain exhibits that have been

10:37   25   withdrawn and --

10:37   1          MR. O'ROURKE:  Correct.

2          THE COURT:  -- I know there's a lengthy -- maybe part

3     of that is reflected in the exhibit list itself.

4          MR. O'ROURKE:  Correct.

10:37   5          THE COURT:  Now, taking this document as a completed

6     document now, having ruled on this portion --

7          MR. O'ROURKE:  Sure.

8          THE COURT:  -- what is it that needs to be corrected

9     or brought to the Court's attention?

10:38   10          MR. O'ROURKE:  Gotcha.  Your Honor, Exhibit 13.

11          THE COURT:  Let me just get there.

12              All right.  Thirteen?

13          MR. O'ROURKE:  Defendants have agreed that that should

14     be admitted.

10:38   15          THE COURT:  All right.

16          MR. O'ROURKE:  Exhibit 37, we're now withdrawing.

17          THE COURT:  Thirty-seven.  Okay.

18          MR. O'ROURKE:  Skipping on to 100 to 102 -- 100, 101,

19     102, those are also being withdrawn.

10:38   20          THE COURT:  101 and 102 or all three?

21          MR. O'ROURKE:  All three, your Honor, 100, 101, and

22     102.

23          THE COURT:  All right.

24          MR. O'ROURKE:  Exhibit 172, 173, and 174 are all being

10:38   25     admitted.

10:38   1         THE COURT:  172, 173, and 174, admitted.

2         MR. O'ROURKE:  As well as 176, 178 --

3         THE COURT:  All right.

4         MR. O'ROURKE:  -- and 179.

10:38   5         THE COURT:  All right.

6         MR. O'ROURKE:  Those are all admitted.

7            Number 211, your Honor, is going to be withdrawn.

8         THE COURT:  211, previously admitted or agreed to but

9 withdrawn now?

10:39  10         MR. O'ROURKE:  Yes, your Honor.

11         THE COURT:  Okay.

12         MR. O'ROURKE:  And 220 is going to be withdrawn.

13         THE COURT:  Okay.

14         MR. O'ROURKE:  222 is admitted.

10:39  15         THE COURT:  All right.

16         MR. O'ROURKE:  And then, with the Court's ruling on

17 247 through 260, they're admitted --

18         THE COURT:  That completes -- all right.  Very good.

19 All right.  Thank you.

10:39  20         MR. O'ROURKE:  Thank you, your Honor.

21         THE COURT:  And, yes, you can give us a clean version

22 of that after lunch because we'll file the cleaned up version

23 but I'll need to maintain this one for crosschecking.

24         MR. COURTNEY:  Certainly, your Honor.

10:40  25         THE COURT:  All right.  Did you-all get a copy of the

10:40  1  charge?

2         MR. BROWN:  Just now.  We didn't realize we had it.

3         THE COURT:  Oh, okay.

4          All right.  Gentlemen, let me do this so that we

10:41  5  can make sure we're focused on the same areas of concern that

6  we focused on while in chambers.  What I have done is -- I need

7  to make sure I've got counsel's attention.

8         MR. BROWN:  I'm listening.

9         THE COURT:  All right.  You can do that.

10:41  10         What I have done is I have taken the plaintiffs'

11  restructured portion -- because what they did is they

12  incorporated the instructions that I had given to you-all and

13  then modified them to their satisfaction and now we've talked

14  about some changes to those.  So, if you would take a look at

10:41  15  your -- I just want to point out where they are.

16         If you would look at your jury charge, the one

17  that I've just given to you, under the "Contentions of Parties"

18  section, you would see that that change has been

19  incorporated -- or reflected in the top portion of the first

10:42  20  paragraph.

21         You would also see in the second paragraph the

22  reflection of those that the defendant requested.  And you

23  would see the reincorporation of the (c) and (d) portions that

24  the defendant initially had in -- or that I had in my

10:42  25  instruction.

10:42  1        We're still on Page 4.  At the bottom of Page 4,

2   you see that the term "contractor" and the doctrine of

3   respondeat superior have been removed.

4        On Page 5 you see "Definitions" has been

10:42  5   incorporated.  At "proximate cause," you'll see the sole -- or

6   single sentence, being the sentence that concludes that

7   portion.  And that has been taken care of.

8        Under "Negligence," you'll see that I did

9   incorporate the standard definition of "negligence," deleting

10:43  10   what I had in there at the beginning.

11        Under "Gross Negligence," you'll see that we --

12   let me make sure.  Yeah.  Under "Gross Negligence," you'll see

13   that I broke out -- or I at least broke that up into two

14   paragraphs.  And then the, quote, "the actor" has been replaced

10:43  15   with "BP."

16        And that last paragraph ends with "welfare of the

17   plaintiffs," as I indicated.  And I deleted that sentence that

18   says, "If a plaintiff does not establish," that's out.

19        Now, here's an area that you both want to take a

10:43  20   look at because it's one that we might have to struggle a

21   little bit with.  But if you look at the bottom of Page 7,

22   where it says "Interrogatories," there is an objection -- or

23   will be an objection by BP as to that section.  But what I need

24   is a definition -- or needed was a definition of "control."

10:44  25        I went back in and re-engineered the (b) portion

10:44  1  because the plaintiffs' allegations of negligence relate to

2  maintenance or failure to maintain and properly maintain the

3  facility and plant.  It doesn't have anything to do with an

4  instrumentality as I had put it in the charge.

10:44  5          So, if you -- on Page 7, at the bottom it says,

6  "(b), that the cause of the accident (i.e., BP's -- maintenance

7  program) was under the management and control of BP at the time

8  of the negligence, if any, causing the accident that probably

9  occurred."

10:44  10          And then, "'Control' means that BP controlled the

11  time and manner of the maintenance of its facility," because

12  that's really what this case, from the plaintiffs' perspective

13  in part, is about.

14          Now, we can argue about that; but I want to bring

10:44  15  that to your attention specifically as to how I've reworded

16  that.  Because it's not like an automobile accident, an

17  automobile that went out of control and that becomes the

18  instrumentality.  We're talking about, from what I understand,

19  a release that was a result of lack of maintenance or poor

10:45  20  maintenance.  It's a part of a scheme, a lack of maintenance or

21  poor maintenance as a result.  So, we'll talk about that if we

22  need to and take objections.

23          Beyond that, I believe all of the other -- just

24  double-check -- all of the other changes that we did to the

10:45  25  interrogatories have been reflect -- or are reflected, should I

10:45   1    say.

2                    And that Interrogatory Number 4 individualizes

3    the claim for damages as it relates to punitive damages.

4                    So, now, go ahead and reflect on that; and you

10:45   5    can certainly give me your appreciation for what I think the

6    changes --

7                    MR. BUZBEE:  Your Honor, with regard to what you

8    focused in on on "control," I think I would respectfully

9    suggest the word should be "timing" rather than "the time."  We

10:46   10    should say, "the timing and manner of the maintenance"; and

11    that's the only change I would suggest to you.

12                    THE COURT:  What page was that on?  Seven?

13                    MR. TAAFFE:  Yes, your Honor.

14                    MR. BUZBEE:  And with that, your Honor, I think that's

10:46   15    sufficient from our perspective.

16                    THE COURT:  There is another error that I made that I

17    think I marked, and I need to bring it to your attention.  And

18    then I'll hear from the other side on this.

19                    Interrogatory Number 1 -- and there is another

10:46   20    change.  Interrogatory Number 1, I take "contractor" out.

21    That -- and I think that's the only place.  I'll double-check,

22    but I believe --

23                    MR. BROWN:  I think it is.

24                    THE COURT:  Yeah.  So, I wanted to make sure I brought

10:47   25    that to your attention, as well.

10:47  1                    Now, as it relates to Page 7, counsel?

       2                    I know you haven't had a chance to think about

       3     it.  Do you want to think about what I've said?

       4                    MR. BROWN:  Well, just at the outset, I think that the

10:47  5     "res" in "res ipsa loquitur" has to be a thing and it has to be

       6     a place.  I mean, this is -- a program?  That's -- I just don't

       7     think that an activity or a procedure --

       8                    THE COURT:  But that's where the duty lies.  The duty

       9     lies in the activity itself.  So, as far as negligence is

10:47  10    concerned, when a person has a duty to perform and fails to

       11    maintain that duty, that failing becomes the instrumentality,

       12    if that's your argument.

       13                   MR. BROWN:  Okay.

       14                   THE COURT:  Or a failure of that duty becomes the

10:47  15    basis for the negligence claim.

       16                   MR. BROWN:  Under -- okay.  I would just note that the

       17    definition of "control" under Chapter 95 to the --

       18                   THE COURT:  Yeah, I can't give that definition.  I

       19    have to structure it to the facts of this case.  And I do

10:48  20    recognize what you're saying.

       21                   MR. BROWN:  And for purposes of the record --

       22                   THE COURT:  Because, see, 95 goes to facility, in

       23    terms of control of a piece of real estate, a piece of

       24    geography.  We're not talking about control -- at least I think

10:48  25    the plaintiff is not talking about control of a facility.

10:48   1   They're talking about a control of a program, a duty owed under
        2   the maintenance program.  And, so, I'll permit your objection
        3   at that point.
        4       MR. BROWN:  The only trouble is, your Honor, is will I
10:48   5   have time logistically to work out a way to tender an
        6   alternative definition?
        7       THE COURT:  Yes.  That's why I said that I know you
        8   haven't had a chance to think about it.  But I wanted you to be
        9   able to see it, and certainly I want to hear what you have to
10:48  10   say now just in case it refines my thinking.
       11       But at the same time, I think what we'll probably
       12   end up doing -- we're going to check and see if our jury is
       13   present.  But we probably will just go ahead and send them to
       14   lunch early.  After all, they just had breakfast.  But we'll
10:49  15   probably just get them to take an early lunch -- let's go ahead
       16   and do that.
       17       *(Sotto voce discussion at bench with court staff)*
       18       THE COURT:  I won't give you more than 10 minutes'
       19   rebuttal.  But we're talking two and a half hours of time this
10:49  20   afternoon.  So, I would say 1:00 o'clock.  Is that -- that
       21   would give us time to get it all in to them, for them to get
       22   into the jury room, select a foreperson, and at least commence
       23   deliberations and have a full day ahead of them tomorrow.  So,
       24   1:00 o'clock?
10:50  25       MR. BUZBEE:  (Nodding head.)

10:50   1          THE COURT:  1:00 o'clock?

2          MR. BROWN:  Just before that, your Honor, would you

3     might want us to come in and do the charge conference?

4          THE COURT:  Well, I'm going to take your objections --

10:50   5     except as to this part, I want to go ahead and take your

6     objections to the charge.

7          MR. BROWN:  Oh, on the record?

8          THE COURT:  And you reserve the right to certainly

9     make an alternative or correction in this area.  So, what I

10:50   10     would like to do is take your objections to the charge.

11              Now, you don't have to repeat your -- if they're

12     complete -- and I am looking at your filing from last night,

13     BP's objections to the Court's proposed charge.  If these are

14     complete, then I need to simply say that the objections are

10:50   15     overruled and those -- and that the proffers made of

16     interrogatories and definitions are refused except to the

17     extent that the Court has adopted and incorporated them into

18     its proposed and presented charge.

19              Now, that takes care of this.

10:51   20          MR. BROWN:  Yes, your Honor.  And for the record, I

21     filed that with the Court this morning.  I guess we can file a

22     duplicate on the electronic system.

23          THE COURT:  Well, if you -- you filed a hard copy on

24     4?  Or you just brought this and gave it to me?

10:51   25          MR. BROWN:  I brought that and gave it to you.

10:51   1          THE COURT:  Oh, okay.  So, this does need to be filed.

2    You can file it right here.

3          MR. BROWN:  Okay.

4          THE COURT:  You can give it to Kathy here in the

10:51   5    courtroom, the case manager in the courtroom.  And she can go

6    ahead and file it, and the record will reflect the filing as

7    well as my ruling.  Now, outside of this document -- so, let me

8    say it like this.  That's my ruling.  All right?

9          MR. BROWN:  Okay.

10:51  10          THE COURT:  Okay.  So, the record reflects that.

11              Now, outside of this document, there are some

12    concerns that you have; and we'll take those up in just a

13    minute.

14              The plaintiff has also filed a proposed jury

10:52  15    charge, and the Court's statement in that regard is the Court

16    would overrule the objections and refuse proposed definitions

17    and interrogatories or changes except to the extent that the

18    Court has incorporated any changes requested in the Court's

19    instructions to the jury.  Now, that takes care of your

10:52  20    instructions, as well.

21              And let's start with the plaintiff now.  Beyond

22    what I have already done and what you know is present and

23    reserving the right to make your arguments as it relates to the

24    res ipsa section of this, do you have other objections you need

10:52  25    to make?

10:52  1          MR. BUZBEE:  No, sir.

       2          THE COURT:  All right.

       3          MR. BROWN:  Your Honor, just to protect myself and

       4   make sure under the record, I renew the objections set out in

10:52  5   the pleading, which we will file with the clerk.

       6               And also for the record, given the fact that we

       7   object to Interrogatories Numbers 1, 2, and 3, based on the

       8   fact that there is no evidence or, alternatively, that they are

       9   legally and factually -- there's legally and factually

10:53  10  insufficient evidence to support those and that they

       11  incorrectly state the legal standards, I would tender our

       12  proposed interrogatories for the Court to consider.

       13         THE COURT:  Are those interrogatories already included

       14  in -- in the -- in BP's --

10:53  15         MR. BROWN:  Yes.

       16         THE COURT:  -- objections -- what is it called --

       17  objections and proposed charge?

       18         MR. BROWN:  Yes, your Honor.

       19         THE COURT:  All right.  Then you don't need to

10:53  20  re-tender them.  Just tender that document to the case manager

       21  at this time.

       22         MR. BROWN:  Understood.

       23              And that also includes our proposed

       24  interrogatories under Chapter 95, which I understand the Court

10:53  25  will not submit?

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

10:53   1          THE COURT:  Correct.

2          MR. BROWN:  Okay.

3          THE COURT:  All right.  We'll need that filed as the

4     objections and requests of the -- of BP for instructions and

10:54   5     definitions and interrogatories.

6               And the Court has previously and will restate its

7     ruling in relationship to that, and that is that they are

8     overruled and they are refused except to the extent

9     incorporated.

10:54  10          MR. BROWN:  And for the record, I'm tendering a

11    duplicate copy of what the Court has been reading to the clerk

12    for filing.

13          THE COURT:  Thank you.

14               All right.  Now, where are we in terms of any

10:54  15    other objections or corrections to the -- save the res ipsa,

16    are there other objections or corrections that we have not

17    addressed for the defense?

18          MR. BROWN:  I do not believe so, your Honor.

19          THE COURT:  All right.  Then, with that reservation,

10:55  20    the Court is concluding the objections and corrections and

21    proposals for the instructions to the jury; and we'll go back

22    to the exhibit team.

23          MR. COURTNEY:  We're ready, your Honor.

24          THE COURT:  All right.  I don't believe I have a copy

10:55  25    of what you are going to be talking from or about.

10:55   1          MR. COURTNEY:  Your Honor, we have a marked up copy

2      that we're going to clean up over lunch.

3          THE COURT:  Okay.  Hold on just one second.  Make sure

4      I'm not throwing away some goodies here.  Try to clean up a

10:55   5      little bit here.

6              What you've handed to me are BP's third amended

7      exhibit list, and let's keep it at that.  Let's don't change it

8      to a fourth when you go back and clean it up.  All right?

9              And the report reflects a deletion -- reflects

10:56  10      that certain exhibits have been deleted and certain have been

11     admitted; and that's what we're going to go through now,

12     correct?

13         MR. COURTNEY:  Correct, your Honor.

14         THE COURT:  All right.  So, let's see.  Let's hear

10:56  15     where you have trouble or difficulty.  Is there anything that

16     you have objection to -- I'll tell you what.  Tell me where the

17     trouble is, and then we'll go from there.

18             And give us your name from the record, please.

19         MS. MARBURGER:  I'm sorry, your Honor.  My name is

10:56  20  April Marburger.

21         THE COURT:  All right.

22         MS. MARBURGER:  And for the record, I don't think we

23     have any trouble.  I think we resolved everything.  So, would

24     you like us to start with what we've withdrawn?

10:56  25         THE COURT:  Yes, Exhibit -- what is that?

10:56    1    Seventy-six?

2            MS. MARBURGER:  Yes, your Honor.  We withdraw

3    Exhibit 76.  We withdraw Exhibit 192.

4            THE COURT:  Okay.

10:57    5            MS. MARBURGER:  We withdraw Exhibit 292A.

6            THE COURT:  Hold on just one second.  Let me see what

7    happened here at the bottom.  292?

8            MS. MARBURGER:  A, yes, your Honor, 292A.

9            THE COURT:  All right.

10:57    10           MS. MARBURGER:  293.

11           THE COURT:  Okay.

12           MS. MARBURGER:  We withdraw Exhibit 2013.  We withdraw

13    Exhibit --

14           THE COURT:  2013?

10:57    15           MS. MARBURGER:  Yes, your Honor.  And Exhibit 2015.

16           THE COURT:  All right.

17           MS. MARBURGER:  Exhibit 2101.

18           THE COURT:  Uh-huh.

19           MS. MARBURGER:  Exhibit 2103.

10:57    20           THE COURT:  All right.

21           MS. MARBURGER:  Exhibit 2105, 2106, 2107, 2110, 2201.

22           THE COURT:  Okay.

23           MS. MARBURGER:  2202, 2206, 2211, 2319.

24           THE COURT:  What's going to happen with 2305?

10:58    25           MS. MARBURGER:  2305?  Your Honor, I don't believe --

10:58   1           MR. VICK:  I think we agreed to admit that one, your

2    Honor.

3           THE COURT:  Okay.  2305.  2306 is in then, correct?

4           MS. MARBURGER:  Yes, your Honor.

10:58   5           THE COURT:  And 2308, 2310, 2312, those will be coming

6    in?

7           MR. VICK:  Yes, your Honor.

8           THE COURT:  And, now, for 2319, that would be out; is

9    that right?

10:58   10          MS. MARBURGER:  Yes, your Honor.

11              I'm sorry.  Just to make sure for the record, did

12   we skip 2311?  I believe he agreed that that's in, as well.

13          THE COURT:  We did.  That would be admitted.  Okay.

14          MS. MARBURGER:  So, back -- okay.  We've withdrawn

10:58   15   2319.  We withdraw 2323.  We withdraw --

16          THE COURT:  What about 2321; is that admitted?

17          MR. VICK:  It's admitted.

18          THE COURT:  Okay.

19          MS. MARBURGER:  We withdraw Exhibit 2325.  We withdraw

10:58   20   Exhibit -- well, I'm sorry.  Let's start -- 2342, I believe

21   Mr. Vick has agreed to allow that.

22          THE COURT:  All right.

23          MR. VICK:  Yes.

24          MS. MARBURGER:  And the same with 2345?

10:59   25          THE COURT:  Correct.

10:59  1          MS. MARBURGER:  We withdraw Exhibit 2347.

     2          THE COURT:  Okay.

     3          MS. MARBURGER:  Next is Exhibit 2400.  We withdraw

     4   that exhibit.  We withdraw 2401.  We withdraw 2404, 2405.

10:59  5          THE COURT:  Withdrawing that, as well?

     6          MS. MARBURGER:  Yes, your Honor.

     7          THE COURT:  Okay.

     8          MS. MARBURGER:  2406, 2409, 2412, 2500, 2501, 2502.

     9          And I believe counsel has agreed to 2503.

10:59  10         MR. VICK:  Correct.

    11          THE COURT:  Is admitted.  Okay.

    12          MS. MARBURGER:  We withdraw Exhibit 2507 and 2509, as

    13   well as Exhibit 2602, 2605, 2606, 2607, and 2626.

    14          2705 we withdraw, as well as Exhibit 2706, 2709,

11:00  15   2710.  2802 we withdraw, as well as 2804, 2807, 2808, 2811.  We

    16   withdraw Exhibit 2900, 2901, 2902.

    17          And I believe counsel has agreed to 2904.

    18          MR. VICK:  That's correct.

    19          THE COURT:  All right.

11:00  20         MS. MARBURGER:  We withdraw Exhibit 2905, 2906, 2907,

    21   2908, and 2909.

    22          THE COURT:  All right.  What is listed at the bottom

    23   as a potential rebuttal exhibit, that has been admitted.  Is

    24   that correct?

11:00  25         MS. MARBURGER:  Yes, your Honor.

11:01    1              MR. COURTNEY:  Correct, your Honor.

         2              MS. MARBURGER:  And I believe, your Honor --

         3              MR. COURTNEY:  Did we skip these?

         4              MS. MARBURGER:  Yeah.

11:01    5                  I think if we go back, your Honor, to exhibits

         6     that start with 2000, there was some that counsel and I agreed

         7     to that we didn't discuss originally.

         8              THE COURT:  All right.  I'm there, I believe.

         9              MS. MARBURGER:  Okay.  Exhibit 2001, we've agreed to

11:01   10     that exhibit.

        11              THE COURT:  Admitted.

        12              MS. MARBURGER:  And 2002, we've agreed, 2003, as well

        13     as Exhibit 2300.

        14              THE COURT:  Let me get there.  All right.

11:01   15              MS. MARBURGER:  And then did we cover all these?

        16              THE COURT:  What about 2102?

        17              MR. O'ROURKE:  That's admitted.

        18              MS. MARBURGER:  Yes, your Honor.

        19              THE COURT:  Okay.  And 2204 would be admitted,

11:01   20     correct?

        21              MR. O'ROURKE:  Correct, your Honor.

        22              THE COURT:  Okay.

        23              MS. MARBURGER:  And then -- I apologize.  I'm not sure

        24     if we went down 2301 yet.

11:01   25              THE COURT:  Have not.

11:01  1                  MS. MARBURGER:  Okay.  2301, I believe counsel has

2          agreed.

3                  MR. VICK:  No objection.

4                  MS. MARBURGER:  2302, 2304, '05, '06.

11:02  5                  THE COURT:  Yeah, we did those.

6                  MS. MARBURGER:  Okay.

7                  THE COURT:  How about '09?

8                  MS. MARBURGER:  '09?

9                  MR. VICK:  No objection to 09.

11:02  10                  THE COURT:  And '14, 2314?

11                  MR. VICK:  I think we went through those and agreed to

12          them.

13                  MS. MARBURGER:  Yes.  Yes.

14                  THE COURT:  Okay.

11:02  15                  MS. MARBURGER:  And do you have the same for 2321,

16          your Honor?

17                  THE COURT:  Yes.

18                  MS. MARBURGER:  Okay.

19                  THE COURT:  Are we there?

11:02  20                  MS. MARBURGER:  Yes, sir.

21                  MR. VICK:  Yes, your Honor.

22                  THE COURT:  All right.  Then, the remaining

23          exhibits -- and let me just say it like this for the record.

24          For both plaintiff and defendant, the -- the plaintiff -- the

11:02  25          fourth amended exhibit list will be the -- will be the official

*Cheryll K. Barron, CSR, CM, FCRR*                              *713.250.5585*

11:02    1    record of the exhibits admitted by the Court and/or withdrawn

         2    and for which no objection -- no additional objections have

         3    been made.

         4              BP's third amended exhibit list will be -- that

11:03    5    will be the official record representing the exhibits admitted,

         6    reflecting exhibits withdrawn, and as well other -- other

         7    exhibits that have been admitted or that were admitted today

         8    and are reflected on the record and as well -- well, I think I

         9    spoke to withdrawn.  Yeah.  Okay.

11:03   10              MS. MARBURGER:  Thank you.

        11              THE COURT:  Now, as it relates to the documents,

        12    themselves, that's the next task.  And, so, you still need to

        13    get that done; is that right?

        14              MR. O'ROURKE:  Well, we have our box ready to go.

11:03   15              MS. MARBURGER:  And we do, as well, your Honor.

        16              THE COURT:  Okay.  Have you-all peeked into each

        17    other's box?

        18              MS. MARBURGER:  We have.

        19              MR. O'ROURKE:  We've checked back and forth.

11:03   20              MS. MARBURGER:  With permission.

        21              THE COURT:  All right.  You're going to have to sign

        22    in blood that you both have reviewed each of the other's -- I

        23    think we may have performed something somewhere -- each other's

        24    exhibits and that you are agreeing that these are the, quote,

11:04   25    exhibits that can go back to the jury.

11:04   1          MS. MARBURGER:  Yes.

2          MR. O'ROURKE:  Yes.

3          THE COURT:  All right.

4          MR. BROWN:  Should we come back a little bit before

11:04   5   1:00 in order to just address our objection and tender on the

6   res ipsa --

7          THE COURT:  No.  You're going to have to come back a

8   lot before 1:00.

9          MR. BROWN:  Oh, okay.

11:04   10         THE COURT:  Because I've got to either get the

11   correction in the machine or take your objection on it.  And

12   when I say "a lot," I mean probably, like, 12:30.

13         MR. BROWN:  Sure.

14         THE COURT:  So I'll have at least enough time to make

11:04   15   the correction on the record.

16             I provide generally to the jurors a copy of the

17   entire charge so they can read along with me.  And they'll have

18   it for all purposes at that time.

19             I also will need to get a -- will have attached

11:05   20   to the back of it a certificate, which is not reflected on your

21   copies; but it will be reflected on the official original copy

22   saying, "We the jury make this unanimous verdict."

23         MR. BUZBEE:  Okay.  12:30, your Honor?

24         THE COURT:  12:30.  See you later.

11:05   25         MR. BUZBEE:  Okay.

11:05    1           THE COURT:  Oh, those who have signed off on the
         2    exhibit list, before you leave, we need to get your signatures.
         3           I'll tell you what, we'll get you at 12:30.
         4           MR. COURTNEY:  Judge, should we submit a revised
11:05    5    updated list that's not scratched out or are you okay with the
         6    one --
         7           THE COURT:  No.  I want you to submit a revised.  I
         8    mean, if you can get that done, fine.  Because the one that you
         9    have that you have given me is quite scratched up.  It would be
11:05   10    better if the jury saw just a clean version without my
        11    handwriting on it.
        12           MR. COURTNEY:  Okay.  Very good.
        13           THE COURT:  So, can you get that ready for us by
        14    12:30?
11:06   15           MS. MARBURGER:  Yes, your Honor.
        16           MR. COURTNEY:  Yes, your Honor.
        17           THE COURT:  Okay.  Good.  Do you plan to submit a
        18    cleaned up or different version back at 12:30, as well?
        19           MR. O'ROURKE:  Yeah.  We're working on it right now,
11:06   20    your Honor.
        21           THE COURT:  Oh, good.  All right.  I just wanted to
        22    make sure.
        23       (Recess taken from 11:06 to 12:39)
        24       (Jury not present)
12:39   25           THE COURT:  Please be seated.  Okay.  Gentlemen, let

12:39   1   me tell you what I've done in terms of improving what I believe
        2   to be the -- and placing in what I believe to be the
        3   appropriate language in the -- in the charge itself on Page 7.
        4   You can read it.

12:40   5           MR. BUZBEE:  Your Honor, this phrase "exclusive
        6   management," that's obviously something new and --

        7           THE COURT:  Yeah.  I'm saying that I think to have
        8   control, that might be -- I added that word.

        9           MR. BUZBEE:  I think that's more than what's required.

12:40  10           THE COURT:  It may be, and that's why I asked you to
       11   take a look at it.  I know that "control" means essentially
       12   that it has to be under its exclusive control, but management
       13   control is certainly enough.  I don't know of anybody else who
       14   BP would claim is in charge of their maintenance and preventive

12:40  15   techniques program, let's call it, "techniques" meaning you
       16   talk about it in terms of --

       17           MR. BUZBEE:  Maintenance and inspections?

       18           THE COURT:  Well, there's some instrumentations.
       19   So --

12:41  20           MR. BUZBEE:  Right.

       21           THE COURT:  -- that needed to be -- or should have
       22   been in place, as you argued.

       23           MR. BUZBEE:  Correct.

       24           THE COURT:  And, so, I think you may be right about

12:41  25   the exclusive control -- exclusive management.  I'm sorry.

12:41   1          MR. BUZBEE:  Yes, sir.  That would be my objection to

2      this, is I would strike those two words and just leave

3      "control."

4              THE COURT:  What two words?

12:41   5          MR. BUZBEE:  "Exclusive management."

6              THE COURT:  Just say that maintenance was under the

7      control --

8              MR. BUZBEE:  Yes, sir.

9              THE COURT:  -- of BP?

12:41  10          MR. BUZBEE:  Yes, sir.

11             THE COURT:  Okay.  Yeah, because "management" might

12     imply some other duties and responsibilities that are not

13     there.

14             All right.  Counsel, you indicated you wanted to

12:41  15     look and think about it.  You've seen what I've tried to do.

16     Now tell me what you want to do.

17             MR. BROWN:  Your Honor, we object to the tender of

18     this instruction.  We renew our objection that any instruction

19     under res ipsa, we contend that it should not be submitted

12:41  20     under Marathon Oil versus Sterner, the 1982 Supreme Court case

21     we discussed earlier.

22             THE COURT:  All right.

23             MR. BROWN:  Subject to that, we believe that this

24     specific instruction is not supported by the evidence.  There's

12:42  25     no legally or factually sufficient evidence to support it and

12:42  1    that it improperly shifts the burden of proof to us and is an

2    incorrect statement of the law.

3              We are particularly concerned about the

4    definition of "control," which almost -- it almost requires

12:42  5    them to -- directs them on what answer they need to find.  So,

6    we object to this; and we would just tender a very general --

7    if the Court is going to submit one, we tender to the Court

8    just a general straight Mobil -- Mobil Chemical instruction

9    that was --

12:42  10             THE COURT:  Let me read it into the record, then.

11   What you've tendered as a supplementation to your previous

12   submissions is this; it would say as follows -- you have a copy

13   of it, counsel?

14             MR. BUZBEE:  No.

12:42  15            MR. BROWN:  I showed it to him.

16             THE COURT:  Okay.  I'm going to read it, and then

17   you'll hear it anyway.

18             "You are instructed that you may infer negligence

19   by a party but are not compelled to do so if you find that the

12:43  20   character of the accident is such that it would ordinarily not

21   happen in the absence of negligence and if you find that the

22   instrumentality causing the accident was under the management

23   and control of the party at the time of the negligence, if any,

24   causing the accident" -- and it should be "causing the accident

12:43  25   probably to occur."  I believe you've got to have that "to" in

_Cheryll K. Barron, CSR, CM, FCRR_                                     _713.250.5585_

12:43  1    there.

2              MR. BROWN:  Oh, yes.

3              THE COURT:  And then the definition of "control" would

4    be, "'Control' means the owner must control the mode or method

12:43  5    of the contractor's" -- and there's a problem right there --

6    "contractor's work, and this control must extend to the

7    operative detail of the work being performed."

8              I think we're -- you're placing this in someone's

9    hands that is not responsible.  And we're saying that somehow

12:43  10   the maintenance program, which is what the plaintiffs are

11   complaining about, is under the control of another person.

12   And, of course, we recognize that BP has contracted out its --

13   what do you call that program?  Startup or --

14             MR. BUZBEE:  "Turnaround."

12:44  15             THE COURT:  Turnaround program.  But that's not --

16   that is not the object of the plaintiffs' complaint.

17             MR. BUZBEE:  Correct.

18             MR. BROWN:  Based on that concern, Judge, we would

19   tender deleting the word "contractor" so it simply means that

12:44  20   the owner must control the mode or method of the work.

21             THE COURT:  Well, what work are we talking about?

22             MR. BROWN:  The --

23             THE COURT:  See, that's the issue that you have.  "The

24   mode and method of work," I don't have a problem with those

12:44  25   terms; but the mode and method of work is the very argument

12:44   1    that the plaintiffs complain is the preventive techniques; that

2    is, the instrumentalities that you would put out there, the

3    choice in when you maintain and how you maintain the facility,

4    that's what the -- so, the object of the instrumentality

12:44   5    problem now is no longer an animate object or -- I'm not saying

6    that right -- inanimate -- it's now inanimate.  It's a program.

7            MR. BROWN:  Okay.  Well, then perhaps, your Honor, as

8    a final alternate offer, we would simply offer the straight

9    Mobil Chemical instruction with no definition of "control."

12:45  10    That would clearly be appropriate under Texas law, and that way

11    we don't have to worry about any possible error that might come

12    about as a result of the submission of a definition.

13            THE COURT:  Say that again.  You proposed what now?

14            MR. BROWN:  Just completely omitting the definition of

12:45  15    "control," just leaving that first paragraph, which is the

16    straight language out of Mobil Chemical.

17            MR. BUZBEE:  As I said, your Honor, first off, there

18    is -- it is undisputed that the timing and implementation of

19    preventive techniques and corrective measures at BP plant was

12:46  20    controlled.  There's no evidence otherwise.  So, as we put in

21    our brief, it shouldn't even be in there anyway.  But if it's

22    going to be in there -- because it's an undisputed fact.  If

23    it's going to be in there, then we got to take out this word

24    "exclusive" because --

12:46  25            THE COURT:  Right, I agree with that.  But he's --

12:46    1          MR. BUZBEE:  I mean, he just keeps arguing these

         2    fall-back positions; but the bottom line is, I think, the

         3    instruction, if it's going to be in there, is correct if you

         4    take out "exclusive."  And he continues to fall back and -- you

12:46    5    know, I guess like a member of the military.

         6          THE COURT:  Well, he wants to take out the definition

         7    of "control" where it says, "'Control' means that BP controlled

         8    the timing and implementation of any preventive techniques,"

         9    etcetera.

12:46   10          Certainly, I think that if that's going to stay

        11    in there, it needs to change to, "'Control' means that BP must

        12    control the timing and implementation of any preventive

        13    techniques," as opposed to past tense.  I certainly think it

        14    needs to be stated in such a way that that's what they must

12:46   15    find.  In terms of determining these issues, they must

        16    determine that control is under BP's -- that BP controlled the

        17    timing and implementation and not tell them that it is

        18    controlled in the past tense.

        19          "'Control' means that BP must control the timing

12:47   20    and implementation of any preventive techniques," that's what

        21    they need to find -- or utilize that definition.  That's the

        22    way I think I'll submit it, and your objections -- your

        23    objection and submission is refused.

        24          We -- if you want to place this separately there,

12:47   25    you can; but it's -- I've read it into the record; and that's

1  what I am refusing, your res ipsa loquitur proposed

2  instruction.

3      MR. BROWN:  Okay.  I would request that it be tendered

4  to the clerk for filing with the papers.

5      THE COURT:  All right.

6      MR. BUZBEE:  Do you intend to strike the word

7  "exclusive," your Honor?

8      THE COURT:  The words that will come -- the way this

9  will be worded now, it will say, "was under the control of BP

10  at the time of the negligence, if any, causing the accident

11  that probably occurred."

12     MR. BUZBEE:  Okay.  We're good with that.

13     MR. BROWN:  "Probably"?

14     THE COURT:  I think I need to say "allegedly."

15     MR. BROWN:  "Allegedly."

16     THE COURT:  Because, again, the other case, there was

17  no -- no dispute that an accident had occurred.  Okay?

18     MR. BUZBEE:  Yes, sir.

19     THE COURT:  And we will provide you with clean copies

20  of that, of the charge itself, in just a minute.

21     *(Sotto voce discussion at bench with court staff)*

22     THE COURT:  Now let's deal with another matter that I

23  did not address.  The plaintiffs filed a motion for judgment as

24  a matter of law on the defendant's affirmative defenses.  Have

25  you had a chance to review that?  Who will respond to that?

12:49  1        MR. COURTNEY:  I guess I can, your Honor.

2        THE COURT:  All right.  Here's the affirmative

3    defenses that are identified by the plaintiff.  The second --

4    and if you are looking at their motion, what they call the

12:49  5    second defense is contributory negligence.

6        MR. COURTNEY:  Judge, there is none in this case --

7        THE COURT:  On that?

8        MR. COURTNEY:  -- as a general --

9        THE COURT:  Yeah.  And an unavoidable accident?

12:49  10        MR. COURTNEY:  Same.

11        THE COURT:  And third-party negligence?

12        MR. COURTNEY:  We would submit that this does apply.

13    There is evidence that the source came from off site as

14    suggested by the wind data, personal observations from the rail

12:50  15    yard, the wind was from the southeast.  And, so, we would stand

16    by that one, please.

17        THE COURT:  That would be the -- what number is that?

18    That's called the fourth --

19        MR. COURTNEY:  Third-party negligence.

12:50  20        THE COURT:  That's the fourth and fifth defenses,

21    third-party negligence?

22        MR. COURTNEY:  Correct.

23        THE COURT:  All right.  What is called the fourth and

24    fifth defenses.

12:50  25            And, then, as relates to the 22nd?

12:50    1          MR. COURTNEY:  Preexisting conditions, we heard

2     evidence from at least eight of the plaintiffs that they had

3     preexisting conditions, including Mr. Fuentes, Munoz,

4     Jefferson, Mays, Cantu, Pearson, Taylor, and Ms. Claudio.  So,

12:50    5     we feel that that one should remain.

6          THE COURT:  And the 23rd is the plaintiffs' released

7     claims.

8          MR. COURTNEY:  There's no claims --

9          THE COURT:  Okay.

12:50   10          MR. COURTNEY:  -- for this trial group, of release.

11          THE COURT:  And 24 is Chapter 95.  I'm going to -- 24

12     is Chapter 95.  I will grant that because I've already done

13     that in the record.

14              Now, backing up, 23, plaintiffs' release, that's

12:51   15     granted.  I'm sorry.  That would be granted, right?

16          MR. COURTNEY:  Of course.

17          THE COURT:  Yeah.  And 22 is the preexisting

18     conditions.  I'm going to deny that.  That's an argument.  When

19     I say "argument," I'm going to deny their motion to -- that is,

12:51   20     the defendant's motion -- to strike that as an argument to be

21     made.

22              I don't know that it's an affirmative defense

23     that you need to prove.  It is simply a disputed fact issue as

24     it relates to whether or not the jury could consider

12:51   25     aggravation and all that kind of thing as opposed to

12:51  1   preexisting conditions.  So, that would be denied as to the

2   defendant's motion -- I'm sorry, the plaintiffs' motion.

3            Backing up now to the fourth and fifth, having to

4   do with third-party negligence, I think that in terms of the

12:52  5   plaintiffs' affirmative duty, the plaintiff has to -- and I

6   don't want to say this as a matter of law.  I want to say it as

7   a matter of appreciation.

8            I think the plaintiff has to eliminate the

9   possibility or at least make the possibility of a third-party

12:52  10  liability issue go away; in other words, this did not come from

11  off site, it came on -- it came on the plant or was on the

12  plant or was permitted on the plant as a result of lack of

13  maintenance.

14            So, the, quote, release or whatever it was that

12:52  15  created this odor event, I'm not sure there's any evidence from

16  the defense, if this is an affirmative defense, that it came

17  off site.  That's the problem I have with granting it and

18  denying it.

19       MR. TAAFFE:  Yeah, your Honor.  I'd just say we've

12:53  20  heard extensively about their claim that it came from off site,

21  but I haven't heard a shred of evidence that they've identified

22  some other third-party's negligence that caused this alleged

23  offsite --

24       THE COURT:  Right.  And you can argue that it came off

12:53  25  site, without having the burden of proving, because it seemed

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

12:53  1   to me that when you argue that as an affirmative defense you've

2   got to produce a preponderance of the evidence to show that

3   there was, in fact, either an identifiable source or that you

4   eliminate that it was on your site.  Now, you haven't

12:53  5   eliminated it except by testimony, just as they haven't

6   eliminated off site except by testimony.  So, it's a

7   credibility issue.

8              Now, what does that mean?  That means for the

9   fourth and fifth, I'm going to deny them as affirmative

12:54  10   defenses.  In other words, I'm granting their motion.  But that

11   doesn't prevent you from arguing that somebody else caused

12   this.

13              Okay?  All right.  I think I got it right.  Thank

14   you, gentlemen.

12:54  15              MR. TAAFFE:  Thank you.

16              MR. COURTNEY:  Thank you.

17              THE COURT:  Did you file this motion this morning, or

18   did you just hand it to me?

19              MR. TAAFFE:  This is the motion for judgment as a

12:54  20   matter of law?

21              THE COURT:  Right.

22              MR. TAAFFE:  That was filed last night by E-filing.

23              THE COURT:  Last night.  All I'll need to give you is

24   the order, then.

12:54  25              Well, we've got about five minutes.  And we'll

12:54   1   get those jury charges in and place them on the jurors' seats,

2   and then we'll be ready to go.  If there's nothing else -- who

3   is going to be arguing for the plaintiff?

4          MR. BUZBEE:  That would be me.

12:54   5          THE COURT:  All right.  And who is arguing for the

6   defense?

7          MR. BROWN:  Mr. Galbraith.

8          THE COURT:  Okay.  He'll be coming shortly.

9          All right.  I think we're on the same page.

12:54   10   Argument, one hour each; and then you'll get a 10 minute

11   rebuttal, at most.

12          MR. BUZBEE:  Excellent.  Thank you.

13      *(Judge leaves bench briefly)*

14          THE COURT:  Remain standing.  The jury is on its way

01:03   15   in.

16      *(Jury present)*

17          THE COURT:  All right.  Please be seated.

18          Well, good afternoon, ladies.

19          THE JURORS:  (In unison)  Hello.

01:04   20          THE COURT:  I sure hope you-all had a good lunch.

21          THE JURORS:  (In unison)  We did.

22          THE COURT:  Great.  We are now ready.  We're down to

23   that portion of the case that involves a little bit more

24   attention -- directed attention from you.

01:04   25          I'll be reading what you have in your hands,

01:04   1   called the "Instructions to the Jury."  You certainly can

2   follow along.  You can take those back with you so that as you

3   get into your discussions and deliberations you don't need to

4   look over each others' shoulders to discuss various aspects of

01:04   5   the case.  However, the answers to the interrogatories that are

6   attached to that are to be made on the original.  And I have

7   the original here, which will go back with you.  Now, when I

8   say "go back with you," it will go along with the exhibits that

9   have been admitted.

01:05   10        And what you will find is two exhibit lists that

11   have -- both having excluded a lot of documents that are no

12   longer a part of the offer by the plaintiffs or the defendants.

13   And, so, you'll have those two lists so that you might find

14   those exhibits in the exhibit boxes, in the boxes that we will

01:05   15   also have delivered back to you.  So, you'll have your

16   instructions, you'll have the exhibits, and you'll have the

17   exhibit list.

18        And just as a friendly reminder, we will not be

19   able to bring to you, provide to you the testimony of any

01:05   20   witnesses.  You're going to have to rely upon your collective

21   recollections as to what was said and how it was said or what

22   was done.  So, that credibility issue becomes one that must be

23   a part of your discussions.

24        So, when you are back -- and I'm not suggesting

01:05   25   that you will.  But if you come to some point where there is a

01:06    1    serious dispute as to what a particular person said, if it's

2    specifically identifiable in a way that we can find it in the

3    record, we'll go look for it.  But we don't have printed copies

4    of the record to hand to you for you to read and go back

01:06    5    through the testimony, because that would not be an appropriate

6    way to present the evidence to you in this case.

7         Let's see.  Is there anything else I need to say

8    before I get started?

9         Let's see.  The closing arguments, the time

01:06   10    allocated for counsel for plaintiff and defendant is one hour

11    each with plaintiff having a 10 minute -- at most, 10 minute

12    rebuttal.

13         I think the better way to do this, so that we

14    don't look at two and a half hours of sitting -- or two hours

01:06   15    and so-many minutes of sitting, is we will take about a 10

16    minute break at the end of the plaintiffs' presentation,

17    stretch your legs, walk around, and then we'll go to the

18    defendant's and we'll take all of that plus the plaintiffs'

19    rebuttal, and then you'll be retired to the jury room for

01:07   20    deliberations.

21         All right.  I think we're ready to get started,

22    and I will start, myself, by reading the charge to you.  The

23    lawyers have copies of this.  And if you see typographical

24    errors, blame it on me.  If you see -- if I make a mistake in

01:07   25    reading, blame it on me.

01:07   1          And the reason I give it to you is because you'll

2     be able to do your own perfect reading yourself if I misstate

3     something.  Sometimes I -- having done this for so many years,

4     I'll say things that I've seen so many times and perhaps

01:07   5     they're in this and perhaps they're not.  But just watch me

6     carefully as I go through.

7          All right.  Ladies, you have heard the evidence

8     in this case.  I will now instruct you on the law that you must

9     apply.  It is your duty to follow the law as I give it to you.

01:07  10     On the other hand, you the jury are the judges of the facts.

11     Do not consider any statements that I have made during the

12     course of the trial or made in these instructions as an

13     indication that I have any opinion about the facts of this

14     case.

01:08  15          After I instruct you on the law, the attorneys

16     will have an opportunity to make their closing arguments.

17     Statements and arguments of the attorneys are not evidence and

18     are not instructions on the law.  They are intended only to

19     assist the jury in understanding the evidence and the parties'

01:08  20     contentions.

21          Answer each question from the facts as you find

22     them.  Do not decide who you think should win and then answer

23     the questions accordingly.  Your answers and your verdict must

24     be unanimous.

01:08  25          Do not let bias, prejudice, or sympathy play any

part in your deliberations.  A corporation and all other
persons are equal before the law and must be treated as equals
in a court of justice.

You must answer all questions by a preponderance
of the evidence.  By this is meant the greater weight and
degree of credible evidence before you.  In other words, a
preponderance of the evidence just means the amount of evidence
that persuades you that a claim is more likely so than not so.
In determining whether any fact has been proved by a
preponderance of the evidence in the case, you may, unless
otherwise instructed, consider the testimony of all witnesses,
regardless of who may have called them, and all exhibits and
evidence, regardless of who may have produced them.

The testimony of a single witness may be
sufficient to prove any fact even if a greater number of
witnesses may have testified to the contrary if, after
considering all other evidence, you believe that single
witness.

In determining the weight to give to the
testimony of a witness, you should ask yourselves whether there
was evidence tending to prove that the witness falsely
testified concerning some important fact or whether there was
evidence that at some other time the witness said or did
something or failed to say or do something that was different
from the testimony the witness gave before you during the

trial.

A witness may be discredited or "impeached" by contradictory evidence, by showing that he or she testified falsely concerning a material matter or by evidence that at some other time the witness has said or done something or has failed to say or do something which is inconsistent with the witness' present testimony.  If you believe that any witness has been so impeached, then it is your exclusive province to give the testimony of that witness such credibility or weight, if any, as you think -- or may think it deserves.

You should keep in mind, of course, that a single mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately.  So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

Now, while you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience.  In other words, you may make deductions and reach conclusions that reason and common sense leads you to draw from the facts that have been

01:11  1   established by the testimony and evidence in the case.

2   There are two types of evidence that you may

3   consider in properly finding the truth as to the facts in the

4   case.  One is direct evidence, such as the testimony of an

01:11  5   eyewitness.  The other is indirect or circumstantial evidence,

6   the proof of a chain of circumstances that indicates the

7   existence or nonexistent of certain other facts.  As a general

8   rule, the law makes no distinction between direct and

9   circumstantial evidence but simply requires that you find the

01:11  10  facts from the preponderance of all the evidence, both direct

11  and circumstantial.

12  Now, when you retire to the jury room to

13  deliberate on your verdict, you may take this charge with you

14  as well as exhibits which the Court has admitted into evidence.

01:12  15  Select your foreperson and conduct your deliberations.  If you

16  recess during your deliberations, follow all of the

17  instructions that the Court has given to you about/on your

18  conduct during the trial.

19  After you have reached your unanimous verdict,

01:12  20  your foreperson is to fill in on the form your answers to the

21  questions.  Do not reveal your answers until such time as you

22  are discharged, unless otherwise directed by me.  You must

23  never disclose to anyone, not even me, your numerical division

24  on any question.

01:12  25  Now, just as a matter of point at this juncture,

there may be -- and I have not checked, but we'll check to see.
There may be question forms in the jury room for you.  If
they're not there, we will certainly make sure there is a form
for -- or paperwork for you -- for the foreperson to raise a
question.

If there is a question that you need me to
answer, then I will be -- the case manager will be bringing
that to me, or the marshal or the court security officer will
bring that to me.  So, we'll make sure we've got some paper in
there for that question, if any question arises.

If you want to communicate with me at any time,
please write a written message or question to the bailiffs, who
will bring it to me.  I will then respond as promptly as
possible either in writing or by having you brought into the
courtroom so that I can address you orally.  I will always
first disclose to the attorneys your question and my response
before I answer your question.

After you reach a verdict, you're not required to
talk with anyone about the case, unless the Court, I should
say, directs or orders otherwise.

Section II deals with the contentions of the
parties.

In this case, the plaintiff claims -- the
plaintiffs claim that, in the evening hours of April 19, 2007,
while working in the BP Pipestill 3B and Cat 1 Units, they were

01:14   1   exposed to toxic substances.  They claim to have experienced

2   various symptoms that required medical evaluation and/or

3   treatment.  In this regard, the plaintiff claims that BP was

4   negligent in failing to maintain a safe workplace due to poor

01:14   5   maintenance.

6            The plaintiffs assert that the equipment is old

7   and unreliable and that BP's maintenance program reacts to

8   breakdowns as opposed to proactively addressing them.  Hence,

9   there have been numerous releases and spills of toxic

01:14  10   substances at the BP facility before and since April 19th,

11   2007.

12            The plaintiffs also assert that BP did not have

13   sufficient monitoring systems in place to detect a release of

14   toxic substances, to warn workers of a release, and to timely

01:14  15   evacuate them from the premises.  Those are the plaintiffs'

16   contentions.

17            The defendant, BP, claims that it did not release

18   a toxic substance on the evening of April 19th, 2007.  BP

19   disputes that the plaintiffs sustained disabling injuries as a

01:15  20   result of its conduct.  Moreover, BP claims that there is no

21   evidence that the plaintiffs were exposed to any substance in

22   excess of the applicable permissible exposure limits

23   established by OSHA.

24            Finally, BP claims, (a), it was not in control of

01:15  25   any instrumentality that caused the odor event of April 19th,

2007; (b), there's no evidence that the alleged unidentified cause of the odor was under control of BP; (c), the cause of the odor event was due to the negligence of a third party over whom BP had no control; and (d), the plaintiffs' injuries, if any, were preexisting and not proximately caused by the odor event of April 19th; and, (e), the odor event was the result of an unavoidable accident.  These are BP's contentions.

Because corporations are not natural persons, they act through agents, employees, and servants.  Therefore, acts of negligence committed by BP's agents, employees, and servants, that arose out of or done in conducting BP's business and done in the course and scope of that relationship binds BP. Hence, the negligence of BP, if any, may be due to acts of any such agent, employee, or servant of BP.

"Definitions."  The Rules of Evidence provide that -- it should be "if" -- that if scientific, technical, or other specialized knowledge might assist you in understanding -- in the understanding of the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify and state his or her opinion concerning such matters.

You should consider each expert opinion received in this case and give it such weight as you may think it deserves.  If you should decide that the opinion of an expert witness is not based on sufficient education and experience or

01:17  1    if you should conclude that the reasons given in support of the
       2    opinion are not sound or that the opinion is outweighed by
       3    other evidence, then you may disregard that opinion entirely.

       4            "Proximate cause" means that cause which, in a
01:17  5    natural and continuous sequence, produces an event and without
       6    which cause such event would not have occurred.  In order to be
       7    a proximate cause, the act or omission complained of must be
       8    such that a person using ordinary care would have foreseen that
       9    the event or some similar event might reasonably result
01:17 10    therefrom.  There may be more than one proximate cause of an
      11    event.

      12            "Negligence" is a failure to use ordinary care;
      13    that is, failing to do that which a person of ordinary prudence
      14    would have done under the same or similar circumstances or
01:17 15    doing that which a person of ordinary prudence would not have
      16    done under the same or similar circumstances.

      17            "Ordinary care" means that degree of care that
      18    would be used by a person of ordinary prudence under the same
      19    or similar circumstances.

01:18 20            Gross negligence.  The plaintiff also claims that
      21    the defendant was grossly negligent.  To prevail on this claim,
      22    the plaintiff must prove that BP was grossly negligent by clear
      23    and convincing evidence.

      24            Now, you notice earlier I used the term
01:18 25    "preponderance of the evidence" having to do with one standard

01:18   1    of proof.  "Gross negligence" requires a different standard of

        2    proof, and that's what I am referring to here.

        3                    "Clear and convincing evidence" is the measure or

        4    degree of proof that produces a firm belief or conviction of

01:18   5    the truth of the allegations sought to be established.

        6                    "Gross negligence" must be viewed objectively

        7    from the standpoint of BP, the act or omission must involve an

        8    extreme degree of risk, considering the probability and

        9    magnitude of the potential harm to others; and BP must have

01:19  10    actual, subjective awareness of the risk involved but,

       11    nevertheless, proceed in conscious indifference to the rights,

       12    safety, or welfare of the plaintiffs.

       13                    Compensatory damages.  If you find that BP is

       14    liable to the plaintiffs, then you must determine an amount

01:19  15    that is fair compensation for all of the plaintiffs' damages.

       16    These damages are called "compensatory damages."  The purpose

       17    of compensatory damages is to make the plaintiffs whole; that

       18    is, to compensate the plaintiffs for the damages the plaintiffs

       19    have suffered.

01:19  20                    Compensatory damages are not limited to expenses

       21    that the plaintiff may have incurred because of the injury.  If

       22    the plaintiffs prevail, they're entitled to compensatory

       23    damages for the physical injury, pain and suffering, mental

       24    anguish that they have suffered because of BP's conduct.  The

01:19  25    plaintiffs' claims -- the plaintiffs claim damages of past

01:19  1  physical pain, mental anguish, loss of earnings, and medical

2  expenses.

3            Of course, the fact that I give you instructions

4  concerning the issue of damages should not be interpreted in

01:20  5  any way as an indication that I believe that the plaintiffs

6  should or should not prevail in the case.  You may award

7  compensatory damages only for injuries that the plaintiffs have

8  proved were proximately caused by BP's allegedly wrongful

9  conduct.

01:20  10            The damages that you award must be fair

11  compensation for all of the plaintiffs' damages, no more or

12  less.  You should not award compensatory damages for

13  speculative -- speculative injuries but only those injuries

14  which the plaintiffs have actually suffered or that the

01:20  15  plaintiffs are reasonably likely to suffer in the future.

16            If you decide to award compensatory damages, you

17  should be guided by dispassionate common sense.  Computing

18  damages may be difficult, but you must not let that difficulty

19  in such calculations lead you to engage in arbitrary guesswork.

01:20  20  On the other hand, the law does not require the plaintiff to

21  prove the amount of his or her losses with mathematical

22  precision but only with as much definiteness and accuracy as

23  the circumstances permit.

24            You may award damages for any injury or illness

01:21  25  that any plaintiff suffered before the date of his -- you may

01:21  1    not -- I'm sorry.

2              You may not award damages for any injury or

3    illness that any plaintiff suffered before the date of his or

4    her alleged injury or accident, should I say, on April 19,

01:21  5    2007.  However, you may award damages for aggravation of an

6    existing physical defect or activation of any such latent

7    condition resulting from physical injury to any plaintiff.

8              If you find that -- if you find that there was

9    such an aggravation, you must determine, if you can, what

01:21  10   portion of a plaintiff's condition resulted from the

11   aggravation and make allowance in your verdict only for that

12   aggravation.

13             And the next and final section is

14   "Interrogatories."

01:21  15             You're instructed that you may infer negligence

16   by BP but not -- are not compelled to do so, if you find, (a),

17   that the character of the accident is such that it would not

18   ordinarily -- would ordinarily not happen in the absence of

19   negligence; and, (b), that the cause of the accident -- i.e.,

01:22  20   BP's failure to implement preventive techniques and corrective

21   measures in its maintenance program -- was under the control of

22   BP at the time of the -- at the time the negligence, if any,

23   causing the accident that allegedly occurred.

24             "Control" means that BP must control the timing

01:22  25   and implementation of any preventive techniques and corrective

01:22    1    measures at its facility.

2            You'll answer the following interrogatories.  And

3    Interrogatory Number 1 inquires:  Was there an escape, spill,

4    release, or leak of a toxic substance at the BP facility on the

01:22    5    occasion in question, due to the negligence of BP, its agents,

6    employees, or servants?

7            You'll answer that "yes" or "no," and a line is

8    provided for your answer.

9            Now, if you answer "yes" to Interrogatory

01:22   10    Number 1, then answer Interrogatory Number 2:  Was such

11    negligence, if you have so found in Interrogatory Number 1, a

12    proximate cause of the injuries, if any, that you found -- that

13    you found that any plaintiff suffered?

14            You'll answer that "yes" or "no" as to each

01:23   15    plaintiff, if any, that you have found sustained an injury.

16    And lines are provided for your answers as to each plaintiff.

17    You'll answer those "yes" or "no," and lines are provided.

18            If you've answered "yes" to Interrogatory

19    Number 2 as to any plaintiff, and only in that event, answer

01:23   20    the following interrogatory:  What compensatory damages -- and

21    we defined that earlier -- if any, do you find as to each

22    plaintiff for whom you answered "yes" in Interrogatory

23    Number 2?

24            You'll answer in dollars and cents, if any.

01:23   25    Lines are provided for your answers.

01:23   1          By way of example, Number 1, Gilberto Cantu, you

2     see lines for Mental Anguish/Pain and Suffering, past medical

3     expenses, lost income.  That same or those same claims are

4     being made by all of the plaintiffs except Edwin Munoz,

01:24   5     Number 8.  So, 1 through 7, the same claims are being made.

6     Edwin Munoz is asking for, additionally, future medical

7     expenses; and that's the distinction between Mr. Munoz and the

8     others.

9          Lines are provided for your answers as to each of

01:24  10     those if you are led to those by your answers.

11          If you have answered Interrogatory Number 3 as to

12     any plaintiff, and only in that event, then answer the

13     following interrogatory.

14          This deals with punitive damages.

01:24  15          You may also award punitive damages if the

16     plaintiff, or any plaintiff, for that matter, has proven that

17     BP acted with gross negligence, with malice, or with

18     willfulness, or with callous and reckless indifference for the

19     safety or rights of others.

01:24  20          One acts willfully or with reckless indifference

21     for the rights of others when he acts in disregard of a high

22     and excessive degree of danger about which he knows or would

23     have -- or which would be apparent to a reasonable person in

24     his position.

01:25  25          If you determine that BP's conduct was so

01:25   1   shocking and offensive as to justify an award of punitive
2   damages, you must exercise your discretion to award those
3   damages.   In making any award of punitive damages, you should
4   be -- you should consider -- I'm sorry, I'm getting tired --
01:25   5   that the purpose of punitive damages is to punish a defendant
6   for shocking conduct and to deter that defendant and others
7   from engaging in similar conduct in the future.
8       The law does not require you to award punitive
9   damages.   However, if you decide to award punitive damages, you
01:25  10   must use sound reason in setting the amount of the damages.
11   The amount of the award of punitive damages must not reflect
12   bias, prejudice, or sympathy toward any party.   However, the
13   amount can be as large as you believe necessary to fulfill the
14   purposes of punitive damages.
01:26  15       Interrogatory Number 4 inquires:   What damages,
16   if any, do you award as punitive damages against BP?
17       And a line is provided as relates to each of the
18   plaintiffs, assuming that you make that choice.
19       The jurors certificate.   We the jury have
01:26  20   answered the above and foregoing questions as herein indicated
21   and herewith return our unanimous verdict into court, to be
22   signed by the jury foreperson.
23       I have the original.   As I indicated earlier,
24   we'll make sure this original gets back.   The answers are to be
01:26  25   recorded on the original.

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:26    1          All right.  Ladies and gentlemen, we're now ready
         2  to start with the closing arguments; and we'll start with the
         3  plaintiff.
         4          Counsel, you may proceed.
01:26    5      MR. BUZBEE:  Yes, your Honor.  May it please the
         6  Court.
         7      THE COURT:  Yes.
         8      MR. BUZBEE:  Ladies of the jury, I know it's been a
         9  long three weeks.  I promised you at the beginning that I would
01:26   10  move it as quickly as I could, and I tried to do that.
        11          But I've got to go back to this.  This case is
        12  about responsibility, and that's not just a word.  We use it a
        13  lot.  I use it with my four kids a lot, "responsibility."  And
        14  "Kids of Character," you've probably heard of all that, talking
01:27   15  about responsibility all the time.  But I think we use that
        16  word so much that we sometimes forget what it really means.
        17          It means being morally, legally, or mentally
        18  accountable for your actions.  And what we have here in this
        19  case is a defendant, a company, that simply will not take
01:27   20  responsibility for its own actions.
        21          This -- and, you know, I put up these damages.
        22  And every time I put up these small amount of medical damages I
        23  cringe a little bit because my thought was maybe you were
        24  thinking, "Well, wait a minute, Tony.  I just got ripped out of
01:27   25  my life for three weeks to come down here and sit through a lot

01:27   1   of stuff that's boring, a lot of things that were aggravating,"

2   I'm sure, to you.  You were kept out of a lot of the

3   discussions that happened over there.

4            And every time I wrote down 1200 bucks or

01:28   5   900 bucks, I was thinking what must you be thinking.  Maybe

6   you're thinking, "This is a complete waste of my time."  But I

7   hope, now that we've done this for three weeks, that you see

8   that this, indeed, is the most important case that will be

9   tried this year in this state.  The most important case.

01:28   10           Before I talk about the facts, I need to talk

11   about this -- this Latin phrase, "res ipsa loquitur."  Now, one

12   of you is going to be the foreperson of this jury; and I hope

13   that whoever that is remembers, on Page 7 of the -- and that's

14   where it starts "Interrogatories" -- the judge instructs you on

01:28   15   res ipsa loquitur.

16           What it means is, we learned in law school, "the

17   thing speaks for itself."  In other words, if BP controlled the

18   timing of their maintenance program and if this event was the

19   type that normally would not happen but for the lack of

01:29   20   maintenance, then the plaintiffs win the case.  And the law

21   recognizes that it's inherently unfair for someone who is

22   outside looking in, who has no access to the plant, to be able

23   to tell you where that leak came from.  The law doesn't require

24   us to do that.

01:29   25           We tried to do that, and they've taken potshots

01:29  1   at us all week.  They didn't like the way we did our mask; they

2   didn't like this; they didn't like that.  But the fact is we

3   tried to show you where carbon disulfide would come from.  And

4   I think, more likely than not, we clearly did that.

01:29  5          But even if you say, "You know what, Tony?  I

6   don't like the fact that the mask sat in your offices for three

7   weeks" or "I don't like the fact that one of your lawyers, Kyle

8   Smith, somehow the box got busted and, so, therefore, you

9   haven't proven to me with mathematical certainty," which you

01:29  10  saw we're not required to do, "that that's carbon disulfide," I

11  would submit to you this: res ipsa loquitur.  It means if this

12  is the type of event that normally does not happen with

13  negligence -- without negligence -- in other words, we know

14  releases don't happen but for negligence, bottom line --

01:30  15  because the number one rule is what?  Keep it in the pipes.

16  How many times did you hear that -- and we know that BP has

17  complete control over their facility and it's, in fact, their

18  duty and responsibility morally, ethically, and legally to do

19  maintenance, then we win, whether you think it's the SRU, which

01:30  20  I believe it clearly was, or whether you think they were using

21  some sort of carbon disulfide industrial solvent to -- and

22  didn't properly clear it all out before these contractors went

23  in there.  That's the -- that's why Page 7 is what I would like

24  you to focus on, res ipsa.  You won't see the Latin phrase, but

01:30  25  that's what it is, something that we talk about in law school.

01:30  1          Now, the burden of proof.  This is the oldest

2    court, the oldest federal court in the State of Texas.  I bet

3    you didn't know that.  This is the oldest federal court.  When

4    Texas became a part of the United States, it wasn't -- wasn't

01:30  5    located here but it was located in Galveston.  And this is the

6    oldest court that has ever existed in the State of Texas.

7          And one cool thing about this court -- and I have

8    tried 20 or 30 cases in this court -- is, if you look up at the

9    lights -- see the lights?  Those are patterned after the scales

01:31  10   of justice.  It's a real cool feature.  And one of the judges

11   that was here, you know, he did spend a lot of time trying to

12   give a nod to history and a nod to the fact that, you know,

13   these courtrooms mean something.

14         To me it's -- for my profession, it's almost a

01:31  15   church, because this is the great equalizer.  This is a place

16   where if you get too big to be regulated by the State or by the

17   federal government you can still be regulated by eight people

18   yanked out of their lives to hear facts.

19         But I want you to remember this:  The burden of

01:31  20   proof is, is it more likely than not.  Basically, as the judge

21   said, if you believe that we have shown you that it's more

22   likely than not, that we have tipped the scale in favor of

23   these plaintiffs, we win the case.  It's mandated if you

24   believe that.

01:32  25         So, the question you're going to have to ask was

01:32  1   BP negligent, and the answer, I submit to you, is going to be,

2   yes.

3          And are the plaintiffs entitled to damages; and I

4   submit to you again, it's more likely than not, yes, they're

01:32  5   entitled to damages.

6          Now, BP, they're a convicted felon.  We know

7   this.  We spent a lot of time about their background.  Why do

8   we talk about background?  As anybody that's been in, for

9   instance, the teaching profession knows, there are people that

01:32  10   can turn the corner.  We know that.  People can change.  But if

11   you want to know where someone is going, you look at where

12   they've been.

13          They've got -- they're a convicted felon for lack

14   of maintenance and inspections.  Forty-six illegal pollutant

01:32  15   emissions.  OSHA has fined them and cited them over 600 times,

16   400 times in September, for the exact same thing we're here to

17   talk about, failure to keep it in the pipes, failure to

18   inspect, failure to maintain.  We heard that they were -- they

19   were over a thousand inspections behind, seven years behind.

01:33  20   By 2005 they were seven years behind in their maintenance.

21          Now, you're saying, "Well, okay.  So what?"

22   Well, I submit to you that -- that you don't make that up in

23   two years when you're seven years behind.  And that is a

24   conscious disregard for the safety of not only BP's own

01:33  25   employees but these contractors that come in here and do this

01:33  1    work at their plant.

2              They have the worst process safety management

3    record in the history of the United States, of keeping it in

4    the pipes; and they're the biggest polluter in the United

01:33  5    States.  There's been over 500 releases, emissions, spills, and

6    leaks.

7              Remember -- remember Fire Chief McLemore?  A fire

8    a week?  And they tried to sugar coat that a little bit.

9    Remember?  And he was doing his best, but you could tell his

01:33  10   heart really wasn't in it.  He was done.  He got his

11   retirement.  But the truth is -- I showed you his deposition

12   where he admitted a couple years ago that they had one fire a

13   week.

14             Think about that.  One fire a week, does that

01:34  15   sound like someplace safe to work?  That sounds like a place

16   that is a disaster waiting to happen.

17             They average 200 leaks a year.  And 70 percent of

18   the time that someone is made sick by an odor, they don't find

19   the source.  I mean, if you got a plant where you're making

01:34  20   people sick out there and you can't find the source, what does

21   that tell you?  That tells you that you are doing something

22   wrong.

23             And let me tell you something.  I don't attack

24   chemical companies.  I mean, they obviously have their place.

01:34  25   I drive cars.  I use gas.  These people, this company is an

*Cheryll K. Barron, CSR, CM, FCRR*                    *713.250.5585*

01:34   1    anomaly.  They're not like everyone else.  They're the worst.

2    They can do this safely.  It can be done the

3    right way, but they don't do it the right way.  The lack of

4    maintenance and inspections leads to leaks, spills, and

01:34   5    releases.  I mean, it just goes on and on.

6    Now, we're talking about chemicals.  You know, I

7    was concerned in the case that -- we were talking about these

8    odors, and there's something to say -- we can talk about a

9    smell or it stinks, and we know what that is.  But we're

01:35   10    talking about smells that make people sick or make people pass

11    out or make people throw up blood or make people have to use a

12    breathing machine for a couple of months.  That's what I am

13    talking about.

14    It's a lot worse than simply a foul smell.  We're

01:35   15    talking about corrosive, reactive, explosive, flammable; and

16    we're talking about pollutants.  I mean, this is -- we live

17    here.  This is where we live.  This is our good neighbor that's

18    polluting our air, our ground, and our water.

19    I'm going to run through these quickly because

01:35   20    you've seen it about four times.  Ninety-five leaks in a

21    six-month period; one hundred five leaks in that six-month

22    period.  One hundred twenty-six leaks.

23    And do you also notice that Pipestill 3B, which

24    is supposed to be de-inventoried and have nothing in it,

01:35   25    they're still having leaks there?  Anyone with common sense

01:36    1    knows if it's de-inventoried, they cleaned it out, they flushed

2    it out, they vacuumed it, all this stuff they claim they did

3    before the contractors went in.  Then why is it still having

4    leaks?

01:36    5            January 1 up until -- or the six-month period

6    that this incident occurred, 162 leaks.  Now, did you notice

7    that they came in and they tried to minimize that and tried to

8    say, "Well, every leak doesn't mean somebody got sick or that

9    there was pollution or that it was illegal"?  Every leak means

01:36   10    they violated Rule Number 1.

11            And granted, I mean, if we wanted to stay here

12    for six months, which I gathered you guys didn't want to do, we

13    could have went through every leak.  We could have done that

14    and we could have put BP to task and we could have said, "Okay,

01:36   15    BP.  See, that's a major leak, that's a major leak."

16            But did they bring you a document that says that

17    none of these were major leaks?  Of course, not.  All they

18    brought you was a bunch of talk.  They didn't bring you

19    anything to look at or to hold or to read.

01:37   20            BP also -- not only do they have all these leaks

21    and spills and releases, they also don't investigate them.  You

22    remember what the worker said?  Remember that little survey

23    that I went over with Chief McLemore?  Remember one of the

24    things the worker said was "no one looks at Traction."

01:37   25            Remember Traction was supposed to be this real

01:37   1   important thing that everybody looked at and followed because
        2   it was logged?  No one looks at it.
        3           "No inspections," "there's not enough
        4   inspections," "not enough money spent on maintenance," "we're
01:37   5   understaffed," these are their own workers saying it.  I mean,
        6   one way you can look at this is to blame the BP workers.  And I
        7   think that's an unfair way to look at it, personally.  I think
        8   that's a management problem.
        9           And it's probably not even the man from League
01:37  10   City, the plant manager.  It's probably a management problem
       11   over in London because they simply don't want to spend the
       12   money to make the plant safe.
       13           Remember this whole idea of "clamp on top of
       14   clamp on top of clamp"?  It's basically putting a Band-Aid over
01:37  15   a Band-Aid over a Band-Aid.  They don't do proper investigation
       16   of incidents.  And we know, all the while this is going on,
       17   they're making $130 million of profit a month.  That's what we
       18   know.
       19           Here is just a list of various instances simply
01:38  20   not investigated.  I mean, the releases listed?  And they don't
       21   spend a minute investigating.  If that is not -- does not shock
       22   your conscience, I don't think I can shock your conscience.
       23   It's going to take a much better lawyer than me to shock your
       24   conscience.  If you look at that and you see the
01:38  25   350,000 gallons of hydrocarbon that was spilled out there and

01:38   1    there was not -- beyond that one piece of paper, there's no

2    investigation, I can't shock your conscience.

3            And, then, odor events, what BP calls "odor

4    events."  This is the first -- I never heard that phrase

01:38   5    before, "odor event," until I started looking at this case.

6    This is what BP calls when somebody gets sick, and it goes into

7    Traction, "That's an odor event."  We all know that means that

8    somebody got exposed to a chemical.  Seventy percent of the

9    time, they don't investigate it.  Seventy percent of the time

01:38   10   they don't find out what it was.

11           Why would they do that?  Because if they find out

12   what it is they have to report it.  That's a fact.  And, so,

13   what we have is -- I made this nifty little graph -- is

14   70 percent of the time, they don't source it, they don't report

01:39   15   it.

16           Now, that is actually a picture of the

17   pipestills.  Never did a good job of showing you that, but

18   that's what it is.  You can see the towers, but you can also

19   see that that area is very -- you know, we talked about whether

01:39   20   it's a confined area or not a confined area.  Anybody with

21   common sense can see that's a confined area.  It's not a

22   football field.  There's a bunch of equipment out there.

23           The SRU Unit, we know that the SRU Unit is a --

24           A JUROR:  (Indicating).

01:39   25           MR. BUZBEE:  I'm sorry.  I keep trying to --

01:39  1          A JUROR:  I can't stand this.

2          MR. BUZBEE:  I know.  I'm sorry about that.  This

3     thing right here, I'm looking at --

4          THE COURT:  You can let those arms down.  I think they

01:39  5     will let down.  They should release.

6          MR. BUZBEE:  All right.  Maybe that's better.

7          THE COURT:  Same with those arms there.

8          MR. BUZBEE:  Sorry.

9          Okay.  Let's talk about the SRU Unit.  You heard

01:40  10    the SRU Unit has carbon disulfide.  But the whole argument is

11    this, "Well, yes, Tony, it has carbon disulfide.  But if it

12    leaked carbon disulfide, it would have leaked hydrogen sulfide;

13    so, it would have killed everybody."  I mean, that's their

14    argument, right?

01:40  15         But that's when the SRU Unit is functioning

16    properly.  Now, how many times do we know that it wasn't

17    functioning properly?  How many times do we know that there --

18    remember I got that anonymous call, that they squalled about

19    because I was asking some of the witnesses about it?  The

01:40  20    anonymous caller was right.  It took me a couple of questions

21    to get the guy from Cherry Point to admit that there was, in

22    fact, a problem with the seal.  Now, they didn't replace the

23    seal; but there was a problem, and it was leaking.

24         And you heard the evidence that there was an

01:40  25    announcement that the SRU has been fixed and it was, like, a

01:40  1  wave of relief because the SRU had been acting up and causing

2  problems.  But it wasn't the only time it had been acting up.

3  There had been 50 total events at the SRU Unit.  And one -- in

4  a seven year period, they -- they leaked 407,000 pounds of

01:41  5  sulfur dioxide and 7,000 pounds of hydrogen sulfide from that

6  one SRU Unit that is, literally, less than 30 miles from this

7  courthouse.

8          The SRU Unit, we talked about the ratios.  We

9  know that it routinely malfunctions.  And we had to reach an

01:41  10  agreement on what "malfunction" means, it doesn't operate

11  properly.  We know that the seal was, in fact, repaired.  And

12  we also know one thing about carbon disulfide:  It evaporates

13  very easily and the vapor can collect on top of the pool.

14          And, so, carbon disulfide will evaporate and

01:41  15  become a vapor; and then it can get leaked.  And it can get

16  leaked from high up.  And it's heavier than air, and it can

17  rain down on people in vapor form; and that's exactly what

18  happened here.  And anybody that has common sense knows that's

19  probably what happened here.

01:42  20          Let's talk about this -- look at that quote

21  there.  "There is no shame in not knowing.  The shame lies in

22  not finding out."  We know that in the days leading up to this

23  release, March 21st -- let's skip that because that's not close

24  enough in time.  Let's start with January 22nd.  Workers were

01:42  25  overcome by a chemical, causing nausea and sore throat.

01:42    1          Then April 12th, five days before the incident,

2   workers were -- worker was overcome by a chemical, causing

3   nausea.  And then we see on April 19th, literally 20 hours

4   before this event, that five workers -- now, you-all remember

01:42    5   Paula Jowell?  Remember her?  She was early on in the case, and

6   a lot has happened.

7          But I was thinking, in my view, she was probably

8   one of the most powerful witnesses because you -- she didn't

9   have any experience with plants.  You can tell.  She was out

01:42   10   there picking up trash.  But you could see she was terrified

11   when she had been gassed the night before and then, when it

12   happened again and she -- remember, her statement is in

13   evidence, you-all can look at it.  She came out of the

14   Pipestill 3B Unit; and she said people were just strung

01:43   15   everywhere, people were sick everywhere, people were throwing

16   up, people were passing out, people were dizzy.  This was an

17   odor event according to BP.

18          And you heard Chief McLemore.  Remember what he

19   said?  I said, "Chief, if there was an incident 20 hours before

01:43   20   that caused five people to get sick, would you have sent them

21   right back in there?"  And remember I said, "That would be

22   ridiculous, wouldn't it?"

23          And he said, "Yes."  That's the fire chief.

24          Now, granted, he didn't know anything about it;

01:43   25   but we know that that unit, Pipestill 3B, because of caustic

01:43   1   odors making people sick, was evacuated more than 17 times

2   during this turnaround.  That is a workplace that's unsafe.

3   Now, it's one thing to tell these workers, "Hey,

4   look here, workers, you're going to get gassed.  Here's you a

01:43   5   mask you can wear, and you can wear it all the time."  That's

6   one thing.  It's quite another to say, "No.  We have a safe

7   workplace," and then repeatedly make people sick and then stick

8   your head in the sand like an ostrich and pretend like you

9   don't know what it was and you're not going to find out.

01:44   10   We know there was overwhelming evidence of a

11   release that caused five workers to get sick 20 hours prior and

12   BP did nothing.  They were out of that unit for about two hours

13   and then, without finding the source, without setting up any

14   kind of monitoring, without taking any precautions whatsoever,

01:44   15   they sent them right back in there.  None of the prior

16   incidents that I just showed you were investigated.  The blind

17   cannot see.  The arrogant will not see.

18   Now, we know for a fact that 110 people went to

19   the hospital.  And despite what their last expert said, we know

01:44   20   that they weren't light hearted.  We know they were throwing

21   up.  We had -- one guy said he threw up blood.  We talked about

22   two people, at least, that had to have breathing treatments.

23   We had two people, at least, that passed out.  We had eyes

24   burning, throwing up -- I mean, everything you can imagine.

01:45   25   And if you put it in the context of getting gassed with

01:45  1   something, it will scare the devil out of you.  It will scare

2   the devil out of you.

3          You know, in the Marines -- we talked about it a

4   little bit in the opening statements.  They used to gas us

01:45  5   purposely so we -- you probably -- now you know why I'm screwed

6   up like I am.  They used to gas us purposely.  They'd take us

7   into a gas chamber, with a mask on; and the idea was to teach

8   you how important the mask was.

9          So, you would be in there; and they would gases

01:45  10  you.  All right?  And then you would have to take your mask off

11  and then do exercises.  And then you would run out; and you

12  would be sick, and you would be this and that.  But we knew

13  what we had been gassed with, and we knew that it wouldn't hurt

14  you.  And the idea was to teach -- but it was still scary.  It

01:45  15  was very scary.

16         So, imagine when you're at work or these workers

17  are at work and they're just all of the sudden vapored and

18  gassed and they see people passing out and throwing up and

19  there's ambulances coming and then no one will tell them what

01:46  20  it is.  We know that some people passed out, some people threw

21  up blood, a hundred and eighty-nine people reported the odor.

22  BP has a long history of this conduct.

23         The smell -- their own expert said that the smell

24  and the symptoms were consistent with carbon disulfide, and we

01:46  25  know that carbon disulfide was found on the mask.  And even

01:46   1   their $400,000 expert, I made him admit you cannot rule out
        2   carbon disulfide.
        3           Remember they -- at the beginning -- I don't know
        4   if you remember Mr. Galbraith's opening statement.  He promised
01:46   5   a lot.  Boy, he promised a lot.  He didn't prove anything.  He
        6   didn't prove anything.  Their own expert says you can't rule
        7   out carbon disulfide.
        8           This is their rigorous investigations.  I really
        9   wish you would, if you feel compelled, look at Plaintiffs'
01:46  10   Exhibit 2, the investigative report.  Read that.  When you read
       11   it, you'll, just like I do, pick out every inconsistency and
       12   every falsehood that we know the evidence does not support.
       13   There was no mention of passing out, no mention of dead birds,
       14   no mention of -- you're going to see all these statements where
01:47  15   people saw other people foaming at the mouth -- remember the
       16   guy flopping like a fish?  Remember that?  When Mr. Galbraith
       17   said, "Well, you said nobody passed out" -- I'm sorry.  I said
       18   "flopping like a fish."  I -- semantics.  Sorry about that --
       19   vomiting.
01:47  20           And if you look at it, you can see lawyers --
       21   lawyers all over that document.  It was written by lawyers.  It
       22   was what you would call a prophylactic measure.  It's somebody
       23   protecting themselves.  It's somebody circling the wagons.
       24   Because this event was reported in all the newspapers, that
01:47  25   they had -- you look in the investigative report, by 23:00,

11:00 o'clock or so, the press was at the hospitals; and then they came to the front gate.

They were circling the wagons already.  It was a big deal.  And that's why this investigative report was written by lawyers.  And you can tell.  If you read it, you'll see it was written by lawyers.  It was written very carefully.  And they left out a lot of key facts.  Specifically the SRU seal, they left that out, conveniently.

Where is the pressure data from the SRU Unit? It's not in there.  Now, the Cherry Point guy said he'd seen it.  But have we seen it?  No, not ever produced it.

The pressure data, they produced pressure data from Cat 3, which shows pressure drop.  Remember we looked at that?  But they didn't produce the data from the SRU Unit for some reason.  There's no mention of all the previous incidents.  There's no mention of the subsequent incidents that happened later.

They say in there that CTEH was on the scene within hours.  We know that's not true at all.  It was 25 hours later.  Now, you may say:  Tony, you're hedging words.  You're not" -- no, no.  When you read the way it's written, it makes it seem like that these guys were on call and they were on the site, when they actually came a day later, when all the gas was gone and most of the people had already been released from the hospital.

01:48 1      And they say that BP was going up as the workers

2    were coming down.  Well, that was physically impossible.  Now,

3    do I have a problem with Darwin Perren?  No.  That guy was in

4    between a rock and a hard -- remember the guy on Friday last

01:49 5    week?  When he walked out of here, he looked -- if looks could

6    kill, he would have killed me.  No doubt about it.

7      But the truth is, by the time he got out there --

8    and whether you believe he knew how to use the monitor or

9    not -- I read the manual, but one thing I understand is people

01:49 10   out in the field know more than some silly lawyer reading a

11   manual.  I realize that.  I'm not so dumb as to not know that.

12   But I do know what the manual says, and I do know he didn't

13   operate that device in accordance with the manual.  Now, does

14   that mean that his readings are wrong?  I don't know, but it's

01:49 15   of no moment.

16     And the reason it's not important is because by

17   the time he started taking readings the gas was long gone, long

18   gone.  Because you can imagine if you -- if someone were

19   150 feet up on that tower, they getting off that tower and

01:49 20   they're getting off it fast.  And don't try to pretend that

21   there's going to be some guy up there who's getting gassed

22   who's going to say, "Oh, yeah, we'll hold up, Darwin.  Let's

23   all move aside and let Darwin come up."  There ain't no way.

24     We just -- everybody would be trying to get off

01:50 25   that tower.  And there was one way up, and there was one way

01:50   1   down.  And everybody got down, and then he went up; and it took

2   a long time.  So, of course his testing didn't find anything.

3   We can do the same tests right here, but we know the gas is not

4   here.  The gas is long gone.

01:50   5           I'd like you to really look at Exhibit 2, their

6   investigative report, because I submit to you it's written in a

7   defensive mode, period.  It's not written in a mode trying to

8   find anything out.  It's written in a mode to protect

9   themselves.

01:50   10           The key witnesses, we've talked about Paula

11   Jowell.  We talked about Chief McLemore.  Dr. Dydek, now, "Tony

12   Buzbee's mask test is baloney.  It's not scientific.  He didn't

13   keep a chain of custody.  He didn't do this" -- okay.  That's

14   fine, armchair quarterback.  Where is your test?  You collected

01:50   15   over a hundred masks.  You collected over a hundred masks,

16   lawyers out there on the site that night.  Where are they?  Why

17   didn't you test them?

18           I was able to get my hands on one mask, and I did

19   my best to test it.  And maybe I'm not a scientist; but one

01:51   20   thing I know, told you from the very beginning:  I, from the

21   mask, cannot tell you how much carbon disulfide was on there.

22   The purpose of the test of the mask is to tell you that it was

23   there.  That it was there.  And we have to do it -- we have to

24   go about it the other way.  There's more than one way to skin a

01:51   25   cat.

01:51    1          We know it was present.  So, now we have to

     2    figure out how much.  And the way we figure out how much is

     3    based on symptoms.  And then it comes down to you deciding

     4    whether you thought these ten people were liars.  Because for

01:51    5    you not to believe that these folks were gassed, you'll have to

     6    believe that all ten are liars and the other eight that came

     7    in, some of which don't even have cases, were liars, too.

     8          That's what -- now, BP hasn't come out and said,

     9    "You're a liar, you're a liar."  But that's -- their whole case

01:52   10    comes down to that, that these workers, 18 or so of them,

    11    they're liars, they're not telling the truth.  When they

    12    passed -- they didn't really pass out, even though there was

    13    several witnesses who saw it.  They didn't really throw up

    14    blood, because they didn't collect a sample.  How many times

01:52   15    when you've thrown up have you collected a sample right then so

    16    you could have proof of it?  That's ridiculous on its face.

    17          Now, who did we not -- one person we heard from

    18    is Jeremy Gracia.  Do you-all remember him?  Remember the young

    19    man who he came in and he talked about an event that occurred

01:52   20    on January 14th of 2008, well after this one, a process safety

    21    management event that had a great impact on his life?  Let me

    22    tell you something.  These releases and spills and leaks have

    23    major consequences.  Major consequences.  Lay aside the ISOM

    24    event -- which you've heard a little bit about, not much, in --

01:52   25    2005.  We're talking about events that are still happening,

01:52  1  January 14th of '08, that have major impacts on people's lives.

2  Who did we not hear from?  We didn't hear from

3  one operator of the adjacent units.  They didn't bring the SRU

4  operator.  They didn't bring the Cat operator.  They didn't

01:53  5  bring any operator, any BP operator, other than Darwin Perren.

6  That's all they brought.

7  They brought some guy from Cherry Point to tell

8  us about an SRU Unit in BP Texas City.  What does that tell

9  you?  They didn't bring anybody in maintenance.  Did they come

01:53  10  in here and say, "No, we're not seven years behind on

11  maintenance"?

12  "No.  You're wrong, Tony.  We have been spending

13  proper money on maintenance and inspections."  Of course,

14  they're going to say that.  Because we know it's not true, that

01:53  15  they're way behind.  And that's why this plant is so old and

16  dilapidated.  It is in bad shape, and that's why people

17  continue to get sick out there.

18  They didn't bring in any -- not even a person

19  from the investigation team, not one.  They brought in this

01:53  20  guy, Mr. Trapp, who wasn't a part of the investigation team.

21  That's what you call "window dressing."  They brought in

22  professional witnesses who are called in when companies have

23  big problems, and they came in as window dressing and tried to

24  convince you that the sky is not blue.

01:54  25  Let me tell you, there's experts out -- I've been

01:54   1   around this business long enough to know that there are
     2   particular experts, you pay them enough money and they'll
     3   smooth things out for you.  And that's what was attempted here.
     4         BP's strategy -- this is their trial strategy,
01:54   5   just like their corporate strategy:  If I don't see it, didn't
     6   happen.  If I didn't see it -- I mean, it's like saying I walk
     7   along the beach over here and I see footprints and then I take
     8   the position, "Well, those footprints are there; but there's
     9   really no one walking there."  That's just asinine on its face.
01:54  10         They guys did not find the source because they
    11   didn't want to find the source.  And I guess we could look at
    12   it two ways.  We could say, "They tried real hard, Tony.
    13   They're just incompetent."  That's one way.  Or the second way
    14   is they really didn't want to find it.  Either way is
01:55  15   unacceptable.  That's their corporate philosophy.
    16         Even Secretary James Baker -- even Secretary
    17   James Baker, the head of the investigative committee, said that
    18   this company has a corporate blind spot to process safety
    19   management.  Now, this is after a long and troubled history, a
01:55  20   long and troubled history.  They still have this problem.
    21   After repeated OSHA violations, after repeated TCEQ violations,
    22   after repeated -- I mean, you can -- you can imagine what
    23   they've gone through, but nothing has changed.  Not one thing.
    24         I asked this -- this plant manager.  He said,
01:55  25   "Yeah, Tony, we turned the corner in 2007."  Two months ago

01:55   1   they got cited again 439 times because they simply had not done

2   any of the audits of their pressure safety relief valves, any

3   of their inspections.

4           And there's -- there are companies that are too

01:55   5   big to be regulated.  Those companies exist.  This is one of

6   them.  They didn't even mention the pressure drop of the

7   Cat Unit.  And, obviously, we talked about it.  They didn't

8   mention the SRU pressure data, because they never produced it.

9           Their conclusion was there were no operational

01:56   10   upsets, in the report.  No mention of the other incidents, the

11   pressure drops, no pressure data from the SRU Unit.

12           And, incidentally, you remember the guy, two

13   hours later --

14           What was his name, Sean?

01:56   15       MR. O'ROURKE:  Gomez.

16       MR. BUZBEE:  Mr. Gomez, two hours later he comes out

17   and they say, "What the devil are you doing here?"  Remember he

18   was driving down and they got gassed and they all jumped out

19   and was ripping off their shirts and so forth?  He never heard

01:56   20   an alarm.  He was never told anything was going on.

21           We know for a fact that the alarm was not --

22   Darwin Perren wouldn't take any responsibility for it.  It was

23   probably because it wasn't his -- it wasn't his duty to set off

24   the alarm.  A lot of people could have avoided this just with a

01:56   25   proper alarm.  They don't mention the alarm at all in their

01:56  1  investigation report.

2  What they did was they minimized the incident.

3  They sugar coated it; they downplayed it; they made pretend

4  like it wasn't a big deal.  We know for a fact that within two

01:57  5  hours of this happening that Jerry Duke called TCEQ and said,

6  "There are some people with medical issues" -- this is what he

7  said -- "but there was no release here."

8  Now, remember they said they did a -- what was

9  that word -- a robust -- you don't hear that very often, do

01:57  10  you -- a robust investigation, five weeks even.  They had

11  already made their conclusion within two hours.  Certainly,

12  that's what they told the authorities.

13  Let me tell you something.  Having been -- having

14  worked for the federal government in several capacities myself,

01:57  15  I can assure you that the federal government and OSHA and TCEQ,

16  the state are busier than one-armed paper hangers.  Okay?  We

17  know that.  They do the best they can.  But when they're lied

18  to, a lot of times they don't have the ability to ferret that

19  out.  That's a fact.  All right?

01:58  20  And that's why we have courts, because the

21  ultimate decision maker on BP's conduct is not OSHA and it's

22  not TCEQ, because they don't have any proceeding where you can

23  put somebody on the stand and cross-examine them and ferret out

24  the real truth.  It's in a court of law and a jury.

01:58  25  BP's trial strategy is to ignore its own wind

01:58  1    data.  Do you remember the wind data?  I didn't do a good job

2    on the cross-examination, but this was the wind data.  Remember

3    their expert said, 20 minutes leading up to the event, that's

4    the key wind data.  This was BP's wind data from the closest

01:58  5    source to where this occurred.  Look where the wind was coming

6    from.  It doesn't say -- there's one point here.  It's

7    east-southeast.

8                Their entire defense rests upon the fact of the

9    prevailing wind from the southeast.  Show me a document that

01:59  10   says that.  Show me your wind data that says that.  It doesn't

11   exist.  That's just people saying stuff.  There's the facts.

12               You've got Wheeler saying it's from the north,

13   and then their investigation report -- now, remember, there's

14   two winds you got to focus in on here.  I don't think any of

01:59  15   you -- and I may be wrong -- bought that at all, that it came

16   from off site.  It jumped Valero -- it came from the docks, it

17   jumped Valero, no one got sick, no one got sick at the docks,

18   and then it landed on BP.  Now, does anybody really buy that?

19   Do I need to spend time on that?  Because that's ridiculous.

01:59  20   That violates common sense.

21               One thing you see in the charge is you don't

22   check your common sense at the door.  There is no evidence of

23   anybody in Valero, any surrounding facility, from the train

24   docks, anyone, getting sick or any release whatsoever.  To

01:59  25   believe that and to let them walk, you would have to suspend

1   belief.  That some release went straight up in the air when the

2   wind was going this direction, completely opposite, somehow

3   found its way over BP and then literally parachuted in right on

4   top of Pipestill 3B, that's just ridiculous; but that's their

5   defense.

6           The winds are relevant because the release came

7   from inside the plant.  And you may say, "Well, Tony, why

8   didn't they pick it up, because we know the wind, after the

9   release, shifted?"  There's no doubt the wind, after people got

10  sick, shifted southeast.  You can look at Plaintiffs' Exhibit

11  23.  But at the time leading up to the people getting sick, it

12  was coming from the north.

13          So, let's say it came in -- the release happened

14  inside the plant and then the wind shifted from southeast and

15  blew it out of the plant.  Then you're wondering, "Well, why

16  didn't it get picked up on the Texas City monitoring station?"

17  Well, because they don't pick up carbon disulfide.  It makes

18  complete sense.  Those monitoring stations, everyone admits, do

19  not detect carbon disulfide.

20          So, BP's trial strategy, besides just pretend

21  something didn't happen, stick their head in the sand, is just

22  to attack the testing, even though they didn't do any

23  themselves, minimize the incident and spend hundreds of

24  thousands of dollars to prove something that would violate all

25  principles of common sense.

02:01  1          So, here we are.  No one died.  One man has a

2    back injury that needs treatment.  "But you're not asking for

3    thousands and thousands of dollars; so, why are you putting us

4    through this?"  You're probably wondering, "Why are you putting

02:01  5    me through this?"  Because just because no one died this time

6    we know for a fact doesn't mean somebody is not going to die

7    next time.  And until this stops, until it stops, it's going to

8    continue.  Because we know it continued after this.  It

9    continued.

02:02  10          And I won't go through all of them, but just on

11   and release after release and people getting sick.  Nothing

12   changed.  And all of this happens during this $2 million fancy

13   monitoring they were doing.  Because they were being reactive

14   and not proactive.

02:02  15          You can go out there and monitor till the cows

16   come how.  But until you fix your pipes, maintain them, inspect

17   them, what's the purpose?  You're just putting up window

18   dressing so when you come into court you can try to convince

19   eight people that, "Oh, we've turned the corner."

02:02  20          Look at -- look at the $2 million monitoring

21   documents.  What?  Plaintiffs' 13?  Plaintiffs' 13, remember

22   that big stack I showed you some of it yesterday?  With their

23   expert, their last one?

24          In that document, it shows that 15 people went to

02:02  25   the hospital just in the time frame they were doing this fancy

02:02   1    monitoring, the digging in the dirt -- just digging in the dirt

2    causes benzene exposure and other VOC exposure -- that there

3    were multiple odor events with people getting sick in that 315

4    days of monitoring and many, many, many were never sourced.  I

02:03   5    mean, what does it take?  The point is you have to inspect,

6    maintain, repair, and replace, not just monitor.

7             Now, why does this matter?  Well, for every

8    person that goes in that plant -- every person has a story.

9    Sometimes you're walking down the street.  If you think about

02:03   10   it, when you look at somebody, you say, "That person has a

11   story, and that person has a story."  We're talking about

12   people, not just the workers themselves.  We're talking about

13   people who have families.  We're talking about what matters in

14   this life.

02:03   15            We're not talking about how much profit BP can

16   make or whether BP can cut staffing or -- really, inspections

17   or any of that now.  We're talking about people.  I mean, we're

18   talking about people.

19            I mean, Rosa did not sign on to go work out there

02:04   20   so she could get gassed and bring that home to her kids.  I

21   mean, that's ridiculous.  I mean, these are the people we're

22   talking about.  These people have families, and they are loved.

23   And they should be -- they should get respect.  And they

24   shouldn't be treated like criminals, and they shouldn't have

02:04   25   guards on them to go to the bathroom just because they got

02:04  1    sick.

2              Each one of those people are loved and treasured

3    by somebody in their family, every one of them.  And they

4    should get the same dignity and the same respect not to be put

02:04  5    in a situation, with no warning whatsoever, and then treated

6    like criminals when BP does something wrong.  That is not the

7    way to treat people.  Frankly, that's not the way to treat

8    those workers, that's not the way to treat -- if you're a good

9    neighbor, that's not the way to act.  That's just not the right

02:05  10   way to do things.

11             I mean, we saw on the stand all the TCEQ reports

12   when he claimed they were a good neighbor.  They were gassing

13   people at Dow.  I mean, come on.  When does it stop?  To BP,

14   these people are third-class citizens.  That's a fact.  And you

02:05  15   can tell by the way they treated them, the way they

16   cross-examined them, the way we set there for almost an hour

17   while they went through 20 years of medical.  I mean, is that

18   ridiculous in light of the fact that I told you from the first

19   words out of my mouth in this case that no one was claiming

02:05  20   these people were ruined for life?  Why do people that way?

21             At the end of the case, I'm asking you to give

22   each of them their medical damages.  We put on a chart their

23   medical.  And we got -- thank the Lord that we cannot prove to

24   you that their lungs are damaged.  Thank the Lord.  I'm happy

02:06  25   to say that.  But goodness gracious, aren't they entitled to

02:06  1    have their treatment and their monitoring and their tests paid

2    for?  Of course, they are.

3              You need to give each one of them the appropriate

4    amount of mental anguish damages and pain and suffering.

02:06  5    That's all in your province, and you have to decide what is

6    appropriate.  And I'm not even going to give you a guide

7    because I know -- I've heard you-all laughing -- from outside,

8    when you-all were laughing and I know you-all have spent a lot

9    of time and I hope you-all have gotten to know each other well

02:06  10    enough and I hope collectively you come up with something

11    that's fair for these folks.  Something that's fair.  Because

12    we don't know for sure what's going to happen to them in the

13    future.

14              This is a time to hold BP responsible.  This is a

02:07  15    time that we say, "You know what?  You don't follow your own

16    procedures, and they're inadequate.  Your equipment is old,

17    outdated, and dangerous.  You're seven years behind.  You

18    ignore, literally ignore, hundreds of leaks and releases yearly

19    that pollute our atmosphere and expose workers.  That's not --

02:07  20    that is not the standard that we're going to allow in this

21    community, period, end of story."

22              How can a company not even be able to identify

23    all the many pollutants it exposes the workers to?  How can

24    that be?  We're not talking about just, you know, every now and

02:07  25    then it happens, a random event, a pipe breaks.  You know, you

02:07   1   don't -- we're talking about something that anybody with common

2   sense could predict is going to happen because it happens over

3   and over and over again.

4   Now, at the beginning of this case, I said this,

02:07   5   I said this is an opportunity. Now, after I got out of the

6   Marines, I went to law school. My dad was a butcher; and being

7   a lawyer, first person, it was a big deal. And I didn't go to

8   law school to make a ton of money. Let me tell you what I

9   truly believe -- and I know some of you in the jobs you do try

02:08   10   to make a difference, too.

11   It's not just -- maybe it's making a difference

12   just for your children or maybe it's making a difference in the

13   medical profession or in a lawyer profession or whatever,

14   whatnot, but making a difference. I want to make a difference.

02:08   15   I want -- I want to effect positive change. OSHA can't do it.

16   TCEQ can't do it. I can't do it. He can't do it. The

17   president can't even do it here. There's eight people that can

18   do this, eight people. And that's you.

19   Now, tomorrow or whenever you render a verdict,

02:08   20   if you don't do it, then there's a responsibility at your feet

21   now. This is the first time all of this evidence has ever been

22   out in the open and been heard by a jury, and you have to do

23   something with it. You have a responsibility. TCEQ and OSHA

24   can't do it. The ISOM incident didn't do it. The incident on

02:09   25   January 14th, 2008, didn't do it. But you can do it.

02:09   1           How do you determine -- how do you deter and
        2   change conduct?  You know, I don't -- I don't even want to use
        3   an example of a child because this is much -- much more serious
        4   than that.  This is much more serious.  The ramifications of
02:09   5   what we're trying to do here are much larger than that.  And by
        6   that I mean, you know, use a little school example of, you
        7   know, first you -- I'm a spanker.  I'll just let you-all know
        8   that.  A spanking by one swat and then two swats and then all
        9   of the sudden you're grounded, no X Box or whatever.  That's
02:09  10   not a good example.
       11           But the concepts and the principle is the same,
       12   and that is this.  When someone has been repeatedly punished
       13   but their conduct doesn't change, then the punishment has to be
       14   harsher.  The punishment has to be harsher.
02:10  15           Now, how do you punish a $3.9 billion company?
       16   That's for you to decide, but you have to do it.  Because if
       17   you don't do it there will be another jury sitting here with
       18   some other incident.  There's no doubt about that.  Because
       19   history, if we don't learn from the lessons, has a way of
02:10  20   repeating itself.  You have that responsibility.  You've been
       21   given the evidence.  I've never seen evidence this strong
       22   before.  You have to do this.
       23           Let's put in perspective, a hundred -- we hear
       24   about billions and millions.  Did you know that one million
02:10  25   seconds is equal to 11.5 days but one billion seconds is equal

02:10   1    to 32 years?  That's the difference.  That's the difference

2    between a million and a billion.

3               And, so, the way you punish a company like this

4    one is you -- you have to render a verdict that will make them

02:11   5    say, "You know what, the buck truly does stop here.  We really

6    have to fix this issue now."

7               Maybe you'll do one percent of net worth or one

8    day of profit.  I mean, what amount of money will it take in

9    punitive damages to make them pull their head out of the sand

02:11  10    and stop this corporate speak, corporate lip service, "We're a

11    good neighbor, we've turned the corner," all this jargon that

12    doesn't mean a flip when you compare it to the facts?  You have

13    the power to make an impact, the power to effect change.  This

14    is the time.

02:11  15               I, a couple of times in this trial, got very

16    frustrated.  I got a temper.  I'm sorry.  And I have some

17    history with some of these witnesses, obviously.  But I've done

18    my best to keep all my promises, and I believe I've done that.

19    And, so, I'm asking you now to do your duty because now the

02:12  20    responsibility is yours.

21               Thank you, your Honor.

22          THE COURT:  All right.  Thank you very much, counsel.

23               Why don't we go ahead take our break at this

24    point?

02:12  25               We'll break until -- take about a 15 minute'

02:12   1    break, and we'll come back and hear the closing argument for

2    the defense and the rebuttal.

3              You can leave those on your seat.  Yeah, just

4    leave them on the chair.

02:12   5    *(Recess was taken from 2:12 to 2:36)*

6    *(Jury present)*

7              THE COURT:  All right.  Please be seated.

8              All right.  Ladies and gentlemen, we're ready now

9    to hear from counsel for the defense.

02:36   10              You may proceed with your closing arguments.

11              MR. GALBRAITH:  May it please the Court.

12              THE COURT:  Yes, sir.

13              MR. GALBRAITH:  Thank you, your Honor.

14              Hello.  Workplace safety, we think that is what

02:36   15    is at the crux of this lawsuit.  Workplace safety is very

16    important to BP.  I'm happy that you've now seen just a little

17    bit about what all goes into that.  You've had an opportunity

18    to meet just a few of the folks who devote their lives to

19    worker and workplace safety every day.  It's important to us,

02:37   20    and it's important to our community; and it's an obligation

21    that we take very seriously.  We work hard very hard every day

22    so that our workers can come to work and feel good about it and

23    so that our community can feel good about having us as a

24    neighbor.

02:37   25              We have had some serious attacks on BP in this

02:37   1   lawsuit, and I will address them.  But I want to tell you that

2   our definition of a "good neighbor" and "being a good neighbor"

3   includes recognition of the fact that if BP believed that it

4   was negligent and that its negligence caused a release from our

02:38   5   plant and that that negligent release caused harm to anybody,

6   we recognize that we would be obligated to compensate them

7   fairly and reasonably.  But we do not shy away from that

8   obligation.  That's not the reason why we're here.

9               We are here because we have a real dispute about

02:38   10   what happened on the night of April 19th, 2007.  The attacks on

11   BP, in our view, have nothing to do with April 19th, 2007.

12   It's easy to accuse a big company of being big and bad and

13   assume that they were the cause, but this trial is supposed to

14   be founded and based upon evidence.

02:38   15               We do not believe we were negligent.  We do not

16   believe that our negligence caused a release from our facility

17   that night.  We do not believe that our negligence caused harm

18   to any of these plaintiffs.  That's the ultimate answer to

19   these questions.

02:39   20               I ask you to remember that every one of these

21   plaintiffs was employed by an employer in the State of Texas

22   that had policies in effect for how to take care of workers who

23   allege and claim on-the-job injuries.  We had to check with

24   those employers before we could get medical care to them.

02:39   25               So, why are we here?  This was a very unusual

02:39   1   event for us.  Yes, we said that there are often times when

2   somebody reports a momentary odor five days later and we don't

3   find it or three or four hours later and we don't find it.  But

4   to have this many people spread out over this much geography --

02:39   5   in other words, massive release -- and for us not be able to

6   find it was extremely rare and extremely unusual for us.

7          Okay.  What happened April 19th?  A hole watch --

8   and, by the way, this is all set out in Exhibit 2, our

9   investigation report.  And I, too, would ask you to please take

02:39   10   a look at it, review it and read it, look through it.  I think

11   you'll see something completely different than what Mr. Buzbee

12   thinks you'll see.  But take a look at it, because you'll see

13   what I'm talking about in here.

14          On the evening of April 19th, a safety watch or

02:40   15   hole watch -- and I believe that her name was Natasha Craven.

16   She is not a plaintiff suing in this lawsuit.  But she called

17   on the radio and said, "I smell something."  We don't have any

18   doubt that that is true.  We don't doubt that Natasha Cravens

19   honestly reported smelling something.

02:40   20          Okay.  And what happened when the call comes over

21   the radio?  What I hope and believe you've seen is that BP

22   jumped into action.  Our investigation started immediately.

23          At that point nobody knew anything.  But what you

24   heard is that within a minute or a minute and a half four BP

02:40   25   operators -- it's in our report -- Darwin Perren, Robert

02:40   1    Pacheco, Steven Boyd, and David Ferland -- I was wondering
        2    whether I could remember all those names -- were climbing up as
        3    others were climbing down.  They were going to the towers armed
        4    with their air testing machines.

02:41   5            Why were they going up?  Because there were
        6    continuous air monitors at every access portal on those towers.
        7    They were going up because they honestly really wanted to get
        8    to the bottom of this.  They really wanted to find the answer.
        9    Because they, too -- these are union guys, these are union
02:41  10    members, front-line workers.  They, too, were committed to
       11    workplace safety.  It was a head-scratcher to them, too.

       12            They tested the air immediately, and it was very
       13    good.  What we learned in those very first few minutes was very
       14    good and calming, not alarming.  Because they had those
02:41  15    machines that were able to rule out some very real potentials
       16    or possibilities that could have been much worse.

       17            But we know that they found no H2S at any level,
       18    they found no VOC's at any level.  They confirmed that at every
       19    access portal the monitors were on and were working properly
02:42  20    and weren't registering anything, weren't in alarm status.
       21    That's good.  That rules out some things.  First of all, it
       22    rules out any stream being released that contains any H2S,
       23    which, in turn, in just a few minutes rules out any release
       24    from the SRU.

02:42  25            Okay.  You've seen about how we checked our air,

02:42  1   we checked our plant, our equipment, and our processes and we

2   also checked out these people.  That's good, in my mind, in our

3   minds.  That's what you should expect from us.

4            We spent an extensive investigation.  That

02:42  5   investigation has been attacked.  I think that investigation

6   was honest and real, and I think it was robust -- I'll even say

7   that, too -- and vigorous.  How about that?

8            And after that exhaustive investigation, all we

9   did was rule out any potential source on BP's property.  Okay.

02:43  10  That's good.  That's very good, but we didn't stop there.

11           One thing that must be remembered is that

12  originally, initially, no one seemed to be suffering.  We got

13  them out.  We got them off, but they weren't suffering.  And

14  when that changed, the moment that that seemed -- appeared to

02:43  15  be changing, that's when the alarm sounded and that's when the

16  whole unit -- work was stopped and the whole unit was

17  evacuated.

18           Okay.  I submit to you that that does not show,

19  that is not evidence of any conscious disregard.  Rather, that

02:43  20  shows that we took worker safety seriously, right there.  Okay.

21  First of all, the unit, we know, had long ago been shut down,

22  opened up, cleaned, purged, ventilated.  People had been

23  working in it for months.  Every shift for those months, air

24  readings, air measurements were taken; and they all came back

02:43  25  no alarm, calm, no concern.  Okay.  That's good.

02:44  1        The operators who went up -- Darwin Perren,

2    Robert Pacheco -- see if I can do it twice -- David Ferland,

3    and Steven Boyd -- there you go -- didn't smell a thing

4    themselves, didn't see any cloud, didn't get any hits, 0.0,

02:44  5    nothing but 0.0 on any of the monitors that they checked or

6    carried themselves.  That's good.

7        The other thing that we know is that 450 to

8    500 workers were in that unit.  Each one of them had an

9    H2S monitor, personal monitor, on their -- on the collar of

02:44  10    their overalls.  Now, BP requires that every employee, every

11    worker, every contract worker have one of those H2S monitors.

12    BP pays for those monitors.  That's a good thing.  That's a

13    commitment to worker safety.  And none of them, not a single

14    one, registered any H2S.

02:45  15        In addition to that, we had fixed monitors for

16    H2S all over the plant and we had continuous monitors up at the

17    access portals of this -- of these towers.  Okay.  We didn't

18    stop there.  This is all good so far.

19        We checked with the surrounding units, "Any

02:45  20    upsets, any problems, any startups, any shutdowns, any

21    equipment failures, anything coming off line?"

22        "No problems, steady state, steady as she goes,"

23    upwind and down.

24        We didn't stop there.  We called out our

02:45  25    industrial hygienists from their homes that night.  Why?

02:45  1   Because they could broaden the search.  They first took their
       2   air reading instruments to the plant -- the unit, then the
       3   plant, then the community; and they found nothing.  That's
       4   good.

02:45  5          You have heard that leaks don't fix themselves.
       6   Our experience is such that if you have a leak like this it
       7   doesn't get smaller, it gets bigger.  If you have a pump seal
       8   that fails -- and it can fail without negligence.  It can fail
       9   within its useful life.  It can fail without any foreseeability
02:46 10   or anticipation, but it's not going to seal itself.  It's going
       11  to get worse.

       12         And if you have a pipeline that springs a leak
       13  somewhere, it's not going to seal itself up, it's going to get
       14  bigger, and it's going to get worse.  Leaks don't fix
02:46 15   themselves, and that's why we called out LDAR, the Leak
       16  Detection and Repair team.

       17         Now, what did they add to the investigation?
       18  They have their unique, new infrared cameras, hundred thousand
       19  dollar cameras, that can actually see volatile emissions that
02:46 20   you can't see with the naked eye.  They can see it from
       21  distances.  And we called them out and they scoured our plant
       22  and scoured our plant perimeter, focusing their cameras
       23  virtually all night long back and forth.  And they found
       24  nothing, and that's good.

02:47 25         They found one thing, though; and you've heard

02:47  1    about it.  On the southeast corner of our plant at Loop 197 and

2    around 14th Street, every time they went around the plant, they

3    would stop there and focus their camera.

4          MR. BUZBEE:  I'm sorry, your Honor.  I don't mean to

02:47  5    object; but there's no evidence of this whatsoever in this

6    record, none.

7          THE COURT:  I'm going to instruct the jury that you've

8    heard the evidence in this case and caution both counsel not to

9    refer to anything that's not evidence and did not come from the

02:47  10   witness stand or documents admitted.  So, ladies and gentlemen,

11   you'll recall the evidence in this case, the testimony.  We'll

12   rely upon that.

13          Let's proceed.

14          MR. GALBRAITH:  Dyron Hamlin, you may recall, we asked

02:47  15   him what was the scope and measure, extent of his

16   investigation.  He talked about how that night it was

17   significant to him that the LDAR technicians had stationed

18   themselves or positioned themselves on the southeast corner of

19   the plant at Loop 197, by 14th Street, and they smelled acetone

02:48  20   when the wind was coming from the southeast.

21          And you may remember that what was said was that

22   they focused their cameras that way but they couldn't see

23   anything.  Acetone, we don't think comes from Valero; and

24   there's no acetone at BP.  So, it came from farther away than

02:48  25   that.

02:48   1          But every time they came to the southeast corner

2      of the plant, when the wind was blowing from the southeast,

3      they smelled acetone.  And it's interesting to me that the most

4      frequent odor characterization reported that night, other than

02:48   5      "I didn't smell anything at all," which was number one, was,

6      "It smelled like acetone," or nail polish remover.

7          Okay.  We didn't stop there.  We went to the

8      fixed based monitoring stations.  Now, this is not BP.  These

9      are the monitoring stations operated by the City of Texas City

02:48   10     and TCEQ.  And he's right in saying that it doesn't

11     specifically set out a blip for CS2, just like the UltraRAE.

12     It will pick up volatile organic chemicals.  And if CS2 is in

13     the air, it will be registered as a VOC.  It won't say it's

14     CS2.  It won't say it's benzene.  It won't say it's anything.

02:49   15     It will say it's a hydrocarbon, it's a VOC.

16         Okay.  Those same monitors, they didn't have a

17     CS2 monitor; but they did detect the VOC's and hydrogen

18     sulfide.  And they picked up nothing.  That's not us.  That's

19     the City of Texas City and TCEQ.

02:49   20         And we called out what we refer to as the

21     "professionals," CTEH, Center for Toxicology and Environmental

22     Health.  They did come within hours, because they had somebody

23     in the plant monitoring another welding operation somewhere

24     else.  But the real guys to investigate this, that set up those

02:49   25     huge monitors, didn't show up for 24 hours.  But CTEH was on

02:49    1    the site earlier than that, at least that's the evidence.   And
         2    they were there for 315 days, at great expense, just to provide
         3    worker assurance in the quality of the workspace and the
         4    quality of the worker environment.

02:50    5            That's not evidence of a conscious indifference.
         6    A consciously indifferent company would not do that.   That's
         7    evidence that BP takes worker safety seriously.

         8            I thought it was very interesting that we set up
         9    meetings and we had the toxicologist attend those meetings.
02:50   10    There were three meetings on April 26th and April 27th, two in
        11    English, one in Spanish with an interpreter, not in Spanish but
        12    with an interpreter.   Every turnaround worker on
        13    Pipestill 3B -- it was scheduled so that every turnaround
        14    worker on Pipestill 3B could attend one of those meetings to
02:50   15    get their questions answered, to provide some worker assurance.

        16            Dr. Goad said he stayed around after the meeting,
        17    to answer anybody's individual questions, and quite a few
        18    people stayed and did ask individual questions.   And the point
        19    is, a company that doesn't care wouldn't do that, wouldn't pay
02:51   20    attention to -- wouldn't care about worker assurance.   But BP
        21    did.   It's another example of BP being attuned and attentive to
        22    the workers' needs and the workers' concerns.   We took worker
        23    safety very seriously; and we demonstrated it in countless,
        24    countless ways.

02:51   25            One other very good thing that we did is we

02:51   1   checked on the people.  We brought out EMTs and licensed

2   paramedics that night, from their homes, and we set up a clinic

3   and we listened to everybody's lungs and listened to

4   everybody's heart and filled out questionnaires so that we

02:51   5   could make sure, "Do you need -- do you feel any need, concern,

6   or care at all?  Do you want to see medical care?  Do you want

7   to be checked out?  Do you want to be evaluated?"  And after we

8   got agreement of the employers, we also called out our buses to

9   take them there.

02:52   10          Now, I have to tell you that there's been some

11   talk about the procedures at the hospital that perhaps were not

12   the most sensitive.  And I think, as a community, we probably

13   need to pay a little attention to that and see if we can't, as

14   a community, address that issue.  But those were not our

02:52   15   policies and procedures, and BP is not liable unless BP was

16   proven to be negligent in such a way as to cause these

17   injuries.

18          Okay.  We didn't stop there.  We collected wind

19   data.  And I'm going to tell you that everybody that night knew

02:52   20   the wind was from the southeast.  There was no dispute; there

21   was no disagreement.  But we collected wind data.  This is what

22   you've heard here in this trial.

23          You remember Charles Taylor, or Chucky T, as he

24   was referred to?  He said he smelled it first at the pipestill

02:53   25   and then went and got in his truck and drove to Gate 26, which

02:53   1   was northwest; and as he put it, "It followed me to the

2   northwest."

3           Remember Johnathen Vallery -- I'm going to come

4   back to him in the minute -- one of the first plaintiffs.  Both

02:53   5   of those are plaintiffs in this lawsuit, by the way.

6           My point is no one worked harder to get to the

7   bottom of this, no one worked harder to find this answer than

8   we did at BP.  It was an honest and real effort.

9           Okay.  After CTEH's investigation, they presented

02:53   10  their findings to us and they said the most likely source came

11  from off site; it couldn't have been on site because of the

12  geography of the observers, the geography of the smellers; it

13  had to come from far enough away that it could disperse enough

14  over distance to reach this large mass of observers.

02:53   15          Have we identified exactly, pinpointed the exact

16  railcar or the exact ship that might have been loading or

17  unloading acetone that night?  No.  No one can.  But it's not

18  for lack of effort.  It's not for want of trying.  No one tried

19  harder than we did.

02:54   20          Okay.  We have heard now that the data from the

21  scientists tell us that the likely source was at the rail yards

22  or the shipyards.  And we also know that they were unloading

23  acetone that very night, loading and unloading, handling

24  acetone that very night.

02:54   25          Two things about that.  Number one, there's no

02:54   1   acetone on our plant.  Number two, they handle it off site.

2   Our industrial neighbors do have it, do load it, and do unload

3   it.  And we've now seen records that indicate they were doing

4   that that very night, when our LDAR folks were smelling it

02:54   5   coming from the southeast, coming across our plant.

6           It is the plaintiffs' burden to show you that the

7   source was on our site.  It is the plaintiffs' burden to show

8   you that our negligence caused a leak on our site.  What have

9   they brought to do that?

02:55   10          Okay.  For at least the first week, they brought

11   you a whole lot of stuff that, in our mind, had absolutely

12   nothing to do with April 19th, 2007.  We have -- our witnesses

13   have been what I'm going to call a little bit "beaten up" about

14   our history and attacked a little bit about our past.  It had

02:55   15   nothing to do with April 19th, 2007.

16          There is -- why did they do that?  Why did they

17   do that?  Two reasons.  Number one, because they don't have any

18   evidence of an onsite source.  What is the piece of equipment

19   that supposedly failed from lack of maintenance?  What is the

02:56   20   unit that supposedly failed for of lack of maintenance?  Can't

21   be the SRU.

22          The second reason is because we have a tortuous

23   history and tortuous past leading to the ISOM event in early

24   2005.  That's our history.  We have never denied it.  We've

02:56   25   never shied away from it.  We don't think it has a thing to do

02:56   1   with April 19th, 2007; but that history is ours.  We own it.

2   　　　　　We recognize that we -- it will take time for us

3   to earn the trust of our community.  We're intent upon earning

4   that trust, and we feel that we've not only turned the corner

02:56   5   but we're well along the way.  We recognize, though, that

6   because of that history we have to be extra diligent in

7   situations like this.  And I think that you've seen in our

8   response to April 19th, 2007, that we were.  We take incidents

9   like this very seriously.

02:57   10   　　　　　Under the guidance of Keith Casey, who I'm happy

11   to represent, the agenda has been continuous improvement.  We

12   work hard every day to make the place safer and better every

13   day.  We will all -- after all, we were the ones who shut down

14   the whole plant after Hurricane Rita, shut down the whole plant

02:57   15   for a complete rebuild, replacing pipe, updating units, not

16   producing anything, and bringing them up one by one only after

17   they had been completely rebuilt and had a pre-startup safety

18   review that's fairly arduous.

19   　　　　　And, in fact, plaintiff says our plant is old.

02:57   20   Every unit that was back up and running by April 19th, 2007,

21   was basically brand new, completely overhauled.  And, indeed,

22   that's what Fluor was doing in Pipestill 3B.  And that's what

23   each one of these plaintiffs was doing; they were doing the

24   same thing to Pipestill 3B.  BP was paying hundreds of millions

02:58   25   of dollars to rebuild our plant to make it better.

02:58   1           Now, you've heard that Fluor fenced off this

2      Pipestill 3B Unit and was in total control of the turnaround.

3      So, an indifferent company might turn your eyes away and say,

4      "Call me when you're done."  BP didn't do that.

02:58   5           In spite of the fact that Fluor had complete

6      control of the operation and their own safety people in -- on

7      place, in site, we had our BP folks, safety operators, in there

8      checking every job, every work site, sniffing, issuing permits,

9      confined space entry, LOTO.

02:58   10          I want to say we've thrown a lot at you guys.  We

11     got a lot of faith in you guys.  We've talked about CS2.  Your

12     lives are forever changed.  Forever and the rest of your life

13     you're going to know what CS2 is and H2S and a TAR is a

14     turnaround and LOTO, even LOTO, when somebody says they won the

02:59   15     LOTO, you'll say, "Lock out/tag out?"  That was a little aside.

16     But we do have a lot of faith in you.

17          The point is BP didn't just turn their eyes away

18     and say, "Call me when you're done."  They made sure that they

19     were out there testing and sniffing and issuing permits and

02:59   20     being around in case there was a need for a response like we

21     could provide on April 19th, 2007.  That's not the face or the

22     actions of a company that is indifferent.  That's the face of a

23     company who is trying to get better every day and who is intent

24     upon earning the trust of the community, as a good neighbor.

02:59   25          Okay.  Now, when something like this happens, we

02:59   1   said, initially nobody knows anything.  You have to
        2   investigate.  Ours started immediately.  We checked the air; we
        3   checked our equipment; and we checked the people.  How can it
        4   be said, therefore, that we were consciously indifferent, that
03:00   5   we consciously disregarded?
        6           We appointed a committee after all of this, after
        7   everything that we'd done that we talked about that was
        8   calming, not alarming.  We appointed a committee.  Six people
        9   five weeks away from their jobs, three union members, their
03:00  10   sole mission was get to the bottom of it, find the answer.
       11           Now, I submit to you that if you are a company
       12   which is desiring a cover-up the last thing you would do is put
       13   three union members on your committee.  Because the union
       14   members are the last people on earth who would sweep worker
03:00  15   safety under the rug.  They didn't.
       16           Read that Exhibit 2.  Take a look at it.  See our
       17   investigation report.  What did we find?  We found that there
       18   was no leak, no release from the BP plant property.  We ruled
       19   out every potential source on our plant.  We found it logical,
03:01  20   supported by science that it was one of our industrial
       21   neighbors.  That has happened before.
       22           There is no way it could have been an onsite
       23   source and spread out as quickly as it did.  There's no way
       24   that an onsite source could explain the geography of these
03:01  25   observers.  Doesn't happen.  It had to come from farther away

03:01   1   to have enough distance to dissipate to reach these people.

2           Okay.  Why are we here, and what have plaintiffs

3   brought?  They brought some theories from time to time, but I

4   say no evidence.  And, by the way, another example of folks,

03:01   5   what we can know about people on site at the time, what's their

6   indication of wind direction, what's their training?  They're

7   to evacuate downwind or upwind -- upwind or crosswind, and

8   everybody evacuated southeast.

9           Okay.  One thing I say about the truth and that

03:02   10   is, it never changes.  It's simple, and it never changes.  One

11   thing about plaintiffs' theories, they're always changing.

12   They sued us immediately and they jumped to the conclusion that

13   they had the answer, they had the culprit, they knew what it

14   was, and they said, "We were exposed to H2S, hydrogen sulfide."

03:02   15           Now, that is at a time very early.  They had done

16   no investigation, they had gathered no data, they had no wind

17   data, even; and they were completely unaware that every worker

18   on the unit had on his collar a hydrogen sulfide, H2S, personal

19   monitor, 450 to 500 of those and not a one of them registered

03:03   20   anything.  In addition to that, the fixed monitors you've seen

21   all over the plant and the continuous monitors up the tower,

22   the access portals -- that's a new word I got to learn.

23           Okay.  When they figured that out, they said,

24   "Okay.  We were wrong.  You were right.  We rule out H2S, like

03:03   25   you did long ago."  And, so, they arrived at the theory that it

03:03   1    was a toxic soup.  Remember?  H2S, SO2, and CS2.

2            But then -- and that was before the mask was ever

3    tested when they came up with that theory.  But then they have

4    since found for reasons, scientific, that convinced them they

03:03   5    had to concede, "We rule out H2S, and we rule out SO2.  Again,

6    you were right; and we were wrong.  It wasn't any soup."

7            Okay.  So, now they say it was CS2 from the

8    SRU Unit.  But now we know that CS2 only exists in the plant in

9    the SRU and it only exists in a stream where there's 265 times

03:04   10   of H2S or more.  And how do they even know that?  Just like

11   everything in this case, they know it because we write it down

12   and report it.  It comes from us.  They came up with the theory

13   that it was CS2 and we -- that was a head-scratcher because we

14   have never released CS2, ever.  No refinery does.

03:04   15           But we asked the question.  We tracked it down.

16   We followed up; and we found that, yes, for a few seconds in

17   the SRU, we do create, in the process, a little bit of trace

18   elements of CS2 in a stream that's overwhelmed by the amount of

19   H2S; and it's consumed in there, and it never exists without

03:05   20   H2S.  You can't get one without the other.  They come together.

21           We told them that.  But it was still a

22   head-scratcher because we've never had a CS2 release.  And this

23   is part of the reason why: because they come together.  And if

24   you get any CS2 out that would do anything, even if you get

03:05   25   their original calculation of 12 parts per million, which they

03:05   1  now agree wouldn't hurt a flea so it couldn't have been 12

2  parts per million -- but that was their original calculation --

3  you would get 3,180 parts per million of H2S that would come

4  with it.

03:05   5          Remember, no H2S monitor alarmed anywhere that

6  night on the SRU, on the Pipestill 3B, fixed monitors, personal

7  monitors, or the continuous monitors up the tower.  And, by the

8  way, even at that low dose, 3180, you would be talking about

9  very dire -- not only would it be picked up on monitors, but it

03:06  10  would have very dire toxicological consequences.  If someone

11  breathed that amount for less than a minute, death could result

12  from that exposure.  That's why we don't have those releases.

13  That's why we don't release CS2.  That's why we can rule out

14  the SRU.  You're just not going to find it in the refinery.

03:06  15          Here's the H2S fixed monitors at the SRU that are

16  designed to provide worker assurance and worker safety.

17          Okay.  Why are we here?  What have plaintiffs

18  brought?  They found a mask.  And the mask was so important --

19  by the way, there's no protocol, nobody tests masks like

03:06  20  they've done.  There's no protocol in science.  Nobody's ever

21  figured that out that that's a good thing to do.

22          But this mask was so important that they let it

23  sit for months in a smoke-filled office.  And Mr. Buzbee says

24  that it was on the opposite side of his office suite, but

03:07  25  there's no evidence of that.  No one testified to that.

03:07    1             We know it was mishandled.  We know it was

2   mishandled because Armstrong Labs found it, got it, and sent a

3   letter saying, "Oh, my gosh.  It's been opened.  It's unsealed.

4   You can't rely on the results.  Do you want me to run it

03:07    5   anyway?  I'll do it if you want to send me the money, but you

6   can't rely on the results.  Do you really want me to do it

7   anyway?"

8             And Buzbee said, "Run it anyway."

9             Okay.  And, so, Armstrong comes back again, says,

03:07   10   "Well, if I'm going to do it anyway, I've got to have a

11   comparison mask.  If I'm going to find so-much sulfur, I got to

12   know how much is in there to start.  Could be a lot, could be a

13   little because it varies significantly from lot to lot.  I got

14   to have a comparison mask."

03:07   15             They said, "Well, we can't find one.  We don't

16   have one."

17             And this time they didn't write a letter.  They

18   called and they said, "Do you really want me to do this?  Can't

19   rely on it."

03:08   20             And Buzbee said, "Run it anyway."

21             Okay.  Now, they finally said it had some CS2 on

22   it.  But yesterday we learned from Dr. Goad -- it's in the

23   Armstrong report -- that you can't conclude what he concludes

24   from it because of all the unintended interferences that could

03:08   25   show up on his test read as "CS2."  I guess we're just supposed

03:08   1   to ignore that.

2               But through that all, despite how much of this

3   case is hung on this mask and how frivolous and inconsequential

4   and how unreliable that is, the fact remains you don't get CS2

03:08   5   from a refinery, never have.  There's never been a report of

6   CS2 coming out of a refinery ever.  Not just ours, any

7   refinery.  Refineries just don't have it.

8               Now, we do have it momentarily in small

9   quantities in the SRU, accompanied by huge quantities of H2S.

03:09   10  That's why it's there.  Anything that comes out of there goes

11  to a flare, not to protect from CS2 but to protect from H2S

12  which can hurt you.

13              Okay.  So, when we look at this, we think the

14  plaintiffs have not really attempted to answer the questions

03:09   15  about what was the source.  They just want you to assume that

16  we're big and bad and so it had to be us.  But the fact remains

17  there was no sufficient source of CS2 anywhere on our plant.

18  The fact remains leaks don't fix themselves.

19              Has there been any dispute of that?  Has anybody

03:09   20  testified that that's not a valid point, that you would find it

21  later?  Is there any evidence contradicting that whatsoever?

22              And, further, the odor could not have come from

23  the SRU.  I am particularly enamored of this slide because it

24  shows all the variations, if you will, one on top of the other.

03:10   25  It can't be explained by, "Well, there's eddies in the wind or

Cheryll K. Barron, CSR, CM, FCRR                    713.250.5585

03:10    1    wind currents or something such as that."  You have got guys

         2    shoulder to shoulder, some smelling it, some not smelling it,

         3    some having symptoms, some not having symptoms.  It doesn't

         4    match.

03:10    5           Now, you remember Johnathen Vallery.  I mentioned

         6    that.  In terms of the wind being out of the southeast, it was

         7    interesting to me one of the very first witness that testified,

         8    he is a plaintiff in this lawsuit, he is represented by

         9    Mr. Buzbee, and I think you'll -- I'm sure you will remember

03:10   10    him.  He's the guy who said, "I went to the road at the south

      11    of Pipestill 3B."  It was east and west.  "I went to the road."

      12           I don't know if that's east or west or not.

      13    Okay.

      14           "I went to the south edge of 3B.  And the road is

03:10   15    east and west, and I smelled a smell coming from the southeast.

      16    And I turned and I walked along that road for a block and a

      17    half to my truck.  And the whole time, the smell was being

      18    brought to me from the southeast.  And I smelled it the whole

      19    time I walked, and the whole time the wind was coming from the

03:11   20    southeast."

      21           And Mr. Buzbee asked him, he said, You don't

      22    remember much about that wind, do you?  How much was it

      23    blowing?

      24           And he says, Well, it was blowing medium.

03:11   25    Remember him saying it was blowing medium?

03:11  1          And he said, "Well, you don't know much about

2    direction, do you?  You say it was out of the southeast, but

3    you don't know which direction the southeast is from?"

4          And he said, "Yeah, it was coming right here.

03:11  5    The whole time that I was at the south road, walking a block

6    and a half to the west, I smelled it coming from the

7    southeast," by the way, right from to the southeast corner of

8    our plant where the LDAR folks smelled acetone.

9          Everybody knew the wind was out of the southeast

03:12  10    that night.  It was reported in the first calls.  It was

11    reported on the radio.  All the people who opined -- we've

12    talked about all the wind socks that are out there.  You can't

13    stand anywhere in that plant without seeing a wind sock.  One

14    of the first things you do if there's an odor report is look

03:12  15    and see which way the wind's blowing.  Why?  You heard the

16    plaintiffs say, "We're all trained to do that because we need

17    to know which muster point to evacuate to, which way to go.

18    It's the first thing we do."

19          Totality of the evidence supports that the wind

03:12  20    was out of the southeast.  I mentioned it in opening, and I'm

21    not going to belabor it now.  But the symptoms, the odors, and

22    the duration of symptoms just aren't supported, don't match,

23    can't all be meshed with the facts.  Remember, objective signs

24    and tests, all normal all the time.

03:12  25          Okay.  Logic tells us and the science tells us

03:13  1   that the source was off site, from one of our offsite

2   neighbors.  There are many.  There's docks; there's rail yards

3   in addition to oil tanking, other industry members that store

4   chemicals, load and unload chemicals.  We cannot pinpoint the

03:13  5   exact location, but we tried.  We tried hard, and we tried

6   honestly and we tried real.

7          But what we do know is that the most common

8   report after "no smell at all" was "acetone."  And we know that

9   upwind of us, acetone was being handled that night.  It's the

03:13  10  plaintiffs' burden to show that this occurred from an onsite

11  source that we negligently caused and that it thus caused --

12  our negligence caused harm to these folks.

13         I submit to you that we would not be subjecting

14  ourselves to the abuse of this trial if we had any belief that

03:14  15  we were negligent.  We believe we did a good job that night.

16  We believe that we took this very seriously.  We still believe

17  we handled this incident with professionalism and with respect,

18  with professionalism and respect for the workers and for worker

19  safety.  We took worker safety very seriously.

03:14  20         Now, the plaintiffs -- we have to look at the

21  plaintiffs, and I will tell you right up front we have no doubt

22  that some people sometime that night somewhere smelled

23  something that came across our plant.  But we have to look at

24  the plaintiffs' claims.  Many that night said, "I didn't smell

03:15  25  anything."  Now they say they do, they did.

03:15   1          Many that night said they didn't have any health
        2   complaints; now they said they did.  No one that night
        3   mentioned anything about being held prisoner; and, of course,
        4   we've heard a lot about that now.

03:15   5          All at the time said they had lasting effects;
        6   but now we know plaintiffs' own toxicological experts
        7   characterizes this as something that should be expected to be
        8   temporary and transient and, in his words, hours to days,
        9   before he found the Spyker article which convinced him that it
03:15  10   could be up to nine days or even two weeks.  But the Spyker
       11   article, we have seen, preceded the OSHA guidelines we relied
       12   upon and that was CS2 that had been combusted.  It caught fire.
       13   And what the guidelines tell us is it's the combustion process
       14   that makes CS2 irritating.

03:16  15          And even the firefighters who were exposed to the
       16   irritating combustion process, the fire of CS2, had no signs or
       17   symptoms after the, quote, first few pre-exposure days --
       18   post-exposure days, first few post-exposure days.

       19          Okay.  They also said they have had lasting signs
03:16  20   and symptoms in spite of the fact that they were all seen,
       21   medically treated by doctors.  They were examined and had their
       22   lungs listened to.  They had their hearts listened to.  And
       23   they were seen and released to return to work without
       24   restrictions, without medications, without follow up, without
03:16  25   recommendations for anything, without any abnormalities on

03:16   1   physical exam and without any abnormalities on objective

2   testing.

3         You remember at the first start of this lawsuit,

4   in opening I asked you to keep a lookout for any objective

03:17   5   tests that were abnormal.  We're talking about lab studies,

6   blood studies, x-rays, and pulmonary function studies.  Those

7   are the tests designed to let us know if there has been any

8   significant exposure.  And the evidence is all in now; and all

9   of the objective testing is normal, all normal all the time.

03:17   10        And some of the plaintiffs told their doctors,

11   doctors chosen by Mr. Buzbee, that they had no prior similar

12   conditions.  We now know that at least eight of them, in their

13   medical records, had prior medical conditions.

14        Mr. Munoz would like a significant sum of money

03:17   15   for a surgery that, in my mind, he has not done much to show

16   that he really needs it and is ever going to seek it.  What he

17   has done is repeatedly failed to show up at appointments, and

18   what he did do is fail to tell his doctor about any prior back

19   problems that we now know he had.

03:18   20        Mr. Buzbee says that I told you in opening the

21   real reason he is here is for punitive damages.  And he had

22   each plaintiff, at the end of their testimony, tell you, "I'm

23   here to send BP a message."

24        In Texas punitive damages are limited to special

03:18   25   situations where people in power at a company subjectively were

03:18   1   aware, really knew of a significant risk of harm and injury,

2   and yet they acted in a way that demonstrated that they just

3   didn't care.  There's no evidence of that here.  Rather what

4   you have seen is a very real, a very honest, a very robust, a

03:18   5   very expensive continual commitment to worker safety.  That's

6   not conscious indifference.

7          And -- okay.  They want to talk about our

8   problems in the past and our history which has led us to be

9   under very close scrutiny by the authorities and the agencies.

03:19   10   We don't shy away from that.  That's okay.  That's fine.  But

11   OSHA came out -- as a part of that scrutiny, we know we've got

12   to be extra diligent.  As a part of that scrutiny, OSHA came

13   out after April 19th, 2007, to investigate.  And they had lots

14   of questions and they got their questions answered and they

03:19   15   cleared BP.

16          OSHA is doing that job.  They did it following

17   April 19th, 2007.  They got answers to their questions.

18   There's nothing outstanding regarding April 19th, 2007; and

19   they cleared BP.  That's no evidence of conscious indifference,

03:20   20   certainly not regarding April 19th, 2007.

21          Okay.  And any OSHA fines, while they are

22   directly definitely punitive, they go to the public bureau to

23   enhance enforcement.  Okay.  OSHA is doing that job.  We don't

24   shy away from that, but we don't feel we should have to pay

03:20   25   additional money to these plaintiffs or Mr. Buzbee just because

03:20    1    that's why he's really here.

2              Now, finally, the Judge has said that you are to

3    evaluate this evidence on the strength of the witnesses'

4    testimony, what evidence came to you from the witness chair,

03:20    5    not what either of us lawyers had to say.  Okay.  Mr. Buzbee

6    said that his office protected the mask from his cigars.  No

7    one testified to that.  He should have brought you evidence

8    that the mask was handled properly, but he didn't.

9              He says he got an anonymous call that a seal was

03:21   10    replaced at a sour water tank.  No one testified to that; but

11    yet again we followed up, we tracked it down.  We found

12    Tank 100, the sour water tank, and we looked at its history and

13    its record and its maintenance logs; and it showed the last

14    time the seals were replaced was in 2004.  Those seals have a

03:21   15    10 year expected useful life.  They are scheduled to be

16    replaced again in 2014.  But in the interim, they are inspected

17    regularly; and there's never been any leak.

18              Mr. Buzbee, remember he said that the sewers

19    could have been the source because, after all, they're all

03:21   20    connected?  Nobody testified to that.  But, again, we tracked

21    it down.  What we learned is that there's no pipe, there's no

22    connection between the SRU and the sewer system.  Couldn't have

23    happened.  We tracked that down.  It's bluster, but it's no

24    evidence.

03:22   25              This case is about the evidence, and the evidence

03:22  1   just isn't there.  That is why we are here.

2              Okay.  Please take a look at our investigation

3   report.  I think if you read it, you will see that it is a real

4   and an honest effort.  Those guys on that committee really

03:22  5   tried hard to get to the bottom of this, and all they could do

6   was rule out all potentials on site.

7              Did plaintiffs prove to you that the exposure was

8   to CS2?  Did they prove to you that there was something on our

9   plant that leaked it, that that leak was caused by our

03:22 10   negligence?  No.  That all of this was due to our conscious

11   disregard?  No.  There's no evidence of that.

12              We submit that he's failed on each of those and

13   that those failures answer the questions in this Court's

14   charge.

15              Okay.  Almost done.  You ready?

16          THE COURT:  You got about 12 minutes.

17          MR. GALBRAITH:  Thank you, your Honor.  I hope to give

18   some of that back.

19              We're here because we have faith in you and faith

03:23 20   in this process.  We have respect for your ability to separate

21   right from wrong and to separate fact from fiction and to hold

22   burden -- plaintiffs to their burden of proof.

23              I would like to take a moment just to say

24   something personal, which I don't normally do.  I went to law

03:23 25   school, too, to engage myself in an honest effort to search for

03:23  1   the truth.  But I thought I could help make the world a better

2   place and make our system of justice work better.  And I've

3   always thought that I could help people honestly resolve

4   disputes by seeking the truth, and I've always felt that the

03:24  5   truth will set us free.  And BP has never asked me to deviate

6   from that course.  And I'm very, very proud to represent folks

7   like Keith Casey, Joe Trapp, Mary Clark, Ken Panozzo, and

8   Darwin Perren.

9          That's who BP is.  It's these people.  And these

03:24  10  are good people.  And I'm proud to represent them.  Oh, and

11  they've been beat up on that witness stand.  There's no

12  question about it.  But let me tell you and let me assure you

13  that they are undeterred and they are resolute and their focus

14  is fixed on their mission of enhancing worker safety all day

03:24  15  every day for the good of us all.

16         And I'm thankful that we have folks like them in

17  our industries and in our country.  You will never see us

18  embrace fantasies, promote known falsehoods, tell half truths,

19  show portions of a document, or try to mislead, all to win at

03:25  20  any cost.  Because that is not winning to me.

21         Okay.  I feel it's a great privilege for me to

22  try this case before you.  I hope that I -- that we have never

23  told you anything that wasn't supported and borne out by the

24  facts and by the evidence.  We've tried real hard to make sure

03:26  25  that's the case.

03:26  1          I hope that we have been respectful, because we

2     have striven mightily to show you respect and to show this

3     Court respect and to show respect for this proceeding and,

4     quite frankly, to show respect for these plaintiffs.  I think

03:26  5     that's important, too.  And maybe, through all of that, you've

6     seen just a little bit of taste of our care and our concern for

7     worker safety.  We took worker safety very seriously.

8          We've thrown a lot at you, a lot of terminology,

9     a lot of acronyms.  You've learned a lot of organic chemistry,

03:26  10    quite frankly, and a lot of toxicology.  You'll always know for

11    the rest of your life "dose differentiates poison from cure."

12    That was true in 1500, and it's true today.

13         But one reason we're here is because we have

14    confidence in you.  We have confidence that you get it, you

03:26  15    understand what's at work here, and what's going on here.  And

16    with that, I look forward to your verdict; and I thank you for

17    your attention.

18         THE COURT:  All right.  Thank you very much, counsel.

19         You got ten.

03:27  20    MR. BUZBEE:  Yes, sir.

21         In 1993 I was in Somalia, and we had snipers on

22    the roofs of the buildings so the humanitarian aid workers

23    could hand out aid.  And had we not warned the workers and

24    protected the workers from injury or death from the roving

03:27  25    gangs that were roving throughout Somalia, it would have been

03:27   1   criminal, because that was our responsibility and that was our

2   duty.  And this lawyer, who's been representing this company,

3   has made a ton of money with all the problems they've had over

4   the years, stands up here and tells you things that I know for

03:27   5   a fact are not true.  And it's very, very insulting.  There are

6   motives in this case.  There are people making a lot of money

7   in this case, over at that table.

8        Where is the conscious indifference?  Twenty

9   hours before this happened, five workers were sick.  The report

03:28   10   was minimized.  They didn't source the problem; they didn't put

11   in place air monitoring; and they sent them back in.  That's

12   called "conscious indifference," especially when you put it in

13   context, when you've had 500 releases and spills and leaks in a

14   four year period, especially when you've had 193 in a six-month

03:28   15   period.  That's called conscious indifference.

16        You're spending $2 million to go out there and

17   set up this fancy monitoring -- that, incidentally, people

18   continue to get sick and go to the hospital -- and spend

19   2 million bucks and come here in front of a jury and say, "Boy,

03:28   20   we really care about the workers," in light of your record, you

21   should be laughed out of this courtroom.  You can say anything

22   in a court, obviously; but, obviously, it doesn't have to be

23   true.  Let's just take one example.

24        Can you pull that up?

03:29   25        This lawyer, who said, "I tried my best to be

03:29    1    honest with you ladies throughout this trial," remember he said

2    the monitoring stations down in Texas City, they tested for

3    VOC's?  Remember that?  Remember when I said they don't test

4    for carbon disulfide and that's why this -- when the wind

03:29    5    shifted -- remember, the release happened on the plant.

6    Everybody started recognizing the wind after they started

7    getting sick.  Well, we know the wind shifted and started --

8    and started coming out of the southeast.  That's given.

9          But the wind before, the wind that supposedly was

03:29    10    bringing this stuff in from some phantom site, it was from the

11    north.  It was only after everybody started getting sick the

12    wind shifted and took it off site; and if it went southeast, it

13    went directly into Texas City proper.

14          They do not test for carbon disulfide in Texas

03:29    15    City.  He stood in front of you and told you that they did; and

16    he's done that repeatedly in this trial, tell you things that

17    are demonstratively false.  Do you see VOC testing anywhere

18    there?  No.  Because they don't test for VOC's.  They test for

19    specific chemicals.  Carbon disulfide is not one of them.

03:30    20          He can say things, but he's got to have proof.

21    He just talked about -- this lawyer has been in my law office.

22    I'm not a liar.  He knows I had this fancy system because of

23    one worker, one female, who was pregnant and I was very

24    sensitive to it because my wife would have kicked me in the

03:30    25    rear had I not been.  He knows it.  He has been in my office.

03:30  1  He sat in my office, but yet he stands in front of you and

2  tells you something he knows is a baldfaced -- I'm sorry --

3  lie.

4        That's credibility.  That's what this is about.

03:30  5  And you know what, you choose your lawyer based on who you are;

6  and he is a personification of BP.  And that's a fact.

7        The testimony was, "We were told at BP we would

8  leave in the same condition we came in."  That did not happen.

9  That's worker safety.  They failed.  Where are these fancy

03:31  10  readings from this $1 million camera?  Where are they?  Have

11  you seen the evidence?  Nope.  All you heard is it come out of

12  their mouths.

13        Where are the operators?  Where are these three

14  other operators besides Darwin Perren?  Remember Perren?  He

03:31  15  said he was the only one that went up.  But you hear him?

16  There were three others.

17        They didn't show up here.  They were written in

18  that report, but Darwin Perren says he was the only one.  What

19  they say -- just because he says it doesn't make it true.

03:31  20        The monitoring, look at Exhibit 2.  The result of

21  the investigation was this:  The monitoring was insufficient

22  for worker safety.  Read it.  That's their own conclusion.

23        Now, did they mention the alarms and all the

24  other problems they have?  No.  But that's one conclusion, is

03:32  25  that the monitoring system that's in place is insufficient.

03:32  1          Where are the guys from the surrounding units?

2    He can get up here and say the surrounding units have no

3    problems.  Where are they?  If it's true, bring them here.

4          He can talk about this anonymous call.  I mean, I

03:32  5    didn't make the call.  Somebody blocks their number and calls

6    me?  It's crazy.  They said, "Hey, there was a major problem

7    with the SRU Unit.  They fixed it."  Now, maybe -- I said

8    "replaced the seal."  I'm sorry.  Semantics.  They fixed the

9    seal.

03:32  10          The Cherry Point guy, when I finally asked him,

11    he said, "Oh, yeah, there was some sand issue with the seal."

12    Come on, common sense here.

13          Leaks don't fix themselves.  They continue to

14    leak.  That's the problem they have.  Releases, vapor, you can

03:32  15    have intermittent releases of vapor.  The pressure builds up,

16    the vapor releases.

17          MR. GALBRAITH:  Your Honor, there's no evidence of

18    intermittent releases in this record.

19          MR. BUZBEE:  Said several times by Mr. Trapp.

03:33  20          THE COURT:  Excuse me, counsel.  The jury has heard

21    the evidence; and you're to rely on the evidence.  My

22    admonition and instruction earlier regarding the evidence in

23    the case is that lawyers are not giving you evidence.  So,

24    they're arguing; and the lawyers are to argue within the

03:33  25    confines of the evidence.

03:33   1          MR. BUZBEE:  Yes, sir.

2          THE COURT:  Let's proceed.

3          MR. BUZBEE:  The evidence was this.  The lawyers for

4     BP told the wind guy, the wind data guy, to focus on 8:45 to

03:33   5     9:00.  That was the evidence.  The wind from 8:45 to 9:00,

6     after people were already getting sick and coming off the

7     tower, shifted -- started from the southeast.  The wind before,

8     from their own wind data, was from the north.  This is how the

9     case has been defended.  It was -- from the very beginning, you

03:33  10     can read it, they circle the wagons.

11          BP has a tortured history, and it continues.

12     Somebody can sit in front of you, stand in front of you, and

13     say, "We're a good neighbor."  But if you live right next to

14     BP, I promise you, you wouldn't agree.

03:34  15          In September of 2009, BP, they found -- OSHA

16     found 260 continued violations, violations that are from the

17     big ISOM that have never been fixed, 260, and then found an

18     additional 439.  And I'm not talking about -- you know, I know

19     how OSHA can be nitpicky.  I understand.  We're not talking

03:34  20     about that.

21          We're talking about failure to inspect, failure

22     to maintain, failure to repair, and failure to replace, 439 new

23     ones and 260 some-odd ones that they had never fixed, to begin

24     with.  Even though a lot of people had a lot of trouble and a

03:34  25     lot of families were impacted, BP simply disregarded.

03:34   1          Now, responsibility.  Even after all this three

2    weeks, they refuse to accept responsibility.  And now it's in

3    your hands.  Please don't make the three weeks we were here

4    mean nothing.  Please don't do that.  Make them take

03:35   5    responsibility for what they've done here.  Thank you.

6          THE COURT:  All right.  Thank you very much, counsel.

7          Ladies, let me just bring one matter to your

8    attention that I failed to bring to your attention prior to the

9    arguments.

03:35   10         You'll receive the exhibits and the exhibit list,

11   and you'll see that Exhibits 247 through 260 on the plaintiffs'

12   exhibit list have been admitted.  And I'm obligated to tell you

13   this:  They were admitted not for the truth of the matters that

14   are stated; that is, these are some statements of some of the

03:35   15   people at or around the plant.

16         These documents are not being admitted as to the

17   truth of the matters asserted but simply as evidence of notice

18   to BP concerning the workers' complaints.  That's how they're

19   to be used.

03:35   20         So, you would not go through reading them,

21   saying, "This has got to be true."  You take it as simply the

22   plaintiffs' statement that this is notice that BP had

23   concerning the workers' complaints.

24         Ladies, let me ask you to retire to the jury

03:36   25   room.  The first thing you want to do is select one of your

03:36   1   number to serve as the foreperson.  That person will direct and

2   guide and orchestrate you through the discussion process.

3                And, of course, we have then -- we did find the

4   note forms that if you have a question you need to -- that we

03:36   5   need to respond to, that the Court needs to respond to, you

6   write it on the note.  And please keep those notes in order so

7   that we'll know when -- by number which -- if you do need that,

8   what number it is.

9                I will not permit you to work past 5:00 o'clock

03:36   10   because it just gets dark too soon.  So, whatever work you do

11   this evening or if you choose to recess now and go home, that's

12   your business.  You can call your own shots.

13                I'm going to ask you, however, that if you are

14   not completed with your work this evening that you certainly

03:36   15   return tomorrow morning no later than 9:00 o'clock.  And the

16   building is open certainly prior to that.  But you certainly

17   have a schedule that we followed.  I hope you'll follow that

18   same schedule.

19                All right.  Ladies and gentlemen, retire to the

03:37   20   jury room.  I said "gentlemen."  Ladies, retire to the jury

21   room.

22           *(Proceedings recessed for evening)*

23                            * * * * *

24

25

1                COURT REPORTER'S CERTIFICATION

2         I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled cause.

3

4  Date:   January 25, 2010

5

6                     /s/   Cheryll K. Barron

7                Cheryll K. Barron, CSR, CMR, FCRR
                Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25